**No. 26-1552**

IN THE

# United States Court of Appeals for the Fourth Circuit

---

MARYLAND BUILDING INDUSTRY ASSOCIATION, INC., *et al.*,

*Plaintiff-Appellants*,

*v.*

SERENA COLEMAN MCILWAIN, IN HER OFFICIAL CAPACITY AS THE SECRETARY OF THE MARYLAND DEPARTMENT OF THE ENVIRONMENT,

*Defendant-Appellee*.

---

On Appeal from the U.S. District Court for the District of Maryland, No. 8:25-cv-00113-DLB

---

**OPENING BRIEF OF APPELLANTS**

---

Scott Novak
BAKER BOTTS L.L.P.
700 K Street NW
Washington, D.C. 20001
(202) 304-5099
scott.novak@bakerbotts.com

J. Mark Little
BAKER BOTTS L.L.P.
910 Louisiana Street
Houston, TX 77002
(713) 229-1489
mark.little@bakerbotts.com

Daniel B. Rankin
BAKER BOTTS L.L.P.
401 S. 1st Street, Ste. 1300
Austin, TX 78704
(737) 393-7297
daniel.rankin@bakerbotts.com

*Counsel for Appellants*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No.  26-1552          Caption:  Maryland Building Industry Association, Inc. v. Serena McIlwain

Pursuant to FRAP 26.1 and Local Rule 26.1,

Apartment & Office Building Association of Metropolitan Washington
(name of party/amicus)


 who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO


2.    Does party/amicus have any parent corporations?                          ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:


3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                   ☐YES ☑NO
      If yes, identify all such owners:


12/01/2019 SCC                          - 1 -

4.   Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
     If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)  ☑YES ☐NO
     If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:
       There is no such member.

6.   Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
     If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.   Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
     If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ J. Mark Little                    Date:         5/18/2026

Counsel for: Apartment & Office Building Ass'n

- 2 -

Print to PDF for Filing        Reset Form

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __26-1552__        Caption: __Maryland Building Industry Association, Inc. v. Serena McIlwain__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Building Owners and Managers Association of Greater Baltimore, Inc.__
(name of party/amicus)

_____

 who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

4.     Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?     ☐YES ☑NO
If yes, identify entity and nature of interest:

5.     Is party a trade association? (amici curiae do not complete this question)     ☑YES ☐NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:
There is no such member.

6.     Does this case arise out of a bankruptcy proceeding?     ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.     Is this a criminal case in which there was an organizational victim?     ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ J. Mark Little         Date:   5/18/2026

Counsel for: BOMA of Greater Baltimore

- 2 -

Print to PDF for Filing     Reset Form

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __26-1552__          Caption: __Maryland Building Industry Association, Inc. v. Serena McIlwain__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Columbia Gas of Maryland, Inc.__
(name of party/amicus)

_____

 who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?    ☑ YES ☐ NO
       If yes, identify all parent corporations, including all generations of parent corporations:

       NiSource Inc. is the parent company of NiSource Gas Distribution Group, Inc., which is the parent company of Columbia Gas of Maryland, Inc.

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☑ YES ☐ NO
       If yes, identify all such owners:
       NiSource Inc.

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?      ☐YES ☑NO
If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)      ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?      ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.      Is this a criminal case in which there was an organizational victim?      ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ J. Mark Little          Date:    5/18/2026

Counsel for: Columbia Gas of Maryland, Inc.

Print to PDF for Filing      Reset Form

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __26-1552__       Caption: __Maryland Building Industry Association, Inc. v. Serena McIlwain__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Leisure World Community Corporation__
(name of party/amicus)

_____

 who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO


2.    Does party/amicus have any parent corporations?                                  ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:




3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                                                    ☐YES ☑NO
      If yes, identify all such owners:



12/01/2019 SCC                                    - 1 -

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ J. Mark Little                     Date:        5/18/2026

Counsel for: Leisure World Community Corp.

- 2 -

Print to PDF for Filing    Reset Form

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __26-1552__        Caption: __Maryland Building Industry Association, Inc. v. Serena McIlwain__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Maryland Multi-Housing Association__
(name of party/amicus)

_____

who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
       If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
       If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☑YES ☐NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

There is no such member.

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ J. Mark Little                     Date:        5/18/2026

Counsel for: Maryland Multi-Housing Association

- 2 -

**Print to PDF for Filing**     **Reset Form**

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. _26-1552_        Caption:  Maryland Building Industry Association, Inc. v. Serena McIlwain

Pursuant to FRAP 26.1 and Local Rule 26.1,

Maryland Building Industry Association
(name of party/amicus)


 who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO


2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:


3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☑YES ☐NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:
There is no such member.

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ J. Mark Little      Date: 5/18/2026

Counsel for: Maryland Building Industry Ass'n

- 2 -

**Print to PDF for Filing**    **Reset Form**

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __26-1552__      Caption: __Maryland Building Industry Association, Inc. v. Serena McIlwain__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__NAIOP DC | MD, Inc.__
(name of party/amicus)

_____

 who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
       If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
       If yes, identify all such owners:

12/01/2019 SCC                                           - 1 -

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
   If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☑YES ☐NO
   If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

   There is no such member.

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
   If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
   If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ J. Mark Little        Date: 5/18/2026

Counsel for: NAIOP DC | MD, Inc.

- 2 -

Print to PDF for Filing     Reset Form

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. __26-1552__        Caption: __Maryland Building Industry Association, Inc. v. Serena McIlwain__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__NAIOP Maryland, Inc._____
(name of party/amicus)

_____

 who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO


2.    Does party/amicus have any parent corporations?                ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:




3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                              ☐YES ☑NO
      If yes, identify all such owners:


12/01/2019 SCC                        - 1 -

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☑YES ☐NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:
    There is no such member.

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ J. Mark Little                    Date:        5/18/2026

Counsel for: NAIOP Maryland, Inc.

- 2 -

| Print to PDF for Filing | Reset Form |

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __26-1552__     Caption: __Maryland Building Industry Association, Inc. v. Serena McIlwain__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Promenade Towers Mutual Housing Corporation__
(name of party/amicus)

_____

who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.  Does party/amicus have any parent corporations?  ☐YES ☑NO
    If yes, identify all parent corporations, including all generations of parent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐YES ☑NO
    If yes, identify all such owners:

12/01/2019 SCC                           - 1 -

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?    ☐YES ☑NO
      If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
      If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
      If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
      If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ J. Mark Little    Date:    5/18/2026

Counsel for: Promenade Towers Mutual Housing

- 2 -

[ Print to PDF for Filing ]    [ Reset Form ]

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __26-1552__         Caption: __Maryland Building Industry Association, Inc. v. Serena McIlwain__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__The Elizabeth Condominium Association, Inc.__
(name of party/amicus)

_____

 who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.  Does party/amicus have any parent corporations?                            ☐YES ☑NO
    If yes, identify all parent corporations, including all generations of parent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                              ☐YES ☑NO
    If yes, identify all such owners:

12/01/2019 SCC                              - 1 -

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ J. Mark Little                    Date:        5/18/2026

Counsel for: The Elizabeth Condominium Ass'n

- 2 -

[ Print to PDF for Filing ]    [ Reset Form ]

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __26-1552__          Caption: __Maryland Building Industry Association, Inc. v. Serena McIlwain__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__The Willoughby of Chevy Chase Condominium Council of Unit Owners, Inc.__
(name of party/amicus)

_____

 who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☒ NO


2.    Does party/amicus have any parent corporations?                              ☐ YES ☒ NO
      If yes, identify all parent corporations, including all generations of parent corporations:




3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                              ☐ YES ☒ NO
      If yes, identify all such owners:




12/01/2019 SCC                                - 1 -

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ J. Mark Little                    Date:           5/18/2026

Counsel for: The Willoughby of Chevy Chase

Print to PDF for Filing       Reset Form

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No.  26-1552           Caption:  Maryland Building Industry Association, Inc. v. Serena McIlwain

Pursuant to FRAP 26.1 and Local Rule 26.1,

Washington Gas Light Company
(name of party/amicus)


who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO


2.    Does party/amicus have any parent corporations?                               ☑ YES ☐ NO
      If yes, identify all parent corporations, including all generations of parent corporations:

      AltaGas Ltd. is the parent of AltaGas Services (U.S.) Inc., which is the parent of AltaGas Utility
      Holdings (U.S.) Inc., which is the parent of Wrangler 1 LLC, which is the parent of WGL
      Holdings, Inc., which is the parent of Wrangler SPE LLC, which is the parent of Washington Gas
      Light Company.

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
      other publicly held entity?                                                    ☑ YES ☐ NO
      If yes, identify all such owners:

      AltaGas Ltd. is the ultimate parent of Washington Gas Light Company and thus indirectly owns
      10% or more of Washington Gas Light Company's stock.


12/01/2019 SCC                           - 1 -

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ J. Mark Little                    Date:        5/18/2026

Counsel for:  Washington Gas Light Company

- 2 -

| Print to PDF for Filing | | Reset Form |

# TABLE OF CONTENTS

Table of Contents ........................................................................................... i

Table of Authorities....................................................................................... iv

Jurisdictional Statement ................................................................................1

Statement of Issues........................................................................................2

Introduction...................................................................................................2

Statement of the Case....................................................................................3

I.       Legal Background................................................................................3

         A.       The Energy Policy and Conservation Act ...............................3

         B.       The Ninth Circuit has held that EPCA preempts building
                  regulations that ban gas. ..........................................................5

II.      Factual Background .............................................................................7

         A.       The Maryland BEPS...................................................................7

         B.       Plaintiffs challenge the Maryland BEPS as preempted under
                  EPCA......................................................................................10

         C.       The district court grants the State's motion to dismiss and
                  dismisses the case....................................................................10

Summary of Argument.................................................................................11

Standard of Review......................................................................................13

Argument......................................................................................................14

I.       EPCA's plain text establishes that it preempts the Maryland BEPS. ............14

         A.       EPCA broadly preempts state laws "concerning the energy
                  efficiency [or] energy use" of covered gas appliances........................14

i

B.  EPCA preempts the Maryland BEPS because they "concern[]" the "energy efficiency" and "energy use" of covered gas appliances. ...................................................................16

C.  The use of the broadening term "concerning" in EPCA's preemption provision confirms that it reaches the Maryland BEPS. ...................................................................20

D.  The Maryland BEPS remain preempted regardless of how one reads "energy use" and "point of use." ...............................................24

II.  EPCA's structure, purpose, and history further confirm that it preempts the Maryland BEPS. ...................................................................28

A.  The building code exception establishes that EPCA preempts regulations like the Maryland BEPS. ...................................................29

B.  Numerous other EPCA provisions demonstrate that the Maryland BEPS would imperil the statute's core goals. ...................................33

C.  EPCA's purpose and history further confirm that it preempts the Maryland BEPS. ...................................................................36

III.  The district court reached the opposite conclusion only by adopting an unreasonably narrow view of EPCA's preemption provision. .....................39

