**No. 26-1552**

IN THE

# United States Court of Appeals for the Fourth Circuit

---

MARYLAND BUILDING INDUSTRY ASSOCIATION, INC., *et al*.,

*Plaintiff-Appellants*,

*v.*

SERENA COLEMAN MCILWAIN, IN HER OFFICIAL CAPACITY AS THE SECRETARY OF THE MARYLAND DEPARTMENT OF THE ENVIRONMENT,

*Defendant-Appellee*.

---

On Appeal from the U.S. District Court for the
District of Maryland, No. 8:25-cv-00113-DLB

---

## JOINT APPENDIX

---

Doris Neil Lange
doris.lange@maryland.gov
(410) 537-3038
Kristen Michelle Summers
kristen.summers@maryland.gov
(443) 926-0955
OFFICE OF THE ATTORNEY GENERAL
Maryland Department of Environment
1800 Washington Blvd.
Baltimore, MD 21230-1719

*Counsel for Appellee*

J. Mark Little
BAKER BOTTS L.L.P.
910 Louisiana Street
Houston, TX 77002
(713) 229-1489
mark.little@bakerbotts.com

Scott Novak
BAKER BOTTS L.L.P.
700 K Street NW
Washington, D.C. 20001
(202) 304-5099
scott.novak@bakerbotts.com

Daniel B. Rankin
BAKER BOTTS L.L.P.
401 S. 1st Street, Ste. 1300
Austin, TX 78704
(737) 393-7297
daniel.rankin@bakerbotts.com

*Counsel for Appellants*

**CERTIFICATE OF SERVICE**

I certify that on June 15, 2026, this document was electronically filed through this Court's CM/ECF system, which will send a notice of filing to all registered users.

*/s/ J. Mark Little*
J. Mark Little

## TABLE OF CONTENTS

Order Granting Motion to Dismiss [dkt 66] ........................................................JA1

Amended Memorandum Opinion [dkt 67] ..........................................................JA2

Memorandum Opinion [dkt 65] ........................................................................JA40

District Court Docket Sheet ..............................................................................JA78

Original Complaint [dkt 1]................................................................................JA89

Amended Complaint [dkt 36] ..........................................................................JA115

Defendant's Motion to Dismiss [dkt 49] .........................................................JA144

Notice of Appeal [dkt 68] ...............................................................................JA147

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **MARYLAND BUILDING INDUSTRY ASSOCIATION, INC.,** *et al.,* | * |
| | * |
| **Plaintiffs,** | |
| | * |
| **v.** | * Civ. No. DLB-25-113 |
| | * |
| **SERENA COLEMAN MCILWAIN,** *in her official capacity as Secretary of the Maryland Department of the Environment,* | * |
| | * |
| **Defendant.** | * |

### ORDER

For the reasons stated in the memorandum opinion issued today, it is this 31st day of March, 2026, by the United States District Court for the District of Maryland, hereby ORDERED that:

1.  The defendant's motion to dismiss, ECF 49, IS GRANTED;

2.  This case IS DISMISSED with prejudice; and

3.  The Clerk SHALL CLOSE this case.

_____
Deborah L. Boardman
United States District Judge

JA001

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

MARYLAND BUILDING INDUSTRY    \*
ASSOCIATION, INC., *et al.*,

        \*

     **Plaintiffs,**

        \*

**v.**                        **Civ. No. DLB-25-113**

        \*

**SERENA COLEMAN MCILWAIN,** *in her*
*official capacity as Secretary of the Maryland*   \*
*Department of the Environment,*

        \*

     **Defendant.**

### AMENDED MEMORANDUM OPINION[1]

In 2024, the Maryland Department of the Environment ("MDOE") adopted Building Energy Performance Standards ("BEPS"), which set greenhouse gas emissions targets for certain state-owned, commercial, and multifamily residential buildings in Maryland. The BEPS require the buildings to have net-zero greenhouse gas emissions by 2040.

The BEPS were not well-received by some in the Maryland building and energy industry. A group of condominium, construction, real estate, and cooperative housing associations, as well as utilities, brought this action against MDOE arguing that the BEPS are preempted by express preemption provisions in the Energy Policy and Conservation Act ("EPCA"), 42 U.S.C. §§ 6201–6422. EPCA imposes, among other things, federal energy efficiency standards for consumer and industrial appliances such as dishwashers, kitchen ranges, and air conditioners. To ensure national uniformity on those matters, EPCA expressly preempts state regulations "concerning" the "energy efficiency" and "energy use" of EPCA-covered appliances. 42 U.S.C. §§ 6297(c) & 6316(b)(2)(A).

---

[1] This amended memorandum opinion removes what was footnote nine in the memorandum opinion issued on March 31, 2026. This memorandum opinion is otherwise the same as the original.

The plaintiffs seek a declaration that the BEPS are preempted by EPCA and an injunction blocking their enforcement. MDOE has moved to dismiss the plaintiffs' complaint for failure to state a claim. Because the BEPS are not preempted by EPCA, the motion to dismiss is granted.

## I.      Background

### A.      The BEPS

On April 9, 2022, Maryland enacted the Climate Solutions Now Act of 2022, 2022 Md. Laws Ch. 38 ("Act"). The Act requires MDOE to "develop building energy performance standards for covered buildings that achieve . . . [a] 20% reduction in net direct greenhouse gas emissions on or before January 1, 2030 . . . and . . . [n]et-zero direct greenhouse gas emissions on or before January 1, 2040." Md. Code Ann., Env't § 2-1602(a).

In compliance with its statutory mandate, MDOE promulgated the BEPS, which were adopted on December 23, 2024. As relevant here, the BEPS require all "covered buildings" to meet certain "net direct emissions" standards for the periods 2030–2034 and 2035–2039 and ultimately to achieve net-zero emissions by 2040. *See* Md. Code Regs. ("COMAR") 26.28.03.02(A), (D).[2] Subject to certain exceptions, a "covered building" is:

> a building that is a commercial or multifamily residential building in the State of Maryland or is owned by the State of Maryland and has a gross floor area of 35,000 square feet or more, excluding the parking garage area, and is (i) A single building; (ii) One or more buildings held in the condominium form of ownership with a combined gross floor area of 35,000 square feet or more, excluding the parking garage area, and governed by a single board of managers; or (iii) Two or more buildings with a combined gross floor area of 35,000 square feet or more, excluding the parking garage area, that are served in whole or in part by the same electric or gas meter or are served by the same heating or cooling system or systems, which is not a district energy system.

---

[2] The BEPS also impose detailed reporting, disclosure, and recordkeeping requirements concerning a building's energy consumption and energy efficiency. *See generally* COMAR 26.28.02. Though the plaintiffs claim that the BEPS as a whole are preempted by EPCA, they make no substantive argument that these particular provisions are preempted. They focus instead on the BEPS' emissions standards. The Court will do the same.

COMAR 26.28.01.02(15). The BEPS define "net direct emissions" as "(i) The sum of all direct greenhouse gas emissions from a covered building; or (ii) For a covered building connected to a district energy system, direct greenhouse gas emissions plus the greenhouse gas emissions attributable to thermal energy inputs from the district energy system used by the covered building[.]" COMAR 26.28.01.02(31). The BEPS in turn define "direct greenhouse gas emissions" as "greenhouse gas emissions produced on-site by covered buildings, as calculated by the benchmarking tool"—i.e., the U.S. Environmental Protection Agency's ENERGY STAR Portfolio Manager or any federally-approved successor—"unless otherwise specified by" MDOE. COMAR 26.28.01.02(17), 26.28.01.02(10).

Different types of covered buildings have different interim emissions benchmarks. For example, a building classified as a "Bar/Nightclub" is limited to 1.7 Kg CO2e (kilograms of carbon dioxide equivalent) per square foot in net direct emissions for the 2030–2034 period, whereas a building classified as a "Worship Facility" is limited to 0.87 Kg CO2e per square foot in net direct emissions for the same period. COMAR 26.28.03.02. By 2040, however, all non-exempt covered buildings must reduce their net direct emissions to zero. *Id.*

In lieu of achieving these standards, the owner of a covered building "shall come into compliance" with the standards by paying a yearly "alternative compliance fee" "for every metric ton of net direct emissions in excess of the net direct emissions standard in a given calendar year." COMAR 26.28.04.01(A). The BEPS dub this fee an "Alternative Compliance Pathway." *Id.* The fee, which is measured in 2020 dollars adjusted for inflation, starts at $230 per metric ton for 2030 and increases by $4 per metric ton every year thereafter. *Id.* The BEPS also allow owners of covered buildings to apply for yearlong exemptions from the emissions standards on certain grounds, such as "financial distress" (defined by the BEPS to include situations where, for

3

instance, a property is subject to a tax lien or is controlled by a court-appointed receiver). COMAR 26.28.04.02(A), 26.28.01.02(22).

Before the BEPS were issued, MDOE sought public comment, as Maryland law required. During the public comment period, some commenters expressed concern that the BEPS' emissions standards did not "include a provision for carbon capture" and requested that renewable natural gas, hydrogen, and biofuels be included as an option for achieving compliance with the standards. *See* MDOE, Air & Radiation Admin., *Response to Comments On the Proposed Regulations under COMAR 26.28*, at 41, https://mde.maryland.gov/programs/regulations/air/Documents/Hearings/BEPS%20RTC%20December%202024%20Final%20Draft.pdf ("*Response to Comments*").[3] In response, MDOE "acknowledge[d] that carbon capture can play a role in reducing direct emissions from buildings" and pledged to convene a working group to "identify how to account for differing sources and sinks of onsite emissions like carbon capture in the performance standards" before 2030. *Id.*

### B.    EPCA

EPCA was enacted in 1975 "as part of a 'comprehensive national energy policy'" following a 1973–1974 oil embargo by certain petroleum-producing countries. *Nat. Res. Def. Council, Inc. v. Herrington*, 768 F.2d 1355, 1362, 1364 (D.C. Cir. 1985) (quoting S. Rep. No. 94–516, at 116 (1975)). The statute "was designed, in part, to reduce the United States' 'domestic energy consumption through the operation of specific voluntary and mandatory energy conservation programs.'" *Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*,

---

[3] MDOE asks the Court to take judicial notice of MDOE's response to public comments on the proposed BEPS. ECF 49-1, at 10 n.2. The plaintiffs do not object. The Court takes judicial notice of this public document and considers it when deciding the motion to dismiss. *See Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).

410 F.3d 492, 498–99 (9th Cir. 2005) (quoting S. Rep. No. 94–516, at 117). EPCA sought to achieve this end by authorizing energy efficiency standards and prescribing labeling requirements for "major home appliances and certain other consumer products," in hopes that "better informed consumers and voluntary efforts by manufacturers would make energy efficiency standards unnecessary." *Id.* at 499 (quoting S. Rep. No. 94–516, at 118). As originally enacted, EPCA "preempted state regulations insofar as they were 'other than' the applicable federal rules for testing and labeling" but "allowed state regulations that differed from the federal regulations" if they "were justified by a substantial state or local need, did not interfere with interstate commerce, and were more stringent than the federal standard." *Id.* (citing Pub. L. No. 94–163, §§ 327(a)(1), 327(b)(2), 89 Stat. 871, 927 (1975)).

In 1978, Congress amended EPCA with the National Energy Conservation and Policy Act ("NECPA"), which "required the [Department of Energy] to prescribe minimum energy efficiency standards for thirteen covered products" and allowed states "to prescribe regulations more stringent than federal regulations . . . *only* if the Secretary [of Energy] found there was a significant state or local interest to justify the state's regulation" and that regulation "would not unduly burden interstate commerce." *Id.* (citing Pub. L. No. 95–619, § 424(a), 92 Stat. 3206, 3264 (1978)). Despite this statutory directive, the Department of Energy declined to promulgate efficiency standards and "initiated a general policy of granting petitions from States requesting waivers from preemption"—creating a patchwork of state appliance standards throughout the country. *Id.* (quoting S. Rep. No. 100–6, at 4 (1987)).

Litigation ensued. In 1985, the U.S. Court of Appeals for the District of Columbia Circuit ordered the Department of Energy to adopt the federal standards NECPA had contemplated. *See Herrington*, 768 F.2d at 1433. The Department of Energy was unable to immediately comply with

the D.C. Circuit's mandate. *Air Conditioning*, 410 F.3d at 499. So, "major manufacturer trade associations and the Natural Resources Defense Council negotiated a compromise solution," which resulted in the National Appliance Energy Conservation Act of 1987 ("NAECA"). *Id.* Amending EPCA, NAECA added the current preemption provision regarding consumer appliances, codified at 42 U.S.C. § 6297(c). *See* Pub. L. No. 100–12, § 327(c), 101 Stat. 103, 118 (1987).

> EPCA's preemption provision for consumer products provides, in relevant part:
>
> [E]ffective on the effective date of an energy conservation standard established in or prescribed under section 6295 of this title for any covered [consumer] product, no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be effective with respect to such product[.]

42 U.S.C. § 6297(c). Covered consumer products include consumer appliances that use water or energy, such as air conditioners, water heaters, kitchen ranges, showerheads, and dishwashers.[4] *Id.* §§ 6291(1)–(2), 6292(a). "Energy" is defined as "electricity, or fossil fuels." *Id.* § 6291(3). "'[E]nergy use' means the quantity of energy directly consumed by a consumer product at point of use, determined in accordance with test procedures under section 6293 of this title." *Id.* § 6291(4). "'[E]nergy efficiency' means the ratio of the useful output of services from a consumer product to the energy use of such product, determined in accordance with test procedures under section 6293 of this title." *Id.* § 6291(5). "[E]nergy conservation standard" is defined as "a performance standard which prescribes a minimum level of energy efficiency or a maximum

---

[4] EPCA uses the term "covered product" to refer specifically to consumer products covered by the statute. *See* 42 U.S.C. §§ 6291(1)–(2), 6292. In this opinion, the Court uses the phrase (or, sometimes, "EPCA-covered product") to refer to both consumer *and* industrial products to which the statute applies. When the precise definition matters to the analysis, the Court will use the phrases "covered consumer product" and "covered industrial product" to refer to EPCA-covered consumer and industrial products, respectively.

quantity of energy [or water] use . . . determined in accordance with test procedures prescribed under section 6293 of this title; or . . . a design requirement for" certain covered consumer products. *Id.* § 6291(6). An energy conservation standard also "includes any other requirements which the Secretary [of Energy] may prescribe[.]" *Id.*

NAECA did more than add this preemption provision to EPCA. NAECA also "made it more difficult for states to obtain waivers of preemption [under EPCA] for more stringent state efficiency standards." *Air Conditioning*, 410 F.3d at 500. These changes were designed "to counteract the systems of separate state appliance standards that had emerged" from the Department of Energy's policy of liberally granting preemption waivers, "which [had] caused appliance manufacturers to be confronted with 'a growing patchwork of differing State regulations which would increasingly complicate their design, production and marketing plans.'" *Id.* (quoting S. Rep. No. 100–6, at 4).

In 1992, Congress amended EPCA again, this time through the Energy Policy Act of 1992, which added a preemption provision regarding industrial products, codified at 42 U.S.C. § 6316(b)(2)(A). *See* Pub. L. No. 102–486, § 122(e)(2), 106 Stat. 2776, 2816 (1992). Section 6316(b)(2)(A) is substantively identical to § 6297(c). It provides that "[a] standard prescribed or established under [42 U.S.C. § 6313(a)]"—which governs requirements for devices such as warm-air furnaces, packaged boilers, and commercial air conditioning equipment—"shall, beginning on the effective date of such standard, supersede any State or local regulation concerning the energy efficiency or energy use of a product for which a standard is prescribed or established pursuant to such section." 42 U.S.C. § 6316(b)(2)(A). "Energy," "energy use," and "energy efficiency" have the same or substantially the same meanings as they do in § 6297(c). *Id.* §§ 6311(3)–(4), (7).

Preemption waivers are available, though difficult to obtain. Pursuant to § 6297(d)(1)(A), "[a]ny State or river basin commission with a State regulation which provides for any energy conservation standard or other requirement with respect to energy use, energy efficiency, or water use for any . . . covered [consumer] product" may seek a preemption waiver from the Secretary of Energy. A state regulation of an industrial appliance that would otherwise be preempted also may be waived. *See id.* § 6316(b)(2)(D). The Secretary must grant such a waiver if they find that the "regulation is needed to meet unusual and compelling State or local energy or water interests," but they may not do so if they find, after considering the input of "interested persons," that the "regulation will significantly burden" the product's "manufacturing, marketing, distribution, sale, or servicing . . . on a national basis." *Id.* §§ 6297(d)(1)(B), 6297(d)(3). The Secretary also may not grant a preemption waiver if they find "that the State regulation is likely to result in the unavailability in the State of any covered product type (or class) of performance characteristics . . . , features, sizes, capacities, and volumes that are substantially the same as those generally available in the State at the time of the Secretary's finding[.]" *Id.* § 6297(d)(4).

Both § 6297 and § 6316 also authorize certain exceptions to preemption. As relevant here, § 6297(f)(3)—which, like § 6297(c), was added to EPCA by NAECA—provides that "regulation[s] or other requirement[s] contained in a State or local building code for new construction concerning the energy efficiency or energy use of [a] covered [consumer] product" are not preempted, provided certain requirements are met. And § 6316(b)(2)(B) similarly provides that a "standard [for industrial equipment] prescribed or established under section 6313(a) of this title shall not supersede a standard for such a product contained in a State or local building code for new construction" if, among other things, the building code does not require the product's energy efficiency to exceed a certain threshold. Finally, "a State or local government" need not

8

seek a preemption waiver "in order to enforce or apply its building code" unless the building code "requires the installation of covered [consumer] products with efficiencies exceeding" applicable federal and state standards. *Id.* § 6297(f)(4).

### C.    This Lawsuit

The plaintiffs are condominium associations, builder and real estate trade organizations, and utility companies. They contend that they "and their members have interests in a broad range of residential and commercial buildings covered by the . . . BEPS and in the natural gas and the gas delivery infrastructure that is used to provide gas service to those buildings" and that the BEPS "will cause [them] financial harm, diminish their businesses, and substantially increase the cost for homes, lodging, and energy in Maryland[.]" ECF 36, ¶ 6. Many of them contend that the BEPS will require them or their members to pay more for gas and to comply with "expensive" reporting requirements. *See, e.g., id.* ¶¶ 14, 18, 24.

Maryland Building Industry Association, Inc. is a "not-for-profit trade organization representing the interests of over 1,100 member firms and more than 100,000 . . . home builders, remodelers, developers, and affiliate professional and service providers" across Maryland and the District of Columbia. *Id.* ¶ 13. It contends that the "increased costs of compliance with the . . . BEPS likely will . . . decrease new construction" by "pric[ing] [customers] out of the market" and will force the association's members "to pay higher rates for gas service[.]" *Id.*

The Building Owners and Managers of Greater Baltimore, Inc. is a trade association for real estate professionals. *Id.* ¶ 14. Its "members will incur costs in replacing existing gas appliances in order to comply with the . . . BEPS or will be forced to incur the yearly penalty for noncompliance[.]" *Id.*

9

NAOIP MD, Inc. and NAIOP DC | MD, Inc. are commercial real estate associations whose members will face increased capital and utility costs, lose income "due to vacancy and disruptions to tenant occupancy during construction and renovations made necessary by the . . . BEPS," and suffer from reduced property values if the BEPS are not enjoined. *Id.* ¶¶ 15–17.

Maryland Multi-Housing Association, Inc. is an organization that "serves the multi-housing industry and Maryland communities by providing education, information, and legislative and advocacy services." *Id.* ¶ 18. Because of the BEPS, its members will incur costs to replace their gas appliances to comply with the BEPS "or will be forced to incur the yearly penalty for noncompliance" and will lose tenants during construction and renovation. *Id.*

Washington Gas Light Company, "a regulated public utility that provides natural gas service" throughout the District of Columbia, Maryland, and Virginia, asserts that the BEPS will cause it to lose customers and leave its remaining customers "to cover the costs of [its] new investments in maintaining its gas system." *Id.* ¶ 19.

Leisure World Community Corporation governs trust properties and owns the property manager for a gated community in Silver Spring. *Id.* ¶ 20. Leisure World is owned by the owners of condominiums, a cooperative, and a homeowner association. *Id.* Residents of Leisure World "will have to fund expensive retrofits . . . to comply with the . . . BEPS or will be forced to incur the yearly penalty for noncompliance[.]" *Id.* Many Leisure World residents are "on limited or fixed incomes, such that some owners likely will be unable to afford the increased assessments necessary to pay for the compliance work and/or fees for noncompliance." *Id.*

The Elizabeth Condominium Association, Inc. manages a high-rise condominium in Chevy Chase. *Id.* ¶ 21. It will have to "spend millions of dollars to try to bring its building into compliance with the . . . BEPS" because the building "relies on gas for its boilers[.]" *Id.*

Promenade Towers Mutual Housing Corporation is a cooperative housing corporation that owns residential apartments and commercial spaces in Bethesda. *Id.* ¶ 22. It "relies upon natural gas for residential and commercial uses" and "would have to undertake major and costly projects," such as replacing its boilers, to comply with the BEPS. *Id.* The cost of these improvements would fall on its residents, "many of whom are of modest means[.]" *Id.*

The Willoughby of Chevy Chase Condominium Council of Unit Owners, Inc., which runs a Maryland condominium, claims that in order to comply with the BEPS, it will have "to spend millions of dollars on electrification measures" or else "pay substantial fees for noncompliance" and that some of its members "will be unable to afford the increased assessments necessary to pay for the compliance work and/or fees for noncompliance." *Id.* ¶ 23.

Apartment and Office Building Association of Metropolitan Washington, a membership organization for "commercial office building and multifamily residential real estate," states that its members "will be forced to choose between either incurring substantial costs to replace existing gas appliances . . . or incurring the yearly penalty for noncompliance" with the BEPS' emissions requirements. *Id.* ¶ 24. "For those buildings that cannot comply with the . . . BEPS in an economically viable manner, the best of a bad series of options may be" to install "new structures, at great cost." *Id.*

Finally, Columbia Gas of Maryland, Inc., a regulated public utility that provides gas service throughout western Maryland, states that the BEPS will cause it to lose customers and force it to charge higher rates to its remaining customers. *Id.* ¶ 25. It adds that the BEPS will "impede customers' ability to adopt new, more environmentally-friendly gas technologies which would reduce their costs, improve the reliability of their utility service, and lower emissions at the same time." *Id.*

11

In their amended complaint, the plaintiffs claim that the BEPS' emissions standards are facially invalid because they "restrict[] and penaliz[e] EPCA-covered gas appliances in new and existing buildings[.]" *Id.* ¶¶ 5, 28. "Since all EPCA-covered gas appliances emit some level of carbon dioxide," the plaintiffs maintain, the "BEPS are regulating their energy use and energy efficiency by imposing declining [emissions] requirements—which eventually will go all the way down to zero—and associated penalties if those requirements are not met." *Id.* ¶ 67. The plaintiffs state that the emissions standards "restrict[] and penaliz[e] the consumption of certain quantities— and eventually any quantity—of gas energy by covered appliances" and that they "penalize less efficient gas appliances and effectively require more efficient appliances." *Id.* They seek a declaratory judgment that the BEPS are preempted by EPCA and an injunction against their enforcement. *Id.* ¶ 83.

On May 5, 2025, MDOE filed a motion to dismiss the amended complaint for failure to state a claim. ECF 49. That motion is fully briefed. ECF 49-1, 55 & 62. The Court also has received amicus briefs from the Chesapeake Climate Action Network and Sierra Club, ECF 47, the Public Health Law Center, ECF 52, and the American Gas Association, ECF 61. No hearing is necessary to resolve the motion. *See* Loc. R. 105.6 (D. Md. 2025).

## II.    Standard of Review

Under Rule 12(b)(6), a party may seek dismissal for failure "to state a claim upon which relief can be granted." *Robertson v. Anderson Mill Elementary Sch.*, 989 F.3d 282, 290 (4th Cir. 2021) (quoting Fed. R. Civ. P. 12(b)(6)). To survive the challenge, the opposing party must have pleaded facts demonstrating it has a plausible right to relief from the court. *Lokhova v. Halper*, 995 F.3d 134, 141 (4th Cir. 2021) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A plausible claim is more than merely conceivable or speculative. *See Holloway v. Maryland*, 32 F.4th 293,

299 (4th Cir. 2022). The allegations must show there is "more than a sheer possibility that the defendant has acted unlawfully." *Int'l Refugee Assistance Project v. Trump*, 961 F.3d 635, 648 (4th Cir. 2020) (quoting *Iqbal*, 556 U.S. at 678). But the claim does not need to be probable and the pleader need not show "that alternative explanations are less likely" than their theory. *Jesus Christ Is the Answer Ministries, Inc. v. Baltimore Cnty.*, 915 F.3d 256, 263 (4th Cir. 2019) (quoting *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015)).

When ruling on a Rule 12(b)(6) motion, the court must accept the allegations as true and "draw all reasonable inferences in favor of" the pleader. *Williams v. Kincaid*, 45 F.4th 759, 765 (4th Cir. 2022) (quoting *King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016)). But the court does not accept "legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments." *United States ex rel. Taylor v. Boyko*, 39 F.4th 177, 189 (4th Cir. 2022) (quoting *United States ex rel. Nathan v. Takeda Pharms. N. Am., Inc.*, 707 F.3d 451, 455 (4th Cir. 2013)). Merely reciting a claim's elements "and supporting them by conclusory statements does not meet the required standard." *Sheppard v. Visitors of Va. State Univ.*, 993 F.3d 230, 234 (4th Cir. 2021) (quoting *ACA Fin. Guar. Corp. v. City of Buena Vista*, 917 F.3d 206, 212 (4th Cir. 2019)). The court "does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020) (quoting *Tobey v. Jones*, 706 F.3d 379, 387 (4th Cir. 2013)).

The court's review of a Rule 12(b)(6) motion typically is limited to the pleadings, documents attached to the complaint, and the parties' briefs. *See* Fed. R. Civ. P. 12(b)(6), 12(d); *see also* Fed. R. Civ. P. 10(c). The court also may consider judicially noticed facts and documents integral to and explicitly relied on in the complaint when their authenticity is not disputed. *See Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606–07 (4th Cir. 2015); Fed. R. Evid. 201(b).

13

Courts frequently resolve preemption challenges such as this one on Rule 12(b)(6) motions. *See, e.g.*, *Va. Uranium, Inc. v. Warren*, 848 F.3d 590, 593–94 (4th Cir. 2017) (affirming 12(b)(6) dismissal of complaint challenging Virginia's moratorium on uranium mining as preempted by Atomic Energy Act), *aff'd*, 587 U.S. 761 (2019); *Self-Ins. Inst. of Am., Inc. v. Snyder*, 827 F.3d 549, 553–54 (6th Cir. 2016) (affirming 12(b)(6) dismissal of complaint challenging Michigan health care tax as preempted by Employee Retirement and Income Security Act of 1974 ("ERISA")); *Allied Concrete & Supply Co. v. Baker*, 904 F.3d 1053, 1057–58 (9th Cir. 2018) (affirming 12(b)(6) dismissal of complaint challenging California prevailing wage law as preempted by Federal Aviation Administration Authorization Act of 1994 ("FAAAA")).

## III.    Discussion

Under the Constitution's Supremacy Clause, federal law is "the supreme law of the Land." U.S. Const. art. VI, cl. 2. Thus, "in our system federal statutes take precedence over conflicting state laws provided that Congress acted within its authority"—a phenomenon known as preemption. *GenBioPro, Inc. v. Raynes*, 144 F.4th 258, 270 (4th Cir. 2025). "Preemption can take three basic forms:" express, field, and conflict. *Real Time Med. Sys., Inc. v. PointClickCare Techs., Inc.*, 131 F.4th 205, 229 (4th Cir. 2025). The plaintiffs here rely on express preemption, which occurs when "Congress clearly expresses an intention for a federal law to preempt state law[.]" *Id.* (quoting *N. Va. Hemp & Agric., LLC v. Virginia*, 125 F.4th 472, 492 (4th Cir. 2025)).

"Preemption fundamentally is a question of congressional intent[.]" *English v. Gen. Elec. Co.*, 496 U.S. 72, 78–79 (1990). Where, as here, a "statute 'contains an express pre-emption clause,' [courts] do not invoke any presumption against [preemption] but instead 'focus on the plain wording of the clause, which necessarily contains the best evidence of Congress'[s] pre-emptive intent.'" *Puerto Rico v. Franklin Cal. Tax-free Tr.*, 579 U.S. 115, 125 (2016) (quoting

*Chamber of Commerce v. Whiting*, 563 U.S. 582, 594 (2011)). In interpreting an express preemption clause, the court must "identify the domain expressly pre-empted by" the statute. *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 517 (1992). "As in any case of statutory construction, [the court's] analysis begins with the language of the statute." *Air Evac EMS, Inc. v. Cheatham*, 910 F.3d 751, 764 (4th Cir. 2018) (quoting *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999)).

Nevertheless, "because an express preemption clause may not always 'immediately end the inquiry,' [a court] also [may] look to the statute's structure and purpose" to ascertain its preemptive scope. *PCS Phosphate Co. v. Norfolk S. Corp.*, 559 F.3d 212, 217–18 (4th Cir. 2009) (quoting *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008)).[5] The court must read the words of a preemption clause "in their context and with a view to their place in the overall statutory scheme," also taking into account their "history [and] purpose[.]" *Gundy v. United States*, 588 U.S. 128, 141 (2019) (plurality opinion) (first alteration in *Gundy*) (quoting *Maracich v. Spears*, 570 U.S. 48, 76 (2013)). And the court should strive "to 'interpret [the] statute as a symmetrical and coherent regulatory scheme, and fit, if possible, all parts into an harmonious whole.'" *In re Rowe*, 750 F.3d 392, 396 (4th Cir. 2014) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000)).

---

[5] The Court heeds the Supreme Court's instruction in *Puerto Rico* and does not employ a presumption against preemption in resolving this case. As the Fourth Circuit has observed, however, "[t]he Supreme Court has made somewhat varying pronouncements on presumptions in express preemption cases," creating some confusion in this area of law. *Cheatham*, 910 F.3d at 762 n.1; *see also Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094, 1107–08 (9th Cir. 2024) (O'Scannlain, J., concurring) (explaining that, prior to *Puerto Rico*, "[t]he Supreme Court consistently instructed [the courts] to apply the presumption [against preemption] in express-preemption cases, at least in areas of traditional state concern" and that *Puerto Rico* "did not mention—much less expressly overrule—the decades of cases where the presumption had been applied in like circumstances").

The two preemption clauses at issue here, § 6297(c) and § 6316(b)(2)(A), preempt state regulations "concerning the energy efficiency [and] energy use" of covered products. 42 U.S.C. §§ 6297(c), 6316(b)(2)(A). The plaintiffs argue that the BEPS "concern" the "energy efficiency" and "energy use" of EPCA-covered products and thus are preempted and invalid.[6] MDOE argues that the BEPS are not preempted because the BEPS' connection to the energy use and energy efficiency of covered products "is too indirect, remote, and tenuous to support preemption." ECF 49-1, at 23–24. To determine who is correct, the Court examines the statutory text, "the necessary starting point." *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 319 (2016).

### A.    The Meaning of "Concerning"

Sections 6297(c) and 6316(b)(2)(A) preempt regulations "concerning" the energy use or energy efficiency of covered products. The statute does not define "concerning." Merriam-Webster's Dictionary defines "concern" as "to relate to : be about." *See Concern*, Merriam-Webster's Dictionary, https://www.merriam-webster.com/dictionary/concern (last visited Mar. 31, 2026); *see also Concern*, Oxford English Dictionary Online, https://doi.org/10.1093/OED/1097976362 (last visited Mar. 31, 2026) (listing first definition of "concern" as "[t]o refer or relate to; to be about"). The Supreme Court likewise has explained that "'[c]oncerning' means 'relating to,' and is the equivalent of 'regarding, respecting, about.'" *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 717 (2018).[7] It follows that a regulation "concerning" energy use or energy efficiency is one that "relates to" those subjects.

---

[6] The plaintiffs assert a facial challenge to the BEPS. This means that they are asking the Court to conclude that "no set of circumstances exists under which the [BEPS] would be valid." *AES Sparrows Point LNG, LLC v. Smith*, 470 F. Supp. 2d 586, 600 (D. Md. 2007) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).