A.  The district court created a massive loophole by misunderstanding the relevance of the Maryland BEPS' fee for excess emissions. ...................................................................40

B.  The district court minimized the interpretive importance of EPCA's building code exception. ...................................................45

C.  The Maryland BEPS are preempted under the district court's own conception of "concerning." ...................................................48

D.  The district court based its dismissal of Plaintiffs' facial challenge on these errors. ...................................................51

Conclusion ...................................................................52

Request for Oral Argument ...................................................................53

ii

Certificate of Compliance ................................................................54

Certificate of Service ................................................................55

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Air Evac EMS, Inc. v. Cheatham*,
  910 F.3d 751 (4th Cir. 2018) .................................................................14

*Am. Auto. Mfrs. Ass'n v. Cahill*,
  152 F.3d 196 (2d Cir. 1998) ..................................................................44

*Ass'n of Contracting Plumbers of the City of New York, Inc. v. City of New York*,
  No. 23-CV-11292, 2025 WL 843619 (S.D.N.Y. Mar. 18, 2025).........................7

*Bldg. Indus. Ass'n of Wash. v. Wash. State Bldg. Code Council*,
  683 F.3d 1144 (9th Cir. 2012) ...............................................................32

*Bonnie v. Dunbar*,
  157 F.4th 610 (4th Cir. 2025) ................................................................13

*California Restaurant Association v. City of Berkeley*,
  89 F.4th 1094 (9th Cir. 2024) ............................................. 5, 6, 7, 23, 27, 29, 51

*Chamber of Com. of U.S. v. Whiting*,
  563 U.S. 582 (2011).............................................................................14

*Champion v. Ames*,
  188 U.S. 321 (1903).............................................................................18

*Chevron USA Inc. v. Plaquemines Parish, La.*,
  146 S. Ct. 1052 (2026).........................................................................21

*Cipollone v. Liggett Grp., Inc.*,
  505 U.S. 504 (1992).............................................................................32

*Coventry Health Care of Mo., Inc. v. Nevils*,
  581 U.S. 87 (2017)...............................................................................49

*Dan's City Used Cars, Inc. v. Pelkey*,
  569 U.S. 251 (2013).............................................................................23

iv

*Egelhoff v. Egelhoff ex rel. Breiner*,
    532 U.S. 141 (2001)..................................................................................49

*Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*,
    541 U.S. 246 (2004)..................................................................................44

*Env't Def. v. Duke Energy Corp.*,
    549 U.S. 561 (2007)..................................................................................26

*FDA v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000)..................................................................................36

*Gobeille v. Liberty Mut. Ins. Co.*,
    577 U.S. 312 (2016).................................................................21, 22, 50

*Ingersoll-Rand Co. v. McClendon*,
    498 U.S. 133 (1990)..................................................................................21

*Lamar, Archer & Cofrin, LLP v. Appling*,
    584 U.S. 709 (2018).............................................................................20, 21

*Metro. Taxicab Bd. of Trade v. City of New York*,
    615 F.3d 152 (2d Cir. 2010) ...............................................................50, 51

*Morales v. Trans World Airlines, Inc.*,
    504 U.S. 374 (1992)..........................................................................21, 22, 23

*Mulhern Gas Co. v. Mosley*,
    798 F. Supp. 3d 304 (N.D.N.Y. 2025)...............................................7, 19

*N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*,
    514 U.S. 645 (1995)..................................................................................44

*Nat'l Ass'n of Home Builders of the U.S. v. D.C.*,
    No. 24-CV-02942, 2026 WL 837674 (D.D.C. Mar. 26, 2026)............................7

*Nat'l Ass'n of Home Builders of the U.S. v. Montgomery County*,
    No. 8:24-CV-03024-PX, 2026 WL 817322 (D. Md. Mar. 25, 2026) ..................7

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
    567 U.S. 519 (2012)..................................................................................24

v

*Nat'l Meat Ass'n v. Harris,*
    565 U.S. 452 (2012)..................................................................................44

*Pharm. Coal. for Patient Access v. United States,*
    126 F.4th 947 (4th Cir. 2025) ...............................................................27

*Puerto Rico v. Franklin Cal. Tax-Free Tr.,*
    579 U.S. 115 (2016)..................................................................................14

*Pulsifer v. United States,*
    601 U.S. 124 (2024)..........................................................................29, 32

*Shaw v. Delta Air Lines, Inc.,*
    463 U.S. 85 (1983)....................................................................................23

*United States v. Montejo,*
    442 F.3d 213 (4th Cir. 2006) ................................................................36

*Util. Air Regul. Grp. v. EPA,*
    573 U.S. 302 (2014)..................................................................................26

*Wos v. E.M.A. ex rel. Johnson,*
    568 U.S. 627 (2013)..................................................................................42

**STATUTES AND REGULATIONS**

28 U.S.C. § 1291 ...............................................................................................1

28 U.S.C. § 1331 ...............................................................................................1

42 U.S.C. § 6291 ..........................................................................16, 17, 18, 24, 27

42 U.S.C. § 6292 ...........................................................................................16, 26

42 U.S.C. § 6293 ...........................................................................................15, 24, 25

42 U.S.C. § 6295 ................................................................. 4, 5, 14, 30, 31, 34, 37

42 U.S.C. § 6297.......2, 4, 5, 6, 11, 14, 15, 20, 29, 31, 32, 34, 35, 37, 38, 39, 45, 47

42 U.S.C. § 6311 ...........................................................................................17, 18, 24

42 U.S.C. § 6314 ...........................................................................................15, 24, 25

42 U.S.C. § 6316 ...................................................... 2, 4, 5, 14, 15, 20, 30

Pub. L. No. 94-163, 89 Stat. 871 (1975).................................3, 36, 38

Pub. L. No. 95-619, 92 Stat. 3206 (1978).....................................36, 38

Pub. L. No. 100-12, 101 Stat. 103 (1987).........................................3

Md. Code Envir. § 2-1602 ............................................................7

2022 Md. Laws Ch. 38.................................................................7

2025 Md. Laws Ch. 844 ..............................................................9

10 C.F.R. § 430.32 ............................................................5, 16, 17, 41

76 Fed. Reg. 51,281 (Aug. 18, 2011)...........................................27

COMAR 26.28.01.02 ..............................................................8, 9

COMAR 26.28.02.02 .................................................................9

COMAR 26.28.03.02 ......................................................8, 9, 16, 19

COMAR 26.28.04.01 ......................................................8, 9, 18, 40

COMAR 26.28.04.02 ..................................................................8

## LEGISLATIVE AUTHORITIES

S. Rep. No. 100-6 (1987) ...............................................3, 4, 34, 36, 37, 39

H.R. Rep. No. 100-11 (1987).......................................................3, 37

## OTHER AUTHORITIES

Black's Law Dictionary 1158 (5th ed. 1979) ........................................21

DOE, *Standards and Test Procedures*,
     https://www.energy.gov/eere/buildings/standards-and-test-procedures ..............5

Cambridge English Dictionary Online (2025).....................................27

Oxford English Dictionary Online (2022) ...........................................27

## JURISDICTIONAL STATEMENT

After the Maryland Department of the Environment promulgated the Maryland Building Energy Performance Standards ("Maryland BEPS"), which impose declining emissions caps on certain buildings, Plaintiffs sued in Maryland federal court, asserting that the Maryland BEPS are preempted by the Energy Policy and Conservation Act, 42 U.S.C. § 6201, *et seq.*, and seeking declaratory and injunctive relief. JA89-114, JA115-143. Because Plaintiffs' preemption claim arose under federal law, the district court exercised subject-matter jurisdiction over the suit pursuant to 28 U.S.C. § 1331. JA120.

Defendant-Appellee Serena Coleman McIlwain, in her official capacity as Secretary of the Maryland Department of the Environment, moved to dismiss Plaintiffs' claims under Federal Rule of Civil Procedure 12(b)(6). JA144-146. The district court granted the motion and dismissed Plaintiffs' claims. JA1. The district court's Memorandum Opinion and accompanying Order, which disposed of all parties' claims, were both entered on March 31, 2026. JA1, JA40-77. The district court subsequently entered an Amended Memorandum Opinion on April 2, 2026. JA2-39. Plaintiffs filed a timely notice of appeal on April 14, 2026. JA147-149. This Court accordingly has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

1

**STATEMENT OF ISSUES**

Whether the federal Energy Policy and Conservation Act, which preempts any state regulation "concerning the energy efficiency [or] energy use" of covered gas appliances, preempts the Maryland BEPS.

**INTRODUCTION**

The Energy Policy and Conservation Act ("EPCA") expressly preempts state laws "concerning the energy efficiency [or] energy use" of gas appliances. 42 U.S.C. §§ 6297(c), 6316(b)(2)(A). The Maryland BEPS are precisely that. They impose declining net kilograms of carbon dioxide equivalent per square foot ("kg CO2e/sq. ft.") emissions limits—eventually going all the way down to zero—on a large swath of buildings in the State. Because all gas appliances emit some level of carbon dioxide or other gases that qualify as CO2e under the Maryland BEPS, the Maryland BEPS regulate those appliances' energy use and energy efficiency by restricting— and ultimately prohibiting entirely (unless the building owner takes costly measures to avoid their emissions or pays an alternative compliance fee)—those natural byproducts of their use of gas energy. The Maryland BEPS thus qualify as a state law "concerning the energy efficiency [or] energy use" of gas appliances. EPCA's text, context, history, and purpose are all in accord on this point and confirm that EPCA preempts laws like the Maryland BEPS. This Court should so hold and reverse the district court's contrary judgment.

2

**STATEMENT OF THE CASE**

I.    **Legal Background**

A.    **The Energy Policy and Conservation Act**

EPCA was first passed in 1975 to create a national, comprehensive energy policy. *See* Pub. L. No. 94-163, 89 Stat. 871 (1975). As originally enacted, EPCA mandated that appliance manufacturers label their appliances with energy-efficiency standards, but permitted significant state involvement in appliance regulation. *See id.* § 327(b), 89 Stat. at 927. Since 1975, however, Congress has amended EPCA several times, progressively moving away from this laissez faire approach and toward binding federal appliance standards.

The most important of these amendments was the National Appliance Energy Conservation Act of 1987 ("NAECA"). Pub. L. No. 100-12, 101 Stat. 103 (1987). NAECA was designed to "reduce the regulatory and economic burdens on the appliance manufacturing industry through the establishment of national energy conservation standards for major residential appliances." S. Rep. No. 100-6, at 2 (1987). Through it, Congress sought to "end an era of confusion and uncertainty" for the appliance industry and to "protect the appliance industry from having to comply with a patchwork of numerous conflicting State requirements." H.R. Rep. No. 100-11, at 24, 30 (1987); *see also* S. Rep. No. 100-6, at 4 (1987) (similar).

NAECA thus contained "two basic provisions": "[t]he establishment of Federal standards and the preemption of State standards." S. Rep. No. 100-6, at 2 (1987). "In general, these national standards would preempt all State standards." *Id.* To that end, EPCA's current preemption provision regarding consumer appliances reads:

> [E]ffective on the effective date of an energy conservation standard established in or prescribed under [42 U.S.C. § 6295] for any covered product, **no State regulation concerning the energy efficiency, energy use,** or water use of **such covered product shall be effective with respect to such product** . . . .