[7] *Appling* was not a preemption case. It concerned the interpretation of a provision in the Bankruptcy Code. Even so, the Supreme Court's explanation of the meaning of "concerning" in

What, then, does it mean for a regulation to "relate to" the energy use or energy efficiency of an EPCA-covered product? In answering this question, the Court does not write on a blank slate. Several federal statutes contain express preemption clauses that preempt state laws "related to" the clauses' subject matter. *See, e.g.*, 29 U.S.C. § 1144(a) (ERISA); 49 U.S.C. § 14501(c)(1) (FAAAA); 49 U.S.C. § 41713(b)(1) (Airline Deregulation Act of 1978). The Supreme Court has "repeatedly recognized" that such language "express[es] a broad pre-emptive purpose." *Coventry Health Care of Mo., Inc. v. Nevils*, 581 U.S. 87, 95–96 (2017) (alteration in *Nevils*) (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992)). That said, "the breadth of the words 'related to' does not mean the sky is the limit"; the phrase should not be read "with an 'uncritical literalism,' else 'for all practical purposes pre-emption would never run its course.'" *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 260 (2013) (quoting *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655–56 (1995)). After all, "universally, relations stop nowhere." *Dubin v. United States*, 599 U.S. 110, 119 (2023) (quoting *Travelers*, 514 U.S. at 655). Thus, "[p]re-emption does not occur . . . if the state law has only a 'tenuous, remote, or peripheral' connection with" the specified subject matter. *District of Columbia v. Greater Wash. Bd. of Trade*, 506 U.S. 125, 130 n.1 (1992) (quoting *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 100 n.21 (1983)).

For purposes of a preemption provision with "relating-to" language, a state law "relates to" a particular subject matter if the law has "a connection with, or reference to" the subject matter. *Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 370 (2008) (emphasis omitted) (quoting

---

that context informs this Court's interpretation of "concerning" here. At least one other court has relied on *Appling* to determine the scope of "concerning" in § 6297(c). *See Berkeley*, 89 F.4th at 1103 (citing *Appling* for the proposition that "concerning" "has a broadening effect") (internal quotation marks omitted).

*Morales*, 504 U.S. at 384); *Gobeille*, 577 U.S. at 319–20. A law "refers to" a subject if the law "acts immediately and exclusively upon" it or if the subject's "existence . . . is essential to the law's operation[.]" *Gobeille*, 577 U.S. at 319–20 (quoting *Cal. Div. of Lab. Standards Enf't v. Dillingham Constr., N.A.*, 519 U.S. 316, 325 (1997)). And "to determine whether a state law has the forbidden connection, [a court must] look both to the objectives of the [federal] statute as a guide to the scope of the state law that Congress understood would survive, as well as to the nature of the effect of the state law on" the preempted subject matter. *Egelhoff v. Egelhoff ex rel. Breiner*, 532 U.S. 141, 147 (2001) (quoting *Dillingham*, 519 U.S. at 325).

Guided by this precedent, the Court finds that the BEPS concern the energy use or energy efficiency of covered products, and are thus preempted, if either (1) they "refer to" those subjects, that is, "act[] immediately and exclusively upon" covered products' energy use or energy efficiency or rely upon covered products' energy use or energy efficiency as "essential to [their] operation"; or (2) they have a sufficient "connection with" those subjects, considering Congress's preemptive intent and the nature and effect of the BEPS on covered products' energy use and energy efficiency. *See Dillingham*, 519 U.S. at 325.

### B.    Whether the BEPS "Refer To" or Have an Impermissible "Connection With" Covered Products' Energy Use or Energy Efficiency

For the reasons explained below, the BEPS do not "refer to" or have an impermissible "connection with" the "energy use" or "energy efficiency" of covered products. Thus, the BEPS are not preempted by EPCA.

#### 1.    "Refer To"

The BEPS "refer to" covered products' energy use or energy efficiency if they "act[] immediately and exclusively upon" the products' energy use or energy efficiency or if the energy

18

use or energy efficiency of covered products is "essential to [the BEPS'] operation."[8] *Gobeille*, 577 U.S. at 319–20 (quoting *Dillingham*, 519 U.S. at 325).

The Supreme Court recently applied this "refer to" test in an ERISA preemption case. In *Rutledge v. Pharmaceutical Care Management Association*, the Supreme Court considered whether an Arkansas law that required pharmacy benefit managers ("PBMs") to reimburse pharmacies for prescription drugs "at a price equal to or higher than that which the pharmacy paid to buy the drug from a wholesaler" was preempted by ERISA.[9] 592 U.S. 80, 84 (2020). "ERISA pre-empts 'any and all State laws insofar as they may now or hereafter relate to any employee benefit plan' covered by ERISA." *Id.* at 86 (quoting 29 U.S.C. § 1144(a)). The Supreme Court had to determine whether the Arkansas law "related to"—that is, "referred to" or "had a connection with"—ERISA plans. *See id.* at 83.

The Court concluded that the Arkansas law was not preempted by ERISA. *Id.* at 91–92. In relevant part, the Court reasoned that the Arkansas law did not "refer to" ERISA plans. The Arkansas law did "not act immediately and exclusively upon ERISA plans," the Court explained, "because it applie[d] to PBMs" irrespective of whether the PBMs managed a plan covered by ERISA. *Id.* at 88. In a similar vein, the Court concluded that ERISA plans were "likewise not essential to [the Arkansas law's] operation" because the law defined regulated PBMs to broadly encompass PBMs that serviced both ERISA plans and other healthcare plans that ERISA did not

---

[8] The analysis in this section applies equally to covered consumer products and covered industrial products.

[9] As the Supreme Court explained, "PBMs serve as intermediaries between prescription-drug plans and the pharmacies that beneficiaries use" by informing pharmacies about beneficiaries' coverage and copayment information and by reimbursing pharmacies for beneficiaries' prescriptions. *Rutledge*, 592 U.S. at 83–84. In turn, the PBMs are reimbursed by the beneficiaries' prescription-drug plans. *Id.* at 84.

19

cover, such as "Medicaid, Medicare, military, and market place plans." *Id.* at 89 & n.1. In other words, the law "regulat[ed] PBMs whether or not the plans they service[d] f[e]ll within ERISA's coverage." *Id.* at 89. Therefore, the Arkansas law did not "refer to" ERISA plans. In reaching its holding, the Court relied on two other cases that had employed similar reasoning to conclude that a state law did not "refer to" ERISA plans. *See Travelers*, 514 U.S. at 656 (New York law that imposed surcharges on "patients and HMO's, regardless of whether the commercial coverage or membership, respectively, [was] ultimately secured by an ERISA plan" did not "refer to" ERISA plans); *Dillingham*, 519 U.S. at 328 (California wage statute regulating apprenticeship programs that was "indifferent to the funding, and attendant ERISA coverage, of apprenticeship programs" did not "refer to" ERISA plans).

Consider another case, this one from the Second Circuit, that addressed whether a state regulation "relates to" the subject matter of another federal preemption clause. In *Metropolitan Taxicab Board of Trade v. City of New York*, the court considered whether New York City rules that imposed lower taxicab lease caps (i.e., "the maximum dollar amount per shift for which taxis can be leased") on "non-hybrid, non-clean diesel" taxis were preempted by an EPCA provision (not the preemption provisions at issue here) that forbids states from adopting laws or regulations "related to fuel economy standards[.]" 615 F.3d 152, 155–56 (2d Cir. 2010) (quoting 49 U.S.C. § 32919(a)). The court concluded that the rules were "related to" fuel economy standards because they "referred to" fuel economy standards. *Id.* at 157. This was so, the court reasoned, because the "rules expressly rel[ied] on a distinction between hybrid and non-hybrid vehicles": They required "that a taxi be a hybrid in order to qualify for [an] upwardly adjusted lease cap," which did "nothing more than draw a distinction between vehicles with greater or lesser fuel-efficiency." *Id.* Fuel

20

economy standards, the court found, were "essential to [the taxicab rules'] operation[.]" *Id.* Because the taxicab rules referred to fuel economy standards, they were preempted.

As these cases demonstrate, in determining whether the BEPS "refer to" the energy use or energy efficiency of covered products, the Court must ask whether the BEPS regulate buildings differently depending on the energy use or energy efficiency of the covered products in the buildings.[10] If the BEPS drew such a distinction—by, for example, imposing different greenhouse gas emissions benchmarks based on the energy efficiency of a building's appliances or by rendering the owners of buildings with less energy-efficient appliances ineligible for a waiver of the emissions requirements—the BEPS would be akin to the preempted New York City taxicab rules in *Metropolitan Taxicab*. They would regulate their objects differently depending on the subject matter of the preemption clause: In *Metropolitan Taxicab*, it was fuel economy standards; here, it is the energy use and energy efficiency of covered products.

But the BEPS do not work that way. The BEPS impose declining greenhouse gas emissions benchmarks on buildings across Maryland, ultimately requiring that all buildings subject to the BEPS achieve net-zero emissions by 2040. These emissions requirements do not change depending on the energy use or energy efficiency of covered products in those buildings. The BEPS do not draw a distinction between buildings with high-efficiency covered products and those with less-efficient covered products. To be sure, the BEPS do draw distinctions on other bases—such as the type of building or the financial health of its owner. A nightclub, for example, has different interim emissions benchmarks than a house of worship. A building subject to a tax lien may be eligible for a waiver of the emissions requirements that an unencumbered building could not obtain. But the

---

[10] Recall that "energy use" is defined as "the quantity of energy directly consumed . . . at point of use," and "energy efficiency" is defined as "the ratio of the useful output of services . . . to the [product's] energy use," *see* 42 U.S.C. §§ 6291(4)–(5).

BEPS do not distinguish between buildings that use high-efficiency covered products and those that do not. Like the Arkansas law at issue in *Rutledge*, which applied to PBMs "whether or not they manage[d] an ERISA plan," the BEPS' greenhouse gas emissions requirements apply to buildings regardless of how much energy their covered products use or how efficient those products are. *See Rutledge*, 592 U.S. at 88. Similarly, the energy use and energy efficiency of covered products are "not essential to [the BEPS'] operation." *See id.* The regulation's emissions requirements apply across the board to all buildings subject to the BEPS—without regard to the buildings' covered products. Thus, the BEPS do not "act[] immediately and exclusively upon" EPCA-covered products' energy use or energy efficiency, and the energy use or efficiency of EPCA-covered products is not "essential to [the BEPS'] operation." *See Gobeille*, 577 U.S. at 319–20 (quoting *Dillingham.*, 519 U.S. at 325).

Thus, the BEPS do not "refer to" the energy efficiency or energy use of covered products.

### 2.    "Connection With"

The Court now turns to the more difficult question: Do the BEPS have a forbidden "connection with" the energy use or energy efficiency of EPCA-covered products? In considering this question, the Court must "look both to the objectives of the [federal] statute as a guide to the scope of the state law that Congress understood would survive, as well as to the nature of the effect of the state law on" the energy use and energy efficiency of covered products. *See Egelhoff*, 532 U.S. at 147 (quoting *Dillingham*, 519 U.S. at 325). To discern the objectives of EPCA's preemption provisions, the Court considers their texts, their titles, their broader statutory schemes, and their legislative histories. *See, e.g.*, *Gobeille*, 577 U.S. at 321–23 (considering ERISA's "extensive" "reporting, disclosure, and recordkeeping requirements" as guide to Congress's preemptive intent); *Rowe*, 552 U.S. at 370, 373 (considering legislative history of FAAAA in

discussing Congress's preemptive purpose); *Ass'n of Contracting Plumbers of City of New York, Inc. v. City of New York*, No. 23-CV-11292 (RA), 2025 WL 843619, at *6 (S.D.N.Y. Mar. 18, 2025) (considering statutory scheme and title of § 6297(c) in determining Congressional objectives), *appeal docketed*, No. 25-977 (2d Cir. Apr. 21, 2025); *see also Yates v. United States*, 574 U.S. 528, 540 (2015) (plurality opinion) (explaining that statutory headings, while "not commanding," "supply cues" as to Congress's intent). Because EPCA's preemption provisions for covered consumer products and covered industrial products vary slightly in these respects, the Court analyzes them separately.

### a.    Covered Consumer Products

The Court first determines whether the BEPS have an impermissible "connection with" the energy use or energy efficiency of covered consumer products.

MDOE argues this analysis should begin and end with § 6297(c)'s title. "'[T]he title of a statute and the heading of a section' are 'tools available for the resolution of a doubt' about the meaning of a statute." *Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998) (quoting *Bhd. of R.R. Trainmen v. Balt. & Ohio R.R.*, 331 U.S. 519, 528–29 (1947)). Section 6297(c) is titled "General rule of preemption for energy conservation standards when Federal standard becomes effective for product." EPCA defines "energy conservation standard" as "a performance standard which prescribes a minimum level of energy efficiency or a maximum quantity of energy [or water] use . . . determined in accordance with test procedures prescribed under section 6293 of this title; or . . . a design requirement for" certain covered consumer products. 42 U.S.C. § 6291(6). Thus, according to § 6297(c)'s title, Congress sought to preempt state regulations that set an energy efficiency floor or an energy use ceiling for covered consumer products or otherwise seek to modify their design.

23

There is some support in § 6297(c)'s broader statutory scheme for the notion that Congress intended to preempt state energy conservation standards. Section 6297(c) is found in a part of EPCA titled "Energy Conservation Program for Consumer Products Other than Automobiles" (42 U.S.C. §§ 6291–6309). That part establishes comprehensive federal energy conservation standards for covered consumer products, *see id.* § 6295, imposes reporting and labeling requirements on manufacturers of covered consumer products regarding the products' energy consumption, *see id.* §§ 6294, 6296, and with limited exceptions, bars the distribution in commerce of covered consumer products that do not conform to federal energy conservation standards, *see id.* § 6302(a)(5). From these parts of EPCA, it is clear that Congress sought to impose nationwide energy conservation standards for covered consumer products and to maintain a tight grip over those products' manufacture and distribution. Allowing states to set their own standards for covered consumer products' energy use or efficiency would upset this carefully crafted scheme.

If the Court were to stop its analysis at the preemption provision's title, as MDOE urges, and find that § 6297(c) preempts energy conservation standards and nothing else, the conclusion that the BEPS lack the forbidden "connection with" energy use and energy efficiency of covered consumer products would be inescapable. This is because the BEPS do not set a floor for the energy efficiency of covered consumer products or impose a ceiling on how much electricity or fossil fuels a covered consumer product may use. And they do not require that covered consumer products be designed in any particular way. Thus, the BEPS are not an "energy conservation standard," as EPCA defines that term. If the analysis were that simple, the BEPS clearly would be the sort of state regulation "that Congress understood would survive[.]" *See Egelhoff*, 532 U.S. at 147 (quoting *Dillingham*, 519 U.S. at 325).

The analysis, however, is not so simple. MDOE overlooks other parts of the statutory scheme that indicate Congress intended § 6297(c) to sweep more broadly than just energy conservation standards. Consider afresh the language of § 6297(c) itself. If Congress truly intended to limit § 6297(c)'s preemption to energy conservation standards, it easily could have said so in the text of the statute—not just the title. After all, "energy conservation standard" is defined in EPCA as a standalone term. *See* 42 U.S.C. § 6291(6). Section 6297(c) could have read: "No State energy conservation standard of such covered product shall be effective with respect to such product." But instead, it reads: "[N]o State regulation *concerning the energy efficiency, energy use or water use* of such covered product shall be effective with respect to such product[.]" *Id.* § 6297(c) (emphasis added). The Court may not disregard the statutory text. *See Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998) ("[T]he title of a statute . . . cannot limit the plain meaning of the text.") (alterations in *Yeskey*) (quoting *Trainmen*, 331 U.S. at 519). Also consider the language of § 6297's waiver provision: "Any State . . . which provides for any energy conservation standard *or other requirement* with respect to energy use [or] energy efficiency" of a covered consumer product may seek a preemption waiver from the Secretary of Energy. 42 U.S.C. § 6297(d)(1)(A) (emphasis added). If states need a preemption waiver to enforce "other requirement[s]" aside from energy conservation standards, that suggests that § 6297(c) preempts more than just energy conservation standards. Thus, the title of § 6297(c) notwithstanding, the Court cannot conclude that § 6297(c) preempts only state energy conservation standards.

Turning its focus from the title of § 6297(c) to the text, MDOE argues that § 6297(c)'s preemptive scope is narrowed by the words "with respect to." Recall that § 6297(c) states that a regulation "concerning the energy efficiency [or] energy use" of a covered consumer product "shall [not] be effective with respect to" that product. For support, MDOE relies on the Supreme

Court's decision in *Dan's City*. There, the Court held that the words "with respect to," as used in the FAAAA's preemption clause, "'massively limit[ed] the scope of preemption' ordered by the FAAAA." 569 U.S. at 261 (quoting *City of Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424, 449 (2002) (Scalia, J., dissenting)). MDOE overlooks a key difference in how § 6297(c) and the FAAAA's preemption clause are written. The latter provides that "[a] State . . . may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier . . . with respect to the transportation of property." 49 U.S.C. § 14501(c)(1). There, "with respect to" limits the scope of preemption, as the Supreme Court recognized, because it modifies "law, regulation, or other provision"—adding an additional condition that a law must satisfy before it may be preempted. In § 6297(c), on the other hand, "with respect to" modifies "effective"—signaling simply that a preempted regulation is not "effective with respect to" a covered consumer product. In this context, "with respect to" neither limits nor illuminates the universe of regulations that are preempted in the first place.

Other parts of § 6297's statutory scheme shed more light. Most illuminating, for purposes of this case, are the provisions that apply to building codes, which signal Congress's intent about the preemption of building regulations such as the BEPS.

Section 6297 contains an exception to preemption for certain building codes. *See* 42 U.S.C. § 6297(f)(3). This exception, of course, does not "delineate the scope" of the preemption clause. *Dan's City*, 569 U.S. at 264. But the Court may look to this exception as an "interpretive guide," *see id.*—a way of illuminating the "domain" of building regulations that Congress sought to preempt, *see Cipollone*, 505 U.S. at 517.[11]

---

[11] The parties dispute whether the BEPS qualify as a "building code" under § 6297(f). The Court need not resolve that question. The building code exception to § 6297(c) is relevant because of what it tells us about the scope of state laws—including building regulations—that Congress

Section 6297(f)(3) provides that, once a federal energy conservation standard for a covered consumer product goes into effect, "a regulation or other requirement contained in a State or local building code for new construction concerning the energy efficiency or energy use of [that] covered [consumer] product" is not preempted if the following requirements are met:

(A) The code permits a builder to meet an energy consumption or conservation objective for a building by selecting items whose combined energy efficiencies meet the objective.

(B) The code does not require that the covered [consumer] product have an energy efficiency exceeding the applicable energy conservation standard established in or prescribed under section 6295 of this title, except that the required efficiency may exceed such standard up to the level required by a regulation of that State for which the Secretary has issued a rule granting a waiver under subsection (d).

(C) The credit to the energy consumption or conservation objective allowed by the code for installing covered [consumer] products having energy efficiencies exceeding such energy conservation standard established in or prescribed under section 6295 of this title or the efficiency level required in a State regulation referred to in subparagraph (B) is on a one-for-one equivalent energy use or equivalent cost basis.

(D) If the code uses one or more baseline building designs against which all submitted building designs are to be evaluated and such baseline building designs contain a covered [consumer] product subject to an energy conservation standard established in or prescribed under section 6295 of this title, the baseline building designs are based on the efficiency level for such covered [consumer] product which meets but does not exceed such standard or the efficiency level required by a regulation of that State for which the Secretary has issued a rule granting a waiver under subsection (d).

(E) If the code sets forth one or more optional combinations of items which meet the energy consumption or conservation objective, for every combination which includes a covered [consumer] product the efficiency of which exceeds either standard or level referred to in subparagraph (D), there also shall be at least one combination which includes such covered [consumer] product the efficiency of which does not exceed such standard or level by more than 5 percent, except that at least one combination shall include such covered [consumer] product the efficiency of which meets but does not exceed such standard.

---

understood would be preempted. The *Building* Energy Performance Standards are indisputably a building regulation—regardless of whether they are a "building code."

27

(F) The energy consumption or conservation objective is specified in terms of an estimated total consumption of energy (which may be calculated from energy loss- or gain-based codes) utilizing an equivalent amount of energy (which may be specified in units of energy or its equivalent cost).

(G) The estimated energy use of any covered [consumer] product permitted or required in the code, or used in calculating the objective, is determined using the applicable test procedures prescribed under section 6293 of this title, except that the State may permit the estimated energy use calculation to be adjusted to reflect the conditions of the areas where the code is being applied if such adjustment is based on the use of the applicable test procedures prescribed under section 6293 of this title or other technically accurate documented procedure.

*Id.*

To state the obvious: This building code exception tells us that Congress did not intend to preempt building codes that meet the exception's criteria. But what does the exception tell us about the scope of state regulations that Congress *did* intend to preempt? It tells us that Congress wanted to preempt (at a minimum) state or local building codes that set an "objective" for "energy consumption" or "conservation" and do so in a way that mandates the installation of high-efficiency appliances. *See id.*; *see also Berkeley*, 89 F.4th at 1125 (Friedland, J., dissenting from denial of rehearing en banc) (citing § 6297(f) for the proposition that "EPCA contemplates preempting building codes that set building-wide energy efficiency standards that can only be met through the use of hyper-efficient appliances").

The legislative history of the building code exception to § 6297(c) confirms this conclusion. *See Travelers*, 514 U.S. at 657 (consulting legislative history of ERISA to gauge congressional intent for preemption provision); *Rowe*, 552 U.S. at 373 (same for FAAAA). The Senate report on NAECA states that "the limited requirements" of § 6297(f)(3) "are designed to ensure the performance-based building codes cannot circumvent the federal standard for a given covered product by effectively requiring the installation of such product with an efficiency exceeding the applicable Federal standards or State standards for which a waiver from preemption

28

JA029

has been obtained." *See* S. Rep. No. 100–6, at 11. This legislative history of the building code exception to preemption confirms that Congress wanted to ensure that state building codes could not frustrate national uniformity in appliance standards by requiring the installation of products whose efficiencies exceeded federal standards.[12] Those types of building codes are not excepted from preemption.

Another provision in § 6297(f) also signals that Congress intended to preempt state regulations that require the installation of covered products whose energy efficiency exceeds federal standards. Section 6297(f)(4) provides that, while states generally do not need to petition the Secretary of Energy to enforce their building codes, states may not enforce a building code without first obtaining a preemption waiver from the Secretary of Energy if the code "requires the installation of covered [consumer] products with efficiencies exceeding" the federal standard. 42 U.S.C. § 6297(f)(4)(B). This prohibition against a state's enforcement of certain building codes, without first obtaining a waiver, evinces Congress's concern that states would misuse their building codes to require the installation of high-efficiency products. Section 6297(f)(4) is further evidence of Congress's intent to preempt such building codes.

These building code provisions within § 6297(c)'s statutory scheme illuminate the kinds of building regulations that Congress intended to preempt: regulations that mandate the installation of high-efficiency appliances. The BEPS are not such a regulation. They do not require the installation of more energy-efficient appliances in buildings. To comply with the BEPS' greenhouse gas emissions standards, building owners need not replace their appliances at all.

---

[12] This concern is reflected in Congress's overarching purpose in enacting NAECA. With NAECA, Congress sought "to counteract . . . systems of separate state appliance standards . . . which [had] caused appliance manufacturers to be confronted with 'a growing patchwork of differing State regulations which would increasingly complicate their design, production and marketing plans.'" *Air Conditioning*, 410 F.3d at 500 (quoting S. Rep. No. 100–6, at 4).

JA030

Owners can comply in other ways, including by paying a yearly compliance fee—an option that would not require replacement of a single appliance. Moreover, there are still other ways of complying with the standards, such as the installation of carbon-capture technology.[13] Because the BEPS do not require building owners to install appliances whose energy efficiencies exceed federal standards, they are not like the building codes that Congress intended to preempt.

The plaintiffs agree that the Court may consider the building code provisions in § 6297 as a useful interpretive tool to discern the type of building regulations that Congress intended to preempt under § 6297(c). But that is where the plaintiffs' agreement with the Court's analysis ends. In the plaintiffs' view, these building code provisions *help*, rather than hurt, their case. As they see it, the building code exception in § 6297(f)(3) *proves*, rather than disproves, that Congress intended to preempt a regulation like the BEPS. Their argument goes like this. They argue (correctly) that the BEPS do not satisfy the exception's requirements. Because the BEPS do not satisfy these requirements, the BEPS are not excepted from preemption. And because the BEPS are not excepted from preemption, they must be preempted. *See* ECF 36, ¶ 71 ("The . . . BEPS do not meet all seven requirements listed in Section 6297(f)(3) and are therefore preempted."). This argument is a fallacy. "Exceptions to a general rule, while sometimes a helpful interpretive guide, do not in themselves delineate the scope of the rule." *Dan's City*, 569 U.S. at 264. The mere fact that a regulation does not satisfy the criteria for a preemption exception does not mean the regulation is preempted.

---

[13] According to Amicus Public Health Law Center, "weatherization measures like insulation and ventilation improvements" also may reduce a building's emissions. ECF 52, at 6. MDOE plans to convene a working group "to identify how to account for differing sources of onsite emissions like biofuels in the performance standards" before 2030. *See Response to Comments*, at 41.

Indeed, if anything, assessing the BEPS against the criteria for the building code exception—as the plaintiffs encourage the Court to do—demonstrates how far afield the BEPS are from the type of building regulation Congress intended to preempt. Comparing the BEPS to § 6297(f)(3)'s criteria is like trying to fit a square peg into a round hole. Consider the first criterion: "The code permits a builder to meet an *energy consumption or conservation objective* for a building by selecting items whose combined energy efficiencies meet the objective." 42 U.S.C. § 6297(f)(3)(A) (emphasis added). Or the third: "The credit to the *energy consumption or conservation objective* allowed by the code for installing covered [consumer] products having energy efficiencies exceeding [the federal] energy conservation standard . . . is on a one-for-one equivalent energy use or equivalent cost basis." *Id.* § 6297(f)(3)(C) (emphasis added). These criteria cannot sensibly be applied to the BEPS. They presume that a building code being assessed against the criteria sets an "objective" for a building's "energy consumption" or "conservation." They also presume that the building code prescribes means of achieving the objective that may or may not require installation of high-efficiency products. But the BEPS do not set an objective for energy consumption or conservation at all, much less one that can be accomplished only through the installation of high-efficiency products. The square peg (the BEPS) cannot fit into the round hole (the exception to preemption). This is evidence that the BEPS are not the type of building regulation that Congress understood would need an exception to preemption in the first place. Put slightly differently, the BEPS are not the type of regulation that Congress intended to preempt.[14]

---

[14] The Court notes, however, an important caveat. It appears from MDOE's response to public comments on the BEPS that—in compliance with its statutory mandate—MDOE intends to update the BEPS to include "energy use intensity" targets that may push building owners to install more efficient products. *See, e.g., Response to Comments*, at 42–43 (explaining that the General Assembly required the BEPS to include energy use intensity standards and that MDOE intends to adopt such standards in 2027 and recommending that building owners "not install[] any inefficient electric equipment in anticipation of this energy efficiency standard being adopted"). The current

In sum, a close examination of § 6297's statutory scheme, including its building code provisions, reveals that—at least with respect to building regulations such as the BEPS—the "domain" Congress sought to preempt, *Cipollone*, 505 U.S. at 517, consists of building regulations that require building owners to swap out less-efficient appliances for appliances whose efficiencies exceed federal standards. The BEPS are not such a regulation. Thus, considering "the objectives of the [federal] statute as a guide to the scope of the state law that Congress understood would survive," *Egelhoff*, 532 U.S. at 147 (quoting *Dillingham*, 519 U.S. at 325), the Court finds that the BEPS are a regulation that Congress understood would survive a preemption challenge. They do not have a forbidden "connection with" the energy use or energy efficiency of EPCA-covered consumer products.

### b.    Covered Industrial Products

The Court next considers whether the BEPS have an impermissible "connection with" the energy use or energy efficiency of covered industrial products.

Section 6316(b)(2)(A) was enacted just five years after § 6297(c). It provides that federal standards for covered industrial products "shall, beginning on the effective date of such standard, supersede any State or local regulation *concerning the energy efficiency or energy use* of [those] product[s.]"[15] 42 U.S.C. § 6316(b)(2)(A) (emphasis added). This provision contains substantially identical language to § 6297(c). *See Air Conditioning*, 410 F.3d at 500 (explaining that in passing the Energy Policy Act of 1992, Congress, "with a few subtle distinctions," largely "incorporated

---

version of the BEPS does not include "energy use intensity" targets, and the Court expresses no view on whether any future version of the BEPS that includes such a requirement would be preempted by EPCA in whole or in part.

[15] Unlike § 6297(c), § 6316(b)(2)(A) has no subsection-specific title that might illuminate its meaning, and the legislative history of the Energy Policy Act of 1992, which added § 6316(b)(2)(A) to EPCA, "is silent on preemption." *Air Conditioning*, 410 F.3d at 500.

32

the preemption provisions of . . . § 6297"). "When Congress uses the same language in two statutes having similar purposes, particularly when one is enacted shortly after the other, it is appropriate to presume that Congress intended that text to have the same meaning in both statutes." *Smith v. City of Jackson*, 544 U.S. 228, 233 (2005). Because the two preemption provisions use substantially the same language and have a similar purpose, the Court presumes Congress intended them to have the same meaning. Thus, the Court's preemption analysis of § 6297(c) applies equally to § 6316(b)(2)(A). For the same reasons the BEPS are not preempted under § 6297(c), they are not preempted under § 6316(b)(2)(A).

The BEPS are not preempted by EPCA.[16]

### 3.    The Plaintiffs' Counterarguments

The plaintiffs' arguments to the contrary are unpersuasive.

The plaintiffs argue that the BEPS are preempted by EPCA because the BEPS "restrict[]" the use of gas appliances. ECF 55, at 20. In the plaintiffs' view, the BEPS "regulate [gas] appliances' energy use and energy efficiency by restricting—and ultimately prohibiting entirely—[the] necessary byproducts of their use of gas energy," i.e., carbon dioxide and other gases. *Id.* at

---

[16] The parties spill much ink disputing whether "energy use," as EPCA defines the term, refers to a fixed characteristic of a covered product when it is manufactured or whether it refers to a covered product's actual use of energy by a consumer. This question of statutory interpretation divided the Ninth Circuit when it decided an EPCA preemption case two years ago. *See Berkeley*, 89 F.4th at 1101–02 (panel opinion); *id.* at 1121–22 (Friedland, J., dissenting from denial of rehearing en banc). This Court need not weigh in on the question here because the analysis in this case does not turn on this nuance in the meaning of "energy use." Regardless of whether "energy use" refers to a fixed or mutable characteristic of a covered product, the BEPS are not preempted by EPCA because (i) the BEPS do not distinguish between buildings with high-efficiency covered products and those with less-efficient covered products and the emissions requirements do not depend on the energy efficiency or energy use of a building's covered products; and (ii) the BEPS do not require building owners to use more energy-efficient products at all. Thus, regardless of whether "energy use" means what the plaintiffs urge or what MDOE urges, the BEPS do not "refer to" or have a forbidden "connection with" the energy use or energy efficiency of EPCA-covered products.

19–20. This regulation of the byproducts of gas appliances is, according to the plaintiffs, a regulation of the energy use and energy efficiency of gas appliances. Thus, the plaintiffs believe the BEPS "concern" the "energy use" of an EPCA-covered product—gas appliances—and are preempted by EPCA.

In support of this argument, the plaintiffs rely on the U.S. Court of Appeals for the Ninth Circuit's recent decision in *California Restaurant Association v. City of Berkeley*. There, the Ninth Circuit held that a City of Berkeley ordinance prohibiting natural gas piping in newly-constructed buildings was preempted by EPCA because it "concerned" the "energy use" of EPCA-covered gas appliances. *Berkeley*, 89 F.4th at 1101. This was so, the court reasoned, because the ordinance prevented consumers from using natural-gas-powered appliances where the consumers would otherwise be able to; thus, the ordinance necessarily restricted the "quantity of energy" those appliances could use at their "point of use," i.e., the place they were used. *Id.* at 1101–03. The court emphasized, however, that its holding was a narrow one: "We only decide that EPCA's preemptive scope applies to building codes that regulate the gas usage of covered appliances on premises where gas is otherwise available." *Id.* at 1103.