42 U.S.C. § 6297(c) (emphases added).

After NAECA, federal law provided two routes for a state to avoid preemption. First, the Department of Energy ("DOE") can grant a waiver of preemption in limited circumstances. *Id.* § 6297(d). Second, there is an exception from preemption for certain performance-based building codes for new construction that meet a strict seven-part test enumerated in 42 U.S.C. § 6297(f)(3).[1]

Congress later expanded the federal appliance program to industrial appliances and added a preemption provision to "**supersede any State or local regulation concerning the energy efficiency or energy use of a product** for which a standard is prescribed or established pursuant to [EPCA]." 42 U.S.C.

---

[1] Sections 6297(f)(1)-(2) set forth separate exceptions for building codes that apply before the relevant energy conservation standard is established.

§ 6316(b)(2)(A) (emphasis added). Congress provided an exception from preemption for certain building regulations. 42 U.S.C. § 6316(b)(2)(B)(i).

Thus, in its present form, EPCA covers both consumer and industrial appliances, sets federal standards for the energy use and efficiency of those products, and preempts state regulations concerning those matters. Invoking its authority under EPCA, DOE has set energy conservation standards for all manner of consumer and industrial appliances. DOE, *Standards and Test Procedures*, https://www.energy.gov/eere/buildings/standards-and-test-procedures. To name a few, gas stoves, ovens, heaters, water heaters, and dryers are all subject to federal energy conservation standards that DOE has promulgated under EPCA. *Id.*; 42 U.S.C. § 6295; 10 C.F.R. § 430.32.

**B.    The Ninth Circuit has held that EPCA preempts building regulations that ban gas.**

In *California Restaurant Association v. City of Berkeley*, 89 F.4th 1094 (9th Cir. 2024), the Ninth Circuit became the first (and so far only) court of appeals to confront the question of whether EPCA preempts building regulations that ban gas. There, the City of Berkeley, California, passed a law "prohibiting the installation of natural gas piping within newly constructed buildings." *Id.* at 1098. Relying on the "text, structure, and context" of EPCA, *id.* at 1101, the Ninth Circuit held that the City's law was preempted as a local law "concerning the energy use" of EPCA-covered gas appliances, *id.* at 1098 (citing 42 U.S.C. § 6297(c)).

5

"Of critical importance" to this determination, the court wrote, was EPCA's exception to preemption for certain building codes, a piece of EPCA's "structure" which "demonstrates that EPCA's preemptive scope extends beyond direct or facial regulations of covered products to at least include building codes 'concerning the energy . . . use' of such products." *Id.* at 1101. The court then turned to the terms of the EPCA preemption provision itself, 42 U.S.C. § 6297(c), and interpreted them to mean that "EPCA preempts regulations, including building code requirements, that relate to 'the quantity of natural gas directly consumed by' certain consumer appliances at the place where those products are used," *id.* at 1101 (internal brackets and citations omitted). "[A] building code regulation that imposes a total ban on natural gas is not exempt from EPCA just because it lowers the 'quantity of energy' consumed to 'zero.'" *Id.* at 1102.

Notably, in reaching this conclusion, the Ninth Circuit confirmed that "EPCA would no doubt preempt an ordinance that directly prohibits the use of covered natural gas appliances in new buildings." *Id.* at 1107. It followed that, given the breadth of EPCA's preemption provision, the City could not so easily "evade preemption by merely moving up one step in the energy chain [by] banning natural gas piping within those buildings." *Id.*

6

The Ninth Circuit declined to rehear the case en banc. *See id.* at 1098.[2]

## II.    Factual Background

### A.    The Maryland BEPS

With that legal background as context, consider the Maryland regulations that are the focus of this appeal. In April 2022, the State of Maryland enacted the Climate Solutions Now Act of 2022. 2022 Md. Laws Ch. 38. The law requires the Maryland Department of the Environment to "develop building energy performance standards for covered buildings that achieve . . . [a] 20% reduction in net direct greenhouse gas emissions on or before January 1, 2030 . . . and . . . [n]et-zero direct greenhouse gas emissions on or before January 1, 2040." Md. Code Envir. § 2-1602(a).

In December 2024, pursuant to that statutory mandate, the Maryland Department of the Environment adopted the Maryland BEPS, Subtitle 28 of Title 26 of the Code of Maryland Regulations ("COMAR"). Starting in 2030, the Maryland BEPS impose declining net kg CO2e/sq. ft. emissions limits—eventually going all the way down to zero by 2040—on a large swath of buildings in the State. *See*

---

[2] Since *Berkeley* was decided, a number of district courts have disagreed with the Ninth Circuit's analysis and upheld similar state and local regulations against EPCA preemption challenges. *See Nat'l Ass'n of Home Builders of the U.S. v. D.C.*, No. 24-CV-02942, 2026 WL 837674 (D.D.C. Mar. 26, 2026); *Nat'l Ass'n of Home Builders of the U.S. v. Montgomery County*, No. 8:24-CV-03024-PX, 2026 WL 817322 (D. Md. Mar. 25, 2026); *Mulhern Gas Co. v. Mosley*, 798 F. Supp. 3d 304 (N.D.N.Y. 2025); *Ass'n of Contracting Plumbers of the City of New York, Inc. v. City of New York*, No. 23-CV-11292, 2025 WL 843619 (S.D.N.Y. Mar. 18, 2025).

COMAR 26.28.03.02 (establishing performance standards for covered buildings). Buildings must comply with the Maryland BEPS by ceasing their on-site gas combustion and other emissions-generating conduct, avoiding their CO2e emissions through costly means, or paying a substantial fee for emissions in excess of the limits. *See* COMAR 26.28.04.01A(1)-(2).

The Maryland BEPS have a broad scope. They apply to all "[c]overed building[s]," which generally include any new or existing "building that is a commercial or multifamily residential building in the State of Maryland . . . [that] has a gross floor area of 35,000 square feet or more." COMAR 26.28.01.02B(15). But the Maryland BEPS contain limited exceptions for some covered buildings, including for certain discrete types of buildings (*e.g.*, buildings unoccupied for the calendar year reported) and building owners who can demonstrate financial distress. COMAR 26.28.04.02A.

The Maryland BEPS impose interim and final "net direct emissions standards" measured in kg CO2e/sq. ft. on covered buildings. COMAR 26.28.03.02A. "Net Direct Emissions" are "(i) [t]he sum of all direct greenhouse gas emissions from a covered building; or (ii) [f]or a covered building connected to a district energy system, direct greenhouse gas emissions plus the greenhouse gas emissions attributable to thermal energy inputs from the district energy system used by the covered building . . . ." COMAR 26.28.01.02B(31)(a). "Direct greenhouse

8

gas emissions" are "greenhouse gas emissions produced on-site by covered buildings, as calculated by the benchmarking tool unless otherwise specified by the Department." COMAR 26.28.01.02B(17).

The Maryland BEPS' emissions standards differ by building type (*e.g.*, multifamily housing, office, strip mall, etc.), and come in three forms: the Interim Standard for years 2030-2034, the Interim Standard for years 2035-2039, and the Final Standard for year 2040 and beyond. COMAR 26.28.03.02A (Table 1). Measured as kg CO2e/sq. ft., the Interim Standard for years 2030-2034 is the highest, followed by the Interim Standard for years 2035-2039. The Final Standard for all non-exempt building types is 0 kg CO2e/sq. ft. *Id.* Owners of covered buildings can opt to pay a fee in lieu of meeting the standard, starting at $230 per metric ton of excess CO2e in 2030, and increasing each year thereafter. COMAR 26.28.04.01A.[3]

---

[3] On April 7, 2025, the Maryland General Assembly passed House Bill 49 ("HB 49"), amending the Climate Solutions Now Act of 2022. 2025 Md. Laws Ch. 844 (available at https://mgaleg.maryland.gov/2025RS/Chapters_noln/CH_844_hb0049e.pdf). HB 49 directs the Department to make various changes to the Maryland BEPS, including adding a $100 annual reporting fee per covered building, waiving compliance with the Maryland BEPS for those buildings already subject to certain county-level BEPS, crediting the generation of on-site renewable energy, and exempting from compliance with the Maryland BEPS additional kinds of buildings (*e.g.*, hospitals). Other than the new $100 reporting fee, *see* COMAR 26.28.02.02E(3), the Department of the Environment has not yet implemented HB 49's amendments through regulations. In any event, nothing in HB 49 changes the fundamental nature of the Maryland BEPS or of Plaintiffs' EPCA preemption challenge.

B.     **Plaintiffs challenge the Maryland BEPS as preempted under EPCA.**

In January 2025, Plaintiffs—a diverse coalition of condominium associations, cooperative housing associations, construction and real estate trade associations, and a utility—filed suit seeking a declaration that the Maryland BEPS are preempted by EPCA and an injunction against their enforcement. JA89-114. After Plaintiffs filed an amended complaint, JA115-143, the State moved to dismiss Plaintiffs' claims, arguing that EPCA did not preempt the Maryland BEPS.

C.     **The district court grants the State's motion to dismiss and dismisses the case.**

The district court agreed with the State and held that EPCA does not preempt the Maryland BEPS. JA39. The key for the district court was that "building owners need not replace their appliances at all" to comply with the Maryland BEPS. JA30. Instead, they could take costly measures to avoid emissions or "pay[] a yearly compliance fee—an option that would not require replacement of a single appliance." JA31. In other words, in the district court's view, a state regulation that would otherwise "concern[] the energy efficiency [or] energy use" of an EPCA-covered appliance can escape preemption through the addition of a costly alternative path to compliance. JA31.

Also central to the district court's analysis was the interpretive import of EPCA's building code exception. Although the district court recognized that the

10

Maryland BEPS did not meet the strict requirements for EPCA's building code exception—and in fact likened it to "trying to fit a square peg into a round hole," JA32—the district court considered that failure as "evidence that the BEPS are not the type of building regulation that Congress understood would need an exception to preemption in the first place." JA32.  In the district court's view, that inability to meet the exception only further confirmed that EPCA did not preempt the Maryland BEPS. JA32.

For those primary reasons (and others that Plaintiffs will address below), the district court granted the State's motion and dismissed the case. JA1. This appeal followed. JA147.

## SUMMARY OF ARGUMENT

EPCA's preemption provision sweeps broadly, displacing any state regulation "concerning the energy efficiency [or] energy use" of a covered appliance. 42 U.S.C. §§ 6297(c), 6316(b)(2)(A). The Maryland BEPS fall squarely within the scope of that preemption clause. By imposing declining net kg CO2e/sq. ft. emissions limits—and eventually prohibiting all net CO2e emissions—on a large swath of buildings in the State, the Maryland BEPS "concern[] the energy efficiency [and] energy use" of EPCA-covered gas appliances. Specifically, the Maryland BEPS penalize appliances that use gas energy—and particularly the less efficient ones— by placing a cap on these natural byproducts of their operation. To be sure, regulated

11

parties can continue using their gas appliances if they take costly measures to avoid their emissions or pay a monetary fee for emissions over the limit, but that does not make the Maryland BEPS any less of a regulation "concerning the energy efficiency [or] energy use" of covered gas appliances.