To hear the plaintiffs tell it, the BEPS are analogous to the ordinance at issue in *Berkeley* because they "limit" and "penalize" the use of gas appliances. ECF 55, at 28. But even assuming *Berkeley* bound this Court—which it does not—the plaintiffs' reliance on *Berkeley* rests on a faulty premise. The BEPS do not restrict or prohibit the use of gas appliances in the way the *Berkeley* Court deemed problematic. A regulated party subject to the BEPS need not abandon their gas appliances or even use them less. They can reduce a building's emissions in other ways, such as

by installing carbon-capture technology.[17] Or, if they wish, they can pay a predetermined fee for every ton of emissions they emit in excess of the BEPS' benchmarks. In these respects, the BEPS are meaningfully distinct from the ordinance at issue in *Berkeley*. Far from imposing any requirements that would constrain a building owner's ability to use otherwise-available gas (like the gas-piping restrictions at issue in *Berkeley*), the BEPS instead set greenhouse gas emissions benchmarks that can be met in a variety of ways—or not met at all, if one opts instead to pay a fee. This means that a building may continue using gas at its current rate while remaining in full compliance with the regulation.

Perhaps recognizing the problem that the alternative compliance fee poses for their argument, the plaintiffs characterize the fee as a penalty on building owners who do not replace their gas appliances. Many building owners, the plaintiffs argue, cannot afford to replace their gas appliances, and if they do not, they cannot meet the emissions benchmarks and must pay a compliance fee. The compliance fee, the plaintiffs insist, effectively penalizes building owners for not replacing their gas appliances. As the plaintiffs see it, this "penalty" is tantamount to a gas ban.

---

[17] The plaintiffs state that "presumably," "the installation of [carbon-capture] technology . . . would have to be considered when designing and manufacturing EPCA-covered products—precisely the kind of factory-floor complications that . . . EPCA preemption was designed to prevent." ECF 55, at 31. This is not "presumable." Even a quick internet search discloses examples of carbon-capture technology that can be installed in buildings without any apparent need to modify the design of existing appliances. *See, e.g.*, *Fit Guide*, CarbinX, https://www.carbinx.com/buy-carbinx [https://perma.cc/GC4B-T43P] (last visited Mar. 31, 2026) (marketing a carbon-capture unit "roughly the size of two refrigerators" that can be installed in mechanical rooms and "is compatible with UL category 1, 2 and 3 vented natural-gas heating appliances"); Paul Daling, *Innovation turns building vents into carbon-capture devices*, Univ. of Chicago Pritzker Sch. of Molecular Eng'g (Nov. 11, 2025), available at https://pme.uchicago.edu/news/innovation-turns-building-vents-carbon-capture-devices (describing recently-developed "carbon nanofiber direct air capture" filter that could be integrated into buildings' ventilation systems and "potentially turn every home, office, school or other building into a small carbon-capture system"). The plaintiffs offer no support for their assertion that carbon-capture technology requires making alterations to the design of appliances themselves, and the Court cannot take judicial notice of this presumed "fact."

The plaintiffs are incorrect. A monetary assessment is a penalty "only if it is sought for the purpose of punishment, and to deter others from offending in like manner." *Gonzalez v. Sessions*, 894 F.3d 131, 138 (4th Cir. 2018) (quoting *Kokesh v. S.E.C.*, 581 U.S. 455, 462 (2017)). Nothing about the BEPS' alternative compliance fee suggests that it qualifies, literally or functionally, as a penalty. The alternative compliance fee is assessed at the same rate for all who pay it. It is not imposed as a sanction for a violation of the BEPS. *See id.* ("To properly advance the[] punitive goals of retribution and deterrence, a particular punishment or penalty must account for the culpability flowing from the actor's underlying conduct."). It is, rather, an elective option—a *means of complying* with the law rather than a punishment for violating it. Moreover, as amicus Public Health Law Center observes, there is a preexisting penalty scheme under Maryland law for violating regulations such as the BEPS. *See* ECF 52, at 6. The state may pursue fines running into the tens of thousands of dollars against violators. *See* Md. Code Ann., Env't §§ 2-610, 2-610.1. There is no indication that the BEPS' alternative compliance fee was intended to supplant this penalty scheme.

True, as the plaintiffs argue, for some building owners, it may ultimately be more cost-effective to replace their gas appliances. But not even the *Berkeley* Court went so far as to conclude that EPCA preempts regulations that merely discourage gas usage. As one member of the panel explained in concurrence, "EPCA preemption is unlikely to reach a host of state and local regulations that incidentally impact" covered products' gas usage. *See Berkeley*, 89 F.4th at 1117 (Baker, J., concurring). Indeed, Judge Baker observed in his concurrence that "states and local governments are likely free to impose carbon taxes designed to discourage such consumption." *Id.* If that is so, it strains credulity to suggest that Maryland could not structure its building regulations in such a way as to render alternatives to gas appliances a more financially attractive option.

For plaintiffs with financial constraints, phasing out gas appliances may be the only feasible option. For them, the BEPS may effectively require, not merely encourage, the abandonment of gas appliances. Even if that meant the BEPS were preempted for those plaintiffs, the plaintiffs have brought a facial challenge: They ask this Court to find there is no set of circumstances under which the BEPS would be lawful under EPCA. To succeed on their facial challenge, the plaintiffs cannot point to *some* circumstances under which the BEPS would be preempted. Instead, they must plausibly allege that the BEPS would be preempted under *every* circumstance. *See, e.g.*, *Cal. Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572, 593 (1987) ("To defeat Granite Rock's facial [preemption] challenge [to the California Coastal Commission's permit requirement], the Coastal Commission needed merely to identify a possible set of permit conditions not in conflict with federal law."); *Iowa Migrant Movement for Just. v. Bird*, 157 F.4th 904, 919 (8th Cir. 2025) (noting that to defeat plaintiffs' preemption challenge to Iowa law, defendant needed to "show only that the Act '[was] constitutional in some of its applications'") (quoting *United States v. Rahimi*, 602 U.S. 680, 693 (2024)). They have not done so here. By the plaintiffs' own allegations, at least some of them *do* have a choice (albeit one they would rather not make) between replacing their gas appliances and pursuing another compliance option. *See, e.g.*, ECF 36 ¶ 14 (stating that members of Building Owners and Managers of Greater Baltimore "will incur costs in replacing existing gas appliances in order to comply with the . . . BEPS *or* will be forced to" pay the compliance fee) (emphasis added); *id.* ¶ 24 (stating that "[f]or those buildings that cannot comply with the . . . BEPS in an economically viable manner, *the best of a bad series of options* may be" to install "new structures, at great cost") (emphasis added). That dooms their facial preemption challenge.

The plaintiffs' challenge to the BEPS on federal preemption grounds fails.

JA038

**IV. Conclusion**

For the foregoing reasons, the BEPS are not a regulation "concerning the energy efficiency [and] energy use" of consumer and industrial appliances covered by EPCA's preemption provisions, 42 U.S.C. §§ 6297(c) and 6316(b)(2)(A). The BEPS are not preempted by EPCA. MDOE's motion to dismiss is granted. This case is dismissed with prejudice because there are no facts the plaintiffs can allege to establish that EPCA preempts the BEPS. A separate Order follows.

Date: April 2, 2026

Deborah L. Boardman
United States District Judge

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

MARYLAND BUILDING INDUSTRY    *
ASSOCIATION, INC., *et al.*,

    *

     Plaintiffs,

    *

v.              Civ. No. DLB-25-113

    *

SERENA COLEMAN MCILWAIN, *in her*
*official capacity as Secretary of the Maryland* *
*Department of the Environment*,

    *

     Defendant.

### MEMORANDUM OPINION

In 2024, the Maryland Department of the Environment ("MDOE") adopted Building Energy Performance Standards ("BEPS"), which set greenhouse gas emissions targets for certain state-owned, commercial, and multifamily residential buildings in Maryland. The BEPS require the buildings to have net-zero greenhouse gas emissions by 2040.

The BEPS were not well-received by some in the Maryland building and energy industry. A group of condominium, construction, real estate, and cooperative housing associations, as well as utilities, brought this action against MDOE arguing that the BEPS are preempted by express preemption provisions in the Energy Policy and Conservation Act ("EPCA"), 42 U.S.C. §§ 6201–6422. EPCA imposes, among other things, federal energy efficiency standards for consumer and industrial appliances such as dishwashers, kitchen ranges, and air conditioners. To ensure national uniformity on those matters, EPCA expressly preempts state regulations "concerning" the "energy efficiency" and "energy use" of EPCA-covered appliances. 42 U.S.C. §§ 6297(c) & 6316(b)(2)(A). The plaintiffs seek a declaration that the BEPS are preempted by EPCA and an injunction blocking their enforcement. MDOE has moved to dismiss the plaintiffs' complaint for failure to state a

claim. Because the BEPS are not preempted by EPCA, the motion to dismiss is granted.

## I. Background

### A. The BEPS

On April 9, 2022, Maryland enacted the Climate Solutions Now Act of 2022, 2022 Md. Laws Ch. 38 ("Act"). The Act requires MDOE to "develop building energy performance standards for covered buildings that achieve . . . [a] 20% reduction in net direct greenhouse gas emissions on or before January 1, 2030 . . . and . . . [n]et-zero direct greenhouse gas emissions on or before January 1, 2040." Md. Code Ann., Env't § 2-1602(a).

In compliance with its statutory mandate, MDOE promulgated the BEPS, which were adopted on December 23, 2024. As relevant here, the BEPS require all "covered buildings" to meet certain "net direct emissions" standards for the periods 2030–2034 and 2035–2039 and ultimately to achieve net-zero emissions by 2040. *See* Md. Code Regs. ("COMAR") 26.28.03.02(A), (D).[1] Subject to certain exceptions, a "covered building" is:

> a building that is a commercial or multifamily residential building in the State of Maryland or is owned by the State of Maryland and has a gross floor area of 35,000 square feet or more, excluding the parking garage area, and is (i) A single building; (ii) One or more buildings held in the condominium form of ownership with a combined gross floor area of 35,000 square feet or more, excluding the parking garage area, and governed by a single board of managers; or (iii) Two or more buildings with a combined gross floor area of 35,000 square feet or more, excluding the parking garage area, that are served in whole or in part by the same electric or gas meter or are served by the same heating or cooling system or systems, which is not a district energy system.

---

[1] The BEPS also impose detailed reporting, disclosure, and recordkeeping requirements concerning a building's energy consumption and energy efficiency. *See generally* COMAR 26.28.02. Though the plaintiffs claim that the BEPS as a whole are preempted by EPCA, they make no substantive argument that these particular provisions are preempted. They focus instead on the BEPS' emissions standards. The Court will do the same.

COMAR 26.28.01.02(15). The BEPS define "net direct emissions" as "(i) The sum of all direct greenhouse gas emissions from a covered building; or (ii) For a covered building connected to a district energy system, direct greenhouse gas emissions plus the greenhouse gas emissions attributable to thermal energy inputs from the district energy system used by the covered building[.]" COMAR 26.28.01.02(31). The BEPS in turn define "direct greenhouse gas emissions" as "greenhouse gas emissions produced on-site by covered buildings, as calculated by the benchmarking tool"—i.e., the U.S. Environmental Protection Agency's ENERGY STAR Portfolio Manager or any federally-approved successor—"unless otherwise specified by" MDOE. COMAR 26.28.01.02(17), 26.28.01.02(10).

Different types of covered buildings have different interim emissions benchmarks. For example, a building classified as a "Bar/Nightclub" is limited to 1.7 Kg CO2e (kilograms of carbon dioxide equivalent) per square foot in net direct emissions for the 2030–2034 period, whereas a building classified as a "Worship Facility" is limited to 0.87 Kg CO2e per square foot in net direct emissions for the same period. COMAR 26.28.03.02. By 2040, however, all non-exempt covered buildings must reduce their net direct emissions to zero. *Id.*

In lieu of achieving these standards, the owner of a covered building "shall come into compliance" with the standards by paying a yearly "alternative compliance fee" "for every metric ton of net direct emissions in excess of the net direct emissions standard in a given calendar year." COMAR 26.28.04.01(A). The BEPS dub this fee an "Alternative Compliance Pathway." *Id.* The fee, which is measured in 2020 dollars adjusted for inflation, starts at $230 per metric ton for 2030 and increases by $4 per metric ton every year thereafter. *Id.* The BEPS also allow owners of covered buildings to apply for yearlong exemptions from the emissions standards on certain grounds, such as "financial distress" (defined by the BEPS to include situations where, for

3

instance, a property is subject to a tax lien or is controlled by a court-appointed receiver). COMAR 26.28.04.02(A), 26.28.01.02(22).

Before the BEPS were issued, MDOE sought public comment, as Maryland law required. During the public comment period, some commenters expressed concern that the BEPS' emissions standards did not "include a provision for carbon capture" and requested that renewable natural gas, hydrogen, and biofuels be included as an option for achieving compliance with the standards. *See* MDOE, Air & Radiation Admin., *Response to Comments On the Proposed Regulations under COMAR 26.28*, at 41, https://mde.maryland.gov/programs/regulations/air/Documents/Hearings/ BEPS%20RTC%20December%202024%20Final%20Draft.pdf ("*Response to Comments*").[2] In response, MDOE "acknowledge[d] that carbon capture can play a role in reducing direct emissions from buildings" and pledged to convene a working group to "identify how to account for differing sources and sinks of onsite emissions like carbon capture in the performance standards" before 2030. *Id.*

### B.    EPCA

EPCA was enacted in 1975 "as part of a 'comprehensive national energy policy'" following a 1973–1974 oil embargo by certain petroleum-producing countries. *Nat. Res. Def. Council, Inc. v. Herrington*, 768 F.2d 1355, 1362, 1364 (D.C. Cir. 1985) (quoting S. Rep. No. 94–516, at 116 (1975)). The statute "was designed, in part, to reduce the United States' 'domestic energy consumption through the operation of specific voluntary and mandatory energy conservation programs.'" *Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*,

---

[2] MDOE asks the Court to take judicial notice of MDOE's response to public comments on the proposed BEPS. ECF 49-1, at 10 n.2. The plaintiffs do not object. The Court takes judicial notice of this public document and considers it when deciding the motion to dismiss. *See Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).

410 F.3d 492, 498–99 (9th Cir. 2005) (quoting S. Rep. No. 94–516, at 117). EPCA sought to achieve this end by authorizing energy efficiency standards and prescribing labeling requirements for "major home appliances and certain other consumer products," in hopes that "better informed consumers and voluntary efforts by manufacturers would make energy efficiency standards unnecessary." *Id.* at 499 (quoting S. Rep. No. 94–516, at 118). As originally enacted, EPCA "preempted state regulations insofar as they were 'other than' the applicable federal rules for testing and labeling" but "allowed state regulations that differed from the federal regulations" if they "were justified by a substantial state or local need, did not interfere with interstate commerce, and were more stringent than the federal standard." *Id.* (citing Pub. L. No. 94–163, §§ 327(a)(1), 327(b)(2), 89 Stat. 871, 927 (1975)).

In 1978, Congress amended EPCA with the National Energy Conservation and Policy Act ("NECPA"), which "required the [Department of Energy] to prescribe minimum energy efficiency standards for thirteen covered products" and allowed states "to prescribe regulations more stringent than federal regulations . . . *only* if the Secretary [of Energy] found there was a significant state or local interest to justify the state's regulation" and that regulation "would not unduly burden interstate commerce." *Id.* (citing Pub. L. No. 95–619, § 424(a), 92 Stat. 3206, 3264 (1978)). Despite this statutory directive, the Department of Energy declined to promulgate efficiency standards and "initiated a general policy of granting petitions from States requesting waivers from preemption"—creating a patchwork of state appliance standards throughout the country. *Id.* (quoting S. Rep. No. 100–6, at 4 (1987)).

Litigation ensued. In 1985, the U.S. Court of Appeals for the District of Columbia Circuit ordered the Department of Energy to adopt the federal standards NECPA had contemplated. *See Herrington*, 768 F.2d at 1433. The Department of Energy was unable to immediately comply with

5

the D.C. Circuit's mandate. *Air Conditioning*, 410 F.3d at 499. So, "major manufacturer trade associations and the Natural Resources Defense Council negotiated a compromise solution," which resulted in the National Appliance Energy Conservation Act of 1987 ("NAECA"). *Id.* Amending EPCA, NAECA added the current preemption provision regarding consumer appliances, codified at 42 U.S.C. § 6297(c). *See* Pub. L. No. 100–12, § 327(c), 101 Stat. 103, 118 (1987).

> EPCA's preemption provision for consumer products provides, in relevant part:
>
> [E]ffective on the effective date of an energy conservation standard established in or prescribed under section 6295 of this title for any covered [consumer] product, no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be effective with respect to such product[.]

42 U.S.C. § 6297(c). Covered consumer products include consumer appliances that use water or energy, such as air conditioners, water heaters, kitchen ranges, showerheads, and dishwashers.[3] *Id.* §§ 6291(1)–(2), 6292(a). "Energy" is defined as "electricity, or fossil fuels." *Id.* § 6291(3). "'[E]nergy use' means the quantity of energy directly consumed by a consumer product at point of use, determined in accordance with test procedures under section 6293 of this title." *Id.* § 6291(4). "'[E]nergy efficiency' means the ratio of the useful output of services from a consumer product to the energy use of such product, determined in accordance with test procedures under section 6293 of this title." *Id.* § 6291(5). "[E]nergy conservation standard" is defined as "a performance standard which prescribes a minimum level of energy efficiency or a maximum

---

[3] EPCA uses the term "covered product" to refer specifically to consumer products covered by the statute. *See* 42 U.S.C. §§ 6291(1)–(2), 6292. In this opinion, the Court uses the phrase (or, sometimes, "EPCA-covered product") to refer to both consumer *and* industrial products to which the statute applies. When the precise definition matters to the analysis, the Court will use the phrases "covered consumer product" and "covered industrial product" to refer to EPCA-covered consumer and industrial products, respectively.

quantity of energy [or water] use . . . determined in accordance with test procedures prescribed under section 6293 of this title; or . . . a design requirement for" certain covered consumer products. *Id.* § 6291(6). An energy conservation standard also "includes any other requirements which the Secretary [of Energy] may prescribe[.]" *Id.*

NAECA did more than add this preemption provision to EPCA. NAECA also "made it more difficult for states to obtain waivers of preemption [under EPCA] for more stringent state efficiency standards." *Air Conditioning*, 410 F.3d at 500. These changes were designed "to counteract the systems of separate state appliance standards that had emerged" from the Department of Energy's policy of liberally granting preemption waivers, "which [had] caused appliance manufacturers to be confronted with 'a growing patchwork of differing State regulations which would increasingly complicate their design, production and marketing plans.'" *Id.* (quoting S. Rep. No. 100–6, at 4).

In 1992, Congress amended EPCA again, this time through the Energy Policy Act of 1992, which added a preemption provision regarding industrial products, codified at 42 U.S.C. § 6316(b)(2)(A). *See* Pub. L. No. 102–486, § 122(e)(2), 106 Stat. 2776, 2816 (1992). Section 6316(b)(2)(A) is substantively identical to § 6297(c). It provides that "[a] standard prescribed or established under [42 U.S.C. § 6313(a)]"—which governs requirements for devices such as warm-air furnaces, packaged boilers, and commercial air conditioning equipment—"shall, beginning on the effective date of such standard, supersede any State or local regulation concerning the energy efficiency or energy use of a product for which a standard is prescribed or established pursuant to such section." 42 U.S.C. § 6316(b)(2)(A). "Energy," "energy use," and "energy efficiency" have the same or substantially the same meanings as they do in § 6297(c). *Id.* §§ 6311(3)–(4), (7).

7

Preemption waivers are available, though difficult to obtain. Pursuant to § 6297(d)(1)(A), "[a]ny State or river basin commission with a State regulation which provides for any energy conservation standard or other requirement with respect to energy use, energy efficiency, or water use for any . . . covered [consumer] product" may seek a preemption waiver from the Secretary of Energy. A state regulation of an industrial appliance that would otherwise be preempted also may be waived. *See id.* § 6316(b)(2)(D). The Secretary must grant such a waiver if they find that the "regulation is needed to meet unusual and compelling State or local energy or water interests," but they may not do so if they find, after considering the input of "interested persons," that the "regulation will significantly burden" the product's "manufacturing, marketing, distribution, sale, or servicing . . . on a national basis." *Id.* §§ 6297(d)(1)(B), 6297(d)(3). The Secretary also may not grant a preemption waiver if they find "that the State regulation is likely to result in the unavailability in the State of any covered product type (or class) of performance characteristics . . . . , features, sizes, capacities, and volumes that are substantially the same as those generally available in the State at the time of the Secretary's finding[.]" *Id.* § 6297(d)(4).

Both § 6297 and § 6316 also authorize certain exceptions to preemption. As relevant here, § 6297(f)(3)—which, like § 6297(c), was added to EPCA by NAECA—provides that "regulation[s] or other requirement[s] contained in a State or local building code for new construction concerning the energy efficiency or energy use of [a] covered [consumer] product" are not preempted, provided certain requirements are met. And § 6316(b)(2)(B) similarly provides that a "standard [for industrial equipment] prescribed or established under section 6313(a) of this title shall not supersede a standard for such a product contained in a State or local building code for new construction" if, among other things, the building code does not require the product's energy efficiency to exceed a certain threshold. Finally, "a State or local government" need not

seek a preemption waiver "in order to enforce or apply its building code" unless the building code "requires the installation of covered [consumer] products with efficiencies exceeding" applicable federal and state standards. *Id.* § 6297(f)(4).

### C.    This Lawsuit

The plaintiffs are condominium associations, builder and real estate trade organizations, and utility companies. They contend that they "and their members have interests in a broad range of residential and commercial buildings covered by the . . . BEPS and in the natural gas and the gas delivery infrastructure that is used to provide gas service to those buildings" and that the BEPS "will cause [them] financial harm, diminish their businesses, and substantially increase the cost for homes, lodging, and energy in Maryland[.]" ECF 36, ¶ 6. Many of them contend that the BEPS will require them or their members to pay more for gas and to comply with "expensive" reporting requirements. *See, e.g.*, *id.* ¶¶ 14, 18, 24.

Maryland Building Industry Association, Inc. is a "not-for-profit trade organization representing the interests of over 1,100 member firms and more than 100,000 . . . home builders, remodelers, developers, and affiliate professional and service providers" across Maryland and the District of Columbia. *Id.* ¶ 13. It contends that the "increased costs of compliance with the . . . BEPS likely will . . . decrease new construction" by "pric[ing] [customers] out of the market" and will force the association's members "to pay higher rates for gas service[.]" *Id.*

The Building Owners and Managers of Greater Baltimore, Inc. is a trade association for real estate professionals. *Id.* ¶ 14. Its "members will incur costs in replacing existing gas appliances in order to comply with the . . . BEPS or will be forced to incur the yearly penalty for noncompliance[.]" *Id.*

NAOIP MD, Inc. and NAIOP DC | MD, Inc. are commercial real estate associations whose members will face increased capital and utility costs, lose income "due to vacancy and disruptions to tenant occupancy during construction and renovations made necessary by the . . . BEPS," and suffer from reduced property values if the BEPS are not enjoined. *Id.* ¶¶ 15–17.

Maryland Multi-Housing Association, Inc. is an organization that "serves the multi-housing industry and Maryland communities by providing education, information, and legislative and advocacy services." *Id.* ¶ 18. Because of the BEPS, its members will incur costs to replace their gas appliances to comply with the BEPS "or will be forced to incur the yearly penalty for noncompliance" and will lose tenants during construction and renovation. *Id.*

Washington Gas Light Company, "a regulated public utility that provides natural gas service" throughout the District of Columbia, Maryland, and Virginia, asserts that the BEPS will cause it to lose customers and leave its remaining customers "to cover the costs of [its] new investments in maintaining its gas system." *Id.* ¶ 19.

Leisure World Community Corporation governs trust properties and owns the property manager for a gated community in Silver Spring. *Id.* ¶ 20. Leisure World is owned by the owners of condominiums, a cooperative, and a homeowner association. *Id.* Residents of Leisure World "will have to fund expensive retrofits . . . to comply with the . . . BEPS or will be forced to incur the yearly penalty for noncompliance[.]" *Id.* Many Leisure World residents are "on limited or fixed incomes, such that some owners likely will be unable to afford the increased assessments necessary to pay for the compliance work and/or fees for noncompliance." *Id.*

The Elizabeth Condominium Association, Inc. manages a high-rise condominium in Chevy Chase. *Id.* ¶ 21. It will have to "spend millions of dollars to try to bring its building into compliance with the . . . BEPS" because the building "relies on gas for its boilers[.]" *Id.*

Promenade Towers Mutual Housing Corporation is a cooperative housing corporation that owns residential apartments and commercial spaces in Bethesda. *Id.* ¶ 22. It "relies upon natural gas for residential and commercial uses" and "would have to undertake major and costly projects," such as replacing its boilers, to comply with the BEPS. *Id.* The cost of these improvements would fall on its residents, "many of whom are of modest means[.]" *Id.*

The Willoughby of Chevy Chase Condominium Council of Unit Owners, Inc., which runs a Maryland condominium, claims that in order to comply with the BEPS, it will have "to spend millions of dollars on electrification measures" or else "pay substantial fees for noncompliance" and that some of its members "will be unable to afford the increased assessments necessary to pay for the compliance work and/or fees for noncompliance." *Id.* ¶ 23.

Apartment and Office Building Association of Metropolitan Washington, a membership organization for "commercial office building and multifamily residential real estate," states that its members "will be forced to choose between either incurring substantial costs to replace existing gas appliances . . . or incurring the yearly penalty for noncompliance" with the BEPS' emissions requirements. *Id.* ¶ 24. "For those buildings that cannot comply with the . . . BEPS in an economically viable manner, the best of a bad series of options may be" to install "new structures, at great cost." *Id.*

Finally, Columbia Gas of Maryland, Inc., a regulated public utility that provides gas service throughout western Maryland, states that the BEPS will cause it to lose customers and force it to charge higher rates to its remaining customers. *Id.* ¶ 25. It adds that the BEPS will "impede customers' ability to adopt new, more environmentally-friendly gas technologies which would reduce their costs, improve the reliability of their utility service, and lower emissions at the same time." *Id.*

11

JA050

In their amended complaint, the plaintiffs claim that the BEPS' emissions standards are facially invalid because they "restrict[] and penaliz[e] EPCA-covered gas appliances in new and existing buildings[.]" *Id.* ¶¶ 5, 28. "Since all EPCA-covered gas appliances emit some level of carbon dioxide," the plaintiffs maintain, the "BEPS are regulating their energy use and energy efficiency by imposing declining [emissions] requirements—which eventually will go all the way down to zero—and associated penalties if those requirements are not met." *Id.* ¶ 67. The plaintiffs state that the emissions standards "restrict[] and penaliz[e] the consumption of certain quantities—and eventually any quantity—of gas energy by covered appliances" and that they "penalize less efficient gas appliances and effectively require more efficient appliances." *Id.* They seek a declaratory judgment that the BEPS are preempted by EPCA and an injunction against their enforcement. *Id.* ¶ 83.

On May 5, 2025, MDOE filed a motion to dismiss the amended complaint for failure to state a claim. ECF 49. That motion is fully briefed. ECF 49-1, 55 & 62. The Court also has received amicus briefs from the Chesapeake Climate Action Network and Sierra Club, ECF 47, the Public Health Law Center, ECF 52, and the American Gas Association, ECF 61. No hearing is necessary to resolve the motion. *See* Loc. R. 105.6 (D. Md. 2025).

## II.    Standard of Review

Under Rule 12(b)(6), a party may seek dismissal for failure "to state a claim upon which relief can be granted." *Robertson v. Anderson Mill Elementary Sch.*, 989 F.3d 282, 290 (4th Cir. 2021) (quoting Fed. R. Civ. P. 12(b)(6)). To survive the challenge, the opposing party must have pleaded facts demonstrating it has a plausible right to relief from the court. *Lokhova v. Halper*, 995 F.3d 134, 141 (4th Cir. 2021) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A plausible claim is more than merely conceivable or speculative. *See Holloway v. Maryland*, 32 F.4th 293,

299 (4th Cir. 2022). The allegations must show there is "more than a sheer possibility that the defendant has acted unlawfully." *Int'l Refugee Assistance Project v. Trump*, 961 F.3d 635, 648 (4th Cir. 2020) (quoting *Iqbal*, 556 U.S. at 678). But the claim does not need to be probable and the pleader need not show "that alternative explanations are less likely" than their theory. *Jesus Christ Is the Answer Ministries, Inc. v. Baltimore Cnty.*, 915 F.3d 256, 263 (4th Cir. 2019) (quoting *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015)).

When ruling on a Rule 12(b)(6) motion, the court must accept the allegations as true and "draw all reasonable inferences in favor of" the pleader. *Williams v. Kincaid*, 45 F.4th 759, 765 (4th Cir. 2022) (quoting *King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016)). But the court does not accept "legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments." *United States ex rel. Taylor v. Boyko*, 39 F.4th 177, 189 (4th Cir. 2022) (quoting *United States ex rel. Nathan v. Takeda Pharms. N. Am., Inc.*, 707 F.3d 451, 455 (4th Cir. 2013)). Merely reciting a claim's elements "and supporting them by conclusory statements does not meet the required standard." *Sheppard v. Visitors of Va. State Univ.*, 993 F.3d 230, 234 (4th Cir. 2021) (quoting *ACA Fin. Guar. Corp. v. City of Buena Vista*, 917 F.3d 206, 212 (4th Cir. 2019)). The court "does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020) (quoting *Tobey v. Jones*, 706 F.3d 379, 387 (4th Cir. 2013)).

The court's review of a Rule 12(b)(6) motion typically is limited to the pleadings, documents attached to the complaint, and the parties' briefs. *See* Fed. R. Civ. P. 12(b)(6), 12(d); *see also* Fed. R. Civ. P. 10(c). The court also may consider judicially noticed facts and documents integral to and explicitly relied on in the complaint when their authenticity is not disputed. *See Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606–07 (4th Cir. 2015); Fed. R. Evid. 201(b).

Courts frequently resolve preemption challenges such as this one on Rule 12(b)(6) motions. *See, e.g.*, *Va. Uranium, Inc. v. Warren*, 848 F.3d 590, 593–94 (4th Cir. 2017) (affirming 12(b)(6) dismissal of complaint challenging Virginia's moratorium on uranium mining as preempted by Atomic Energy Act), *aff'd*, 587 U.S. 761 (2019); *Self-Ins. Inst. of Am., Inc. v. Snyder*, 827 F.3d 549, 553–54 (6th Cir. 2016) (affirming 12(b)(6) dismissal of complaint challenging Michigan health care tax as preempted by Employee Retirement and Income Security Act of 1974 ("ERISA")); *Allied Concrete & Supply Co. v. Baker*, 904 F.3d 1053, 1057–58 (9th Cir. 2018) (affirming 12(b)(6) dismissal of complaint challenging California prevailing wage law as preempted by Federal Aviation Administration Authorization Act of 1994 ("FAAAA")).

## III.    Discussion

Under the Constitution's Supremacy Clause, federal law is "the supreme law of the Land." U.S. Const. art. VI, cl. 2. Thus, "in our system federal statutes take precedence over conflicting state laws provided that Congress acted within its authority"—a phenomenon known as preemption. *GenBioPro, Inc. v. Raynes*, 144 F.4th 258, 270 (4th Cir. 2025). "Preemption can take three basic forms:" express, field, and conflict. *Real Time Med. Sys., Inc. v. PointClickCare Techs., Inc.*, 131 F.4th 205, 229 (4th Cir. 2025). The plaintiffs here rely on express preemption, which occurs when "Congress clearly expresses an intention for a federal law to preempt state law[.]" *Id.* (quoting *N. Va. Hemp & Agric., LLC v. Virginia*, 125 F.4th 472, 492 (4th Cir. 2025)).

"Preemption fundamentally is a question of congressional intent[.]" *English v. Gen. Elec. Co.*, 496 U.S. 72, 78–79 (1990). Where, as here, a "statute 'contains an express pre-emption clause,' [courts] do not invoke any presumption against [preemption] but instead 'focus on the plain wording of the clause, which necessarily contains the best evidence of Congress'[s] pre-emptive intent.'" *Puerto Rico v. Franklin Cal. Tax-free Tr.*, 579 U.S. 115, 125 (2016) (quoting

14

*Chamber of Commerce v. Whiting*, 563 U.S. 582, 594 (2011)). In interpreting an express preemption clause, the court must "identify the domain expressly pre-empted by" the statute. *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 517 (1992). "As in any case of statutory construction, [the court's] analysis begins with the language of the statute." *Air Evac EMS, Inc. v. Cheatham*, 910 F.3d 751, 764 (4th Cir. 2018) (quoting *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999)).