EPCA's use of the broadening term "concerning"—the equivalent of "relating to" or "respecting"—warrants special emphasis. The Supreme Court has repeatedly held that such language significantly expands a federal statute's preemptive scope. Thus broadened, EPCA's expansive preemption provision easily reaches laws like the Maryland BEPS that so strictly regulate the "energy use" and "energy efficiency" of EPCA-covered products.

EPCA's structure, purpose, and history reinforce what its plain text provides. EPCA's building code exception demonstrates that the statute's preemptive scope extends to building-level regulations, including to rather benign performance-based building codes that apply only to new buildings and operate in an even-handed and fuel-neutral manner. If EPCA would preempt even those relatively gentle building regulations in the absence of the exception, then surely it preempts the far harsher Maryland BEPS. Other provisions in EPCA evince Congress's intent to ensure regulatory uniformity and protect product availability—goals that the Maryland BEPS directly undermine. And EPCA's statutory history further shows Congress progressively clamping down on state regulatory departures to prevent the

12

patchwork regulatory framework that the Maryland BEPS would usher in.

Despite all the statutory indicia pointing toward preemption, the district court nevertheless held that EPCA did not preempt the Maryland BEPS. But it did so only by adopting an unreasonably narrow view of EPCA's preemptive scope—one in which states are free to enact whatever regulations they please that "concern[] the energy efficiency [or] energy use" of EPCA-covered products so long as they include the option of paying a monetary fee in lieu of meeting the regulatory requirement. That cannot be the law, as it would make EPCA's preemption provision trivially easy to evade. Nor, as the district court reasoned, are the Maryland BEPS somehow saved by the fact that they do not qualify for EPCA's building code exception. That is a mark against them, not a saving grace. Indeed, the fact that the Maryland BEPS essentially are a supercharged, more heavy-handed version of the kinds of building codes that the exception saves from preemption further confirms that EPCA preempts them. Only by employing that flawed reasoning was the district court able to hold that EPCA does not preempt the Maryland BEPS.

This Court should hold that EPCA preempts the Maryland BEPS and reverse the district court's contrary judgment.

## STANDARD OF REVIEW

This appeal turns on the meaning of EPCA. Questions of statutory interpretation are reviewed *de novo*. *Bonnie v. Dunbar*, 157 F.4th 610, 614 (4th Cir.

13

2025). And when, as here, the federal statute contains an express preemption provision, no presumption against preemption applies. *See Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016) ("[B]ecause the statute 'contains an express pre-emption clause,' we do not invoke any presumption against pre-emption but instead 'focus on the plain wording of the clause[.]'" (quoting *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 594 (2011))). Instead, "the best course is simply to follow . . . the wording of the express preemption provision, without applying a presumption one way or the other." *Air Evac EMS, Inc. v. Cheatham*, 910 F.3d 751, 762 n.1 (4th Cir. 2018).

## ARGUMENT

## I.      EPCA's plain text establishes that it preempts the Maryland BEPS.

EPCA's plain text provides all the Court needs to resolve the preemption question before it. It clearly establishes that the Maryland BEPS are preempted as state regulations "concerning the energy efficiency [or] energy use" of EPCA-covered appliances. 42 U.S.C. §§ 6297(c), 6316(b)(2)(A).

### A.      EPCA broadly preempts state laws "concerning the energy efficiency [or] energy use" of covered gas appliances.

EPCA's preemption provision broadly provides:

[E]ffective on the effective date of an energy conservation standard established in or prescribed under [42 U.S.C. § 6295] for any covered product, **no State regulation concerning the energy efficiency, energy use,** or water use of **such covered product shall be effective with respect to such product** . . . .

42 U.S.C. § 6297(c) (emphases added); *see also id.* § 6316(b)(2)(A) (similarly preempting for industrial appliances "any State or local regulation concerning the energy efficiency or energy use of a product for which a standard is prescribed or established pursuant to such section").

Examining each of the key terms in that provision, "[e]nergy" includes "electricity[] or fossil fuels," such as natural gas. *Id.* §§ 6291(3), 6311(7). "Energy use" means "the quantity of energy directly consumed by a consumer product at point of use" for consumer products and "the quantity of energy directly consumed by an article of industrial equipment at the point of use" for industrial products, "determined in accordance with test procedures" specified elsewhere in the statute. *Id.* §§ 6291(4), 6311(4). "[E]nergy efficiency" means "the ratio of the useful output of services from a consumer product [or an article of industrial equipment] to the energy use of such product [or article]" and is measured using the same test procedures. *Id.* §§ 6291(5), 6311(3). So the higher the appliance's "energy efficiency," the less energy (*e.g.*, electricity or fossil fuels) it requires for the same amount of output. The specified test procedures are designed to measure "energy efficiency [or] energy use . . . during a representative average use cycle." *Id.* §§ 6293(b)(3), 6314(a)(2). Lastly, "covered product[s]" for which an "energy conservation standard [has been] established" include a wide variety of appliances— including gas stoves, ovens, heaters, water heaters, and dryers—that are covered by

15

an EPCA energy conservation standard. 42 U.S.C. §§ 6291(1)-(2), 6292(a); 10 C.F.R. § 430.32.

Putting that all together, EPCA preempts state laws "concerning" either (1) the "quantity"—*i.e.*, how much, if any—of "energy"—including "fossil fuels" such as natural gas—that can be "use[d]" by an EPCA-covered product, or (2) the "energy efficiency" of an EPCA-covered product.

## B.    EPCA preempts the Maryland BEPS because they "concern[]" the "energy efficiency" and "energy use" of covered gas appliances.

The Maryland BEPS are doubly preempted because they "concern[]" both the "energy efficiency" and "energy use" of EPCA-covered appliances. Because all EPCA-covered gas appliances emit some level of carbon dioxide or other gases that count as CO2e under the Maryland BEPS, the Maryland BEPS regulate those appliances' energy use and energy efficiency by restricting—and ultimately prohibiting—those natural byproducts of their use of gas energy.

The effect of the Maryland BEPS' declining net kg CO2e/sq. ft. requirements is best illustrated by considering what will happen once they reach zero, as they will in 2040. COMAR 26.28.03.02A. At that point, the Maryland BEPS essentially ban gas appliances because they will prohibit EPCA-covered gas appliances from using any gas energy whatsoever. Stated in terms of an energy conservation standard, the Maryland BEPS will set the maximum "energy use" of EPCA-covered gas

16

appliances at zero, as they will prohibit any appliance that is designed to use more than zero gas energy.

That effectively sets a competing "energy conservation standard" for gas appliances. "Energy conservation standard" means "a performance standard which prescribes a minimum level of energy efficiency or a maximum quantity of energy use." 42 U.S.C. §§ 6291(6), 6311(18). For example, the energy conservation standard for "Gas Standalone Cooking Tops" specifies a "[m]aximum integrated annual energy consumption" of "1,770 kBtu/year."[4] 10 C.F.R. § 430.32(j). Everyone agrees that the State could not require that those cooking tops instead have a maximum integrated annual energy consumption of, say, 1,000 kBtu/year. That would be a competing energy conservation standard that seeks to directly override DOE's standard. The result would be the same if the State tried to make the standard 100 kBtu/year or even .0001 kBtu/year. Those, too, would be energy conservation standards that everyone would agree are preempted by EPCA.

Why would it be different when the Maryland BEPS set the standard at 0 kBtu/year? After all, that is what the Maryland BEPS do in their final form. True, the Maryland BEPS do not speak in the language of kilowatt-hours, Btus, or any other technical "energy use" measurement. But they nevertheless effectively set a "maximum quantity of energy use" standard for gas appliances just as a more

---

[4] "kBtu" stands for thousand British thermal units.

traditional energy conservation standard would. 42 U.S.C. §§ 6291(6), 6311(18). By prohibiting gas use entirely, the Maryland BEPS set that value at zero. Any gas appliance with an "energy use" of more than 0 kBtu/year is prohibited. The State cannot sidestep EPCA by essentially creating a backdoor energy conservation standard that imposes an "energy use" limit of zero for EPCA-covered gas appliances.

Indeed, because the Maryland BEPS eventually prohibit entirely the use of any appliance that uses gas energy, they operate as the harshest possible type of energy conservation standard. Under them, no appliance that is designed and manufactured to use any gas energy may be operated in covered buildings. If that does not "concern" the "energy use" of gas appliances, it is hard to know what would. *See Champion v. Ames*, 188 U.S. 321, 358 (1903) ("[R]egulation may sometimes . . . assume the form of prohibition . . . .").

To be sure, a building owner could manage to still use gas appliances by avoiding their emissions through costly means (*e.g.*, by using carbon-capture technology) or by paying a fee for exceeding the permitted net kg CO2e/sq. ft. limit. *See* COMAR 26.28.04.01A. But the key is that building owners will not be able to use any gas appliances whatsoever unless they incur additional costs through either avoiding their emissions or paying the fee. That is no different from a ban on gas

18

appliances with a monetary penalty for non-compliance. The regulated public faces the same choice between giving up their gas appliances or paying a monetary cost.

Moreover, those costs will rise in proportion to the gas appliances' "energy use" and "energy efficiency" since the fee is set per metric ton of CO2e emissions. That tightens the connection between the Maryland BEPS and the "energy use" and "energy efficiency" of covered appliances. The higher an appliance's "energy use" or the lower its "energy efficiency," the higher the compliance fee (or the costs of other avoidance measures) will be. So the Maryland BEPS quite directly "concern[]" the "energy use" and "energy efficiency" of EPCA-covered appliances.

That same basic reasoning holds true during the period in which the Maryland BEPS will allow a positive net kg CO2e/sq. ft. value as well. COMAR 26.28.03.02A. True, during that phase of the regulatory requirements, the Maryland BEPS will not amount to an outright gas ban. But they will restrict and penalize the use of gas appliances—and particularly less efficient gas appliances—nonetheless. That is because the limited kg CO2e/sq. ft. allotment caps the amount of energy gas appliances can use. That impacts both the energy use and energy efficiency of gas appliances—the former by restricting and penalizing their use of gas energy and the latter by penalizing less efficient and rewarding more efficient gas appliances. *See Mulhern Gas Co. v. Mosley*, 798 F. Supp. 3d 304, 326 (N.D.N.Y. 2025) (a building regulation that "sets a maximum building-wide energy consumption limit" "would

19

be clearly preempted" as "an indirect regulation concerning the energy use of the covered products that could be used in that building"). Gas appliances will also eat into the CO2e that buildings are allowed to emit, meaning that each use of any gas appliance—and particularly a less efficient gas appliance—will limit the future use of all gas appliances.