Nevertheless, "because an express preemption clause may not always 'immediately end the inquiry,' [a court] also [may] look to the statute's structure and purpose" to ascertain its preemptive scope. *PCS Phosphate Co. v. Norfolk S. Corp.*, 559 F.3d 212, 217–18 (4th Cir. 2009) (quoting *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008)).[4] The court must read the words of a preemption clause "in their context and with a view to their place in the overall statutory scheme," also taking into account their "history [and] purpose[.]" *Gundy v. United States*, 588 U.S. 128, 141 (2019) (plurality opinion) (first alteration in *Gundy*) (quoting *Maracich v. Spears*, 570 U.S. 48, 76 (2013)). And the court should strive "to 'interpret [the] statute as a symmetrical and coherent regulatory scheme, and fit, if possible, all parts into an harmonious whole.'" *In re Rowe*, 750 F.3d 392, 396 (4th Cir. 2014) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000)).

---

[4] The Court heeds the Supreme Court's instruction in *Puerto Rico* and does not employ a presumption against preemption in resolving this case. As the Fourth Circuit has observed, however, "[t]he Supreme Court has made somewhat varying pronouncements on presumptions in express preemption cases," creating some confusion in this area of law. *Cheatham*, 910 F.3d at 762 n.1; *see also Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094, 1107–08 (9th Cir. 2024) (O'Scannlain, J., concurring) (explaining that, prior to *Puerto Rico*, "[t]he Supreme Court consistently instructed [the courts] to apply the presumption [against preemption] in express-preemption cases, at least in areas of traditional state concern" and that *Puerto Rico* "did not mention—much less expressly overrule—the decades of cases where the presumption had been applied in like circumstances").

The two preemption clauses at issue here, § 6297(c) and § 6316(b)(2)(A), preempt state regulations "concerning the energy efficiency [and] energy use" of covered products. 42 U.S.C. §§ 6297(c), 6316(b)(2)(A). The plaintiffs argue that the BEPS "concern" the "energy efficiency" and "energy use" of EPCA-covered products and thus are preempted and invalid.[5] MDOE argues that the BEPS are not preempted because the BEPS' connection to the energy use and energy efficiency of covered products "is too indirect, remote, and tenuous to support preemption." ECF 49-1, at 23–24. To determine who is correct, the Court examines the statutory text, "the necessary starting point." *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 319 (2016).

### A.    The Meaning of "Concerning"

Sections 6297(c) and 6316(b)(2)(A) preempt regulations "concerning" the energy use or energy efficiency of covered products. The statute does not define "concerning." Merriam-Webster's Dictionary defines "concern" as "to relate to : be about." *See Concern*, Merriam-Webster's Dictionary, https://www.merriam-webster.com/dictionary/concern (last visited Mar. 31, 2026); *see also Concern*, Oxford English Dictionary Online, https://doi.org/10.1093/OED/1097976362 (last visited Mar. 31, 2026) (listing first definition of "concern" as "[t]o refer or relate to; to be about"). The Supreme Court likewise has explained that "'[c]oncerning' means 'relating to,' and is the equivalent of 'regarding, respecting, about.'" *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 717 (2018).[6] It follows that a regulation "concerning" energy use or energy efficiency is one that "relates to" those subjects.

---

[5] The plaintiffs assert a facial challenge to the BEPS. This means that they are asking the Court to conclude that "no set of circumstances exists under which the [BEPS] would be valid." *AES Sparrows Point LNG, LLC v. Smith*, 470 F. Supp. 2d 586, 600 (D. Md. 2007) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).

[6] *Appling* was not a preemption case. It concerned the interpretation of a provision in the Bankruptcy Code. Even so, the Supreme Court's explanation of the meaning of "concerning" in

What, then, does it mean for a regulation to "relate to" the energy use or energy efficiency of an EPCA-covered product? In answering this question, the Court does not write on a blank slate. Several federal statutes contain express preemption clauses that preempt state laws "related to" the clauses' subject matter. *See, e.g.*, 29 U.S.C. § 1144(a) (ERISA); 49 U.S.C. § 14501(c)(1) (FAAAA); 49 U.S.C. § 41713(b)(1) (Airline Deregulation Act of 1978). The Supreme Court has "repeatedly recognized" that such language "express[es] a broad pre-emptive purpose." *Coventry Health Care of Mo., Inc. v. Nevils*, 581 U.S. 87, 95–96 (2017) (alteration in *Nevils*) (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992)). That said, "the breadth of the words 'related to' does not mean the sky is the limit"; the phrase should not be read "with an 'uncritical literalism,' else 'for all practical purposes pre-emption would never run its course.'" *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 260 (2013) (quoting *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655–56 (1995)). After all, "universally, relations stop nowhere." *Dubin v. United States*, 599 U.S. 110, 119 (2023) (quoting *Travelers*, 514 U.S. at 655). Thus, "[p]re-emption does not occur . . . if the state law has only a 'tenuous, remote, or peripheral' connection with" the specified subject matter. *District of Columbia v. Greater Wash. Bd. of Trade*, 506 U.S. 125, 130 n.1 (1992) (quoting *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 100 n.21 (1983)).

For purposes of a preemption provision with "relating-to" language, a state law "relates to" a particular subject matter if the law has "a connection with, or reference to" the subject matter. *Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 370 (2008) (emphasis omitted) (quoting

---

that context informs this Court's interpretation of "concerning" here. At least one other court has relied on *Appling* to determine the scope of "concerning" in § 6297(c). *See Berkeley*, 89 F.4th at 1103 (citing *Appling* for the proposition that "concerning" "has a broadening effect") (internal quotation marks omitted).

*Morales*, 504 U.S. at 384); *Gobeille*, 577 U.S. at 319–20. A law "refers to" a subject if the law "acts immediately and exclusively upon" it or if the subject's "existence . . . is essential to the law's operation[.]" *Gobeille*, 577 U.S. at 319–20 (quoting *Cal. Div. of Lab. Standards Enf't v. Dillingham Constr., N.A.*, 519 U.S. 316, 325 (1997)). And "to determine whether a state law has the forbidden connection, [a court must] look both to the objectives of the [federal] statute as a guide to the scope of the state law that Congress understood would survive, as well as to the nature of the effect of the state law on" the preempted subject matter. *Egelhoff v. Egelhoff ex rel. Breiner*, 532 U.S. 141, 147 (2001) (quoting *Dillingham*, 519 U.S. at 325).

Guided by this precedent, the Court finds that the BEPS concern the energy use or energy efficiency of covered products, and are thus preempted, if either (1) they "refer to" those subjects, that is, "act[] immediately and exclusively upon" covered products' energy use or energy efficiency or rely upon covered products' energy use or energy efficiency as "essential to [their] operation"; or (2) they have a sufficient "connection with" those subjects, considering Congress's preemptive intent and the nature and effect of the BEPS on covered products' energy use and energy efficiency. *See Dillingham*, 519 U.S. at 325.

**B.    Whether the BEPS "Refer To" or Have an Impermissible "Connection With" Covered Products' Energy Use or Energy Efficiency**

For the reasons explained below, the BEPS do not "refer to" or have an impermissible "connection with" the "energy use" or "energy efficiency" of covered products. Thus, the BEPS are not preempted by EPCA.

**1.    "Refer To"**

The BEPS "refer to" covered products' energy use or energy efficiency if they "act[] immediately and exclusively upon" the products' energy use or energy efficiency or if the energy

use or energy efficiency of covered products is "essential to [the BEPS'] operation."[7] *Gobeille*, 577 U.S. at 319–20 (quoting *Dillingham*, 519 U.S. at 325).

The Supreme Court recently applied this "refer to" test in an ERISA preemption case. In *Rutledge v. Pharmaceutical Care Management Association*, the Supreme Court considered whether an Arkansas law that required pharmacy benefit managers ("PBMs") to reimburse pharmacies for prescription drugs "at a price equal to or higher than that which the pharmacy paid to buy the drug from a wholesaler" was preempted by ERISA.[8] 592 U.S. 80, 84 (2020). "ERISA pre-empts 'any and all State laws insofar as they may now or hereafter relate to any employee benefit plan' covered by ERISA." *Id.* at 86 (quoting 29 U.S.C. § 1144(a)). The Supreme Court had to determine whether the Arkansas law "related to"—that is, "referred to" or "had a connection with"—ERISA plans. *See id.* at 83.

The Court concluded that the Arkansas law was not preempted by ERISA. *Id.* at 91–92. In relevant part, the Court reasoned that the Arkansas law did not "refer to" ERISA plans. The Arkansas law did "not act immediately and exclusively upon ERISA plans," the Court explained, "because it applie[d] to PBMs" irrespective of whether the PBMs managed a plan covered by ERISA. *Id.* at 88. In a similar vein, the Court concluded that ERISA plans were "likewise not essential to [the Arkansas law's] operation" because the law defined regulated PBMs to broadly encompass PBMs that serviced both ERISA plans and other healthcare plans that ERISA did not

---

[7] The analysis in this section applies equally to covered consumer products and covered industrial products.

[8] As the Supreme Court explained, "PBMs serve as intermediaries between prescription-drug plans and the pharmacies that beneficiaries use" by informing pharmacies about beneficiaries' coverage and copayment information and by reimbursing pharmacies for beneficiaries' prescriptions. *Rutledge*, 592 U.S. at 83–84. In turn, the PBMs are reimbursed by the beneficiaries' prescription-drug plans. *Id.* at 84.

cover, such as "Medicaid, Medicare, military, and market place plans." *Id.* at 89 & n.1. In other words, the law "regulat[ed] PBMs whether or not the plans they service[d] f[e]ll within ERISA's coverage." *Id.* at 89. Therefore, the Arkansas law did not "refer to" ERISA plans. In reaching its holding, the Court relied on two other cases that had employed similar reasoning to conclude that a state law did not "refer to" ERISA plans. *See Travelers*, 514 U.S. at 656 (New York law that imposed surcharges on "patients and HMO's, regardless of whether the commercial coverage or membership, respectively, [was] ultimately secured by an ERISA plan" did not "refer to" ERISA plans); *Dillingham*, 519 U.S. at 328 (California wage statute regulating apprenticeship programs that was "indifferent to the funding, and attendant ERISA coverage, of apprenticeship programs" did not "refer to" ERISA plans).

Consider another case, this one from the Second Circuit, that addressed whether a state regulation "relates to" the subject matter of another federal preemption clause. In *Metropolitan Taxicab Board of Trade v. City of New York*, the court considered whether New York City rules that imposed lower taxicab lease caps (i.e., "the maximum dollar amount per shift for which taxis can be leased") on "non-hybrid, non-clean diesel" taxis were preempted by an EPCA provision (not the preemption provisions at issue here) that forbids states from adopting laws or regulations "related to fuel economy standards[.]" 615 F.3d 152, 155–56 (2d Cir. 2010) (quoting 49 U.S.C. § 32919(a)).[9] The court concluded that the rules were "related to" fuel economy standards because they "referred to" fuel economy standards. *Id.* at 157. This was so, the court reasoned, because the "rules expressly rel[ied] on a distinction between hybrid and non-hybrid vehicles": They required "that a taxi be a hybrid in order to qualify for [an] upwardly adjusted lease cap," which did "nothing

---

[9] The Second Circuit refers to this as an EPCA preemption provision, but the preemption provision cited, 49 U.S.C. § 32919(a), is not located within EPCA, which is codified at 42 U.S.C. §§ 6201–6422. Regardless, the Second Circuit's preemption analysis is informative.

more than draw a distinction between vehicles with greater or lesser fuel-efficiency." *Id.* Fuel economy standards, the court found, were "essential to [the taxicab rules'] operation[.]" *Id.* Because the taxicab rules referred to fuel economy standards, they were preempted.

As these cases demonstrate, in determining whether the BEPS "refer to" the energy use or energy efficiency of covered products, the Court must ask whether the BEPS regulate buildings differently depending on the energy use or energy efficiency of the covered products in the buildings.[10] If the BEPS drew such a distinction—by, for example, imposing different greenhouse gas emissions benchmarks based on the energy efficiency of a building's appliances or by rendering the owners of buildings with less energy-efficient appliances ineligible for a waiver of the emissions requirements—the BEPS would be akin to the preempted New York City taxicab rules in *Metropolitan Taxicab*. They would regulate their objects differently depending on the subject matter of the preemption clause: In *Metropolitan Taxicab*, it was fuel economy standards; here, it is the energy use and energy efficiency of covered products.

But the BEPS do not work that way. The BEPS impose declining greenhouse gas emissions benchmarks on buildings across Maryland, ultimately requiring that all buildings subject to the BEPS achieve net-zero emissions by 2040. These emissions requirements do not change depending on the energy use or energy efficiency of covered products in those buildings. The BEPS do not draw a distinction between buildings with high-efficiency covered products and those with less-efficient covered products. To be sure, the BEPS do draw distinctions on other bases—such as the type of building or the financial health of its owner. A nightclub, for example, has different interim emissions benchmarks than a house of worship. A building subject to a tax lien may be eligible for

---

[10] Recall that "energy use" is defined as "the quantity of energy directly consumed . . . at point of use," and "energy efficiency" is defined as "the ratio of the useful output of services . . . to the [product's] energy use," *see* 42 U.S.C. §§ 6291(4)–(5).

a waiver of the emissions requirements that an unencumbered building could not obtain. But the BEPS do not distinguish between buildings that use high-efficiency covered products and those that do not. Like the Arkansas law at issue in *Rutledge*, which applied to PBMs "whether or not they manage[d] an ERISA plan," the BEPS' greenhouse gas emissions requirements apply to buildings regardless of how much energy their covered products use or how efficient those products are. *See Rutledge*, 592 U.S. at 88. Similarly, the energy use and energy efficiency of covered products are "not essential to [the BEPS'] operation." *See id.* The regulation's emissions requirements apply across the board to all buildings subject to the BEPS—without regard to the buildings' covered products. Thus, the BEPS do not "act[] immediately and exclusively upon" EPCA-covered products' energy use or energy efficiency, and the energy use or efficiency of EPCA-covered products is not "essential to [the BEPS'] operation." *See Gobeille*, 577 U.S. at 319–20 (quoting *Dillingham.*, 519 U.S. at 325).

Thus, the BEPS do not "refer to" the energy efficiency or energy use of covered products.

### 2.     "Connection With"

The Court now turns to the more difficult question: Do the BEPS have a forbidden "connection with" the energy use or energy efficiency of EPCA-covered products? In considering this question, the Court must "look both to the objectives of the [federal] statute as a guide to the scope of the state law that Congress understood would survive, as well as to the nature of the effect of the state law on" the energy use and energy efficiency of covered products. *See Egelhoff*, 532 U.S. at 147 (quoting *Dillingham*, 519 U.S. at 325). To discern the objectives of EPCA's preemption provisions, the Court considers their texts, their titles, their broader statutory schemes, and their legislative histories. *See, e.g.*, *Gobeille*, 577 U.S. at 321–23 (considering ERISA's "extensive" "reporting, disclosure, and recordkeeping requirements" as guide to Congress's

preemptive intent); *Rowe*, 552 U.S. at 370, 373 (considering legislative history of FAAAA in discussing Congress's preemptive purpose); *Ass'n of Contracting Plumbers of City of New York, Inc. v. City of New York*, No. 23-CV-11292 (RA), 2025 WL 843619, at *6 (S.D.N.Y. Mar. 18, 2025) (considering statutory scheme and title of § 6297(c) in determining Congressional objectives), *appeal docketed*, No. 25-977 (2d Cir. Apr. 21, 2025); *see also Yates v. United States*, 574 U.S. 528, 540 (2015) (plurality opinion) (explaining that statutory headings, while "not commanding," "supply cues" as to Congress's intent). Because EPCA's preemption provisions for covered consumer products and covered industrial products vary slightly in these respects, the Court analyzes them separately.

### a.     Covered Consumer Products

The Court first determines whether the BEPS have an impermissible "connection with" the energy use or energy efficiency of covered consumer products.

MDOE argues this analysis should begin and end with § 6297(c)'s title. "'[T]he title of a statute and the heading of a section' are 'tools available for the resolution of a doubt' about the meaning of a statute." *Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998) (quoting *Bhd. of R.R. Trainmen v. Balt. & Ohio R.R.*, 331 U.S. 519, 528–29 (1947)). Section 6297(c) is titled "General rule of preemption for energy conservation standards when Federal standard becomes effective for product." EPCA defines "energy conservation standard" as "a performance standard which prescribes a minimum level of energy efficiency or a maximum quantity of energy [or water] use . . . determined in accordance with test procedures prescribed under section 6293 of this title; or . . . a design requirement for" certain covered consumer products. 42 U.S.C. § 6291(6). Thus, according to § 6297(c)'s title, Congress sought to preempt state regulations that set an energy

efficiency floor or an energy use ceiling for covered consumer products or otherwise seek to modify their design.

There is some support in § 6297(c)'s broader statutory scheme for the notion that Congress intended to preempt state energy conservation standards. Section 6297(c) is found in a part of EPCA titled "Energy Conservation Program for Consumer Products Other than Automobiles" (42 U.S.C. §§ 6291–6309). That part establishes comprehensive federal energy conservation standards for covered consumer products, *see id.* § 6295, imposes reporting and labeling requirements on manufacturers of covered consumer products regarding the products' energy consumption, *see id.* §§ 6294, 6296, and with limited exceptions, bars the distribution in commerce of covered consumer products that do not conform to federal energy conservation standards, *see id.* § 6302(a)(5). From these parts of EPCA, it is clear that Congress sought to impose nationwide energy conservation standards for covered consumer products and to maintain a tight grip over those products' manufacture and distribution. Allowing states to set their own standards for covered consumer products' energy use or efficiency would upset this carefully crafted scheme.

If the Court were to stop its analysis at the preemption provision's title, as MDOE urges, and find that § 6297(c) preempts energy conservation standards and nothing else, the conclusion that the BEPS lack the forbidden "connection with" energy use and energy efficiency of covered consumer products would be inescapable. This is because the BEPS do not set a floor for the energy efficiency of covered consumer products or impose a ceiling on how much electricity or fossil fuels a covered consumer product may use. And they do not require that covered consumer products be designed in any particular way. Thus, the BEPS are not an "energy conservation standard," as EPCA defines that term. If the analysis were that simple, the BEPS clearly would be

the sort of state regulation "that Congress understood would survive[.]" *See Egelhoff*, 532 U.S. at 147 (quoting *Dillingham*, 519 U.S. at 325).

The analysis, however, is not so simple. MDOE overlooks other parts of the statutory scheme that indicate Congress intended § 6297(c) to sweep more broadly than just energy conservation standards. Consider afresh the language of § 6297(c) itself. If Congress truly intended to limit § 6297(c)'s preemption to energy conservation standards, it easily could have said so in the text of the statute—not just the title. After all, "energy conservation standard" is defined in EPCA as a standalone term. *See* 42 U.S.C. § 6291(6). Section 6297(c) could have read: "No State energy conservation standard of such covered product shall be effective with respect to such product." But instead, it reads: "[N]o State regulation *concerning the energy efficiency, energy use or water use* of such covered product shall be effective with respect to such product[.]" *Id.* § 6297(c) (emphasis added). The Court may not disregard the statutory text. *See Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998) ("[T]he title of a statute . . . cannot limit the plain meaning of the text.") (alterations in *Yeskey*) (quoting *Trainmen*, 331 U.S. at 519). Also consider the language of § 6297's waiver provision: "Any State . . . which provides for any energy conservation standard *or other requirement* with respect to energy use [or] energy efficiency" of a covered consumer product may seek a preemption waiver from the Secretary of Energy. 42 U.S.C. § 6297(d)(1)(A) (emphasis added). If states need a preemption waiver to enforce "other requirement[s]" aside from energy conservation standards, that suggests that § 6297(c) preempts more than just energy conservation standards. Thus, the title of § 6297(c) notwithstanding, the Court cannot conclude that § 6297(c) preempts only state energy conservation standards.

Turning its focus from the title of § 6297(c) to the text, MDOE argues that § 6297(c)'s preemptive scope is narrowed by the words "with respect to." Recall that § 6297(c) states that a

regulation "concerning the energy efficiency [or] energy use" of a covered consumer product "shall [not] be effective with respect to" that product. For support, MDOE relies on the Supreme Court's decision in *Dan's City*. There, the Court held that the words "with respect to," as used in the FAAAA's preemption clause, "'massively limit[ed] the scope of preemption' ordered by the FAAAA." 569 U.S. at 261 (quoting *City of Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424, 449 (2002) (Scalia, J., dissenting)). MDOE overlooks a key difference in how § 6297(c) and the FAAAA's preemption clause are written. The latter provides that "[a] State . . . may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier . . . with respect to the transportation of property." 49 U.S.C. § 14501(c)(1). There, "with respect to" limits the scope of preemption, as the Supreme Court recognized, because it modifies "law, regulation, or other provision"—adding an additional condition that a law must satisfy before it may be preempted. In § 6297(c), on the other hand, "with respect to" modifies "effective"—signaling simply that a preempted regulation is not "effective with respect to" a covered consumer product. In this context, "with respect to" neither limits nor illuminates the universe of regulations that are preempted in the first place.

Other parts of § 6297's statutory scheme shed more light. Most illuminating, for purposes of this case, are the provisions that apply to building codes, which signal Congress's intent about the preemption of building regulations such as the BEPS.

Section 6297 contains an exception to preemption for certain building codes. *See* 42 U.S.C. § 6297(f)(3). This exception, of course, does not "delineate the scope" of the preemption clause. *Dan's City*, 569 U.S. at 264. But the Court may look to this exception as an "interpretive guide,"

*see id.*—a way of illuminating the "domain" of building regulations that Congress sought to preempt, *see Cipollone*, 505 U.S. at 517.[11]

Section 6297(f)(3) provides that, once a federal energy conservation standard for a covered consumer product goes into effect, "a regulation or other requirement contained in a State or local building code for new construction concerning the energy efficiency or energy use of [that] covered [consumer] product" is not preempted if the following requirements are met:

> (A) The code permits a builder to meet an energy consumption or conservation objective for a building by selecting items whose combined energy efficiencies meet the objective.
>
> (B) The code does not require that the covered [consumer] product have an energy efficiency exceeding the applicable energy conservation standard established in or prescribed under section 6295 of this title, except that the required efficiency may exceed such standard up to the level required by a regulation of that State for which the Secretary has issued a rule granting a waiver under subsection (d).
>
> (C) The credit to the energy consumption or conservation objective allowed by the code for installing covered [consumer] products having energy efficiencies exceeding such energy conservation standard established in or prescribed under section 6295 of this title or the efficiency level required in a State regulation referred to in subparagraph (B) is on a one-for-one equivalent energy use or equivalent cost basis.
>
> (D) If the code uses one or more baseline building designs against which all submitted building designs are to be evaluated and such baseline building designs contain a covered [consumer] product subject to an energy conservation standard established in or prescribed under section 6295 of this title, the baseline building designs are based on the efficiency level for such covered [consumer] product which meets but does not exceed such standard or the efficiency level required by a regulation of that State for which the Secretary has issued a rule granting a waiver under subsection (d).
>
> (E) If the code sets forth one or more optional combinations of items which meet the energy consumption or conservation objective, for every combination which

---

[11] The parties dispute whether the BEPS qualify as a "building code" under § 6297(f). The Court need not resolve that question. The building code exception to § 6297(c) is relevant because of what it tells us about the scope of state laws—including building regulations—that Congress understood would be preempted. The *Building* Energy Performance Standards are indisputably a building regulation—regardless of whether they are a "building code."

includes a covered [consumer] product the efficiency of which exceeds either standard or level referred to in subparagraph (D), there also shall be at least one combination which includes such covered [consumer] product the efficiency of which does not exceed such standard or level by more than 5 percent, except that at least one combination shall include such covered [consumer] product the efficiency of which meets but does not exceed such standard.

(F) The energy consumption or conservation objective is specified in terms of an estimated total consumption of energy (which may be calculated from energy loss- or gain-based codes) utilizing an equivalent amount of energy (which may be specified in units of energy or its equivalent cost).

(G) The estimated energy use of any covered [consumer] product permitted or required in the code, or used in calculating the objective, is determined using the applicable test procedures prescribed under section 6293 of this title, except that the State may permit the estimated energy use calculation to be adjusted to reflect the conditions of the areas where the code is being applied if such adjustment is based on the use of the applicable test procedures prescribed under section 6293 of this title or other technically accurate documented procedure.

*Id.*

To state the obvious: This building code exception tells us that Congress did not intend to preempt building codes that meet the exception's criteria. But what does the exception tell us about the scope of state regulations that Congress *did* intend to preempt? It tells us that Congress wanted to preempt (at a minimum) state or local building codes that set an "objective" for "energy consumption" or "conservation" and do so in a way that mandates the installation of high-efficiency appliances. *See id.*; *see also Berkeley*, 89 F.4th at 1125 (Friedland, J., dissenting from denial of rehearing en banc) (citing § 6297(f) for the proposition that "EPCA contemplates preempting building codes that set building-wide energy efficiency standards that can only be met through the use of hyper-efficient appliances").

The legislative history of the building code exception to § 6297(c) confirms this conclusion. *See Travelers*, 514 U.S. at 657 (consulting legislative history of ERISA to gauge congressional intent for preemption provision); *Rowe*, 552 U.S. at 373 (same for FAAAA). The

28

Senate report on NAECA states that "the limited requirements" of § 6297(f)(3) "are designed to ensure the performance-based building codes cannot circumvent the federal standard for a given covered product by effectively requiring the installation of such product with an efficiency exceeding the applicable Federal standards or State standards for which a waiver from preemption has been obtained." *See* S. Rep. No. 100–6, at 11. This legislative history of the building code exception to preemption confirms that Congress wanted to ensure that state building codes could not frustrate national uniformity in appliance standards by requiring the installation of products whose efficiencies exceeded federal standards.[12] Those types of building codes are not excepted from preemption.

Another provision in § 6297(f) also signals that Congress intended to preempt state regulations that require the installation of covered products whose energy efficiency exceeds federal standards. Section 6297(f)(4) provides that, while states generally do not need to petition the Secretary of Energy to enforce their building codes, states may not enforce a building code without first obtaining a preemption waiver from the Secretary of Energy if the code "requires the installation of covered [consumer] products with efficiencies exceeding" the federal standard. 42 U.S.C. § 6297(f)(4)(B). This prohibition against a state's enforcement of certain building codes, without first obtaining a waiver, evinces Congress's concern that states would misuse their building codes to require the installation of high-efficiency products. Section 6297(f)(4) is further evidence of Congress's intent to preempt such building codes.

---

[12] This concern is reflected in Congress's overarching purpose in enacting NAECA. With NAECA, Congress sought "to counteract . . . systems of separate state appliance standards . . . which [had] caused appliance manufacturers to be confronted with 'a growing patchwork of differing State regulations which would increasingly complicate their design, production and marketing plans.'" *Air Conditioning*, 410 F.3d at 500 (quoting S. Rep. No. 100–6, at 4).

These building code provisions within § 6297(c)'s statutory scheme illuminate the kinds of building regulations that Congress intended to preempt: regulations that mandate the installation of high-efficiency appliances. The BEPS are not such a regulation. They do not require the installation of more energy-efficient appliances in buildings. To comply with the BEPS' greenhouse gas emissions standards, building owners need not replace their appliances at all. Owners can comply in other ways, including by paying a yearly compliance fee—an option that would not require replacement of a single appliance. Moreover, there are still other ways of complying with the standards, such as the installation of carbon-capture technology.[13] Because the BEPS do not require building owners to install appliances whose energy efficiencies exceed federal standards, they are not like the building codes that Congress intended to preempt.

The plaintiffs agree that the Court may consider the building code provisions in § 6297 as a useful interpretive tool to discern the type of building regulations that Congress intended to preempt under § 6297(c). But that is where the plaintiffs' agreement with the Court's analysis ends. In the plaintiffs' view, these building code provisions *help*, rather than hurt, their case. As they see it, the building code exception in § 6297(f)(3) *proves*, rather than disproves, that Congress intended to preempt a regulation like the BEPS. Their argument goes like this. They argue (correctly) that the BEPS do not satisfy the exception's requirements. Because the BEPS do not satisfy these requirements, the BEPS are not excepted from preemption. And because the BEPS are not excepted from preemption, they must be preempted. *See* ECF 36, ¶ 71 ("The . . . BEPS do not meet all seven requirements listed in Section 6297(f)(3) and are therefore preempted."). This

---

[13] According to Amicus Public Health Law Center, "weatherization measures like insulation and ventilation improvements" also may reduce a building's emissions. ECF 52, at 6. MDOE plans to convene a working group "to identify how to account for differing sources of onsite emissions like biofuels in the performance standards" before 2030. *See Response to Comments*, at 41.

argument is a fallacy. "Exceptions to a general rule, while sometimes a helpful interpretive guide, do not in themselves delineate the scope of the rule." *Dan's City*, 569 U.S. at 264. The mere fact that a regulation does not satisfy the criteria for a preemption exception does not mean the regulation is preempted.

Indeed, if anything, assessing the BEPS against the criteria for the building code exception—as the plaintiffs encourage the Court to do—demonstrates how far afield the BEPS are from the type of building regulation Congress intended to preempt. Comparing the BEPS to § 6297(f)(3)'s criteria is like trying to fit a square peg into a round hole. Consider the first criterion: "The code permits a builder to meet an *energy consumption or conservation objective* for a building by selecting items whose combined energy efficiencies meet the objective." 42 U.S.C. § 6297(f)(3)(A) (emphasis added). Or the third: "The credit to the *energy consumption or conservation objective* allowed by the code for installing covered [consumer] products having energy efficiencies exceeding [the federal] energy conservation standard . . . is on a one-for-one equivalent energy use or equivalent cost basis." *Id.* § 6297(f)(3)(C) (emphasis added). These criteria cannot sensibly be applied to the BEPS. They presume that a building code being assessed against the criteria sets an "objective" for a building's "energy consumption" or "conservation." They also presume that the building code prescribes means of achieving the objective that may or may not require installation of high-efficiency products. But the BEPS do not set an objective for energy consumption or conservation at all, much less one that can be accomplished only through the installation of high-efficiency products. The square peg (the BEPS) cannot fit into the round hole (the exception to preemption). This is evidence that the BEPS are not the type of building

31

regulation that Congress understood would need an exception to preemption in the first place. Put slightly differently, the BEPS are not the type of regulation that Congress intended to preempt.[14]

In sum, a close examination of § 6297's statutory scheme, including its building code provisions, reveals that—at least with respect to building regulations such as the BEPS—the "domain" Congress sought to preempt, *Cipollone*, 505 U.S. at 517, consists of building regulations that require building owners to swap out less-efficient appliances for appliances whose efficiencies exceed federal standards. The BEPS are not such a regulation. Thus, considering "the objectives of the [federal] statute as a guide to the scope of the state law that Congress understood would survive," *Egelhoff*, 532 U.S. at 147 (quoting *Dillingham*, 519 U.S. at 325), the Court finds that the BEPS are a regulation that Congress understood would survive a preemption challenge. They do not have a forbidden "connection with" the energy use or energy efficiency of EPCA-covered consumer products.

### b.   Covered Industrial Products

The Court next considers whether the BEPS have an impermissible "connection with" the energy use or energy efficiency of covered industrial products.

Section 6316(b)(2)(A) was enacted just five years after § 6297(c). It provides that federal standards for covered industrial products "shall, beginning on the effective date of such standard,

---

[14] The Court notes, however, an important caveat. It appears from MDOE's response to public comments on the BEPS that—in compliance with its statutory mandate—MDOE intends to update the BEPS to include "energy use intensity" targets that may push building owners to install more efficient products. *See, e.g.*, *Response to Comments*, at 42–43 (explaining that the General Assembly required the BEPS to include energy use intensity standards and that MDOE intends to adopt such standards in 2027 and recommending that building owners "not install[] any inefficient electric equipment in anticipation of this energy efficiency standard being adopted"). The current version of the BEPS does not include "energy use intensity" targets, and the Court expresses no view on whether any future version of the BEPS that includes such a requirement would be preempted by EPCA in whole or in part.

supersede any State or local regulation *concerning the energy efficiency or energy use* of [those] product[s.]"[15] 42 U.S.C. § 6316(b)(2)(A) (emphasis added). This provision contains substantially identical language to § 6297(c). *See Air Conditioning*, 410 F.3d at 500 (explaining that in passing the Energy Policy Act of 1992, Congress, "with a few subtle distinctions," largely "incorporated the preemption provisions of . . . § 6297"). "When Congress uses the same language in two statutes having similar purposes, particularly when one is enacted shortly after the other, it is appropriate to presume that Congress intended that text to have the same meaning in both statutes." *Smith v. City of Jackson*, 544 U.S. 228, 233 (2005). Because the two preemption provisions use substantially the same language and have a similar purpose, the Court presumes Congress intended them to have the same meaning. Thus, the Court's preemption analysis of § 6297(c) applies equally to § 6316(b)(2)(A). For the same reasons the BEPS are not preempted under § 6297(c), they are not preempted under § 6316(b)(2)(A).