Again, a building owner can avoid these restrictions by paying money, either for means to avoid those emissions or for the fee for emitting in excess of the regulatory limit. But that does not somehow transform the nature of the regulations. The fact remains that the Maryland BEPS are restricting and penalizing the use of EPCA-covered gas appliances, and doing so more harshly for appliances with higher "energy use" or lower "energy efficiency."

**C.      The use of the broadening term "concerning" in EPCA's preemption provision confirms that it reaches the Maryland BEPS.**

The broadening effect of the term "concerning" further confirms that EPCA's preemptive scope reaches more than far enough to encompass the Maryland BEPS. Congress could have employed narrower language—for example, preempting only regulations "of" the energy use of EPCA-covered appliances—but instead chose to preempt all regulations "*concerning* the . . . energy use" of EPCA-covered appliances. 42 U.S.C. §§ 6297(c), 6316(b)(2)(A) (emphasis added). That word choice substantially broadens the scope of EPCA preemption. *Lamar, Archer &*

*Cofrin, LLP v. Appling*, 584 U.S. 709, 717, 719 (2018) (recognizing that Congress broadened a statute by specifying "statement respecting" rather than "statement of").

"'Concerning' means 'relating to,' and is the equivalent of 'regarding, respecting, about.'" *Id.* Those terms mean "to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992) (quoting Black's Law Dictionary 1158 (5th ed. 1979)); *see also Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 319-20 (2016) (noting that ERISA's "related to" preemption provision preempts any state law that has a "connection with" or "reference to" ERISA plans). "One thing can relate to another even if the connection is 'indirect' [or] . . . it was 'not specifically designed to affect' it." *Chevron USA Inc. v. Plaquemines Parish, La.*, 146 S. Ct. 1052, 1060 (2026) (quoting *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 139 (1990)). Such language "has a broadening effect, ensuring that the scope of a provision covers not only its subject but also matters relating to that subject," and courts therefore read it "expansively." *Appling*, 584 U.S. at 717. It "express[es] a broad pre-emptive purpose" and yields a "deliberately expansive" preemption provision with "expansive sweep" that is "conspicuous for its breadth." *Morales*, 504 U.S. at 383-84.

The Supreme Court has illustrated the broad reach of these kinds of preemption provisions. In *Rowe v. New Hampshire Motor Transportation*

21

*Association*, for example, the Supreme Court held that a federal motor-carrier law with a "related to" provision preempted not only state laws that directly regulated motor carriers, but also those state laws with a "less direct" or "indirect" effect on motor carriers. 552 U.S. 364, 370, 372 (2008). Thus, in *Rowe*, it did not matter that the state law at issue there directly regulated only "shippers" and "retailers" rather than "carriers." *Id.* at 371-72. The key was that the state law "produce[d] the very effect that the federal law sought to avoid, namely, a State's direct substitution of its own governmental commands for 'competitive market forces' in determining (to a significant degree) the services that motor carriers will provide." *Id.* Additionally, the Court explained, "to interpret the federal law to permit these, and similar, state [laws]" would produce the very "state regulatory patchwork" that Congress sought to foreclose. *Id.* at 373.

*Rowe*'s holding followed from the Court's prior decision in *Morales*, a case in which various states attempted to enforce consumer-protection laws against certain airline companies for their allegedly misleading advertising on airfares. 504 U.S. at 379. In the states' view, their consumer-protection laws avoided the "related to" preemption provision in the federal Airline Deregulation Act because their laws were of "general applicability" and did not "specifically address[] the airline industry." *Id.* at 386. The Court rejected that argument, observing that the states "ignore[d] the sweep of the 'relating to' language," *id.*, which, as the Court observed earlier, was

22

"wide and inclusive," *id.* at 384. Granted, the Court acknowledged, some state laws may be "too tenuous, remote, or peripheral" to be preempted, but this was not a "borderline" case, so the Court "express[ed] no views about where it would be appropriate to draw the line." *Id.* at 390 (quoting *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 100 n.21 (1983)).

Applying these teachings in the context of EPCA's preemption provision, the Ninth Circuit explained that, at the very least, "by using the term 'concerning,' Congress meant to expand preemption beyond direct or facial regulations of covered appliances." *Berkeley*, 89 F.4th at 1103. For example, "a building code that bans the installation of piping that transports natural gas from a utility's meter on the premises to products that operate on such gas 'concerns' the energy use of those products as much as a direct ban on the products themselves." *Id.* Just so. And state regulations like the Maryland BEPS that restrict and penalize the natural byproducts of gas appliances' use of gas energy—and eventually ban them altogether—surely at least "concern[]" the "energy use" and "energy efficiency" of gas appliances as well.

To be clear, "concerning" does not confer infinite reach to EPCA's preemption provision. "[T]he breadth of EPCA's preemption provision 'does not mean the sky is the limit,'" *id.* at 1103 (quoting *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 260 (2013)), and delimiting the outer bounds of EPCA preemption will involve some edge cases. But this is not one of them. The Maryland BEPS are not narrowly

23

tailored regulations with only peripheral effects on gas appliances. Instead, they take direct aim at gas appliances by restricting—and eventually banning—the natural byproducts of their operation in a vast swath of buildings in the State. That kind of law falls within the core of EPCA's preemption provision, and thus the Court can and should wait for closer cases to make the tough calls regarding the limits of EPCA preemption. *Cf. Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 585 (2012) ("It is enough for today that wherever that line may be, the statute is surely beyond it.").

**D.    The Maryland BEPS remain preempted regardless of how one reads "energy use" and "point of use."**

Below, there was much debate about the precise definitions of "energy use" and "point of use" and how they impact the preemption analysis. Plaintiffs believe they have the better view of those terms, but ultimately EPCA would preempt the Maryland BEPS under any conceivable definition of them.

1.    Starting with "energy use," the State reads that as a technical term that refers back to a supplied definition: "the quantity of energy directly consumed . . . at point of use, determined in accordance with test procedures" that measure "energy use . . . during a representative average use cycle." 42 U.S.C. §§ 6291(4), 6293(b)(3), 6311(4), 6314(a)(2). That is a factory-floor, static value that can be displayed on the label of a product.

The Maryland BEPS "concern[]" gas appliances' "energy use" in that sense. Specifically, the Maryland BEPS penalize EPCA-covered gas appliances that have

24

a non-zero number specified on their kBtu/year energy-use labels. Any use of an EPCA-covered appliance with an "energy use" value greater than zero (*i.e.*, all of them) would necessarily cut into the net kg CO2e/sq. ft. limits the Maryland BEPS impose. A necessary corollary is that the higher the energy use value or the lower the energy efficiency value of the appliance, the more penalties accrue for its user, since it would produce more of the CO2e that the Maryland BEPS seek to limit and eventually prohibit in covered buildings. So the Maryland BEPS concern gas appliances' "energy use" under this understanding of the term.

That conclusion also holds true under the plain meaning of "energy use," which focuses on the actual use of energy in the real world. In truth, there is not much daylight between this conception of the term and the more technical definition. That, too, is closely linked to real-world usage because the test procedures must measure "energy use . . . during a representative average use cycle." 42 U.S.C. §§ 6293(b)(3), 6314(a)(2). But, for what it is worth, there is good reason to think that the "energy use" referred to in EPCA's preemption provision means actual use of energy in practice rather than a technical, factory-floor value.

To be sure, EPCA provides a technical definition for "energy use," but the presence of a statutory definition does not foreclose adopting the plain meaning of the term in certain circumstances. As the Supreme Court has recognized, "the presumption of consistent usage 'readily yields' to context, and a statutory term—

25

even one defined in the statute—'may take on distinct characters from association with distinct statutory objects calling for different implementation strategies.'" *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 320 (2014) (quoting *Env't Def. v. Duke Energy Corp.*, 549 U.S. 561, 574 (2007)). As cases like *Utility Air Regulatory Group*, 573 U.S. at 320, and *Duke Energy*, 549 U.S. at 574, make clear, that approach is particularly appropriate where a particular term is used in multiple statutory provisions in multiple different senses.

That is the case here. Consider §§ 6292(b)(1)(B) and 6295(*l*)(1)(B). Those provisions mark the outer bounds of DOE's authority under EPCA, and both employ the term "energy use" to refer to the actual, real-world energy usage of a product rather than a technical, static value. Specifically, § 6292(b)(1)(B) permits DOE to classify a product as a covered product if, *inter alia*, the "average annual per-household *energy use* by products of such type is likely to exceed 100 kilowatt-hours (or its Btu equivalent) per year." 42 U.S.C. § 6292(b)(1)(B) (emphasis added). Section 6295(*l*)(1)(B) similarly permits DOE to promulgate energy conservation standards for products if, *inter alia*, "the aggregate household *energy use* within the United States by products of such type (or class) exceeded 4,200,000,000 kilowatt-hours (or its Btu equivalent) for any such 12-month period." *Id.* § 6295(*l*)(1)(B) (emphasis added). Determining EPCA's preemptive scope involves a similar

26

analysis in that it too looks to demarcate the limits of EPCA's reach. Accordingly, "energy use" in this analogous context should carry the same meaning.

In any event, the key point is that the Maryland BEPS are preempted under either conception of "energy use."

2.      As for "point of use," the disagreement on its meaning matters even less. "Point of use" appears in the definition of "energy use." "Energy use" is defined as "the quantity of energy directly consumed . . . *at point of use*," as determined in accordance with specified test procedures. 42 U.S.C. § 6291(4) (emphasis added); *see id.* § 6311(4).

The State interprets that term as a technical specification regarding the omission of indirect energy consumption from the energy use value. Plaintiffs, in contrast, recognize that EPCA does not define "point of use," and that "[t]his court generally gives undefined terms their ordinary or natural meanings." *Pharm. Coal. for Patient Access v. United States*, 126 F.4th 947, 953 (4th Cir. 2025). The plain and ordinary meaning of "point of use" is "the place where or time when a product or service is used," Cambridge English Dictionary Online (2025)[5]; *see Berkeley*, 89 F.4th at 1101 ("'[P]oint of use' means the 'place where something is used.'" (quoting Oxford English Dictionary Online (2022))). That plain meaning aligns with DOE's understanding of the term. *See Statement of Policy for Adopting Full-Fuel-Cycle*

---

[5] https://dictionary.cambridge.org/us/dictionary/english/point-of-use.

*Analyses Into Energy Conservation Standards Program*, 76 Fed. Reg. 51,281, 51,283 (Aug. 18, 2011) (explaining that the "point-of-use method for measuring energy consumption considers the use of electricity, natural gas, propane, and/or fuel oil by an appliance at the site *where the appliance is operated*" (emphasis added)). Accordingly, the most natural reading of "point of use" here is that it tightens the focus on actual energy use of products in the real world.

The point here, however, is that the parties' disagreement on "point of use" is entirely academic. Under Plaintiffs' interpretation, the Maryland BEPS concern an appliance's energy use at its "point of use" because they penalize appliances' use of gas energy in homes and businesses—where those appliances are actually used. Under the State's interpretation, the Maryland BEPS concern a gas appliance's energy use at its "point of use" because they penalize appliances that are designed to use any on-site gas energy. The Maryland BEPS are preempted either way.