The BEPS are not preempted by EPCA.[16]

---

[15] Unlike § 6297(c), § 6316(b)(2)(A) has no subsection-specific title that might illuminate its meaning, and the legislative history of the Energy Policy Act of 1992, which added § 6316(b)(2)(A) to EPCA, "is silent on preemption." *Air Conditioning*, 410 F.3d at 500.

[16] The parties spill much ink disputing whether "energy use," as EPCA defines the term, refers to a fixed characteristic of a covered product when it is manufactured or whether it refers to a covered product's actual use of energy by a consumer. This question of statutory interpretation divided the Ninth Circuit when it decided an EPCA preemption case two years ago. *See Berkeley*, 89 F.4th at 1101–02 (panel opinion); *id.* at 1121–22 (Friedland, J., dissenting from denial of rehearing en banc). This Court need not weigh in on the question here because the analysis in this case does not turn on this nuance in the meaning of "energy use." Regardless of whether "energy use" refers to a fixed or mutable characteristic of a covered product, the BEPS are not preempted by EPCA because (i) the BEPS do not distinguish between buildings with high-efficiency covered products and those with less-efficient covered products and the emissions requirements do not depend on the energy efficiency or energy use of a building's covered products; and (ii) the BEPS do not require building owners to use more energy-efficient products at all. Thus, regardless of whether "energy use" means what the plaintiffs urge or what MDOE urges, the BEPS do not "refer to" or have a forbidden "connection with" the energy use or energy efficiency of EPCA-covered products.

3. **The Plaintiffs' Counterarguments**

The plaintiffs' arguments to the contrary are unpersuasive.

The plaintiffs argue that the BEPS are preempted by EPCA because the BEPS "restrict[]" the use of gas appliances. ECF 55, at 20. In the plaintiffs' view, the BEPS "regulate [gas] appliances' energy use and energy efficiency by restricting—and ultimately prohibiting entirely—[the] necessary byproducts of their use of gas energy," i.e., carbon dioxide and other gases. *Id.* at 19–20. This regulation of the byproducts of gas appliances is, according to the plaintiffs, a regulation of the energy use and energy efficiency of gas appliances. Thus, the plaintiffs believe the BEPS "concern" the "energy use" of an EPCA-covered product—gas appliances—and are preempted by EPCA.

In support of this argument, the plaintiffs rely on the U.S. Court of Appeals for the Ninth Circuit's recent decision in *California Restaurant Association v. City of Berkeley*. There, the Ninth Circuit held that a City of Berkeley ordinance prohibiting natural gas piping in newly-constructed buildings was preempted by EPCA because it "concerned" the "energy use" of EPCA-covered gas appliances. *Berkeley*, 89 F.4th at 1101. This was so, the court reasoned, because the ordinance prevented consumers from using natural-gas-powered appliances where the consumers would otherwise be able to; thus, the ordinance necessarily restricted the "quantity of energy" those appliances could use at their "point of use," i.e., the place they were used. *Id.* at 1101–03. The court emphasized, however, that its holding was a narrow one: "We only decide that EPCA's preemptive scope applies to building codes that regulate the gas usage of covered appliances on premises where gas is otherwise available." *Id.* at 1103.

To hear the plaintiffs tell it, the BEPS are analogous to the ordinance at issue in *Berkeley* because they "limit" and "penalize" the use of gas appliances. ECF 55, at 28. But even assuming

*Berkeley* bound this Court—which it does not—the plaintiffs' reliance on *Berkeley* rests on a faulty premise. The BEPS do not restrict or prohibit the use of gas appliances in the way the *Berkeley* Court deemed problematic. A regulated party subject to the BEPS need not abandon their gas appliances or even use them less. They can reduce a building's emissions in other ways, such as by installing carbon-capture technology.[17] Or, if they wish, they can pay a predetermined fee for every ton of emissions they emit in excess of the BEPS' benchmarks. In these respects, the BEPS are meaningfully distinct from the ordinance at issue in *Berkeley*. Far from imposing any requirements that would constrain a building owner's ability to use otherwise-available gas (like the gas-piping restrictions at issue in *Berkeley*), the BEPS instead set greenhouse gas emissions benchmarks that can be met in a variety of ways—or not met at all, if one opts instead to pay a fee. This means that a building may continue using gas at its current rate while remaining in full compliance with the regulation.

Perhaps recognizing the problem that the alternative compliance fee poses for their argument, the plaintiffs characterize the fee as a penalty on building owners who do not replace

---

[17] The plaintiffs state that "presumably," "the installation of [carbon-capture] technology . . . would have to be considered when designing and manufacturing EPCA-covered products—precisely the kind of factory-floor complications that . . . EPCA preemption was designed to prevent." ECF 55, at 31. This is not "presumable." Even a quick internet search discloses examples of carbon-capture technology that can be installed in buildings without any apparent need to modify the design of existing appliances. *See, e.g.*, *Fit Guide*, CarbinX, https://www.carbinx.com/buy-carbinx [https://perma.cc/GC4B-T43P] (last visited Mar. 31, 2026) (marketing a carbon-capture unit "roughly the size of two refrigerators" that can be installed in mechanical rooms and "is compatible with UL category 1, 2 and 3 vented natural-gas heating appliances"); Paul Daling, *Innovation turns building vents into carbon-capture devices*, Univ. of Chicago Pritzker Sch. of Molecular Eng'g (Nov. 11, 2025), available at https://pme.uchicago.edu/news/innovation-turns-building-vents-carbon-capture-devices (describing recently-developed "carbon nanofiber direct air capture" filter that could be integrated into buildings' ventilation systems and "potentially turn every home, office, school or other building into a small carbon-capture system"). The plaintiffs offer no support for their assertion that carbon-capture technology requires making alterations to the design of appliances themselves, and the Court cannot take judicial notice of this presumed "fact."

their gas appliances. Many building owners, the plaintiffs argue, cannot afford to replace their gas appliances, and if they do not, they cannot meet the emissions benchmarks and must pay a compliance fee. The compliance fee, the plaintiffs insist, effectively penalizes building owners for not replacing their gas appliances. As the plaintiffs see it, this "penalty" is tantamount to a gas ban.

The plaintiffs are incorrect. A monetary assessment is a penalty "only if it is sought for the purpose of punishment, and to deter others from offending in like manner." *Gonzalez v. Sessions*, 894 F.3d 131, 138 (4th Cir. 2018) (quoting *Kokesh v. S.E.C.*, 581 U.S. 455, 462 (2017)). Nothing about the BEPS' alternative compliance fee suggests that it qualifies, literally or functionally, as a penalty. The alternative compliance fee is assessed at the same rate for all who pay it. It is not imposed as a sanction for a violation of the BEPS. *See id.* ("To properly advance the[] punitive goals of retribution and deterrence, a particular punishment or penalty must account for the culpability flowing from the actor's underlying conduct."). It is, rather, an elective option—a *means of complying* with the law rather than a punishment for violating it. Moreover, as amicus Public Health Law Center observes, there is a preexisting penalty scheme under Maryland law for violating regulations such as the BEPS. *See* ECF 52, at 6. The state may pursue fines running into the tens of thousands of dollars against violators. *See* Md. Code Ann., Env't §§ 2-610, 2-610.1. There is no indication that the BEPS' alternative compliance fee was intended to supplant this penalty scheme.

True, as the plaintiffs argue, for some building owners, it may ultimately be more cost-effective to replace their gas appliances. But not even the *Berkeley* Court went so far as to conclude that EPCA preempts regulations that merely discourage gas usage. As one member of the panel explained in concurrence, "EPCA preemption is unlikely to reach a host of state and local regulations that incidentally impact" covered products' gas usage. *See Berkeley*, 89 F.4th at 1117

(Baker, J., concurring). Indeed, Judge Baker observed in his concurrence that "states and local governments are likely free to impose carbon taxes designed to discourage such consumption." *Id.* If that is so, it strains credulity to suggest that Maryland could not structure its building regulations in such a way as to render alternatives to gas appliances a more financially attractive option.

For plaintiffs with financial constraints, phasing out gas appliances may be the only feasible option. For them, the BEPS may effectively require, not merely encourage, the abandonment of gas appliances. Even if that meant the BEPS were preempted for those plaintiffs, the plaintiffs have brought a facial challenge: They ask this Court to find there is no set of circumstances under which the BEPS would be lawful under EPCA. To succeed on their facial challenge, the plaintiffs cannot point to *some* circumstances under which the BEPS would be preempted. Instead, they must plausibly allege that the BEPS would be preempted under *every* circumstance. *See, e.g.*, *Cal. Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572, 593 (1987) ("To defeat Granite Rock's facial [preemption] challenge [to the California Coastal Commission's permit requirement], the Coastal Commission needed merely to identify a possible set of permit conditions not in conflict with federal law."); *Iowa Migrant Movement for Just. v. Bird*, 157 F.4th 904, 919 (8th Cir. 2025) (noting that to defeat plaintiffs' preemption challenge to Iowa law, defendant needed to "show only that the Act '[was] constitutional in some of its applications'") (quoting *United States v. Rahimi*, 602 U.S. 680, 693 (2024)). They have not done so here. By the plaintiffs' own allegations, at least some of them *do* have a choice (albeit one they would rather not make) between replacing their gas appliances and pursuing another compliance option. *See, e.g.*, ECF 36 ¶ 14 (stating that members of Building Owners and Managers of Greater Baltimore "will incur costs in replacing existing gas appliances in order to comply with the . . . BEPS *or* will be forced to" pay the compliance fee) (emphasis added); *id.* ¶ 24 (stating that "[f]or those buildings

37

that cannot comply with the . . . BEPS in an economically viable manner, *the best of a bad series of options* may be" to install "new structures, at great cost") (emphasis added). That dooms their facial preemption challenge.

The plaintiffs' challenge to the BEPS on federal preemption grounds fails.

## IV.    Conclusion

For the foregoing reasons, the BEPS are not a regulation "concerning the energy efficiency [and] energy use" of consumer and industrial appliances covered by EPCA's preemption provisions, 42 U.S.C. §§ 6297(c) and 6316(b)(2)(A). The BEPS are not preempted by EPCA. MDOE's motion to dismiss is granted. This case is dismissed with prejudice because there are no facts the plaintiffs can allege to establish that EPCA preempts the BEPS. A separate Order follows.

Date: March 31, 2026

_____
Deborah L. Boardman
United States District Judge

38
JA077

APPEAL,CLOSED

# U.S. District Court
## District of Maryland (Greenbelt)
### CIVIL DOCKET FOR CASE #: 8:25-cv-00113-DLB

Maryland Building Industry Association, Inc. et al v. McIlwain
Assigned to: Judge Deborah L. Boardman
Case in other court: Fourth Circuit Court of Appeals, 26-01552
Cause: 42:6201 Energy Policy & Conservation Act (statement of purpose)

Date Filed: 01/13/2025
Date Terminated: 03/31/2026
Jury Demand: None
Nature of Suit: 890 Other Statutory Actions
Jurisdiction: Federal Question

**Plaintiff**

**Maryland Building Industry Association, Inc.**

represented by **Ronald Scott Novak , Jr.**
Baker Botts L.L.P.
700 K St NW
Washington, DC 20001
202-304-5099
Fax: 202-585-1000
Email: scott.novak@bakerbotts.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**J. Mark Little**
Baker Botts L.L.P.
910 Louisiana Street
Houston, TX 77002
713-229-1489
Email: mark.little@bakerbotts.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**The Building Owners and Managers Association of Greater Baltimore, Inc.**

represented by **Ronald Scott Novak , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**J. Mark Little**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**NAIOP Maryland, Inc.**

represented by **Ronald Scott Novak , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

JA078

**J. Mark Little**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**NAIOP DC | MD, Inc.**　　　　represented by　**Ronald Scott Novak , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**J. Mark Little**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Maryland Multi-Housing Association, Inc.**　　　represented by　**Ronald Scott Novak , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**J. Mark Little**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Washington Gas Light Company**　　　represented by　**Ronald Scott Novak , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**J. Mark Little**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Leisure World Community Corporation**　　　represented by　**Ronald Scott Novak , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**J. Mark Little**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**The Elizabeth Condominium Association, Inc.**　　　represented by　**Ronald Scott Novak , Jr.**
(See above for address)
*LEAD ATTORNEY*

JA079

*ATTORNEY TO BE NOTICED*

**J. Mark Little**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

| | | |
|---|---|---|
| **Promenade Towers Mutual Housing Corporation** | represented by | **Ronald Scott Novak , Jr.**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**J. Mark Little**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

| | | |
|---|---|---|
| **The Willoughby of Chevy Chase Condominium Council of Unit Owners, Inc.** | represented by | **Ronald Scott Novak , Jr.**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**J. Mark Little**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

| | | |
|---|---|---|
| **Columbia Gas of Maryland, Inc.** | represented by | **Ronald Scott Novak , Jr.**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **Apartment & Office Building Association of Metropolitan Washington** | represented by | **Ronald Scott Novak , Jr.**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

V.

**Defendant**

| | | |
|---|---|---|
| **Serena Coleman McIlwain**<br>*in her Official Capacity as the Secretary of the Maryland Department of the Environment* | represented by | **Doris Neil Lange**<br>Maryland Office of the Attorney General<br>1800 Washington Blvd<br>Ste 6048<br>Baltimore, MD 21230<br>815-325-2418<br>Email: doris.lange@maryland.gov<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

JA080

**Kristen Summers**
Office of the Attorney General
1800 Washington Blvd.
Baltimore, MD 21230
443-926-0955
Email: kristen.summers@maryland.gov
*ATTORNEY TO BE NOTICED*

**Michael F Strande**
Maryland Office of the Attorney General
MD Department of the Environment
1800 Washington Blvd
Baltimore, MD 21230
14105373421
Fax: 14105373943
Email: michael.strande@maryland.gov
*ATTORNEY TO BE NOTICED*

**Amicus**

**Sierra Club**                          represented by **Susan Stevens Miller**
Earthjustice
1625 Massachusetts Ave. NW Ste. 702
Washington, DC 20036
2027975246
Fax: 2026672356
Email: smiller@earthjustice.org
*ATTORNEY TO BE NOTICED*

**Timothy R. Oberleiton**
Earthjustice
1250 I St. NW
Fourth Floor
Washington, DC 20005
202-667-4500
Email: toberleiton@earthjustice.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Chesapeake Climate Action Network**    represented by **Susan Stevens Miller**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Timothy R. Oberleiton**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Public Health Law Center**             represented by **Daniel Nathan Carpenter-Gold**
Public Health Law Center
Climate Justice
875 Summit Avenue

JA081

Saint Paul, MN 55105
651-290-6329
Email:
daniel.carpentergold@mitchellhamline.edu
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jon Alan Mueller**
University of Maryland
Carey School of Law
500 W. Baltimore Street
21201-1786
Baltimore, MD 21201-1786
410-706-0590
Email: jmueller@law.umaryland.edu
*ATTORNEY TO BE NOTICED*

**Amicus**

| **American Gas Association** | represented by | **Paul A Logan** |

Post & Schell, P.C.
Pa
Three Logan Square
1717 Arch Street, 24th Floor
Philadelphia
Philadelphia, PA 19103
215-587-6608
Email: plogan@postschell.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/13/2025 | 1 | COMPLAINT *for Declaratory and Injunctive Relief* against All Defendants ( Filing fee $ 405 receipt number AMDDC-11705743.), filed by NAIOP DC | MD, Inc., Maryland Multi-Housing Association, Inc., Promenade Towers Mutual Housing Corporation, Maryland Building Industry Association, Inc., Leisure World Community Corporation, NAIOP Maryland, Inc.. (Attachments: # 1 Civil Cover Sheet Civil Cover Sheet, # 2 Summons Summons)(Novak, Ronald) (Entered: 01/13/2025) |
| 01/14/2025 |  | Case Reassigned to Judge Deborah L. Boardman. Judge Julie Rebecca Rubin no longer assigned to the case. (jf3s, Deputy Clerk) (Entered: 01/14/2025) |
| 01/14/2025 | 2 | Summons Issued 21 days as to Serena Coleman McIlwain. (av4s, Deputy Clerk) (Entered: 01/14/2025) |
| 01/14/2025 | 3 | Local Rule 103.3 Disclosure Statement by The Building Owners and Managers Association of Greater Baltimore, Inc. identifying Other Affiliate Building Owners and Managers Association (BOMA) International for The Building Owners and Managers Association of Greater Baltimore, Inc..(Novak, Ronald) (Entered: 01/14/2025) |
| 01/14/2025 | 4 | Local Rule 103.3 Disclosure Statement by The Elizabeth Condominium Association, Inc. (Novak, Ronald) (Entered: 01/14/2025) |
| 01/14/2025 | 5 | Local Rule 103.3 Disclosure Statement by Leisure World Community Corporation identifying Other Affiliate Montgomery Mutual, Inc., Other Affiliate Leisure World of |

JA082

| | | |
|---|---|---|
| | | Maryland Corporation, Other Affiliate Maryland Mutual No. 5, Inc., Other Affiliate Council of Unit Owners of Mutual 6-A Condominium of Rossmoor, Inc., Other Affiliate Council of Unit Owners of Mutual 6-B Condominium of Rossmoor, Inc., Other Affiliate Villa Cortese at Leisure World, A Condominium, Other Affiliate Maryland Mutual No. 7, Inc., Other Affiliate Maryland Mutual No. 8, Inc, Other Affiliate Maryland Mutual No. 9, Inc, Other Affiliate Maryland Mutual No. 10, Inc, Other Affiliate Maryland Mutual No. 11, Inc., Other Affiliate Maryland Mutual No. 12, Inc., Other Affiliate Maryland Mutual No. 13, Inc., Other Affiliate Council of Unit Owners of Mutual 14 - Condominium of Rossmoor, Inc., Other Affiliate Council of Unit Owners of Mutual 15 - Condominium of Rossmoor, Inc., Other Affiliate Council of Unit Owners of Mutual 16 - Condominium of Rossmoor, Inc., Other Affiliate The Fairways South of Leisure World, A Condominium, Other Affiliate The Fairways North of Leisure World, A Condominium, Other Affiliate Council of Unit Owners of Mutual 18 - Condominium of Rossmoor, Inc., Other Affiliate Council of Unit Owners of Mutual 19A - Condominium of Rossmoor, Inc., Other Affiliate Council of Unit Owners of Mutual 19B - Condominium of Rossmoor, Inc., Other Affiliate The Greens at Leisure World, A Condominium, Other Affiliate The Greens at Leisure World II, A Condominium, Other Affiliate Turnberry Courts at Leisure World, A Condominium, Other Affiliate Council of Unit Owners of Mutual 22 - Condominium of Rossmoor, Inc., Other Affiliate Vantage Point West at Leisure World, A Condominium, Other Affiliate Vantage Point East at Leisure World, A Condominium, Other Affiliate Regency Homeowners Association, Other Affiliate The Overlook at Leisure World, A Condominium, Other Affiliate Creekside at Leisure World, A Condominium for Leisure World Community Corporation.(Novak, Ronald) (Entered: 01/14/2025) |
| 01/14/2025 | 6 | Local Rule 103.3 Disclosure Statement by Maryland Building Industry Association, Inc. identifying Other Affiliate Home Builders Care Foundation, Other Affiliate Builders Development Guaranty Group for Maryland Building Industry Association, Inc..(Novak, Ronald) (Entered: 01/14/2025) |
| 01/14/2025 | 7 | Local Rule 103.3 Disclosure Statement by NAIOP DC \| MD, Inc. identifying Other Affiliate NAIOP - Commercial Real Estate Development Association for NAIOP DC \| MD, Inc..(Novak, Ronald) (Entered: 01/14/2025) |
| 01/14/2025 | 8 | Local Rule 103.3 Disclosure Statement by NAIOP Maryland, Inc. identifying Other Affiliate NAIOP-Commercial Real Estate Development Association for NAIOP Maryland, Inc..(Novak, Ronald) (Entered: 01/14/2025) |
| 01/14/2025 | 9 | Local Rule 103.3 Disclosure Statement by Washington Gas Light Company identifying Other Affiliate WGL Holdings, Inc., Other Affiliate Wrangler SPE LLC, Other Affiliate AltaGas Ltd., Other Affiliate AltaGas Services (U.S.) Inc., Other Affiliate AltaGas Utility Holdings (U.S.) Inc., Other Affiliate Wrangler 1 LLC for Washington Gas Light Company. (Novak, Ronald) (Entered: 01/14/2025) |
| 01/14/2025 | 10 | Local Rule 103.3 Disclosure Statement by Maryland Multi-Housing Association, Inc. (Novak, Ronald) (Entered: 01/14/2025) |
| 01/14/2025 | 11 | Local Rule 103.3 Disclosure Statement by The Willoughby of Chevy Chase Condominium Council of Unit Owners, Inc. (Novak, Ronald) (Entered: 01/14/2025) |
| 01/14/2025 | 12 | Local Rule 103.3 Disclosure Statement by Promenade Towers Mutual Housing Corporation (Novak, Ronald) (Entered: 01/14/2025) |
| 01/14/2025 | 13 | MOTION to Appear Pro Hac Vice for Jonathan Mark Little (Filing fee $100, receipt number AMDDC-11707972.) by Washington Gas Light Company, Leisure World Community Corporation, The Elizabeth Condominium Association, Inc., Promenade Towers Mutual Housing Corporation, The Willoughby of Chevy Chase Condominium Council of Unit Owners, Inc., Maryland Building Industry Association, Inc., The Building |

JA083

| | | |
|---|---|---|
| | | Owners and Managers Association of Greater Baltimore, Inc., NAIOP Maryland, Inc., NAIOP DC | MD, Inc., Maryland Multi-Housing Association, Inc.(Novak, Ronald) (Entered: 01/14/2025) |
| 01/15/2025 | 14 | QC NOTICE: 13 Motion to Appear Pro Hac Vice,, filed by The Building Owners and Managers Association of Greater Baltimore, Inc., The Willoughby of Chevy Chase Condominium Council of Unit Owners, Inc., Promenade Towers Mutual Housing Corporation, Leisure World Community Corporation, NAIOP Maryland, Inc., Maryland Multi-Housing Association, Inc., NAIOP DC | MD, Inc., Washington Gas Light Company, Maryland Building Industry Association, Inc., The Elizabeth Condominium Association, Inc. needs to be modified. See attachment for details and corrective actions needed regarding the signature(s) on the motion. (mh4s, Deputy Clerk) (Entered: 01/15/2025) |
| 01/15/2025 | 15 | CORRECTED MOTION to Appear Pro Hac Vice for Jonathan Mark Little by Washington Gas Light Company, Leisure World Community Corporation, The Elizabeth Condominium Association, Inc., Promenade Towers Mutual Housing Corporation, The Willoughby of Chevy Chase Condominium Council of Unit Owners, Inc., Maryland Building Industry Association, Inc., The Building Owners and Managers Association of Greater Baltimore, Inc., NAIOP Maryland, Inc., NAIOP DC | MD, Inc., Maryland Multi-Housing Association, Inc.. The fee has already been paid.(Novak, Ronald) (Entered: 01/15/2025) |
| 01/15/2025 | 16 | PAPERLESS ORDER granting 15 Corrected Motion to Appear Pro Hac Vice on behalf of J. Mark Little. Directing attorney J. Mark Little to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 1/15/2025. (mh4s, Deputy Clerk) (Entered: 01/15/2025) |
| 02/03/2025 | 17 | -FILED IN ERROR- AFFIDAVIT of Service for Complaint and Summons served on Serena Coleman McIlwain on 01/31/2025, filed by Washington Gas Light Company, Leisure World Community Corporation, The Elizabeth Condominium Association, Inc., Promenade Towers Mutual Housing Corporation, The Willoughby of Chevy Chase Condominium Council of Unit Owners, Inc., Maryland Building Industry Association, Inc., The Building Owners and Managers Association of Greater Baltimore, Inc., NAIOP Maryland, Inc., NAIOP DC | MD, Inc., Maryland Multi-Housing Association, Inc..(Little, J.) Modified on 2/3/2025 (ols). (Entered: 02/03/2025) |
| 02/03/2025 | 18 | QC NOTICE: 17 Affidavit of Service,, filed by The Building Owners and Managers Association of Greater Baltimore, Inc., The Willoughby of Chevy Chase Condominium Council of Unit Owners, Inc., Promenade Towers Mutual Housing Corporation, Leisure World Community Corporation, NAIOP Maryland, Inc., Maryland Multi-Housing Association, Inc., NAIOP DC | MD, Inc., Washington Gas Light Company, Maryland Building Industry Association, Inc., The Elizabeth Condominium Association, Inc. was filed incorrectly. *\*\*Incorrect event used. Please refile using Service of Process > Summons Returned Executed. It has been noted as FILED IN ERROR, and the document link has been disabled.* (ols, Deputy Clerk) (Entered: 02/03/2025) |
| 02/03/2025 | 19 | SUMMONS Returned Executed by Washington Gas Light Company, The Building Owners and Managers Association of Greater Baltimore, Inc., NAIOP DC | MD, Inc., Maryland Multi-Housing Association, Inc., Promenade Towers Mutual Housing Corporation, The Elizabeth Condominium Association, Inc., Maryland Building Industry Association, Inc., Leisure World Community Corporation, The Willoughby of Chevy Chase Condominium Council of Unit Owners, Inc., NAIOP Maryland, Inc.. Serena Coleman McIlwain served on 1/31/2025, answer due 2/21/2025.(Little, J.) (Entered: 02/03/2025) |

| 02/03/2025 | 20 | Consent MOTION for Extension of Time to File Response/Reply by Serena Coleman McIlwain. (Attachments: # 1 Text of Proposed Order Proposed Order)(Lange, Doris) (Entered: 02/03/2025) |
|---|---|---|
| 02/06/2025 | 21 | PAPERLESS ORDER granting 20 Motion for Extension of Time to File Response to Complaint. The defendant's response is due April 1, 2025. Signed by Judge Deborah L. Boardman on 2/6/2025. (lmys, Chambers) (Entered: 02/06/2025) |
| 04/01/2025 | 22 | NOTICE of Appearance by Michael F Strande on behalf of Serena Coleman McIlwain (Strande, Michael) (Entered: 04/01/2025) |
| 04/01/2025 | 23 | MOTION to Dismiss for Failure to State a Claim by Serena Coleman McIlwain (Attachments: # 1 Memorandum in Support of Motion to Dismiss, # 2 Text of Proposed Order)(Lange, Doris) (Entered: 04/01/2025) |
| 04/07/2025 | 24 | NOTICE of Appearance by Susan Stevens Miller on behalf of Sierra Club, Chesapeake Climate Action Network (Miller, Susan) (Entered: 04/07/2025) |
| 04/07/2025 | 25 | MOTION to Appear Pro Hac Vice for Timothy R. Oberleiton (Filing fee $100, receipt number AMDDC-11894364.) by Chesapeake Climate Action Network, Sierra Club(Miller, Susan) (Entered: 04/07/2025) |
| 04/07/2025 | 26 | Local Rule 103.3 Disclosure Statement by Sierra Club (Miller, Susan) (Entered: 04/07/2025) |
| 04/07/2025 | 27 | Local Rule 103.3 Disclosure Statement by Chesapeake Climate Action Network (Miller, Susan) (Entered: 04/07/2025) |
| 04/08/2025 | 28 | MOTION for Leave to File *Brief Amicus Curiae* by Chesapeake Climate Action Network, Sierra Club (Attachments: # 1 Amicus Brief)(Miller, Susan) (Entered: 04/08/2025) |
| 04/08/2025 | 29 | MOTION for Leave to File by Public Health Law Center (Attachments: # 1 Memorandum in Support)(Mueller, Jon) (Entered: 04/08/2025) |
| 04/08/2025 | 30 | Local Rule 103.3 Disclosure Statement by Public Health Law Center (Mueller, Jon) (Entered: 04/08/2025) |
| 04/09/2025 | 31 | QC NOTICE: 29 Motion for Leave to File filed by Public Health Law Center was filed incorrectly. *\*The following attachments or exhibits are missing - Proposed Order. To correct this problem, file Proposed Order using the event Notice (Other) and link Proposed Order to 29 .* (ols, Deputy Clerk) (Entered: 04/09/2025) |
| 04/09/2025 | 32 | QC NOTICE: 28 Motion for Leave to File filed by Chesapeake Climate Action Network, Sierra Club was filed incorrectly. *\*The following attachments or exhibits are missing - Proposed Order. To correct this problem, file Proposed Order using the event Notice (Other) and link Proposed Order to 28 .* (ols, Deputy Clerk) (Entered: 04/09/2025) |
| 04/09/2025 | 33 | NOTICE by Public Health Law Center re 29 MOTION for Leave to File *Amicus Brief - Proposed Order* (Mueller, Jon) (Entered: 04/09/2025) |
| 04/09/2025 | 34 | PAPERLESS ORDER granting 25 Motion to Appear Pro Hac Vice on behalf of Timothy R. Oberleiton. Directing attorney Timothy R. Oberleiton to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 4/9/2025. (mh4s, Deputy Clerk) (Entered: 04/09/2025) |