## II.    EPCA's structure, purpose, and history further confirm that it preempts the Maryland BEPS.

Other indicia of congressional intent—statutory context, purpose, and history—confirm what the plain text already makes clear: that EPCA preempts the Maryland BEPS.

28

**A.    The building code exception establishes that EPCA preempts regulations like the Maryland BEPS.**

EPCA's exception to preemption for certain kinds of building codes, *see* 42 U.S.C. § 6297(f)(3), further illustrates why the Maryland BEPS are preempted. The building code exception lists seven requirements that "a regulation or other requirement contained in a State or local building code for new construction concerning the energy efficiency or energy use of [a] covered product" must meet to avoid preemption. *Id.* That exception provides crucial context establishing what kinds of building regulations EPCA preempts.

To avoid reading the building code exception as a nullity, the implication must be that in the absence of this exception, EPCA's preemption provision would extend to at least some building codes. *See Pulsifer v. United States*, 601 U.S. 124, 143 (2024) ("When a statutory construction thus render[s] an entire subparagraph meaningless, this Court has noted, the canon against surplusage applies with special force." (internal quotation marks omitted)). As the Ninth Circuit put it, "subsection (f) demonstrates that EPCA's preemptive scope extends beyond direct or facial regulations of covered products to at least include building codes 'concerning the energy . . . use' of such products." *Berkeley*, 89 F.4th at 1101.[6] Accordingly, this

---

[6] EPCA's preemption provision for industrial appliances similarly provides that a "State or local building code for new construction" can avoid preemption if "the standard in the building code does not require that the energy efficiency of such product exceed the applicable minimum energy efficiency requirement in amended

exception rules out a narrow conception of EPCA preemption that covers only direct regulation of appliances as manufactured. Instead, EPCA preemption must extend to laws like the Maryland BEPS that operate at the building level as well. Any such building regulation that "concern[s]" the "energy use" or "energy efficiency" of an EPCA-covered product—like a regulation that penalizes appliances that use gas energy in buildings—falls to EPCA preemption. The Maryland BEPS fit that bill.

But that actually undersells the interpretive significance of the building code exception. It is not just that EPCA preemption would apply to some building codes but for the exception. Rather, it is that but for the exception, EPCA would preempt some building codes *that meet the seven requirements for the exception*. Consider those seven requirements:

> (A) The code permits a builder to meet an energy consumption or conservation objective for a building by selecting items whose combined energy efficiencies meet the objective.
>
> (B) The code does not require that the covered product have an energy efficiency exceeding the applicable energy conservation standard established in or prescribed under section 6295 of this title . . . .
>
> (C) The credit to the energy consumption or conservation objective allowed by the code for installing covered products having energy efficiencies exceeding such energy conservation standard established in or prescribed under section 6295 of this title . . . is on a one-for-one equivalent energy use or equivalent cost basis.

---

ASHRAE/IES Standard 90.1." 42 U.S.C. § 6316(b)(2)(B)(i). The implication is similar—that without the exception, EPCA's preemption provision would extend to reach at least some subset of such building codes.

30

(D) If the code uses one or more baseline building designs against which all submitted building designs are to be evaluated and such baseline building designs contain a covered product subject to an energy conservation standard established in or prescribed under section 6295 of this title, the baseline building designs are based on the efficiency level for such covered product which meets but does not exceed such standard . . . .

(E) If the code sets forth one or more optional combinations of items which meet the energy consumption or conservation objective, for every combination which includes a covered product the efficiency of which exceeds [the] standard . . . , there also shall be at least one combination which includes such covered product the efficiency of which does not exceed such standard . . . by more than 5 percent, except that at least one combination shall include such covered product the efficiency of which meets but does not exceed such standard.

(F) The energy consumption or conservation objective is specified in terms of an estimated total consumption of energy (which may be calculated from energy loss- or gain-based codes) utilizing an equivalent amount of energy (which may be specified in units of energy or its equivalent cost).

(G) The estimated energy use of any covered product permitted or required in the code, or used in calculating the objective, is determined using the applicable test procedures prescribed under section 6293 of this title, except that the State may permit the estimated energy use calculation to be adjusted to reflect the conditions of the areas where the code is being applied if such adjustment is based on the use of the applicable test procedures prescribed under section 6293 of this title or other technically accurate documented procedure.

42 U.S.C. § 6297(f)(3).

A building code that meets all of those requirements would be rather benign.

It would apply only to "new buildings," *id.*, set an "energy consumption or conservation objective for a building" "specified in terms of an estimated total

31

consumption of energy," *id.* §§ 6297(f)(3)(A), (F), and allow the public the freedom to "select[] items whose combined energy efficiencies meet the objective," *id.* It would also operate its credit system "on a one-for-one equivalent energy use or equivalent cost basis." *Id.* § 6297(f)(3)(C); *see also id.* § 6297(f)(3)(F). And it would not prohibit the use of any product that meets EPCA's energy conservation standards. *See* 42 U.S.C. §§ 6297(f)(3)(A), (B), (D), (E); *see Bldg. Indus. Ass'n of Wash. v. Wash. State Bldg. Code Council*, 683 F.3d 1144, 1145 (9th Cir. 2012) ("Section 6297(f)(3)(B) is violated when the [building] code requires a builder, as a matter of law, to select a particular product or option."). Yet even some flexible, performance-based building codes that meet each of those requirements would be preempted by EPCA in the absence of the building code exception. Otherwise, the exception would serve no purpose. *See Pulsifer*, 601 U.S. at 143.

That illustrates the scope of the "domain expressly preempted," *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 517 (1992), and the kind of regulations Congress intended EPCA's preemption provision to encompass. Performance-based building codes that set building-wide energy consumption targets that are fuel-neutral and do not prohibit any particular EPCA-compliant product still would "concern" the "energy use" or "energy efficiency" of EPCA-covered products in at least some instances by virtue of their regulation of the building's energy use. Again, that is the necessary implication of the building code exception—that EPCA's preemption

32

provision extends this far on its face and that only the operation of the exception prevents such building codes from being preempted.

Now compare the Maryland BEPS to those kinds of flexible, fuel-neutral building codes. The Maryland BEPS set no fuel-neutral energy consumption target, but rather specify their goal in terms of an emissions limit that penalizes gas appliances. They offer no one-for-one credit system based on energy equivalency, but instead operate on an emissions basis that favors electric appliances over gas ones. And they apply not only to new buildings, but also to existing ones that were not built with these requirements in mind. If some relatively gentle building codes that meet the above seven requirements would be preempted but for the exception, then this much harsher building regulation that tramples on the building code exception's safeguards must be preempted as well.

**B.      Numerous other EPCA provisions demonstrate that the Maryland BEPS would imperil the statute's core goals.**

The building code exception is not the only provision that sheds light on EPCA's preemptive scope. Multiple other provisions also evidence EPCA's focus on ensuring regulatory uniformity and the availability of covered products for consumer use.

For example, DOE cannot promulgate a new conservation standard if doing so "is likely to result in the unavailability in the United States in any covered product type (or class) of performance characteristics (including reliability), features, sizes,

33

capacities, and volumes that are substantially the same as those generally available in the United States." 42 U.S.C. § 6295(o)(4); *see also id.* § 6297(d)(4) (placing a similar limitation on DOE's ability to waive preemption for state regulations).[7] Nor can DOE waive preemption for a state regulation if doing so would "significantly burden manufacturing, marketing, distribution, sale, or servicing of the covered product on a national basis." *Id.* § 6297(d)(3). In conducting that analysis, DOE must consider not only the effect of the state regulation at issue, but also "the extent to which the State regulation is likely to contribute significantly to a proliferation of State appliance efficiency requirements and the cumulative impact such requirements would have." *Id.* § 6297(d)(3)(D).

The Maryland BEPS imperil what Congress sought to protect. By penalizing gas appliances through their CO2e emissions limits, the Maryland BEPS impose real and significant financial burdens on local consumers, businesses, and manufacturers—a consideration expressly spelled out in EPCA's preemption-waiver provision. *See id.* § 6297(d)(1)(C)(ii) (directing DOE to consider the "costs, benefits, burdens, and reliability" resulting from the state regulation). More broadly speaking,

---

[7] The Senate Report provided an example of how these provisions would work in practice: "[The statute], upon a sufficient showing, would forbid a standard for small gas furnaces being set at a level that would increase the price to the point that the product would be noncompetitive and that would result in minimal demand for the product." S. Rep. No. 100-6, at 8-9 (1987).

34

if regulations like the Maryland BEPS are allowed to proliferate, appliance manufacturers would be forced to radically shift or add production lines—by redesigning and retooling them to manufacture more efficient gas appliances or to shift to the production of electric appliances instead—in an attempt to accommodate discrete jurisdictions all over the nation. The sale and marketing of gas appliances would, in turn, become increasingly complex and economically burdensome, with varying emissions limits and no-go zones scattered across the country. *Cf. id.* § 6295(o)(2)(B)(i)(I) (directing DOE to evaluate, among other things, the "economic impact of the standards on the manufacturers" to determine whether the standards are "economically justified"). So would the servicing of gas appliances, as consumers in an area where gas appliances are banned or heavily penalized could find themselves hours away from a business that could repair their gas appliances. *Cf.* 42 U.S.C. § 6297(d)(3) (DOE cannot grant a preemption waiver if, *inter alia*, the "State regulation will significantly burden manufacturing, marketing, distribution, sale, or servicing of the covered product on a national basis.").

In short, the Maryland BEPS are exactly the sort of state regulation that burdens interstate commerce and prevents the uniform regulation that Congress sought to maintain in the appliance industry. If Congress denied that power even to DOE in exercising its core functions of promulgating standards and granting waivers, then surely it also intended to prevent states from doing the same.

35

C.      **EPCA's purpose and history further confirm that it preempts the Maryland BEPS.**

EPCA's purpose and history provide yet more confirmation that the Maryland BEPS are preempted. The several amendments to EPCA over the years, which have progressively clamped down on state regulatory departures and ratcheted up federal uniformity, further contextualize EPCA's broad preemptive scope. *Cf. FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 143 (2000) (observing that, "over time . . . subsequent acts can shape or focus those meanings" of a statute); *United States v. Montejo*, 442 F.3d 213, 215 (4th Cir. 2006) ("[W]e look to the statutory language and structure and the legislative history and purpose of the statute."). As originally enacted in 1975, EPCA permitted differing state appliance regulations, so long as there was a demonstrated need, the regulations did not interfere with interstate commerce, and the regulations were more stringent than the federal standard. *See* Pub. L. No. 94-163, § 327(b)(2), 89 Stat. 871, 927 (1975). Three years later, Congress added the requirement that states also must obtain a waiver from DOE. *See* Pub. L. No. 95-619, § 424, 92 Stat. 3206, 3263-64 (1978). But in the ensuing years, as states frequently sought waivers from EPCA's preemption provision, Congress came to recognize "the problem of a growing patchwork of differing State regulations" across the country that had "increasingly complicate[d] [appliance manufacturers'] design, production and marketing plans." S. Rep. No. 100-6, at 4 (1987). The parochial state regulatory regimes had, according

36

to federal lawmakers, created "an era of confusion and uncertainty" for appliance manufacturers, who were forced to comply with "numerous conflicting State requirements." H.R. Rep. No. 100-11, at 24, 30 (1987).