JA085

| 04/09/2025 | 35 | NOTICE by Chesapeake Climate Action Network, Sierra Club re 28 MOTION for Leave to File *Brief Amicus Curiae Proposed Order* (Oberleiton, Timothy) (Entered: 04/09/2025) |
|---|---|---|
| 04/21/2025 | 36 | AMENDED COMPLAINT against Serena Coleman McIlwain, filed by NAIOP DC \| MD, Inc., Maryland Multi-Housing Association, Inc., Promenade Towers Mutual Housing Corporation, Maryland Building Industry Association, Inc., Leisure World Community Corporation, NAIOP Maryland, Inc.. (Attachments: # 1 Exhibit 1 - Redline)(Novak, Ronald) (Entered: 04/21/2025) |
| 04/21/2025 | 37 | Local Rule 103.3 Disclosure Statement by Columbia Gas of Maryland, Inc. identifying Corporate Parent NiSource Gas Distribution Group, Inc., Other Affiliate NiSource Inc. for Columbia Gas of Maryland, Inc..(Novak, Ronald) (Entered: 04/21/2025) |
| 04/22/2025 | 38 | (FILED IN ERROR PER COUNSEL)ocal Rule 103.3 Disclosure Statement by Apartment & Office Building Association of Metropolitan Washington identifying Other Affiliate AOBA Alliance, Inc., Other Affiliate Professional Management Association for Apartment & Office Building Association of Metropolitan Washington.(Novak, Ronald) Modified on 4/23/2025 (kb3s). (Entered: 04/22/2025) |
| 04/23/2025 | 39 | Local Rule 103.3 Disclosure Statement by Apartment & Office Building Association of Metropolitan Washington identifying Other Affiliate AOBA Alliance, Inc., Other Affiliate Professional Management Association for Apartment & Office Building Association of Metropolitan Washington.(Novak, Ronald) (Entered: 04/23/2025) |
| 04/25/2025 | 40 | MOTION to Appear Pro Hac Vice for Daniel Carpenter-Gold (Filing fee $100, receipt number AMDDC-11935511.) by Public Health Law Center(Mueller, Jon) (Entered: 04/25/2025) |
| 04/28/2025 | 41 | PAPERLESS ORDER granting 40 Motion to Appear Pro Hac Vice on behalf of Daniel Nathan Carpenter-Gold. Directing attorney Daniel Nathan Carpenter-Gold to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 4/28/2025. (mh4s, Deputy Clerk) (Entered: 04/28/2025) |
| 04/28/2025 | 42 | Joint MOTION for Other Relief *To Set Briefing Schedule for Motion to Dismiss* by Maryland Building Industry Association, Inc. (Attachments: # 1 Proposed Order)(Novak, Ronald) (Entered: 04/28/2025) |
| 05/01/2025 | 43 | PAPERLESS ORDER granting 42 Motion to set schedule. The Defendant has until May 5, 2025 to file its Motion to Dismiss Plaintiffs' Amended Complaint; Plaintiffs have until July 7, 2025 to file their Response to Defendant's Motion to Dismiss Plaintiffs Amended Complaint; and Defendant has until August 6, 2025 to its Reply in support of its Motion to Dismiss. Signed by Judge Deborah L. Boardman on 5/1/2025. (lmys, Chambers) (Entered: 05/01/2025) |
| 05/01/2025 | 44 | PAPERLESS ORDER granting 28 Motion for Leave to File Amicus Brief. Signed by Judge Deborah L. Boardman on 5/1/2025. (lmys, Chambers) (Entered: 05/01/2025) |
| 05/01/2025 | 45 | PAPERLESS ORDER granting 29 Motion for Leave to File Amicus Brief. Signed by Judge Deborah L. Boardman on 5/1/2025. (lmys, Chambers) (Entered: 05/01/2025) |
| 05/01/2025 | 46 | PAPERLESS ORDER finding as moot 23 Motion to Dismiss for Failure to State a Claim in light of 36 amended complaint and the defendant's intent to file a motion to dismiss the amended complaint, see ECF 42 . Signed by Judge Deborah L. Boardman on 5/1/2025. (lmys, Chambers) (Entered: 05/01/2025) |

| 05/01/2025 | 47 | Amicus Curiae Brief in Support re 23 MOTION to Dismiss for Failure to State a Claim filed by Chesapeake Climate Action Network, Sierra Club. (ols, Deputy Clerk) (Entered: 05/01/2025) |
|---|---|---|
| 05/01/2025 | 48 | Amicus Curiae Brief in Support re 23 MOTION to Dismiss for Failure to State a Claim filed by Public Health Law Center. (ols, Deputy Clerk) (Entered: 05/01/2025) |
| 05/05/2025 | 49 | MOTION to Dismiss for Failure to State a Claim by Serena Coleman McIlwain (Attachments: # 1 Memorandum in Support of Motion to Dismiss First Amended Complaint, # 2 Text of Proposed Order)(Lange, Doris) (Entered: 05/05/2025) |
| 05/12/2025 | 50 | MOTION for Leave to File *Brief Amicus Curiae* by Public Health Law Center (Attachments: # 1 Proposed Brief of Amicus Curiae Public Health Law Center, # 2 Proposed Order Granting Leave to File Brief)(Carpenter-Gold, Daniel) (Entered: 05/12/2025) |
| 05/13/2025 | 51 | PAPERLESS ORDER granting 50 Motion for Leave to File Amicus Brief. Signed by Judge Deborah L. Boardman on 5/13/2025. (lmys, Chambers) (Entered: 05/13/2025) |
| 05/13/2025 | 52 | AMICUS BRIEF in Support re 49 MOTION to Dismiss for Failure to State a Claim filed by Public Health Law Center. (ols, Deputy Clerk) (Entered: 05/13/2025) |
| 07/07/2025 | 53 | -FILED IN ERROR- RESPONSE to Motion re 49 MOTION to Dismiss for Failure to State a Claim filed by Columbia Gas of Maryland, Inc., Leisure World Community Corporation, Maryland Building Industry Association, Inc., Maryland Multi-Housing Association, Inc., NAIOP DC | MD, Inc., NAIOP Maryland, Inc., Promenade Towers Mutual Housing Corporation. (Attachments: # 1 Proposed Order)(Novak, Ronald) Modified on 7/8/2025 (ols). (Entered: 07/07/2025) |
| 07/08/2025 | 54 | QC NOTICE: 53 Response to Motion, filed by Promenade Towers Mutual Housing Corporation, Leisure World Community Corporation, NAIOP Maryland, Inc., Columbia Gas of Maryland, Inc., Maryland Multi-Housing Association, Inc., NAIOP DC | MD, Inc., Maryland Building Industry Association, Inc. was filed incorrectly. *\*\*Incorrect event used. Please refile using Responses and Replies > Response in Opposition to Motion. It has been noted as FILED IN ERROR, and the document link has been disabled.* (ols, Deputy Clerk) (Entered: 07/08/2025) |
| 07/08/2025 | 55 | RESPONSE in Opposition re 49 MOTION to Dismiss for Failure to State a Claim filed by Apartment & Office Building Association of Metropolitan Washington, Columbia Gas of Maryland, Inc., Leisure World Community Corporation, Maryland Building Industry Association, Inc., Maryland Multi-Housing Association, Inc., NAIOP DC | MD, Inc., NAIOP Maryland, Inc., Promenade Towers Mutual Housing Corporation, The Building Owners and Managers Association of Greater Baltimore, Inc., The Elizabeth Condominium Association, Inc., The Willoughby of Chevy Chase Condominium Council of Unit Owners, Inc., Washington Gas Light Company. (Attachments: # 1 Proposed Order)(Novak, Ronald) (Entered: 07/08/2025) |
| 07/14/2025 | 56 | MOTION for Leave to File *Amicus Curiae Brief in Support of Plaintiffs* by American Gas Association (Attachments: # 1 Attachment Brief of Amicus Curiae American Gas Association in Support of Plaintiffs)(Logan, Paul) (Entered: 07/14/2025) |
| 07/14/2025 | 57 | Local Rule 103.3 Disclosure Statement by American Gas Association (Logan, Paul) (Entered: 07/14/2025) |
| 07/15/2025 | 58 | QC NOTICE: 56 Motion for Leave to File filed by American Gas Association was filed incorrectly. *\*\*The following attachments or exhibits are missing - Proposed Order. To correct this* |

| | | |
|---|---|---|
| | | *problem, file Proposed Order using the event Notice (Other) and link Proposed Order to* 56 . (ols, Deputy Clerk) (Entered: 07/15/2025) |
| 07/15/2025 | 59 | NOTICE by American Gas Association re 56 MOTION for Leave to File *Amicus Curiae Brief in Support of Plaintiffs* (Attachments: # 1 Text of Proposed Order)(Logan, Paul) (Entered: 07/15/2025) |
| 07/17/2025 | 60 | PAPERLESS ORDER granting 56 Motion for Leave to File amicus brief. Signed by Judge Deborah L. Boardman on 7/17/2025. (lmys, Chambers) (Entered: 07/17/2025) |
| 07/17/2025 | 61 | BRIEF of Amicus Curiae in Support of Plaintiffs filed by American Gas Association. (ols, Deputy Clerk) (Entered: 07/18/2025) |
| 08/06/2025 | 62 | REPLY to Response to Motion re 49 MOTION to Dismiss for Failure to State a Claim filed by Serena Coleman McIlwain. (Attachments: # 1 Attachment Attachment A, Rinnai America Corp. v. South Coast Air Quality Management District (slip op))(Lange, Doris) (Entered: 08/06/2025) |
| 08/07/2025 | 63 | NOTICE of Appearance by Kristen Summers on behalf of Serena Coleman McIlwain (Summers, Kristen) (Entered: 08/07/2025) |
| 03/31/2026 | 64 | NOTICE by Serena Coleman McIlwain re 49 MOTION to Dismiss for Failure to State a Claim *Notice of Supplemental Authority* (Summers, Kristen) (Entered: 03/31/2026) |
| 03/31/2026 | 65 | MEMORANDUM OPINION. Signed by Judge Deborah L. Boardman on 3/31/2026. (kns, Deputy Clerk) (Entered: 03/31/2026) |
| 03/31/2026 | 66 | ORDER granting 49 Motion to Dismiss for Failure to State a Claim. Signed by Judge Deborah L. Boardman on 3/31/2026. (kns, Deputy Clerk) (Entered: 03/31/2026) |
| 04/02/2026 | 67 | AMENDED MEMORANDUM OPINION. Signed by Judge Deborah L. Boardman on 4/2/2026. (ols, Deputy Clerk) (Entered: 04/02/2026) |
| 04/29/2026 | 68 | NOTICE OF APPEAL as to 67 Memorandum Opinion, 66 Order on Motion to Dismiss for Failure to State a Claim, 65 Memorandum Opinion by Apartment & Office Building Association of Metropolitan Washington, Columbia Gas of Maryland, Inc., Leisure World Community Corporation, Maryland Building Industry Association, Inc., Maryland Multi-Housing Association, Inc., NAIOP DC | MD, Inc., NAIOP Maryland, Inc., Promenade Towers Mutual Housing Corporation, The Building Owners and Managers Association of Greater Baltimore, Inc., The Elizabeth Condominium Association, Inc., The Willoughby of Chevy Chase Condominium Council of Unit Owners, Inc., Washington Gas Light Company. Filing fee $ 605, receipt number AMDDC-12718354.(Novak, Ronald) (Entered: 04/29/2026) |
| 04/30/2026 | 69 | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals re 68 Notice of Appeal. IMPORTANT NOTICE: To access forms which you are required to file with the United States Court of Appeals for the Fourth Circuit please go to http://www.ca4.uscourts.gov and click on Forms & Notices.(slss, Deputy Clerk) (Entered: 04/30/2026) |
| 05/04/2026 | 70 | USCA Case Number 26-1552 for 68 Notice of Appeal, filed by The Building Owners and Managers Association of Greater Baltimore, Inc., The Willoughby of Chevy Chase Condominium Council of Unit Owners, Inc., Apartment & Office Building Association of Metropolitan Washington, Promenade Towers Mutual Housing Corporation, Leisure World Community Corporation, NAIOP Maryland, Inc., Columbia Gas of Maryland, Inc., Maryland Multi-Housing Association, Inc., NAIOP DC | MD, Inc., Washington Gas Light Company, Maryland Building Industry Association, Inc., The Elizabeth Condominium Association, Inc. - Case Manager - K. Hancock. (slss, Deputy Clerk) (Entered: 05/04/2026) |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

MARYLAND BUILDING INDUSTRY
ASSOCIATION, INC.
11825 West Market Place
Fulton, MD 20759

THE BUILDING OWNERS AND
MANAGERS ASSOCIATION OF
GREATER BALTIMORE, INC.
2331 Rock Spring Road
Forest Hill, MD 21050

NAIOP MARYLAND, INC.
6030 Marshalee Drive, Suite 208
Elkridge, MD 21075

NAIOP DC | MD, INC.
12300 Twinbrook Pkwy, Suite 600
Rockville, MD 20852

MARYLAND MULTI-HOUSING
ASSOCIATION, INC.
11155 Dolfield Blvd, Suite 200
Owings Mills, MD 21117

WASHINGTON GAS LIGHT COMPANY
1000 Maine Ave, SW
Washington, DC 20024

LEISURE WORLD COMMUNITY
CORPORATION
3701 Rossmoor Boulevard
Silver Spring, MD 20906

THE ELIZABETH CONDOMINIUM
ASSOCIATION, INC.
4601 N Park Ave
Chevy Chase, MD 20815

PROMENADE TOWERS MUTUAL
HOUSING CORPORATION
5225 Pooks Hill Rd
Bethesda, MD 20814

CASE NO. 1:25-cv-113

**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

1

JA089

THE WILLOUGHBY OF CHEVY CHASE
CONDOMINIUM COUNCIL OF UNIT
OWNERS, INC.
4515 Willard Ave
Chevy Chase, MD 20815

     *Plaintiffs,*

  v.

SERENA COLEMAN McILWAIN, in her
Official Capacity as the Secretary of the
Maryland Department of the Environment
1800 Washington Blvd,
Baltimore, MD 21230

     *Defendant.*

## INTRODUCTION

1. Plaintiffs Maryland Building Industry Association, Inc., The Building Owners and Managers Association of Greater Baltimore, Inc., NAIOP Maryland, Inc., NAIOP DC | MD, Inc., Maryland Multi-Housing Association, Inc., Washington Gas Light Company, Leisure World Community Corporation, The Elizabeth Condominium Association, Inc., Promenade Towers Mutual Housing Corporation, and The Willoughby of Chevy Chase Condominium Council of Unit Owners, Inc. seek declaratory and injunctive relief under federal law against enforcement of Code of Maryland Regulations ("COMAR") 26.28 Building Energy Performance Standards ("Maryland BEPS"). The Energy Policy and Conservation Act ("EPCA"), 42 U.S.C. §§ 6201-6422, regulates the energy use and efficiency of many gas appliances and expressly and broadly preempts state and local laws on that subject. The Maryland BEPS fall within the heartland of EPCA's express preemption provision because they regulate and restrict the energy use and efficiency of these covered appliances by restricting and penalizing the carbon dioxide emissions from covered

2

buildings. As such, the Maryland BEPS are preempted by EPCA and unenforceable as a matter of law.

2. Born out of the oil crisis of the 1970s and the accompanying concerns with energy independence, EPCA implements a national energy policy that, among other things, regulates the energy use and energy efficiency of appliances. *See, e.g.*, 42 U.S.C. § 6297(c). The thrust of EPCA is that nationally uniform energy use and efficiency standards are the best way to promote conservation goals while ensuring energy security and domestic supply and preserving consumer choice. *See, e.g.*, *id.*; S. Rep. No. 100-6, at 4 (1987); H.R. Rep. No. 100-11, at 24 (1987).

3. To accomplish that needed national uniformity, EPCA expressly preempts state and local regulations concerning the energy use and energy efficiency of products for which EPCA sets energy conservation standards—with only the narrowest of exceptions to that preemption for state and local regulations that meet certain stringent statutory conditions. 42 U.S.C. §§ 6297(c)(3), (f)(3).

4. The Ninth Circuit's recent invalidation of the City of Berkeley's prohibition on gas piping in new buildings illustrates how EPCA preemption operates to prohibit attempts to regulate the energy use or efficiency of gas appliances. *Cal. Rest. Ass'n v. City of Berkeley*, 65 F.4th 1045 (9th Cir. 2023), *amended and superseded by Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094 (9th Cir. 2024). Perhaps most notable is that the unanimous Ninth Circuit panel emphasized that "EPCA would no doubt preempt an ordinance that directly prohibits the use of covered natural gas appliances in new buildings." *Cal. Rest. Ass'n*, 89 F.4th at 1107. And "States and localities can't skirt the text of broad preemption provisions by doing *indirectly* what Congress says they can't do *directly*." *Id.* Because the Maryland BEPS are an attempt to "skirt the text" of EPCA preemption

3

provisions, there is "no doubt" that EPCA preempts it. *See id.* Indeed, some state and local governments have since taken note of EPCA and reconsidered their efforts to enact similar regulations. *See, e.g.,* Kale Williams, *Eugene reverses natural gas ban after ruling by federal appeals court*, KGW8 (July 12, 2023), https://www.kgw.com/article/news/politics/natural-gas-ban-eugene-oregon-repealed/283-5195461a-22cd-4176-9db7-8047fb56d887.    Because    the Maryland Department of the Environment ("Department") did not do so on its own, the Court must order the Defendant to do the same.

5.   The Maryland BEPS inflict serious and irreparable harm by restricting and penalizing EPCA-covered gas appliances in new and existing buildings through a series of declining carbon dioxide emissions limits for covered buildings. That policy is at odds with the needs of Maryland residents, workers, and businesses for affordable, resilient, and reliable energy. Restricting the use of gas-powered cooking ranges, water heaters, furnaces, and other appliances or equipment is fundamentally inconsistent with the public interest, restricts consumer choice, exacerbates the State's housing crisis, and aims to shift the State's energy demand to an electric system that is facing both historic and increasing electricity demand and dwindling dispatchable electricity supply.

6.   Plaintiffs stand to lose much if the Maryland BEPS are not enjoined. Plaintiffs and their members have interests in a broad range of residential and commercial buildings covered by the Maryland BEPS and in the natural gas and the gas delivery infrastructure that is used to provide gas service to those buildings. The Maryland BEPS will cause Plaintiffs financial harm, diminish their businesses, and substantially increase the cost for homes, lodging, and energy in Maryland—all despite federal law's express preemption of the regulations.

4

JA092

7. Even though the Maryland BEPS do not demand zero carbon dioxide emissions until 2040, their restrictions on gas appliances have a chilling effect now and are already undermining Plaintiffs' livelihoods, harming profits, disrupting long-term business strategy and asset planning, jeopardizing jobs, and hampering the ongoing development of new and desperately needed multifamily homes. Indeed, the Department itself recognizes the immediate impact of the Maryland BEPS: "Between 2025 and 2040, building owners whose buildings do not already meet the BEPS standards will be required to implement energy efficiency measures and/or electrification measures or pay alternative compliance fees in order to comply." Maryland Department of the Environment, Technical Support Document for COMAR 26.28 – Building Energy Performance Standards, Nov. 2023 at 6, https://mde.maryland.gov/programs/regulations/air/Documents/BEPS/BEPS%20TSD%20PACKAGE%20FINAL%20%2812-5-2023%29.pdf. Additionally, the Maryland BEPS require building owners to submit certain "benchmarking information," a process which is both time-consuming and costly, starting on June 1, 2025, and annually thereafter. COMAR 26.28.02.02. Similarly, the Maryland BEPS also require gas utilities to provide data on building energy consumption to building owners upon request starting on January 1, 2025. COMAR 26.28.02.04.

8. In sum, the Maryland BEPS are plainly preempted by EPCA, are already inflicting harm on Plaintiffs and their members, and will cause even more harm unless enjoined. Plaintiffs accordingly bring this action seeking a declaration that the Maryland BEPS are preempted by EPCA and an injunction against their enforcement.

5

**JURISDICTION AND VENUE**

9. Jurisdiction is proper because, under 42 U.S.C. § 6306(c), federal district courts have jurisdiction over suits brought by any adversely affected person concerning state compliance with EPCA. Additionally, under 28 U.S.C. § 1331, the Court has federal question jurisdiction to determine the claims involving EPCA.

10. This Court has personal jurisdiction over the Defendant, as she is domiciled in Maryland and the claim asserted arises out of her actions in Maryland as the Secretary of the Maryland Department of Environment in Maryland.

11. This Court has authority to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202 and Rules 57 and 65 of the Federal Rules of Civil Procedure.

12. Venue in this Court is proper under 28 U.S.C. § 1391(b) because, among other things, (i) the actions violating federal law stated in this Complaint impose injury in the state of Maryland, where Plaintiffs or their members either reside and/or do business, and (ii) the law at issue will be enforced here.

**PARTIES**

13. Plaintiff Maryland Building Industry Association, Inc. ("MBIA") formed in 2014 as the result of a merger between two local associations with over 175 years of combined experience: the Home Builders Association of Maryland that covered the Baltimore area and the Maryland National-Capital Building Industry Association that covered the District of Columbia and Southern Maryland. MBIA is a local chapter of the National Association of Home Builders of the United States. MBIA is a not-for-profit trade organization representing the interests of over 1,100 member firms and more than 100,000 employees, including home builders, remodelers, developers, and

6

JA094

affiliate professional and service providers in the Maryland Counties of Anne Arundel, Baltimore, Calvert, Carroll, Cecil, Charles, Harford, Howard, Montgomery, Prince George's, and St. Mary's, as well as Baltimore City, the Eastern Shore, and the District of Columbia. MBIA has one or more members that do business in Maryland and are suffering or will imminently suffer harm to their profits and business operations as a result of the Maryland BEPS. For example, the Maryland BEPS frustrate MBIA's members' ability to meet customer preferences—especially at a price-point that their customers can afford—since many homeowners prefers using natural gas appliances for heating, hot water, and cooking. The increased costs of compliance with the Maryland BEPS likely will also decrease new construction, as customers will be priced out of the market. The Maryland BEPS also will limit the pool of gas customers, forcing existing gas customers like MBIA's members to pay higher rates for gas service than they would otherwise pay.

14. Plaintiff The Building Owners and Managers Association of Greater Baltimore, Inc. ("BOMA Baltimore") represents the owners and managers of all commercial property types, including 143 million square feet of office space that supports over 15,500 jobs, and contributes $2.1 billion to the Maryland economy. A professional trade association with over 300 members, BOMA Baltimore's mission is to actively represent the best interests of the commercial real estate owner, the real estate professional, and its associate members through effective leadership in advocacy, collection, and dissemination of industry information, education, community involvement, membership participation, and professional development. BOMA Baltimore has one or more members that do business in Maryland and are suffering or will imminently suffer harm to their profits and business operations as a result of the Maryland BEPS. BOMA Baltimore's

7

JA095

members will incur costs in replacing existing gas appliances in order to comply with the Maryland BEPS or will be forced to incur the yearly penalty for noncompliance with kilogram of carbon dioxide equivalent ("Kg CO2e") per square foot requirement in the Maryland BEPS. Additionally, BOMA Baltimore's members will have to meet time-consuming and expensive reporting and benchmarking requirements beginning this year.

15. Plaintiff NAIOP MD, Inc. is a commercial real estate association serving as the industry's legislative advocate, providing superior networking, education, and professional opportunities and delivering high-quality services and valuable member benefits. With more than 400 members, NAIOP MD is comprised of companies involved in development, investment, construction, brokerage, asset management, finance, architecture, engineering, and legal services associated with office, industrial, retail and mixed-use real estate. NAIOP MD members own, operate, and intend to construct new buildings that are subject to the Maryland BEPS.

16. Plaintiff NAIOP DC | MD, Inc. is an organization for those involved in all areas of commercial real estate in Washington, DC, and in Montgomery, Prince George's, and Frederick Counties in Maryland.  Founded in 1990, NAIOP DC | MD's membership represents the region's leading firms involved in all aspects of the commercial real estate industry. NAIOP DC | MD offers educational programming, networking opportunities, and legislative insight and advocacy. NAIOP DC | MD members own, operate, and intend to construct new buildings that are subject to the Maryland BEPS.

17. NAIOP MD and NAIOP DC | MD each have one or more members that do business in Maryland and are suffering or will imminently suffer harm to their profits and business operations as a result of the Maryland BEPS. For example, due to the Maryland BEPS, members will face

8

increased capital costs for equipment replacements and for increases in electric service capacity and increased utility costs from higher electricity use and from higher peak demand charges due to an inability to use hybrid heating systems. Members and their tenants that do not qualify for the limited exemption for the use of backup power generators that run on combustible fuels will be faced with increased costs of installing new standby and backup power equipment as well as risks and costs associated with shorter duration and less reliable backup power systems. Members also will experience loss of income due to vacancy and disruptions to tenant occupancy during construction and renovations made necessary by the Maryland BEPS. The Maryland BEPS will inflict further harm on members in the form of reduced property valuations due to higher operating expenses and lower net operating incomes and reduced marketability to industrial and other tenants that need or prefer fossil fuel energy systems. The Maryland BEPS also place members at a competitive disadvantage to similarly situated buildings in neighboring states and Maryland buildings that are smaller than 35,000 square feet and are thus not subject to the Maryland BEPS. With or without making operational and physical changes to covered buildings, failure to meet the applicable Kg $CO_2e$ per square foot requirement will force members to incur the yearly penalty for noncompliance with the Maryland BEPS. Additionally, members will have to meet time-consuming and expensive reporting and benchmarking requirements beginning this year.

18. Plaintiff Maryland Multi-Housing Association, Inc. ("MMHA") was formed in 1996 and serves the multi-housing industry and Maryland communities by providing education, information, and legislative and advocacy services. Among MMHA's membership are one or more members that do business in Maryland and are suffering or will imminently suffer harm to their profits and business operations as a result of the Maryland BEPS. MMHA's members will incur costs in

9

replacing existing gas appliances in order to comply with the Maryland BEPS or will be forced to incur the yearly penalty for noncompliance with the Kg CO2e per square foot requirement in the Maryland BEPS. Members also will experience loss of income due to vacancy and disruptions to tenant occupancy during construction and renovations made necessary by the Maryland BEPS. Additionally, MMHA's members will have to meet time-consuming and expensive reporting and benchmarking requirements beginning this year.

19. Plaintiff Washington Gas Light Company ("WGL") is a regulated public utility that provides natural gas service to more than 1.2 million customers in Maryland, the District of Columbia, and Virginia. WGL has been providing energy to residential, commercial, and industrial customers for 175 years. The Maryland BEPS will cause the loss of would-be customers and threatens to erode its customer base through the permanent loss of new customers and existing customers over time. As a result, WGL's customer base will grow less than it otherwise would, resulting in higher rates for WGL's remaining gas customers, who will be left to cover the costs of WGL's new investments in maintaining its gas system. The result will be financial harm to and lower profits for WGL. Additionally, under the Maryland BEPS, WGL will have to meet time-consuming and expensive reporting requirements at the request of covered building owners beginning this year.

20. Plaintiff Leisure World Community Corporation is a not-for-profit, non-stock membership corporation that governs the Leisure World of Maryland trust properties and owns Leisure World of Maryland Corporation, which is the property manager for the Leisure World community, a gated community that is home to more than 8,000 residents aged 55 and older located in Silver Spring, Maryland. The Leisure World Community Corporation is owned by the owners of the 29 Mutuals

10

(27 condominiums, 1 cooperative and 1 homeowner association). The Leisure World Community Corporation has the authority to represent the overall interest of the 29 Mutuals on government matters. These Mutuals own 18 multifamily buildings that use gas appliances and are subject to the Maryland BEPS. Resident owners of these buildings will have to fund expensive retrofits impacting the energy use of these appliances in order to comply with the Maryland BEPS or will be forced to incur the yearly penalty for noncompliance with the Kg $CO_2e$ per square foot requirement in the Maryland BEPS. These financial harms are compounded because Leisure World is a senior community with many residents on limited or fixed incomes, such that some owners likely will be unable to afford the increased assessments necessary to pay for the compliance work and/or fees for noncompliance

21. Plaintiff The Elizabeth Condominium Association, Inc. ("The Elizabeth") manages The Elizabeth, a high-rise condominium located in Chevy Chase, Maryland. This building relies on gas for its boilers, which are very efficient in providing large quantities of hot water for domestic use, and its air handler systems for heat and cooling. The Elizabeth will have to spend millions of dollars to try to bring its building into compliance with the Maryland BEPS. The Elizabeth also will also have to meet time-consuming reporting and benchmarking requirements beginning this year.

22. Plaintiff Promenade Towers Mutual Housing Corporation ("The Promenade"), whose major improvements were built in 1973, is a residential cooperative housing corporation formed pursuant to the Maryland Cooperative Housing Corporation Act on March 20, 1980. The Promenade owns and operates (via an independent management company) the real property and improvements thereon located at 5225 Pook Hill Rd., Bethesda, Maryland, 20814. The

11

improvements contain 1,071 residential apartment units and certain commercial spaces. The Promenade relies upon natural gas for residential and commercial uses to fuel: its boilers for potable hot water, its hot water for heating its apartment units, its stoves, its ovens, and other amenities. In order to attempt compliance with the Maryland BEPS, The Promenade would have to replace three gas boilers it uses for heating and hot water, at a cost of millions of dollars. Even if The Promenade implements these upgrades, it still may fail to meet the Maryland BEPS' standards, which could subject The Promenade to significant monetary penalties for noncompliance. Additionally, the units do not have sufficient power capacity to support the installation of electric stoves, and increasing the amperage to accommodate such appliances would involve significant costs amounting to millions of dollars.

23. Plaintiff The Willoughby of Chevy Chase Condominium Council of Unit Owners, Inc. is the Maryland corporation that operates the Willoughby Condominium for the benefit of approximately 700 members who own units and parking spaces in the Willoughby Condominium. The Willoughby Condominium was constructed in the mid-1960s and, as was standard at that time, uses natural gas for heating, domestic hot water, and cooking. The Maryland BEPS will require the Council to spend millions of dollars on electrification measures. Even then, it may not be able achieve compliance. If the Willoughby Condominium does not comply with the Maryland BEPS' requirements, it will have to pay substantial fees for noncompliance. These financial harms likely will compound further because some owners will be unable to afford the increased assessments necessary to pay for the compliance work and/or fees for noncompliance.

24. Defendant Serena Coleman McIlwain is the Secretary of the Maryland Department of the Environment ("Department"). In her capacity as the Secretary of the Maryland Department of the

12

JA100

Environment, Defendant promulgated and is charged with enforcing the Maryland BEPS. Md. Code, Env't §§ 1-301(a); 1-404(b)(1); 2-609.

25. An actual and substantial controversy has arisen and now exists between Plaintiffs and Defendant concerning the validity of the Maryland BEPS. Plaintiffs contend that the Maryland BEPS are preempted by EPCA. Plaintiffs believe, and on that basis allege, that Defendant disagrees with Plaintiffs' contentions and will assert that the Maryland BEPS are lawful and enforceable. Enforcement of the Maryland BEPS will injure Plaintiffs and/or their members. Those injuries will be redressed by a favorable ruling from this Court.

26. The claims asserted herein are ripe for review because Plaintiffs are facing imminent and certain injury from the Maryland BEPS. Plaintiffs challenge the facial validity of the Maryland BEPS, thereby raising a legal question. When a question is "predominantly legal," there is generally no need to await further factual development. *Pacific Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 201 (1983). There is no set of circumstances under which the Maryland BEPS would be valid under federal law.

## ALLEGATIONS

### The Maryland BEPS Regulate EPCA-Covered Appliances

27. The Maryland BEPS regulate the energy use and energy efficiency of EPCA-covered appliances by imposing penalties and restrictions on the emissions from gas appliances.

28. The Maryland BEPS require all "covered building[s]" to achieve certain interim and final "net direct emissions standards" measured on a Kg CO2e per square foot basis. COMAR 26.28.03.02

13

29. "Covered building" is defined as "a building that is a commercial or multifamily residential building in the State of Maryland . . . and has a gross floor area of 35,000 square feet or more, excluding the parking garage area and is (i) a single building; (ii) one or more buildings held in the condominium form of ownership with a combined gross floor area of 35,000 square feet or more, excluding the parking garage area, and governed by a single board of managers; or (iii) two or more buildings with a combined gross floor area of 35,000 square feet or more, excluding the parking garage area, that are served in whole or in part by the same electric or gas meter or are served by the same heating or cooling system or systems, which is not a district energy system." COMAR 26.28.01.02(15).

30. "Net direct emissions" are "(i) the sum of all direct greenhouse gas emissions from a covered building; or (ii) for a covered building connected to a district energy system, direct greenhouse gas emissions plus the greenhouse gas emissions attributable to thermal energy inputs from the district energy system used by the covered buildings." COMAR 26.28.01.02(31).

31. "Direct greenhouse gas emissions" or "direct emissions" are "greenhouse gas emissions produced on-site by covered buildings, as calculated by the benchmarking tool unless otherwise specified by the Department." COMAR 26.28.01.02(17). The "benchmarking tool" is the U.S. Environmental Protection Agency's ENERGY STAR Portfolio Manager. COMAR 26.28.01.02(10).

32. The ENERGY STAR Portfolio Manager calculates "building's emissions (including carbon dioxide, methane, and nitrous oxide) from on-site fuel combustion and purchased electricity and district heating and cooling. Portfolio Manager also enables tracking of avoided emissions from any green power purchases." U.S. Environmental Protection Agency, *How*

14

*Portfolio Manager Calculates Emissions*, https://www.energystar.gov/buildings/benchmark/understand-metrics/how.

33. The performance standards differ by building type (*e.g.*, multifamily housing, office, strip mall, etc.), and come in three forms: Interim Standard for years 2030-2034, Interim Standard for years 2035-2039, and Final Standard for year 2040 and beyond. COMAR 26.28.03.02. Measured as Kg CO2e/sq. ft., the Interim Standard for years 2030-2034 is the highest, followed by the Interim Standard for years 2035-2039. The Final Standard for all non-exempt building types is 0 Kg CO2e/sq. ft. *Id.*

34. Owners of covered buildings can opt to pay a fee in lieu of meeting the standard, starting at $230 per metric ton of excess CO2e in 2030, and increasing each year thereafter. COMAR 26.28.04.01.

35. The Maryland BEPS contain certain exemptions, including for some building types and building owners that can demonstrate financial distress. COMAR 26.28.03.02, 26.28.04.02.

36. The Department published the Maryland BEPS in the *Maryland Register* on December 13, 2024. They took effect on December 23, 2024.

**EPCA Establishes National Binding Appliance Energy Regulations**

37. The Maryland BEPS impermissibly regulate the energy use and efficiency of gas appliances, which is an area that Congress directed the U.S. Department of Energy ("DOE") to regulate through the adoption of federal energy efficiency standards under EPCA. 42 U.S.C. §§ 6201-6422.

15

JA103

38. EPCA was first passed in 1975 to create a comprehensive energy policy to address the serious economic and national security problems associated with our nation's continued reliance on foreign energy resources.

39. The original EPCA was designed to "(1) maximize domestic production of energy and provide for strategic storage reserves of crude oil, residual fuel oil and refined petroleum products; (2) . . . minimize the impact of disruptions in energy supplies by providing for emergency standing measures; (3) provide for domestic crude oil prices that will encourage domestic production in a manner consistent with economic recovery; and (4) reduce domestic energy consumption through the operation of specific voluntary and mandatory energy conservation programs." S. Rep. No. 94-516, at 116-17 (1975).