Congress fixed this problem of balkanization by amending EPCA to centralize appliance regulation in DOE and strengthen EPCA's preemptive effect, both of which brought needed uniformity to the appliance industry. As a Senate report at the time put it, the overarching purpose of the amendments was "to reduce the regulatory and economic burdens on the appliance manufacturing industry through the establishment of national energy conservation standards for major residential appliances." S. Rep. No. 100-6, at 2 (1987). Nationalizing these standards and tightening waiver requirements benefited consumers as well. Rather than subjecting them to a "patchwork" of state regulations, Congress expressly sought to avoid any state deviation that would "result in the unavailability in the State of a product type or of products of a particular performance class." *Id.*; *see* 42 U.S.C. §§ 6295(o)(4), 6297(d)(4).

The changes to the language of EPCA's preemption provision throughout the years likewise demonstrate Congress's manifest intent to broaden EPCA's preemptive scope and encompass more than just literal "energy conservation standards." To start, the 1975 EPCA preempted any state law that "provide[s] for . . . any energy efficiency standard or similar requirement with respect to energy

37

efficiency or energy use of a covered product." Pub. L. No. 94-163, § 327(a)(2), 89 Stat. 871, 926-27 (1975) (emphasis added). Then, in 1978, Congress replaced "similar requirement" with "other requirement respecting energy use or energy efficiency" of a covered product. Pub. L. No. 95-619, § 424(b), 92 Stat. 3206, 3263-64 (1978) (preempting state laws "which establish[] an energy efficiency standard or other requirement respecting energy use or energy efficiency of a type (or class) of covered products"). The result, especially given the use of the broadening term "respecting," was a substantial expansion of EPCA's preemptive scope beyond energy conservation standards and "similar" requirements. The current version of EPCA's preemption provision, amended in 1987, is yet more expansive. It dispenses even with the reference to energy efficiency standards and instead broadly preempts all state laws "concerning the energy efficiency [or] energy use" of covered products. 42 U.S.C. § 6297(c). The evolution of EPCA's preemption provision—dispensing with the reference to efficiency standards, replacing "similar requirement" with "other requirement," and adding "concerning" and "energy use," among others—demonstrates the breadth of state regulations that Congress sought to foreclose.

The purpose and history of EPCA, in short, reinforce Congress's intent to preempt state regulations concerning appliances' energy use and energy efficiency. And they demonstrate, more specifically, that the Maryland BEPS are among the types of state regulations that Congress sought to prevent. If allowed to stand,

38

appliance manufacturers would once again be subjected to a "patchwork" of regulatory regimes across the nation, S. Rep. No. 100-6, at 4 (1987), each one having discrete emissions caps that either restrict or outright ban classes of EPCA-covered appliances. Likewise, consumers and builders in all these jurisdictions would have their choice of gas appliances restricted, or even stripped from them entirely in some cases, rendering those "covered products" effectively "unavailab[le]." *Id*. at 2. It is clear from EPCA's history and purpose that Congress intended to avoid all of this. That manifest intention bolsters the plain-text analysis discussed above and confirms that EPCA preempts the Maryland BEPS.

**III.  The district court reached the opposite conclusion only by adopting an unreasonably narrow view of EPCA's preemption provision.**

The district court started down the correct analytical path before veering off course. It correctly rejected the State's argument that "Congress sought to preempt state regulations that set an energy efficiency floor or an energy use ceiling for covered consumer products or otherwise seek to modify their design," JA24, and held instead that "Congress intended § 6297(c) to sweep more broadly than just energy conservation standards," JA26. Proceeding further down that path, the district court noted that "the provisions that apply to building codes . . . signal Congress's intent about the preemption of building regulations such as the BEPS." JA27. The district court also recognized that the preemption "analysis in this case does not turn on [any] nuance in the meaning of 'energy use'" because it would play

39

out the same way "[r]egardless of whether 'energy use' refers to a fixed or mutable characteristic of a covered product." JA34. Those observations would seem to be the promising beginnings of a chain of reasoning that leads to the conclusion that EPCA preempts the Maryland BEPS. Instead, however, the district court made a series of interpretive missteps that threw off its analysis. Those errors, which are discussed in detail below, are what put the district court on the path to its erroneous conclusion that the Maryland BEPS do not fall within EPCA's preemptive scope.

### A. The district court created a massive loophole by misunderstanding the relevance of the Maryland BEPS' fee for excess emissions.

The district court's first major misstep concerns the "alternative compliance fee" the Maryland BEPS levy "for the greenhouse gas emissions in excess of the net direct emissions standards." COMAR 26.28.04.01A(1). Central to the district court's reasoning was that "[t]o comply with the BEPS' greenhouse gas emissions standards, building owners need not replace their appliances at all." JA30. "Owners can comply in other ways," the district court said, "including by paying a yearly compliance fee—an option that would not require replacement of a single appliance." JA31. And because the Maryland BEPS structured that fee not "as a sanction for a violation of the BEPS," but rather as "a *means of complying* with the law," the district court believed that it essentially immunized the Maryland BEPS from EPCA preemption challenges. JA37.

That reasoning creates a loophole so vast that it threatens to swallow EPCA's

40

preemption provision. According to the district court, states are free to impose any and all regulations that "concern[] the energy efficiency [or] energy use" of covered appliances so long as there is an alternative compliance mechanism that consists solely of paying a monetary fee. That is the core of the reasoning underlying its validation of the Maryland BEPS.

Consider what kinds of regulations the district court's reasoning would permit. Maryland (or any other state) could enact a law that sets an energy conservation standard for "Gas Standalone Cooking Tops" not at DOE's specified value of "1,770 kBtu/year," 10 C.F.R. § 430.32(j), but rather at 1 kBtu/year. Under the district court's reasoning, that would be perfectly permissible so long as it was paired with an alternative compliance option that involved paying a $10,000 fee for each appliance that does not meet that 1 kBtu/year standard. And why stop there? The fee could be $100,000 or even $1,000,000. After all, according to the district court, so long as "[a] regulated party . . . need not abandon their gas appliances or even use them less" and instead has the option of "pay[ing] a predetermined fee" as a means of compliance, there is no EPCA preemption problem. JA35-36.

Needless to say, that cannot be right. If it were, then EPCA preemption would be trivially easy to evade. States could set up not only regulations "concerning the energy efficiency [or] energy use" of covered gas appliances, but also full-blown energy conservation standards for those appliances, so long as the regulated public

41

could avoid those requirements by paying a costly fee. That option to pay a fee does not somehow transform a prohibited regulation that strikes at the heart of EPCA preemption into one that poses no preemption problem. A state regulation that "concern[s] the energy efficiency [or] energy use" of covered gas appliances does so regardless of what alternative fees it may levy, penalties it may impose, or costly compliance paths it may allow. EPCA declares that entire regulatory sphere to be off-limits for states. So no matter how a state dresses up its regulations "concerning the energy efficiency [or] energy use" of covered gas appliances, those regulations remain preempted by EPCA.

Nor does it matter how a state labels the monetary exaction. The district court appeared to believe otherwise and thought it relevant whether the "monetary assessment" at issue is structured as a "penalty" or as an "elective option" for compliance. JA37. But that semantic argument makes no difference to the people and businesses who must shoulder the financial burden the Maryland BEPS impose. Moreover, the Supreme Court has made clear that what matters in preemption cases is substance, not labels. *See, e.g.*, *Wos v. E.M.A. ex rel. Johnson*, 568 U.S. 627, 637 (2013) ("In a pre-emption case . . . a proper analysis requires consideration of what the state law in fact does, not how the litigant might choose to describe it."). Whether one calls it a "fine," a "penalty," or an "alternative compliance fee," the effect is all the same: consumers must pay that monetary exaction if they fail to meet the

42

Maryland BEPS' net kg CO2e/sq. ft. limits.

Importantly, all of that applies equally to the scenario in which instead of a monetary exaction, the regulations require the regulated parties to undertake costly measures to come into compliance. The Maryland BEPS have an element of this as well, with their contemplation of other costly means of avoiding emissions, "such as [through] the installation of carbon-capture technology." JA31. Here, too, consumers would be subjected to the same economic forces in the choice between their EPCA-compliant gas appliances and a monetary outlay. It makes no difference to the consumer that the money would be going to some third party rather than to the State. The same money would be leaving their hands as the price of the continued use of their gas appliances. Regardless of what precise form that monetary lever takes, the State's imposition of this economic force into the prohibited realm of EPCA-covered appliances "concern[s]" their "energy efficiency" and "energy use."

Perhaps best exemplifying the district court's confusion on this point is its closing point that "it strains credulity to suggest that Maryland could not structure its building regulations in such a way as to render alternatives to gas appliances a more financially attractive option." JA37. If a state can manipulate behavior and lawful commerce in this way, then it can easily flout EPCA by achieving through financial means what EPCA's preemption provision would otherwise prohibit. After all, it is the "purpose and effects" of the Maryland BEPS that matter for preemption

43

purposes, *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 658 (1995), not the particular means by which the State achieves its goals.

Federal courts have recognized as much and have held that state laws with downstream effects on federally regulated subject matter are preempted, even if they do not speak strictly in terms of the applicable federal statute. *See, e.g.*, *Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 464 (2012) ("[I]f the sales ban were to avoid the FMIA's preemption clause, then any State could impose any regulation on slaughterhouses just by framing it as a ban on the sale of meat produced in whatever way the State disapproved."); *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 254-55 (2004) (rejecting the argument that a law avoided preemption because it regulated purchasers instead of manufacturers and observing that "[t]he manufacturer's right to sell federally approved vehicles is meaningless in the absence of a purchaser's right to buy them"); *Am. Auto. Mfrs. Ass'n v. Cahill*, 152 F.3d 196, 200 (2d Cir. 1998) (holding that while a New York law requiring that a percentage of vehicle sales be "zero emission vehicles" did not "impose precise quantitative limits on levels of emissions," the Clean Air Act nevertheless preempted the sales requirement because the law was "in the nature of a command having a direct effect on the level of emissions"). The Maryland BEPS are in the same vein as these other backdoor attempts to regulate subject matter on which federal law is

44

supreme and are thus preempted for the same reasons.

**B.    The district court minimized the interpretive importance of EPCA's building code exception.**

The district court added another significant error with its minimization of the interpretive importance of EPCA's building code exception. To be fair, the district court acknowledged that the building code exception "signal[ed] Congress's intent about the preemption of building regulations such as the BEPS." JA27. And it even recognized that the exception served "as an interpretive guide, a way of illuminating the domain of building regulations that Congress sought to preempt." JA27 (internal quotation marks omitted). But the district court's analysis went downhill from there.