40. Since 1975, Congress has amended EPCA several times, progressively moving away from a laissez faire approach to appliance efficiency that relied upon consumers to choose more efficient appliances, and towards binding federal energy efficiency standards. Each amendment to EPCA further emphasized the federal government's intent to regulate appliance energy use and efficiency, and further limited states' abilities to set their own standards.

41. In its original form in 1975, EPCA's provisions regarding consumer appliances focused on requiring labeling of appliances, reasoning that consumers would choose more efficient appliances if they had access to accurate information about efficiency. Thus, the statute required manufacturers to label their appliances and provided that the Secretary of the Federal Energy Administration should utilize energy efficiency standards if the labeling program proved ineffective. The legislative history makes clear Congress's intent at the time: "it is the Committee's hope that voluntary efforts by manufacturers and better consumer information will make energy

16

JA104

efficiency standards unnecessary; however, should the labeling program not suffice, energy efficiency standards should be utilized to achieve the goals of the legislation." H.R. Rep. No. 94-340, at 95 (1975).

42. Originally, EPCA permitted significant state involvement in appliance regulation. It allowed state regulations that differed from the federal regulations if the state regulations were justified by a substantial state or local need, did not interfere with interstate commerce, and were more stringent than the federal standard.

43. In 1978, Congress passed a range of statutes known as the National Energy Act ("NEA"), which gave the federal government broader authority over energy policy to ensure national security, decrease energy consumption, reduce dependency on energy imports, generate a strategic petroleum reserve, and broadly develop reliable sources of energy for sustained economic growth. *See* Julia Richardson and Robert Nordhaus, *The National Energy Act of 1978*, 10 Nat. Res. & Env't 62, 62-63 (1995). President Carter also created the federal DOE in 1977 to coordinate a federal response to the nation's energy problems.

44. One of these 1978 statutes passed as part of NEA was the National Energy Conservation and Policy Act ("NECPA"). NECPA amended the 1975 EPCA. Rather than relying exclusively on labeling, NECPA required DOE to prescribe minimum energy efficiency standards for certain products. NECPA also strengthened the preemption provisions in EPCA, allowing state regulations that were more stringent than federal regulations *only* if the Secretary found there was a significant state or local interest to justify the state's regulation and the regulation would not unduly burden interstate commerce.

17

45. Despite the NECPA's new requirements, DOE did not initially adopt federal minimum energy standards. Instead, it "initiated a general policy of granting petitions from State requesting waivers from preemption. As a result, a system of separate State appliance standards ha[d] begun to emerge and the trend [was] growing." S. Rep. No. 100-6, at 4 (1987).

46. In 1987, Congress responded by passing the National Appliance Energy Conservation Act ("NAECA"). The purpose of the NAECA amendment was "to reduce the regulatory and economic burdens on the appliance manufacturing industry through the establishment of national energy conservation standards for major residential appliances." S. Rep. No. 100-6, at 1 (1987).

47. As the Senate recognized, varying state standards created "the problem of a growing patchwork of differing state regulations which would increasingly complicate [appliance manufacturers'] design, production and marketing plans." S. Rep. No. 100-6, at 4 (1987). Similarly, the reports about NAECA in the House of Representatives make clear that Congress wanted to "end an era of confusion and uncertainty" for the industry and "to protect the appliance industry from having to comply with a patchwork of numerous conflicting State requirements." H.R. Rep. No. 100-11, at 24, 30 (1987).

48. Thus, NAECA contained "two basic provisions:" "[t]he establishment of Federal standards and the preemption of State standards." S. Rep. No. 100-6, at 2 (1987). "In general, these national standards would preempt all State standards." *Id.*

49. After NAECA, federal law provided two routes for a state or local jurisdiction to qualify for an exception to EPCA preemption. First, as mentioned above, DOE can grant a waiver of preemption; but while states could seek permission to establish their own standards, "achieving the waiver is difficult." S. Rep. No. 100-6, at 2 (1987). It would require showing an unusual and

18

JA106

compelling local interest, and the waiver cannot be granted if the "State regulation is likely to result in the unavailability in the State of a product type or of products of a particular performance class, such as frost-free refrigerators." *Id.*

50. The second option to avoid preemption concerns consumer appliances, and it applies only to performance-based building codes for new construction. 42 U.S.C. § 6297(f). To qualify for this exception, the state code must meet a strict seven-part test, enumerated in 42 U.S.C. § 6297(f)(3). The House Report regarding NAECA explains that this exception is intended to "prevent[] state building codes from being used as a means of setting mandatory State appliance standards in excess of Federal Standards." H.R. Rep. 100-11, at 26. In addition, flexibility under this exception was "limited" to "ensure that performance-based codes cannot expressly or effectively require the installation of covered products whose efficiencies exceed . . . the applicable Federal standard . . . ." *Id.* Congress intended to allow only "performance-based codes" that "authorize builders to adjust or trade off the efficiencies of the various building components so long as an energy objective is met." S. Rep. No. 100-6, at 10–11. To avoid preemption, among other requirements, a state building code provision must "establish 'credits' for various conservation measures, to provide, to the greatest degree possible, one-for-one equivalency between the energy efficiency of these differing measures and the credits provided for such energy efficiency." *Id.* at 11. The Senate chose this requirement "to assure that the credits for exceeding Federal standards are even-handed and are not unfairly weighted resulting in undue pressure on builders to install covered products exceeding Federal standards." *Id.*

51. In 1992, Congress amended EPCA once more through the Energy Policy Act of 1992. That amendment expanded the federal appliance program to include energy efficiency standards

19

JA107

for industrial appliances as well as consumer appliances. Likewise, a pathway was added for a state building code regulation for new construction concerning industrial appliances to be exempt from preemption: the regulation must "not require that the energy efficiency of such product exceed the applicable minimum energy efficiency requirement in amended ASHRAE/IES Standard 90.1." 42 U.S.C. § 6316(b)(2)(B)(i).

52. Thus, in its present form, EPCA covers both consumer and industrial appliances, and it sets federal standards for the energy use and efficiency of those products.

**EPCA Expressly Preempts Regulation of Consumer and Industrial Appliances**

53. EPCA expressly preempts state and local regulation of appliance energy use and efficiency, with only narrow exemptions. Congress therefore meant to preempt the entire field of energy use and energy efficiency of covered appliances, leaving DOE to set nationwide standards and establishing detailed conditions that state regulations must meet to avoid preemption.

54. EPCA's energy use and efficiency regulations apply to "covered products." EPCA defines "covered products" for consumers as the types of products listed in Section 6292. 42 U.S.C. § 6291(2). Section 6292 in turn lists 19 types of defined covered products, including "water heaters," "furnaces," and "kitchen ranges and ovens." *Id.* § 6292(a). Section 6295 sets out the energy conservation standards for these covered products.

55. EPCA defines a "consumer product" as one "(A) which in operation consumes, or is designed to consume, energy . . . and (B) which, to any significant extent, is distributed in commerce for personal use or consumption by individuals[.]" *Id.* § 6291(1). The definition of a consumer product is "without regard to whether such article of such type is in fact distributed in commerce for personal use or consumption by an individual . . . ." *Id.* In other words, products

20

which are regularly sold to individuals may be classified as consumer products, regardless of whether a particular *unit* of the product has been purchased by an individual or by a business, and regardless of whether the products are used in a commercial building or a residential building.

56. The express preemption in EPCA's consumer product regulations states that as of "the effective date of an energy conservation standard established in or prescribed . . . for any covered product, no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be effective with respect to such product unless the regulation" falls within certain enumerated exceptions. *Id.* § 6297(c).

57. "Energy use" is defined as "the quantity of energy directly consumed by a consumer product at point of use . . . ." *Id.* § 6291(4). "Energy" is defined as "electricity, or fossil fuels." *Id.* § 6291(3).

58. Thus, EPCA's consumer standards preempt state regulations concerning the quantity of electricity or fossil fuels consumed by appliances (such as water heaters and furnaces and gas stoves) which are regularly sold to individuals.

59. Similarly, EPCA also governs the energy efficiency and energy use of certain industrial appliances. *Id.* § 6311-6317.

60. Like EPCA's consumer standards, the industrial standards explicitly "supersede any State or local regulation concerning the energy efficiency or energy use of a product for which a standard is prescribed or established" in the federal statute. *Id.* § 6316(b)(2)(A).

61. "Energy use," for the purposes of the industrial standards, is defined as "the quantity of energy directly consumed by an article of industrial equipment at the point of use. . . ." *Id.* §

21

6311(4). The definition of "energy" refers back to the definition in the consumer standards in Section 6291: energy is "electricity, or fossil fuels." *Id.* §§ 6311(7), 6291(3).

62. EPCA also prescribes standards for various types of "industrial equipment," including "commercial package air conditioning and heating equipment," "warm air furnaces," and several types of water heaters. *Id.* § 6311(1). Those products are "industrial" rather than "consumer" if they are "distributed in commerce for industrial or commercial use" to "any significant extent." *Id.* § 6311(2)(A).

63. Thus, EPCA's standards for consumer products and industrial equipment preempt state and local regulations concerning energy use or energy efficiency of heating equipment, water heaters, furnaces, and gas stoves which are regularly sold for residential, industrial, or commercial use—including those present in the "covered building[s]" under the Maryland BEPS.

**EPCA Preempts the Maryland BEPS**

64. EPCA preempts the Maryland BEPS because they concern the energy use and energy efficiency of EPCA-covered gas appliances.

65. Since all EPCA-covered gas appliances emit some level of carbon dioxide, the Maryland BEPS are regulating their energy use by imposing declining Kg CO2e per square foot requirements—which eventually will go all the way down to zero—and associated penalties if those are not met. That regulatory mandate "concern[s] the . . . energy use" of those gas appliances because it imposes restrictions on and penalizes "the quantity of energy directly consumed by a consumer product [or by an article of industrial equipment] at the point of use." 42 U.S.C. §§ 6291(4), 6297(c), 6311(4), 6316(b)(1)(2)(A). Specifically, it is restricting and penalizing the consumption of certain quantities—and eventually any quantity—of gas energy by covered gas appliances.

66. The Maryland BEPS do not qualify for an exception from EPCA's preemption provision. For consumer appliances, a state or local regulation is exempted from preemption if it "is in a building code for new construction" and meets seven specific requirements. 42 U.S.C. §§ 6297(c)(3), (f)(3). The regulation is preempted unless it meets *all seven* of these requirements.

67. The seven requirements, taken together, are intended to allow only performance-based codes that give builders a choice about how to meet overall efficiency or conservation objectives, ensuring an even-handed policy that does not pressure builders to choose one type of appliance over another. *See* S. Rep. 100-6, at 10–11 (1987).

68. For new construction, the requirements are based on the typical structure of performance-based energy efficiency provisions in building codes, which establish overall energy efficiency or conservation measures for a building and specify different ways in which a builder or building owner can meet the required objectives.

69. The Maryland BEPS do not meet all seven requirements listed in Section 6297(f)(3) and are thereby preempted. For one, the Maryland BEPS apply to existing buildings while Section 6297(f)(3)'s exception is limited to "new construction."

70. Additionally, the second requirement, for example, is that "[t]he code does not require that the covered product have an energy efficiency exceeding the" federal EPCA standards in section 6295, absent a state waiver (which does not apply in this case). *Id.* § 6297(f)(3)(B). The Maryland BEPS do not meet this requirement because they prohibit in many instances the use of EPCA-covered gas appliances that meet federal energy efficiency standards.

71. As another example, the third requirement is that "[t]he credit to the energy consumption or conservation objective allowed by the code for installing covered products having energy

23

JA111

efficiencies exceeding [the federal EPCA standards in section 6295] is on a one-for-one equivalent energy use or equivalent cost basis." *Id.* § 6297(f)(3)(C). But the Maryland BEPS do not give credit "on a one-for-one equivalent energy use . . . basis" for products that are more efficient than the federal standards require.

72. Similar to the consumer product standards, EPCA contains only limited exemptions to the default rule of preemption of state regulations concerning the energy use or efficiency of industrial appliances. 42 U.S.C. § 6316(b)(2)(B). To avoid preemption, a state regulation must not "require that the energy efficiency of such product exceed the applicable minimum energy efficiency requirement in amended ASHRAE/IES Standard 90.1" *Id.* § 6316(b)(2)(B)(i). This exception applies only to regulations on new construction. *Id.* § 6316(b)(2)(B).

73. The Maryland BEPS do not meet this requirement because they regulate and restrict EPCA-covered industrial appliances even when those appliances meet the efficiency standards in ASHRAE/IES Standard 90.1.

74. On information and belief, Maryland has not applied for a waiver from EPCA preemption from the U.S. Secretary of Energy, as would be required for an exemption under 42 U.S.C. § 6297(d). Further, Maryland, even if it applied, could not lawfully obtain such a waiver. EPCA prohibits the Secretary from granting a waiver where, as is the case here, "the State regulation is likely to result in the unavailability in the State of any covered product type (or class) of performance characteristics (including reliability), features, sizes, capacities, and volumes that are substantially the same as those generally available in the State at the time of the" waiver. *Id.* § 6297(d)(4).

24

JA112

**CAUSES OF ACTION**

**<u>COUNT ONE</u>: FEDERAL PREEMPTION BY
THE ENERGY POLICY AND CONSERVATION ACT**

75. Plaintiffs re-allege the preceding paragraphs as though set forth fully herein.

76. The Maryland BEPS concern the energy efficiency and energy use of EPCA-covered consumer and industrial appliances.

77. The Maryland BEPS do not fall within any exception from EPCA preemption.

78. The Maryland BEPS are therefore preempted by the federal EPCA.

79. There is no set of circumstances under which the Maryland BEPS would be valid.

80. Plaintiffs accordingly request that the Court declare that the Maryland BEPS are preempted by EPCA and enjoin Defendant from enforcing the preempted Maryland BEPS.

**PRAYER FOR RELIEF**

81. WHEREFORE, Plaintiffs pray for relief as follows:

82.  For a permanent injunction enjoining Defendant from enforcing or attempting to enforce the Maryland BEPS;

83.  For a declaratory judgment, pursuant to 28 U.S.C. § 2201(a) and § 1331, that the Maryland BEPS are preempted by federal law because they concern the energy use of appliances covered by the federal Energy Policy and Conservation Act and are therefore void and unenforceable.

84. For costs of this suit, including reasonable attorney's fees; and

85. For such other and further relief as the Court may deem just and proper.

Respectfully submitted,

BAKER BOTTS L.L.P.

/s/ *Scott Novak*
Scott Novak (Bar Number: 31357)
700 K St NW
Washington, DC
(P) 202-639-1316
(F) 202-585-1000
scott.novak@bakerbotts.com

J. Mark Little (*pro hac vice forthcoming*)
910 Louisiana St
Houston, TX
(P) 713-229-1234
(F) 713-229-1522
mark.little@bakerbotts.com

*Counsel for Maryland Building Industry Association, Inc., The Building Owners and Managers Association of Greater Baltimore, Inc., NAIOP Maryland, Inc., NAIOP DC | MD, Inc., Maryland Multi-Housing Association, Inc., Washington Gas Light Company, Leisure World Community Corporation, The Elizabeth Condominium Association, Inc., Promenade Towers Mutual Housing Corporation, and The Willoughby of Chevy Chase Condominium Council of Unit Owners, Inc.*

26

JA114

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

MARYLAND BUILDING INDUSTRY
ASSOCIATION, INC.
11825 West Market Place
Fulton, MD 20759

THE BUILDING OWNERS AND
MANAGERS ASSOCIATION OF
GREATER BALTIMORE, INC.
2331 Rock Spring Road
Forest Hill, MD 21050

NAIOP MARYLAND, INC.
6030 Marshalee Drive, Suite 208
Elkridge, MD 21075

NAIOP DC | MD, INC.
P.O. Box 2064
Kensington, MD 20891

MARYLAND MULTI-HOUSING
ASSOCIATION, INC.
11155 Dolfield Blvd, Suite 200
Owings Mills, MD 21117

WASHINGTON GAS LIGHT COMPANY
1000 Maine Ave, SW
Washington, DC 20024

LEISURE WORLD COMMUNITY
CORPORATION
3701 Rossmoor Boulevard
Silver Spring, MD 20906

THE ELIZABETH CONDOMINIUM
ASSOCIATION, INC.
4601 N Park Ave
Chevy Chase, MD 20815

PROMENADE TOWERS MUTUAL
HOUSING CORPORATION
5225 Pooks Hill Rd
Bethesda, MD 20814

CASE NO. 8:25-CV-00113-DLB

**FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF**

1

THE WILLOUGHBY OF CHEVY CHASE
CONDOMINIUM COUNCIL OF UNIT
OWNERS, INC.
4515 Willard Ave
Chevy Chase, MD 20815

APARTMENT AND OFFICE BUILDING
ASSOCIATION OF METROPOLITAN
WASHINGTON
1025 Connecticut Ave NW, Ste 1005
Washington, DC 20036

COLUMBIA GAS OF MARYLAND, INC.
P.O. Box 2318
Columbus, OH 43216

*Plaintiffs,*

v.

SERENA COLEMAN McILWAIN, in her
Official Capacity as the Secretary of the
Maryland Department of the Environment
1800 Washington Blvd,
Baltimore, MD 21230

*Defendant.*

## INTRODUCTION[1]

1. Plaintiffs Maryland Building Industry Association, Inc., The Building Owners and
Managers Association of Greater Baltimore, Inc., NAIOP Maryland, Inc., NAIOP DC | MD, Inc.,
Maryland Multi-Housing Association, Inc., Washington Gas Light Company, Leisure World
Community Corporation, The Elizabeth Condominium Association, Inc., Promenade Towers
Mutual Housing Corporation, The Willoughby of Chevy Chase Condominium Council of Unit
Owners, Inc., Apartment and Office Building Association of Metropolitan Washington, and
Columbia Gas of Maryland, Inc. seek declaratory and injunctive relief under federal law against

---

[1] Pursuant to Local Rule 103.6(c), attached as Exhibit 1 is a copy of this First Amended Complaint
that reflects the changes from the Original Complaint.

2

enforcement of Code of Maryland Regulations ("COMAR") 26.28 Building Energy Performance Standards ("Maryland BEPS"). The Energy Policy and Conservation Act ("EPCA"), 42 U.S.C. §§ 6201-6422, regulates the energy use and efficiency of many gas appliances and expressly and broadly preempts state and local laws on that subject. The Maryland BEPS fall within the heartland of EPCA's express preemption provision because they regulate and restrict the energy use and efficiency of these covered appliances by restricting and penalizing the carbon dioxide emissions from covered buildings. As such, the Maryland BEPS are preempted by EPCA and unenforceable as a matter of law.

2. Born out of the oil crisis of the 1970s and the accompanying concerns with energy independence, EPCA implements a national energy policy that, among other things, regulates the energy use and energy efficiency of appliances. *See, e.g.*, 42 U.S.C. § 6297(c). The thrust of EPCA is that nationally uniform energy use and efficiency standards are the best way to promote conservation goals while ensuring energy security and domestic supply and preserving consumer choice. *See, e.g.*, *id.*; S. Rep. No. 100-6, at 4 (1987); H.R. Rep. No. 100-11, at 24 (1987).

3. To accomplish that needed national uniformity, EPCA expressly preempts state and local regulations concerning the energy use and energy efficiency of products for which EPCA sets energy conservation standards—with only the narrowest of exceptions to that preemption for state and local regulations that meet certain stringent statutory conditions. 42 U.S.C. §§ 6297(c)(3), (f)(3).

4. The Ninth Circuit's recent invalidation of the City of Berkeley's prohibition on gas piping in new buildings illustrates how EPCA preemption operates to prohibit attempts to regulate the energy use or efficiency of gas appliances. *Cal. Rest. Ass'n v. City of Berkeley*, 65 F.4th 1045 (9th

3

Cir. 2023), *amended and superseded by Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094 (9th Cir. 2024). Perhaps most notable is that the unanimous Ninth Circuit panel emphasized that "EPCA would no doubt preempt an ordinance that directly prohibits the use of covered natural gas appliances in new buildings." *Cal. Rest. Ass'n*, 89 F.4th at 1107. And "States and localities can't skirt the text of broad preemption provisions by doing *indirectly* what Congress says they can't do *directly.*" *Id.* Because the Maryland BEPS are an attempt to "skirt the text" of EPCA preemption provisions, there is "no doubt" that EPCA preempts it. *See id.* Indeed, some state and local governments have since taken note of EPCA and reconsidered their efforts to enact similar regulations. *See, e.g.,* Kale Williams, *Eugene reverses natural gas ban after ruling by federal appeals court*, KGW8 (July 12, 2023), https://www.kgw.com/article/news/politics/natural-gas-ban-eugene-oregon-repealed/283-5195461a-22cd-4176-9db7-8047fb56d887.   Because   the Maryland Department of the Environment ("Department") did not do so on its own, the Court must order the Defendant to do the same.

5.   The Maryland BEPS inflict serious and irreparable harm on Plaintiffs by restricting and penalizing EPCA-covered gas appliances in new and existing buildings through a series of declining carbon dioxide emissions limits for covered buildings and associated penalties for non-compliance. That policy is at odds with the needs of Maryland residents, workers, and businesses for affordable, resilient, and reliable energy. Restricting and penalizing the use of gas-powered cooking ranges, water heaters, furnaces, and other appliances or equipment is fundamentally inconsistent with the public interest, restricts consumer choice, exacerbates the State's housing crisis, and aims to shift the State's energy demand to an electric system that is facing both historic and increasing electricity demand and dwindling dispatchable electricity supply.

6. Plaintiffs stand to lose much if Defendant is not enjoined from enforcing the Maryland BEPS. Plaintiffs and their members have interests in a broad range of residential and commercial buildings covered by the Maryland BEPS and in the natural gas and the gas delivery infrastructure that is used to provide gas service to those buildings. The Maryland BEPS will cause Plaintiffs financial harm, diminish their businesses, and substantially increase the cost for homes, lodging, and energy in Maryland—all despite EPCA's express preemption of the regulations.

7. Even though the Maryland BEPS do not demand net zero carbon dioxide emissions until 2040, their restrictions on gas appliances have a chilling effect now and are already undermining Plaintiffs' livelihoods, harming profits, disrupting long-term business strategy and asset planning, jeopardizing jobs, and hampering the ongoing development of new and desperately needed multifamily homes. Indeed, the Department itself recognizes the immediate impact of the Maryland BEPS: "Between 2025 and 2040, building owners whose buildings do not already meet the BEPS standards will be required to implement energy efficiency measures and/or electrification measures or pay alternative compliance fees in order to comply." Maryland Department of the Environment, Technical Support Document for COMAR 26.28 – Building Energy Performance Standards, Nov. 2023 at 6, https://mde.maryland.gov/programs/regulations/air/Documents/BEPS/BEPS%20TSD%20PACKAGE%20FINAL%20%2812-5-2023%29.pdf. Additionally, starting on June 1, 2025, and annually thereafter, the Maryland BEPS will require building owners to submit certain "benchmarking information," a process that is both time-consuming and costly. COMAR 26.28.02.02. Similarly, the Maryland BEPS also require gas utilities to provide data on building energy consumption to building owners upon request starting on January 1, 2025. COMAR 26.28.02.04.

8.  In sum, the Maryland BEPS are plainly preempted by EPCA, are already inflicting harm on Plaintiffs and their members, and will cause even more harm unless enjoined. Plaintiffs accordingly bring this action seeking a declaration that the Maryland BEPS are preempted by EPCA and an injunction against their enforcement.

## JURISDICTION AND VENUE

9.  Jurisdiction is proper because, under 42 U.S.C. § 6306(c), federal district courts have jurisdiction over suits brought by any adversely affected person concerning state compliance with EPCA. Additionally, under 28 U.S.C. § 1331, the Court has federal question jurisdiction to determine the claims involving EPCA.

10. This Court has personal jurisdiction over the Defendant, as she is domiciled in Maryland and the claim asserted arises out of her actions in Maryland as the Secretary of the Maryland Department of Environment in Maryland.

11. This Court has authority to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202 and Rules 57 and 65 of the Federal Rules of Civil Procedure.

12. Venue in this Court is proper under 28 U.S.C. § 1391(b) because, among other things, (i) the actions violating federal law stated in this Complaint impose injuries in the state of Maryland, where Plaintiffs or their members reside and/or do business, and (ii) the law at issue will be enforced here.

## PARTIES

13. Plaintiff Maryland Building Industry Association, Inc. ("MBIA") formed in 2014 as the result of a merger between two local associations with over 175 years of combined experience: the Home Builders Association of Maryland that covered the Baltimore area and the Maryland

6

National-Capital Building Industry Association that covered the District of Columbia and Southern Maryland. MBIA is a local chapter of the National Association of Home Builders of the United States. MBIA is a not-for-profit trade organization representing the interests of over 1,100 member firms and more than 100,000 employees, including home builders, remodelers, developers, and affiliate professional and service providers in the Maryland Counties of Anne Arundel, Baltimore, Calvert, Carroll, Cecil, Charles, Harford, Howard, Montgomery, Prince George's, and St. Mary's, as well as Baltimore City, the Eastern Shore, and the District of Columbia. MBIA has one or more members that do business in Maryland and are suffering or will imminently suffer harm to their profits and business operations as a result of the Maryland BEPS. For example, the Maryland BEPS frustrate MBIA's members' ability to meet customer preferences—especially at a price-point that their customers can afford—since many homeowners prefers using natural gas appliances for heating, hot water, and cooking. The increased costs of compliance with the Maryland BEPS likely will also decrease new construction, as customers will be priced out of the market. The Maryland BEPS also will limit the pool of gas customers, forcing existing gas customers like MBIA's members to pay higher rates for gas service than they would otherwise pay.

14. Plaintiff The Building Owners and Managers Association of Greater Baltimore, Inc. ("BOMA Baltimore") represents the owners and managers of all commercial property types, including 143 million square feet of office space that supports over 15,500 jobs, and contributes $2.1 billion to the Maryland economy. A professional trade association with over 300 members, BOMA Baltimore's mission is to actively represent the best interests of the commercial real estate owner, the real estate professional, and its associate members through effective leadership in

7

JA121

advocacy, collection, and dissemination of industry information, education, community involvement, membership participation, and professional development. BOMA Baltimore has one or more members that do business in Maryland and are suffering or will imminently suffer harm to their profits and business operations as a result of the Maryland BEPS. BOMA Baltimore's members will incur costs in replacing existing gas appliances in order to comply with the Maryland BEPS or will be forced to incur the yearly penalty for noncompliance with the kilogram of carbon dioxide equivalent ("Kg CO2e") per square foot requirement in the Maryland BEPS. Additionally, BOMA Baltimore's members will have to meet time-consuming and expensive reporting and benchmarking requirements beginning this year. The Maryland BEPS also will limit the pool of gas customers, forcing existing gas customers like BOMA Baltimore's members to pay higher rates for gas service than they would otherwise pay.

15. Plaintiff NAIOP MD, Inc. is a commercial real estate association serving as the industry's legislative advocate, providing superior networking, education, and professional opportunities and delivering high-quality services and valuable member benefits. With more than 400 members, NAIOP MD is comprised of companies involved in development, investment, construction, brokerage, asset management, finance, architecture, engineering, and legal services associated with office, industrial, retail, and mixed-use real estate. NAIOP MD members own, operate, and intend to construct new buildings that are subject to the Maryland BEPS.

16. Plaintiff NAIOP DC | MD, Inc. is an organization for those involved in all areas of commercial real estate in Washington, DC, and in Montgomery, Prince George's, and Frederick Counties in Maryland. Founded in 1990, NAIOP DC | MD's membership represents the region's leading firms involved in all aspects of the commercial real estate industry. NAIOP DC | MD offers

8

JA122

educational programming, networking opportunities, and legislative insight and advocacy. NAIOP DC | MD members own, operate, and intend to construct new buildings that are subject to the Maryland BEPS.

17. NAIOP MD and NAIOP DC | MD each have one or more members that do business in Maryland and are suffering or will imminently suffer harm to their profits and business operations as a result of the Maryland BEPS. For example, due to the Maryland BEPS, members will face increased capital costs for equipment replacements and for increases in electric service capacity and increased utility costs from higher electricity use and from higher peak demand charges due to an inability to use hybrid heating systems. Members and their tenants that do not qualify for the limited exemption for the use of backup power generators that run on combustible fuels will be faced with increased costs of installing new standby and backup power equipment, as well as risks and costs associated with shorter duration and less reliable backup power systems. Members also will experience loss of income due to vacancy and disruptions to tenant occupancy during construction and renovations made necessary by the Maryland BEPS. The Maryland BEPS will inflict further harm on members in the form of reduced property valuations due to higher operating expenses and lower net operating incomes and reduced marketability to industrial and other tenants that need or prefer gas energy systems. The Maryland BEPS also place members at a competitive disadvantage to similarly situated buildings in neighboring states and Maryland buildings that are smaller than 35,000 square feet and are thus not subject to the Maryland BEPS. With or without making operational and physical changes to covered buildings, failure to meet the applicable Kg $CO_2e$ per square foot requirement will force members to incur the yearly penalty for noncompliance with the Maryland BEPS. Additionally, members will have to meet time-

9

consuming and expensive reporting and benchmarking requirements beginning this year. The Maryland BEPS also will limit the pool of gas customers, forcing existing gas customers like NAIOP MD's and NAIOP DC | MD's members to pay higher rates for gas service than they would otherwise pay.

18. Plaintiff Maryland Multi-Housing Association, Inc. ("MMHA") was formed in 1996 and serves the multi-housing industry and Maryland communities by providing education, information, and legislative and advocacy services. Among MMHA's membership are one or more members that do business in Maryland and are suffering or will imminently suffer harm to their profits and business operations as a result of the Maryland BEPS. MMHA's members will incur costs in replacing existing gas appliances in order to comply with the Maryland BEPS or will be forced to incur the yearly penalty for noncompliance with the Kg CO2e per square foot requirement in the Maryland BEPS. Members also will experience loss of income due to vacancy and disruptions to tenant occupancy during construction and renovations made necessary by the Maryland BEPS. Additionally, MMHA's members will have to meet time-consuming and expensive reporting and benchmarking requirements beginning this year. The Maryland BEPS also will limit the pool of gas customers, forcing existing gas customers like MMHA's members to pay higher rates for gas service than they would otherwise pay.

19. Plaintiff Washington Gas Light Company ("WGL") is a regulated public utility that provides natural gas service to more than 1.2 million customers in Maryland, the District of Columbia, and Virginia. WGL has been providing energy to residential, commercial, and industrial customers for 175 years. The Maryland BEPS will cause the loss of would-be customers and threatens to erode its customer base through the permanent loss of new customers and existing

10

JA124

customers over time. As a result, WGL's customer base will grow less than it otherwise would, resulting in higher rates for WGL's remaining gas customers, who will be left to cover the costs of WGL's new investments in maintaining its gas system. The result will be financial harm to and lower profits for WGL. Additionally, under the Maryland BEPS, WGL will have to meet time-consuming and expensive reporting requirements at the request of covered building owners beginning this year.

20. Plaintiff Leisure World Community Corporation is a not-for-profit, non-stock membership corporation that governs the Leisure World of Maryland trust properties and owns Leisure World of Maryland Corporation, which is the property manager for the Leisure World community, a gated community that is home to more than 8,000 residents aged 55 and older located in Silver Spring, Maryland. The Leisure World Community Corporation is owned by the owners of the 29 Mutuals (27 condominiums, 1 cooperative, and 1 homeowner association). The Leisure World Community Corporation has the authority to represent the overall interest of the 29 Mutuals on government matters. These Mutuals own 18 multifamily buildings that use gas appliances and are subject to the Maryland BEPS. Resident owners of these buildings will have to fund expensive retrofits impacting the energy use of these appliances in order to comply with the Maryland BEPS or will be forced to incur the yearly penalty for noncompliance with the Kg CO2e per square foot requirement in the Maryland BEPS. These financial harms are compounded because Leisure World is a senior community with many residents on limited or fixed incomes, such that some owners likely will be unable to afford the increased assessments necessary to pay for the compliance work and/or fees for noncompliance. The Maryland BEPS also will limit the pool of gas customers, forcing existing gas customers like Leisure World's residents to pay higher rates

11

for gas service than they would otherwise pay.