Essentially, the district court took from the building code exception that Congress sought to preempt regulations that came close to, but did not quite satisfy, the exception's seven enumerated requirements: "It tells us that Congress wanted to preempt (at a minimum) state or local building codes that set an 'objective' for 'energy consumption' or 'conservation' and do so in a way that mandates the installation of high-efficiency appliances." JA29. That statement is correct as far as it goes. Indeed, Congress dedicated an entire provision—separate and apart from the seven enumerated requirements—to ensuring that any building code that managed to qualify for an exception while still "requir[ing] the installation of covered products with efficiencies exceeding . . . the applicable Federal standard" would be preempted absent a waiver. 42 U.S.C. § 6297(f)(4)(B).

The district court erred, however, in treating that as not only the "minimum" that EPCA preempts, JA30, but also the maximum. It repeatedly emphasized that the building code exception demonstrated that states cannot "requir[e] the installation of products whose efficiencies exceeded federal standards." JA30; *see also* JA30 ("These building code provisions . . . illuminate . . . that Congress intended to preempt[] regulations that mandate the installation of high-efficiency appliances."). The district court then applied that framework to the Maryland BEPS and—building on its erroneous understanding of the relevance of the "alternative compliance fee"—held that "[b]ecause the BEPS do not require building owners to install appliances whose energy efficiencies exceed federal standards, they are not like the building codes that Congress intended to preempt." JA31.

That cannot be the test. Surely a building code that sets energy conservation standards that are more stringent than DOE's but then allows building owners to avoid them through the payment of a substantial fee would be preempted under EPCA, especially in light of its building code exception. *See supra* § III.A. That is essentially what the Maryland BEPS do in their final, zero net kg CO2e/sq. ft. form. *See supra* § I.B. And even during the interim periods where some emissions are permitted, the Maryland BEPS "concern[] the energy efficiency [and] energy use" of EPCA-covered gas appliances through the operation of their emissions caps. *See supra* § I.B. So, in short, the district court's conception of the import of EPCA's

46

building code exception fails due to the same analytical errors that plague the rest of its interpretive analysis.

The district court then went a step further and insisted that the Maryland BEPS' inability to qualify for the building code exception was proof that they could not be preempted by EPCA. JA32. Plaintiffs agree that the Maryland BEPS do not satisfy the exception's seven requirements—or, in the words of the district court, that it "is like trying to fit a square peg into a round hole." JA32. But that is not "evidence that the BEPS are not the type of building regulation that Congress understood would need an exception to preemption in the first place." JA32. Rather, it demonstrates the opposite here.

The building code exception is meant to permit only a narrow subset of performance-based building codes that meet strict criteria that ensure both fuel neutrality and minimal interference with EPCA's goals. The Maryland BEPS, in contrast, are essentially a building code on steroids. They apply not only to new buildings, but also to existing ones—something that the building code exception explicitly prohibits. *See* 42 U.S.C. § 6297(f)(3) (excepting only certain building codes "for new construction"). Nor do they specify the "energy consumption or conservation objective . . . in terms of an estimated total consumption of energy," *id.* § 6297(f)(3)(F), but instead do so in terms of an emissions limit that inherently penalizes gas appliances. Similarly, the Maryland BEPS do not give credit on a "one-

47

for-one equivalent energy use or equivalent cost basis," *id.* § 6297(f)(3)(C), but instead employ an emissions framework that, again, penalizes gas appliances. In sum, the Maryland BEPS are exactly the kind of heavy-handed and discriminatory building regulation that the building code exception's requirements were meant to weed out.

To be clear, Plaintiffs are not arguing that, as the district court characterized their argument, "because the BEPS are not excepted from preemption, they must be preempted." JA31. Plaintiffs of course agree that "[t]he mere fact that a regulation does not satisfy the criteria for a preemption exception does not mean the regulation is preempted." JA31. Rather, the key insights from the building code exception are (1) that EPCA preemption must reach at least some building codes that satisfy all seven of the exception's requirements, or else the exception would serve no purpose, and (2) regulations like the Maryland BEPS that are more extreme versions of the performance-based building code that the exception permits must be preempted. *See supra* § II.A. That is why the building code exception is so instructive on the preemption question presented here.

### C. The Maryland BEPS are preempted under the district court's own conception of "concerning."

The district court's understanding of the function of the broadening term "concerning" started off promising but then strayed off course. The district court correctly construed the word "concerning" as being synonymous with the phrase

48

"related to," thus significantly broadening the scope of EPCA's preemption clause. "The Supreme Court has 'repeatedly recognized' that such language 'express[es] a broad pre-emptive purpose,'" the district court explained, and "[f]or purposes of a preemption provision with 'related-to' language, a state law 'relates to' a particular subject matter if the law has 'a connection with, or reference to' the subject matter." JA18 (quoting *Coventry Health Care of Mo., Inc. v. Nevils*, 581 U.S. 87, 95-96 (2017), and *Rowe*, 552 U.S. at 370). "'[T]o determine whether a state law has the forbidden connection,'" the district court continued, a court must "'look both to the objectives of the [federal] statute as a guide to the scope of the state law that Congress understood would survive, as well as to the nature of the effect of the state law on' the preempted subject matter." JA19 (quoting *Egelhoff v. Egelhoff ex rel. Breiner*, 532 U.S. 141, 147 (2001)). From there, however, the district court concluded that the Maryland BEPS do not "concern[] the energy efficiency [or] energy use" of covered products because they neither "refer to" nor have a "connection with" those matters. JA19-34. That was error.

The Maryland BEPS, at a minimum, have a "connection with" the energy efficiency or energy use of covered appliances. *Rowe*, 552 U.S. at 370. That is because they "have a significant impact" on covered appliances' energy use and energy efficiency through the operation of their declining net kg CO2e/sq. ft. emissions limits. *See id.* at 371; *see also supra* § I.B. What is more, that "produces

49

the very effect that the federal law sought to avoid," *Rowe*, 552 U.S. at 372, since by penalizing an entire category of covered appliances at the state level, the Maryland BEPS replace the federally mandated uniformity in this area with the regulatory patchwork that Congress went to such great lengths to prevent, *see supra* §§ II.B-C.

The Maryland BEPS also "refer[] to" EPCA-covered appliances' energy use and efficiency. *Gobeille*, 577 U.S. at 319-20. One of the principal cases the district court cited in support of its contrary conclusion, *Metropolitan Taxicab Board of Trade v. City of New York*, 615 F.3d 152 (2d Cir. 2010), proves the point. There, the Second Circuit considered whether New York regulations that reduced taxicab lease caps (*i.e.*, "the maximum dollar amount per shift for which taxis can be leased") on "non-hybrid, non-clean diesel" taxis were preempted by a different provision of EPCA that prohibits states from adopting regulations "related to fuel economy." *Id.* at 155-56. The lease caps essentially incentivized the use of hybrid taxis and penalized the use of non-hybrid taxis. *See id.* at 155. The Second Circuit held that EPCA preempted these lease-cap rules as regulations relating to fuel-efficiency standards because they did "nothing more than draw a distinction between vehicles with greater or lesser fuel-efficiency." *Id.* at 157. Importantly, it did not matter to the Second Circuit's analysis that the new lease-cap "rules did not directly reference fuel economy standards or incorporate those standards into the new rules' operation." *Id.* at 158. That made no difference because the regulations essentially used the "hybrid"

50

label as "a proxy for 'greater fuel efficiency.'" *Id.*

Much of the same can be said in this case. Just as New York used "hybrid" status as "a proxy for 'greater fuel efficiency,'" *id.*, Maryland uses on-site CO2e emissions as a proxy for gas energy use, because covered gas appliances emit CO2e in direct proportion to the amount of gas they burn. Thus, even though the Maryland BEPS do not "directly reference" the energy use or efficiency of covered appliances, they nevertheless "directly relate[]" to the energy use and efficiency of those appliances. *Id.* The State cannot use proxies to so easily circumvent the sweep of EPCA's broad preemption clause. *Cf. Berkeley*, 89 F.4th at 1107 (holding that a city could not "evade [EPCA] preemption by merely moving up one step in the energy chain [by] banning natural gas piping within those buildings").

### D.    The district court based its dismissal of Plaintiffs' facial challenge on these errors.

The district court concluded its analysis by referencing the facial nature of Plaintiffs' challenge. JA38. Building on its various analytical errors, the district court divided the regulated public into two groups: (1) those "with financial constraints, [such that] phasing out gas appliances may be the only feasible [compliance] option," and (2) those with more means who "have a choice (albeit one they would rather not make) between replacing their gas appliances and pursuing another compliance option." JA38. While the district court left open the possibility that the Maryland BEPS may be preempted for the former group, it reasoned that the

51

presence of possible alternative compliance options meant that the Maryland BEPS were not preempted for the latter group. JA38. And because the Maryland BEPS were not preempted in some cases, the district court continued, that "dooms the[] facial preemption challenge." JA38.

The problem is that the district court's conclusion rests on its preceding faulty analysis. As detailed above, the inclusion of an alternative compliance fee and contemplation of costly emissions avoidance measures do not immunize the Maryland BEPS from EPCA preemption. *See supra* § III.A. Once that error is corrected, the district court's category of permissible, non-preempted applications of the Maryland BEPS disappears because a party's financial ability to pursue those alternative compliance options is irrelevant to the preemption analysis. And with that, the district court's ultimate conclusion falls apart, and it becomes clear that EPCA does in fact preempt the Maryland BEPS.

\*    \*    \*

In sum, while much of the district court's analysis was directionally correct, a series of fundamental errors led the district court to wrongly conclude that the Maryland BEPS escaped EPCA's broad preemption provision.

## CONCLUSION

For these reasons, Plaintiffs respectfully request that the Court reverse the district court's judgment and remand the case for further proceedings.

52

## REQUEST FOR ORAL ARGUMENT

Pursuant to Fourth Circuit Rule 34(a) and Federal Rule of Appellate Procedure 34(a)(1), Plaintiffs submit that oral argument would be helpful in this case given the important preemption questions at issue.

Respectfully submitted,

BAKER BOTTS L.L.P.

By: */s/ J. Mark Little*
J. Mark Little
910 Louisiana Street
Houston, TX 77002
(713) 229-1489
mark.little@bakerbotts.com

Scott Novak
700 K Street NW
Washington, D.C. 20001
(202) 304-5099
scott.novak@bakerbotts.com

Daniel B. Rankin
401 S. 1st Street, Ste. 1300
Austin, TX 78704
(737) 393-7297
daniel.rankin@bakerbotts.com

*Counsel for Appellants*

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,599 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word in 14-point Times New Roman font.

/s/ J. Mark Little
J. Mark Little

**CERTIFICATE OF SERVICE**

I certify that on June 15, 2026, the foregoing was electronically filed through this Court's CM/ECF system, which will send a notice of filing to all registered users.


/s/ J. Mark Little
J. Mark Little