21. Plaintiff The Elizabeth Condominium Association, Inc. ("The Elizabeth") manages The Elizabeth, a high-rise condominium located in Chevy Chase, Maryland. This building relies on gas for its boilers, which are very efficient in providing large quantities of hot water for domestic use, and its air handler systems for heat and cooling. The Elizabeth will have to spend millions of dollars to try to bring its building into compliance with the Maryland BEPS. The Elizabeth also will have to meet time-consuming reporting and benchmarking requirements beginning this year. Additionally, the Maryland BEPS will limit the pool of gas customers, forcing existing gas customers like The Elizabeth to pay higher rates for gas service than they would otherwise pay.

22. Plaintiff Promenade Towers Mutual Housing Corporation ("The Promenade"), built in 1973, is a residential cooperative housing corporation formed pursuant to the Maryland Cooperative Housing Corporation Act on March 20, 1980. The Promenade owns and operates (via an independent management company) the real property and improvements thereon located at 5225 Pooks Hill Rd., Bethesda, Maryland, 20814. The improvements contain 1,071 residential apartment units and certain commercial spaces. The Promenade relies upon natural gas for residential and commercial uses to fuel: its boilers for potable hot water, its hot water for heating its apartment units, its stoves, its ovens, and other amenities. In order to attempt compliance with the Maryland BEPS, The Promenade would have to undertake major and costly projects. For example, it would have to replace three gas boilers it uses for heating and hot water, at a cost of millions of dollars. Even if The Promenade implements these upgrades, it still may fail to meet the Maryland BEPS' standards, which could subject The Promenade to significant monetary penalties for noncompliance. Additionally, the units do not have sufficient power capacity to support the

12

installation of electric stoves and other appliances, and increasing the amperage to accommodate such appliances would involve significant costs amounting to millions of dollars. The Promenade's residents—many of whom are of modest means—would have to bear these costs and may be financially unable to do so. The Maryland BEPS also will limit the pool of gas customers, forcing existing gas customers at the The Promenade to pay higher rates for gas service than they would otherwise pay.

23. Plaintiff The Willoughby of Chevy Chase Condominium Council of Unit Owners, Inc. is the Maryland corporation that operates the Willoughby Condominium for the benefit of approximately 700 members who own units and parking spaces in the Willoughby Condominium. The Willoughby Condominium was constructed in the mid-1960s and, as was standard at that time, uses natural gas for heating, domestic hot water, and cooking. The Maryland BEPS will require the Council to spend millions of dollars on electrification measures. Even then, it may not be able achieve compliance. If the Willoughby Condominium does not comply with the Maryland BEPS' requirements, it will have to pay substantial fees for noncompliance. These financial harms likely will compound further because some owners will be unable to afford the increased assessments necessary to pay for the compliance work and/or fees for noncompliance. The Maryland BEPS also will limit the pool of gas customers, forcing existing gas customers like Willoughby Condominium owners to pay higher rates for gas service than they would otherwise pay.

24. Plaintiff Apartment and Office Building Association of Metropolitan Washington ("AOBA") is a membership organization representing commercial office building and multifamily residential real estate in the Washington, D.C. Metropolitan Area, including in parts of Maryland. AOBA has 151 commercial and multifamily members that comprise 19,540,735 square feet of

13

JA127

office buildings and 168,131 multifamily apartment units in the state of Maryland. AOBA serves its members by advocating for the industry, providing information, and fostering professional development. Among AOBA's membership are one or more members that do business in Maryland and are suffering or will imminently suffer harm to their profits and business operations as a result of the Maryland BEPS. AOBA's members will be forced to choose between either incurring substantial costs to replace existing gas appliances (and make the associated necessary electrical upgrades) in order to comply with the Maryland BEPS or incurring the yearly penalty for noncompliance with the Kg CO2e per square foot requirement in the Maryland BEPS. Members also may experience loss of income due to vacancy and disruptions to tenant occupancy during construction and renovations made necessary by the Maryland BEPS. For those buildings that cannot comply with the Maryland BEPS in an economically viable manner, the best of a bad series of options may be to replace them entirely with new structures, at great cost. Additionally, AOBA's members will have to meet time-consuming and expensive reporting and benchmarking requirements beginning this year. The Maryland BEPS also will limit the pool of gas customers, forcing existing gas customers like AOBA's members to pay higher rates for gas service than they would otherwise pay.

25. Plaintiff Columbia Gas of Maryland, Inc. is a regulated public utility that provides natural gas service to more than 34,000 customers in western Maryland. The Maryland BEPS will cause the permanent loss of current customers and potential new customers and threatens to erode the company's customer base. As a result, Columbia Gas of Maryland, Inc.'s customer base will be smaller than it otherwise would be, but the overall costs of service will largely remain the same, resulting in higher rates for Columbia Gas of Maryland, Inc.'s remaining gas customers, who will

14

JA128

be left to cover the costs of Columbia Gas of Maryland, Inc.'s investments to maintain and operate its gas system. The result will be financial harm to all of Columbia Gas of Maryland's remaining customers and to the company itself. The regulations also impede customers' ability to adopt new, more environmentally-friendly gas technologies which would reduce their costs, improve the reliability of their utility service, and lower emissions at the same time. Additionally, under the Maryland BEPS, Columbia Gas of Maryland, Inc. will have to meet time-consuming and expensive energy use data reporting requirements at the request of covered building owners beginning this year as mandated by the regulations.

26. Defendant Serena Coleman McIlwain is the Secretary of the Maryland Department of the Environment ("Department"). In her capacity as the Secretary of the Maryland Department of the Environment, Defendant promulgated and is charged with enforcing the Maryland BEPS. Md. Code, Env't §§ 1-301(a); 1-404(b)(1); 2-609.

27. An actual and substantial controversy has arisen and now exists between Plaintiffs and Defendant concerning the validity of the Maryland BEPS. Plaintiffs contend that the Maryland BEPS are preempted by EPCA. Plaintiffs believe, and on that basis allege, that Defendant disagrees with Plaintiffs' contentions and will assert that the Maryland BEPS are lawful and enforceable. Enforcement of the Maryland BEPS will injure Plaintiffs and/or their members. Those injuries will be redressed by a favorable ruling from this Court.

28. The claims asserted herein are ripe for review because Plaintiffs are facing imminent and certain injury from the Maryland BEPS. Plaintiffs challenge the facial validity of the Maryland BEPS, thereby raising a legal question. When a question is "predominantly legal," there is generally no need to await further factual development. *Pacific Gas & Elec. Co. v. State Energy*

15

JA129

*Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 201 (1983). There is no set of circumstances under which the Maryland BEPS would be valid under federal law.

## ALLEGATIONS

### The Maryland BEPS Regulate EPCA-Covered Appliances

29. The Maryland BEPS regulate the energy use and energy efficiency of EPCA-covered appliances by imposing penalties and restrictions on the emissions from gas appliances.

30. The Maryland BEPS require all "covered building[s]" to achieve certain interim and final "net direct emissions standards" measured on a Kg $CO_2$e per square foot basis. COMAR 26.28.03.02.

31. "Covered building" is defined as "a building that is a commercial or multifamily residential building in the State of Maryland . . . and has a gross floor area of 35,000 square feet or more, excluding the parking garage area and is (i) a single building; (ii) one or more buildings held in the condominium form of ownership with a combined gross floor area of 35,000 square feet or more, excluding the parking garage area, and governed by a single board of managers; or (iii) two or more buildings with a combined gross floor area of 35,000 square feet or more, excluding the parking garage area, that are served in whole or in part by the same electric or gas meter or are served by the same heating or cooling system or systems, which is not a district energy system." COMAR 26.28.01.02(15).

32. "Net direct emissions" are "(i) the sum of all direct greenhouse gas emissions from a covered building; or (ii) for a covered building connected to a district energy system, direct greenhouse gas emissions plus the greenhouse gas emissions attributable to thermal energy inputs from the district energy system used by the covered buildings." COMAR 26.28.01.02(31).

16

JA130

33. "Direct greenhouse gas emissions" or "direct emissions" are "greenhouse gas emissions produced on-site by covered buildings, as calculated by the benchmarking tool unless otherwise specified by the Department." COMAR 26.28.01.02(17). The "benchmarking tool" is the U.S. Environmental Protection Agency's ENERGY STAR Portfolio Manager. COMAR 26.28.01.02(10).

34. The ENERGY STAR Portfolio Manager calculates "building's emissions (including carbon dioxide, methane, and nitrous oxide) from on-site fuel combustion and purchased electricity and district heating and cooling. Portfolio Manager also enables tracking of avoided emissions from any green power purchases." U.S. Environmental Protection Agency, *How Portfolio Manager Calculates Emissions*, https://www.energystar.gov/buildings/benchmark/understand-metrics/how.

35. The Maryland BEPS performance standards differ by building type (*e.g.*, multifamily housing, office, strip mall, etc.), and come in three forms: Interim Standard for years 2030-2034, Interim Standard for years 2035-2039, and Final Standard for year 2040 and beyond. COMAR 26.28.03.02. Measured as Kg CO2e/sq. ft., the Interim Standard for years 2030-2034 is the highest, followed by the Interim Standard for years 2035-2039. The Final Standard for all non-exempt building types is 0 Kg CO2e/sq. ft. *Id.*

36. Owners of covered buildings can opt to pay a fee in lieu of meeting the standard, starting at $230 per metric ton of excess CO2e in 2030, and increasing each year thereafter. COMAR 26.28.04.01.

37. The Maryland BEPS contain certain exemptions, including for some building types and building owners that can demonstrate financial distress. COMAR 26.28.03.02, 26.28.04.02.

17

38. The Department published the Maryland BEPS in the *Maryland Register* on December 13, 2024. They took effect on December 23, 2024.

**EPCA Establishes National Binding Appliance Energy Regulations**

39. The Maryland BEPS impermissibly regulate the energy use and efficiency of gas appliances, which is an area that Congress directed the U.S. Department of Energy ("DOE") to regulate through the adoption of federal energy efficiency standards under EPCA. 42 U.S.C. §§ 6201-6422.

40. EPCA was first passed in 1975 to create a comprehensive energy policy to address the serious economic and national security problems associated with our nation's continued reliance on foreign energy resources.

41. The original EPCA was designed to "(1) maximize domestic production of energy and provide for strategic storage reserves of crude oil, residual fuel oil and refined petroleum products; (2) . . . minimize the impact of disruptions in energy supplies by providing for emergency standing measures; (3) provide for domestic crude oil prices that will encourage domestic production in a manner consistent with economic recovery; and (4) reduce domestic energy consumption through the operation of specific voluntary and mandatory energy conservation programs." S. Rep. No. 94-516, at 116-17 (1975).

42. In its original form in 1975, EPCA's provisions regarding consumer appliances focused on requiring labeling of appliances, reasoning that consumers would choose more efficient appliances if they had access to accurate information about efficiency. Thus, the statute required manufacturers to label their appliances and provided that the Secretary of the Federal Energy Administration should utilize energy efficiency standards if the labeling program proved

18

JA132

ineffective. The legislative history makes clear Congress's intent at the time: "it is the Committee's hope that voluntary efforts by manufacturers and better consumer information will make energy efficiency standards unnecessary; however, should the labeling program not suffice, energy efficiency standards should be utilized to achieve the goals of the legislation." H.R. Rep. No. 94-340, at 95 (1975).

43. Originally, EPCA permitted significant state involvement in appliance regulation. It allowed state regulations that differed from the federal regulations if the state regulations were justified by a substantial state or local need, did not interfere with interstate commerce, and were more stringent than the federal standard.

44. Since 1975, Congress has amended EPCA several times, progressively moving away from a laissez faire approach to appliance efficiency that relied upon consumers to choose more efficient appliances, and towards binding federal energy efficiency standards. Each amendment to EPCA further emphasized the federal government's intent to regulate appliance energy use and efficiency, and further limited states' abilities to set their own standards.

45. In 1978, Congress passed a range of statutes known as the National Energy Act ("NEA"), which gave the federal government broader authority over energy policy to ensure national security, decrease energy consumption, reduce dependency on energy imports, generate a strategic petroleum reserve, and broadly develop reliable sources of energy for sustained economic growth. *See* Julia Richardson and Robert Nordhaus, *The National Energy Act of 1978*, 10 Nat. Res. & Env't 62, 62-63 (1995). President Carter also created the federal DOE in 1977 to coordinate a federal response to the nation's energy problems.

46. One of these 1978 statutes passed as part of NEA was the National Energy Conservation and Policy Act ("NECPA"). NECPA amended the 1975 EPCA. Rather than relying exclusively on labeling, NECPA required DOE to prescribe minimum energy efficiency standards for certain products. NECPA also strengthened the preemption provisions in EPCA, allowing state regulations that were more stringent than federal regulations, but *only* if the Secretary found there was a significant state or local interest to justify the state's regulation and the regulation would not unduly burden interstate commerce.

47. Despite the NECPA's new requirements, DOE did not initially adopt federal minimum energy standards. Instead, it "initiated a general policy of granting petitions from States requesting waivers from preemption. As a result, a system of separate State appliance standards ha[d] begun to emerge and the trend [was] growing." S. Rep. No. 100-6, at 4 (1987).

48. In 1987, Congress responded by passing the National Appliance Energy Conservation Act ("NAECA"). The purpose of the NAECA amendment was "to reduce the regulatory and economic burdens on the appliance manufacturing industry through the establishment of national energy conservation standards for major residential appliances." S. Rep. No. 100-6, at 1 (1987).

49. As the Senate recognized, varying state standards created "the problem of a growing patchwork of differing state regulations which would increasingly complicate [appliance manufacturers'] design, production and marketing plans." S. Rep. No. 100-6, at 4 (1987). Similarly, the reports about NAECA in the House of Representatives make clear that Congress wanted to "end an era of confusion and uncertainty" for the industry and "to protect the appliance industry from having to comply with a patchwork of numerous conflicting State requirements." H.R. Rep. No. 100-11, at 24, 30 (1987).

20

JA134

50. Thus, NAECA contained "two basic provisions": "[t]he establishment of Federal standards and the preemption of State standards." S. Rep. No. 100-6, at 2 (1987). "In general, these national standards would preempt all State standards." *Id.*

51. After NAECA, federal law provided two routes for a state or local jurisdiction to qualify for an exception to EPCA preemption. First, as mentioned above, DOE can grant a waiver of preemption; but while states could seek permission to establish their own standards, "achieving the waiver is difficult." S. Rep. No. 100-6, at 2 (1987). It would require showing an unusual and compelling local interest, and the waiver cannot be granted if the "State regulation is likely to result in the unavailability in the State of a product type or of products of a particular performance class, such as frost-free refrigerators." *Id.*

52. The second option to avoid preemption concerns consumer appliances, and it applies only to performance-based building codes for new construction. 42 U.S.C. § 6297(f). To qualify for this exception, the state code must meet a strict seven-part test, enumerated in 42 U.S.C. § 6297(f)(3). The House Report regarding NAECA explains that this exception is intended to "prevent[] state building codes from being used as a means of setting mandatory State appliance standards in excess of Federal Standards." H.R. Rep. 100-11, at 26. In addition, flexibility under this exception was "limited" to "ensure that performance-based codes cannot expressly or effectively require the installation of covered products whose efficiencies exceed . . . the applicable Federal standard . . . ." *Id.* Congress intended to allow only "performance-based codes" that "authorize builders to adjust or trade off the efficiencies of the various building components so long as an energy objective is met." S. Rep. No. 100-6, at 10–11. To avoid preemption, among other requirements, a state building code provision must "establish 'credits' for various conservation measures, to

21

JA135

provide, to the greatest degree possible, one-for-one equivalency between the energy efficiency of these differing measures and the credits provided for such energy efficiency." *Id.* at 11. The Senate chose this requirement "to assure that the credits for exceeding Federal standards are even-handed and are not unfairly weighted resulting in undue pressure on builders to install covered products exceeding Federal standards." *Id.*

53. In 1992, Congress amended EPCA once more through the Energy Policy Act of 1992. That amendment expanded the federal appliance program to include energy efficiency standards for industrial appliances as well as consumer appliances. Likewise, a pathway was added for a state building code regulation for new construction concerning industrial appliances to be exempt from preemption: the regulation must "not require that the energy efficiency of such product exceed the applicable minimum energy efficiency requirement in amended ASHRAE/IES Standard 90.1." 42 U.S.C. § 6316(b)(2)(B)(i).

54. Thus, in its present form, EPCA covers both consumer and industrial appliances, and it sets federal standards for the energy use and efficiency of those products.

**EPCA Expressly Preempts Regulation of Consumer and Industrial Appliances**

55. EPCA expressly preempts state and local regulation of appliance energy use and efficiency, with only narrow exemptions. Congress therefore meant to preempt the entire field of energy use and energy efficiency of covered appliances, leaving DOE to set nationwide standards and establishing detailed conditions that state regulations must meet to avoid preemption.

56. EPCA's energy use and efficiency regulations apply to "covered products." EPCA defines "covered products" for consumers as the types of products listed in Section 6292. 42 U.S.C. § 6291(2). Section 6292 in turn lists 19 types of defined covered products, including "water

22

JA136

heaters," "furnaces," and "kitchen ranges and ovens." *Id.* § 6292(a). Section 6295 sets out the energy conservation standards for these covered products.

57. EPCA defines a "consumer product" as one "(A) which in operation consumes, or is designed to consume, energy . . . and (B) which, to any significant extent, is distributed in commerce for personal use or consumption by individuals[.]" *Id.* § 6291(1). The definition of a consumer product is "without regard to whether such article of such type is in fact distributed in commerce for personal use or consumption by an individual . . . ." *Id.* In other words, products which are regularly sold to individuals may be classified as consumer products, regardless of whether a particular *unit* of the product has been purchased by an individual or by a business, and regardless of whether the products are used in a commercial building or a residential building.

58. The express preemption provision in EPCA's consumer product regulations states that as of "the effective date of an energy conservation standard established in or prescribed . . . for any covered product, no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be effective with respect to such product unless the regulation" falls within certain enumerated exceptions. *Id.* § 6297(c).

59. "Energy use" is defined as "the quantity of energy directly consumed by a consumer product at point of use . . . ." *Id.* § 6291(4). "Energy efficiency" is defined as "the ratio of the useful output of services from a consumer product to the energy use of such product . . . ." *Id.* §§ 6291(5). "Energy" is defined as "electricity, or fossil fuels." *Id.* § 6291(3).

60. Thus, EPCA's consumer standards preempt state regulations concerning the quantity of electricity or fossil fuels consumed by appliances (such as water heaters and furnaces and gas stoves) which are regularly sold to individuals or the efficiency of such appliances.

23

61. Similarly, EPCA also governs the energy efficiency and energy use of certain industrial appliances. *Id.* § 6311-6317.

62. Like EPCA's consumer standards, the industrial standards explicitly "supersede any State or local regulation concerning the energy efficiency or energy use of a product for which a standard is prescribed or established" in the federal statute. *Id.* § 6316(b)(2)(A).

63. "Energy use," for the purposes of the industrial standards, is defined as "the quantity of energy directly consumed by an article of industrial equipment at the point of use . . . ." *Id.* § 6311(4). "Energy efficiency," for the industrial standards, is defined as "the ratio of the useful output of services from an article of industrial equipment to the energy use by such article . . . ." *Id.* § 6311(3). The definition of "energy" refers back to the definition in the consumer standards in Section 6291: energy is "electricity, or fossil fuels." *Id.* §§ 6311(7), 6291(3).

64. EPCA also prescribes standards for various types of "industrial equipment," including "commercial package air conditioning and heating equipment," "warm air furnaces," and several types of water heaters. *Id.* § 6311(1). Those products are "industrial" rather than "consumer" if they are "distributed in commerce for industrial or commercial use" to "any significant extent." *Id.* § 6311(2)(A).

65. Thus, EPCA's standards for consumer products and industrial equipment preempt state and local regulations concerning energy use or energy efficiency of heating equipment, water heaters, furnaces, gas stoves, and other appliances which are regularly sold for residential, industrial, or commercial use—including those present in the "covered building[s]" under the Maryland BEPS.

24

**EPCA Preempts the Maryland BEPS**

66. EPCA preempts the Maryland BEPS because they concern the energy use and energy efficiency of EPCA-covered gas appliances.

67. Since all EPCA-covered gas appliances emit some level of carbon dioxide, the Maryland BEPS are regulating their energy use and energy efficiency by imposing declining net Kg CO2e per square foot requirements—which eventually will go all the way down to zero—and associated penalties if those requirements are not met. That regulatory mandate "concern[s] the . . . energy use" and "energy efficiency" of those gas appliances because it imposes restrictions on and penalizes "the quantity of energy directly consumed by a consumer product [or by an article of industrial equipment] at the point of use." 42 U.S.C. §§ 6291(4), 6297(c), 6311(4), 6316(b)(1)(2)(A). Specifically, the Maryland BEPS are restricting and penalizing the consumption of certain quantities—and eventually any quantity—of gas energy by covered gas appliances. The Maryland BEPS concern the "energy efficiency" of those appliances as well since the declining Kg CO2e requirements penalize less efficient gas appliances and effectively require more efficient appliances.

68. The Maryland BEPS do not qualify for an exception from EPCA's preemption provision. For consumer appliances, a state or local regulation is exempted from preemption if it "is in a building code for new construction" and meets seven specific requirements. 42 U.S.C. §§ 6297(c)(3), (f)(3). The regulation is preempted unless it meets *all seven* of these requirements.

69. The seven requirements, taken together, are intended to allow only performance-based codes that give builders a choice about how to meet overall efficiency or conservation objectives, ensuring an even-handed policy that does not pressure builders to choose one type of appliance over another. *See* S. Rep. 100-6, at 10–11 (1987).

25

JA139

70. For new construction, the requirements are based on the typical structure of performance-based energy efficiency provisions in building codes, which establish overall energy efficiency or conservation measures for a building and specify different ways in which a builder or building owner can meet the required objectives.

71. The Maryland BEPS do not meet all seven requirements listed in Section 6297(f)(3) and are therefore preempted. For one, the Maryland BEPS are not "a building code for new construction." Indeed, the Maryland BEPS even apply to existing buildings.

72. Additionally, the second requirement, for example, is that "[t]he code does not require that the covered product have an energy efficiency exceeding the" federal EPCA standards in section 6295, absent a state waiver (which does not apply in this case). *Id.* § 6297(f)(3)(B). The Maryland BEPS do not meet this requirement because they prohibit (or effectively prohibit via costly penalties and/or compliance costs) in many instances the use of EPCA-covered gas appliances that meet federal energy efficiency standards.

73.  As another example, the third requirement is that "[t]he credit to the energy consumption or conservation objective allowed by the code for installing covered products having energy efficiencies exceeding [the federal EPCA standards in section 6295] is on a one-for-one equivalent energy use or equivalent cost basis." *Id.* § 6297(f)(3)(C). But the Maryland BEPS do not give credit "on a one-for-one equivalent energy use . . . basis" for products that are more efficient than what the federal standards require.

74. The Maryland BEPS fail the sixth requirement, too—that "[t]he energy consumption or conservation objective is specified in terms of an estimated total consumption of energy . . .

26

JA140

utilizing an equivalent amount of energy," *id.* § 6297(f)(3)(F)—because they specify their objective in terms of emissions rather than energy consumption.

75. Similar to the consumer product standards, EPCA contains only limited exemptions to the default rule of preemption of state regulations concerning the energy use or efficiency of industrial appliances. 42 U.S.C. § 6316(b)(2)(B). To avoid preemption, a regulation in a "State or local building code for new construction" must not "require that the energy efficiency of such product exceed the applicable minimum energy efficiency requirement in amended ASHRAE/IES Standard 90.1" *Id.* § 6316(b)(2)(B)(i).

76. The Maryland BEPS do not meet this requirement because they are not a "building code for new construction." Indeed, the Maryland BEPS even apply to existing buildings and require (or at least effectively require) that EPCA-covered industrial appliances exceed the efficiency standards in ASHRAE/IES Standard 90.1.

77. On information and belief, Maryland has not applied for a waiver from EPCA preemption from the U.S. Secretary of Energy, as would be required under 42 U.S.C. § 6297(d). Further, even if it applied, Maryland could not lawfully obtain such a waiver. EPCA prohibits the Secretary from granting a waiver where, as is the case here, "the State regulation is likely to result in the unavailability in the State of any covered product type (or class) of performance characteristics (including reliability), features, sizes, capacities, and volumes that are substantially the same as those generally available in the State at the time of the" waiver. *Id.* § 6297(d)(4).

**CAUSES OF ACTION**

**<u>COUNT ONE</u>: FEDERAL PREEMPTION BY
THE ENERGY POLICY AND CONSERVATION ACT**

78. Plaintiffs re-allege the preceding paragraphs as though set forth fully herein.

27

JA141

JA142

79. The Maryland BEPS concern the energy efficiency and energy use of EPCA-covered consumer and industrial appliances.

80. The Maryland BEPS do not fall within any exception from EPCA preemption.

81. The Maryland BEPS are therefore preempted by the federal EPCA.

82. There is no set of circumstances under which the Maryland BEPS would be valid.

83. Plaintiffs accordingly request that the Court declare that the Maryland BEPS are preempted by EPCA and enjoin Defendant from enforcing the preempted Maryland BEPS.

## PRAYER FOR RELIEF

84. WHEREFORE, Plaintiffs pray for relief as follows:

85. For a permanent injunction enjoining Defendant from enforcing or attempting to enforce the Maryland BEPS;

86. For a declaratory judgment, pursuant to 28 U.S.C. § 2201(a) and § 1331, that the Maryland BEPS are preempted by federal law because they concern the energy use of appliances covered by the federal Energy Policy and Conservation Act and are therefore void and unenforceable.

87. For costs of this suit, including reasonable attorney's fees; and

88. For such other and further relief as the Court may deem just and proper.

28

Respectfully submitted,

BAKER BOTTS L.L.P.

/s/ *Scott Novak*
Scott Novak (Bar Number: 31357)
700 K St NW
Washington, DC
(P) 202-639-1316
(F) 202-585-1000
scott.novak@bakerbotts.com

J. Mark Little (*admitted pro hac vice*)
910 Louisiana St
Houston, TX
(P) 713-229-1234
(F) 713-229-1522
mark.little@bakerbotts.com

*Counsel for Maryland Building Industry Association, Inc., The Building Owners and Managers Association of Greater Baltimore, Inc., NAIOP Maryland, Inc., NAIOP DC | MD, Inc., Maryland Multi-Housing Association, Inc., Washington Gas Light Company, Leisure World Community Corporation, The Elizabeth Condominium Association, Inc., Promenade Towers Mutual Housing Corporation, The Willoughby of Chevy Chase Condominium Council of Unit Owners, Inc., Apartment and Office Building Association of Metropolitan Washington, and Columbia Gas of Maryland, Inc.*

29

JA143

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

| | | |
|---|---|---|
| **MARYLAND BUILDING INDUSTRY ASSOCIATION, INC., ET AL.** | * | |
| | * | |
| | * | |
| **Plaintiffs,** | * | |
| | * | |
| **V.** | * | |
| | * | **CIVIL NO. 8:25-cv-00113-DLB** |
| **SERENA COLEMAN McILWAIN, IN HER OFFICIAL CAPACITY AS SECRETARY OF THE MARYLAND DEPARTMENT OF THE ENVIRONMENT,** | * | |
| | * | |
| | * | |
| | * | |
| | * | |
| | * | |
| **Defendant.** | * | |
| | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Defendant Serena Coleman McIlwain in her Official Capacity as Secretary of the Maryland Department of the Environment ("Department"), by its undersigned counsel, pursuant to Federal Rule of Civil Procedure 12(b)(6), files this Motion to Dismiss and in support thereof states as follows:

1.    In response to the existential threat of climate change, the Maryland General Assembly enacted the Climate Solutions Now Act of 2022, which in part, directed the Department to promulgate regulations to reduce greenhouse gas emissions from certain large buildings in the State to net-zero by 2040. Md. Code Ann. Envir. §§ 2-1601 and 2-1602 (LexisNexis Supp. 2024). As directed, the Department promulgated its Building

Energy Performance Standards ("Regulation"), codified in Code of Maryland Regulations ("COMAR") 26.28.

2.    Plaintiffs filed this lawsuit against the Department seeking declaratory and injunctive relief under federal law to enjoin the Department's enforcement of the Regulation and declare it expressly preempted by the Energy Policy and Conservation Act, 42 U.S.C. §§ 6201 through 6422 ("EPCA").

3.    Section 6297(c) of EPCA preempts state and local authorities from enacting regulations concerning the energy use or energy efficiency of certain appliances and industrial equipment, which Plaintiffs assert includes the Regulation's restrictions on greenhouse gas emissions from buildings.

4.    As more fully explained in the attached Memorandum of Law, the Regulation does not concern energy use or energy efficiency standards for appliances, and therefore, is not preempted. Because Plaintiffs' First Amended Complaint relies on an incorrect interpretation of EPCA, it should be dismissed for failure to state a claim.

WHEREFORE, the foregoing considered, and for the reasons more fully set forth in the attached Memorandum of Law, Defendant respectfully requests that the above-captioned action against it be dismissed with prejudice.

**REQUEST FOR HEARING**

Defendant hereby requests a hearing on this motion to dismiss.

Respectfully submitted:

ANTHONY G. BROWN

2

JA145

Attorney General of Maryland


*/s/ Doris N. Lange*
Doris N. Lange
Assistant Attorney General
Federal Bar No.: 19679
Maryland Department of the
Environment
1800 Washington Boulevard, Suite 6048
Baltimore, MD 21230
Phone: 410-537-3038
Fax: 410-538-3943
doris.lange@maryland.gov

Michael F. Strande
Assistant Attorney General
Federal Bar No.: 30039
Maryland Department of the
Environment
1800 Washington Boulevard, Suite 6048
Baltimore, MD 21230
Phone: 410-537-3421
Fax: 410-538-3943
michael.strande@maryland.gov

*Attorneys for Defendant*


## <u>NOTICE OF ELECTRONIC FILING</u>

I hereby certify that on May 5, 2025, a copy of the foregoing Motion to Dismiss Plaintiffs' First Amended Complaint for Declaratory and Injunctive Relief was electronically filed and served on all counsel of record via the Court's CM/ECF system.


*/s/ Doris N. Lange*
Doris N. Lange

3

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

MARYLAND BUILDING INDUSTRY
ASSOCIATION, INC., et al.,

    *Plaintiffs*,

 v.

SERENA COLEMAN MCILWAIN, in her
Official Capacity as the Secretary of the
Maryland Department of the Environment,

    *Defendant*.

CASE NO. 8:25-CV-00113-DLB

**NOTICE OF APPEAL**

Pursuant to Rules 3 and 4 of the Federal Rules of Appellate Procedure, notice is hereby given that Plaintiffs Maryland Building Industry Association, The Building Owners and Managers Association of Greater Baltimore, Inc., NAIOP MD, Inc., NAIOP DC | MD, Inc., Maryland Multi-Housing Association, Inc., Washington Gas Light Company, Leisure World Community Corporation, The Elizabeth Condominium Association, Inc., Promenade Towers Mutual Housing Corporation, The Willoughby of Chevy Chase Condominium Council of Unit Owners, Inc., Columbia Gas of Maryland, Inc., and Apartment and Office Building Association of Metropolitan Washington appeal to the United States Court of Appeals for the Fourth Circuit the order entered in this action on March 31, 2026 (Dkt. 66), the Memorandum Opinion of this Court entered on March 31, 2026 (Dkt. 65), and the Amended Memorandum Opinion entered on April 2, 2026 (Dkt. 67).

Respectfully submitted,

BAKER BOTTS L.L.P.

/s/ Scott Novak
Scott Novak (Bar ID: 1736274)
700 K Street N.W.
Washington, D.C. 20001
202.639.1316
scott.novak@bakerbotts.com

J. Mark Little (*pro hac vice*)
910 Louisiana Street
Houston, TX 77098
713.229.1489
mark.little@bakerbotts.com

*Counsel for Maryland Building Industry Association, Inc., The Builders Owners and Managers Association of Greater Baltimore, Inc., NAIOP Maryland, Inc., NAIOP DC | MD, Inc., Washington Gas Light Company, Leisure World Community Corporation, The Elizabeth Condominium Association, Inc., Promenade Towers Mutual Housing Corporation, The Willoughby of Chevy Chase Condominium Council of Unit Owners, Inc., Apartment and Office Building Association of Metropolitan Washington, and Columbia Gas of Maryland, Inc.*

JA148

**CERTIFICATE OF SERVICE**

On April 29, 2026, I electronically submitted the foregoing document with the clerk of the court of the U.S. District Court, District of Maryland, using the electronic case filing system of the court. Service was accomplished through the CM/ECF system.

*/s/ Scott Novak*
Scott Novak