**No. 26-1552**

In The

# United States Court of Appeals
# for the Fourth Circuit

———————————————————

MARYLAND BUILDING INDUSTRY ASSOCIATION, INC., *et al*.,

*Plaintiff-Appellants*,

*v.*

SERENA COLEMAN MCILWAIN, IN HER OFFICIAL CAPACITY AS THE SECRETARY OF THE MARYLAND DEPARTMENT OF THE ENVIRONMENT,

*Defendant-Appellee*.

———————————————————

On Appeal from the U.S. District Court for the District of Maryland, No. 8:25-cv-00113-DLB

———————————————————

## APPELLANTS' STATUTORY AND REGULATORY ADDENDUM
———————————————————

Scott Novak
BAKER BOTTS L.L.P.
700 K Street NW
Washington, D.C. 20001
(202) 304-5099
scott.novak@bakerbotts.com

J. Mark Little
BAKER BOTTS L.L.P.
910 Louisiana Street
Houston, TX 77002
(713) 229-1489
mark.little@bakerbotts.com

Daniel B. Rankin
BAKER BOTTS L.L.P.
401 S. 1st Street, Ste. 1300
Austin, TX 78704
(737) 393-7297
daniel.rankin@bakerbotts.com

*Counsel for Appellants*

## CERTIFICATE OF SERVICE

I certify that on June 15, 2026, the foregoing was electronically filed through this Court's CM/ECF system, which will send a notice of filing to all registered users.

/s/ J. Mark Little
J. Mark Little

# TABLE OF CONTENTS

Subtitle 28 of Title 26 the Code of Maryland Regulations....................................A1

42 U.S.C. § 6291 (excerpts)....................................................................A25

42 U.S.C. § 6292 ....................................................................................A27

42 U.S.C. § 6293 (excerpts)....................................................................A29

42 U.S.C. § 6295 (excerpts)....................................................................A30

42 U.S.C. § 6297 ....................................................................................A35

42 U.S.C. § 6311 (excerpts) ...................................................................A46

42 U.S.C. § 6314 (excerpts) ...................................................................A49

42 U.S.C. § 6316 (excerpts)....................................................................A50

**Subtitle 28 of Title 26 of the Code of Maryland Regulations ("COMAR").**
**Building Energy Performance Standards**

**Chapter 01 Definitions and Documents Incorporated by Reference**

.01 Purpose.

The purpose of this chapter is to define the terms used in this subtitle and identify the documents that are incorporated by reference.

.02 Definitions.

A. In this subtitle, the following terms have the meanings indicated.

B. Terms Defined.

(1) "Affordable housing providers" means the owner of a covered building that primarily provides housing to limited income households, where a minimum of 51 percent of households living within the building are at or below 80 percent of the area median income, as defined in the Housing and Community Development Article, § 4-1801, Annotated Code of Maryland, or a covered building that is restricted under the Low-Income Housing Tax Credit (LIHTC) program.

(2) Agricultural Building.

(a) "Agricultural building" means a structure that is used primarily to cultivate, manufacture, process, or produce agricultural crops, raw materials, products, livestock, or commodities.

(b) "Agricultural building" includes a greenhouse.

(3) "Alternative compliance fee" means a fee paid by the building owner to come into compliance with applicable net direct emissions standards, as specified in COMAR 26.28.04.01A.

(4) "Area-weighted standard" means an interim or final performance standard that is calculated based on the floor area proportion of the property types within a covered building.

(5) Authorized Occupant.

A1

(a) "Authorized occupant" means a person that is approved by a building owner to be within a covered building.

(b) "Authorized occupant" does not include:

(i) Security guards;

(ii) Janitors;

(iii) Construction workers;

(iv) Landscapers; and

(v) Other maintenance personnel.

(6) "Baseline performance" means the weather-normalized numeric values of net direct greenhouse gas emissions and site EUI of a covered building for the covered building's baseline year.

(7) "Baseline year" means either calendar year 2025 for a covered building that was constructed and occupied prior to calendar year 2025 or the first full calendar year in which a newly constructed covered building was occupied.

(8) "Benchmark" means to track and input a building's energy consumption data and other relevant building information on a monthly basis for at least 12 consecutive months, as required by the benchmarking tool, to quantify the building's energy use and greenhouse gas emissions.

(9) Benchmarking Information.

(a) "Benchmarking information" means descriptive information about a building, its operating characteristics, and information generated by the benchmarking tool regarding the building's energy consumption, efficiency, and performance.

(b) "Benchmarking information" includes but is not limited to the building identification number, address, gross floor area, and separate energy consumption totals for each fuel type.

(10) "Benchmarking tool" means the website-based software, commonly known as ENERGY STAR Portfolio Manager, or any successor system, approved by the United States Environmental Protection Agency.

A2

(11) "Building" has the meaning set forth in the International Building Code, which is incorporated by reference under COMAR 09.12.51.04A and as modified in COMAR 09.12.51.04B.

(12) "Building owner" means an individual or legal entity possessing title to a building including but not limited to a board of the owners' association, master association, board of directors, community association, cooperative housing corporation, or condominium.

(13) "Campus" means a collection of two or more buildings, of any building type or size, that act as a single cohesive property with a single shared primary function and are owned and operated by the same party, such as, but not limited to, higher education or hospital campuses, as determined by the Department.

(14) "Commercial building" means a commercial building as defined and subject to the commercial provisions of the International Energy Conservation Code, which is incorporated by reference in COMAR 09.12.51.04A and as modified in COMAR 09.12.51.04D, regardless of the nature of the entity or government that owns the building.

(15) Covered Building.

> (a) "Covered building" means a building that is a commercial or multifamily residential building in the State of Maryland or is owned by the State of Maryland and has a gross floor area of 35,000 square feet or more, excluding the parking garage area, and is:

> > (i) A single building;

> > (ii) One or more buildings held in the condominium form of ownership with a combined gross floor area of 35,000 square feet or more, excluding the parking garage area, and governed by a single board of managers; or

> > (iii) Two or more buildings with a combined gross floor area of 35,000 square feet or more, excluding the parking garage area, that are served in whole or in part by the same electric or gas meter or are served by the same heating or cooling system or systems, which is not a district energy system.

A3

(b) "Covered building" includes a building that meets the criteria for a covered building as described in this section and is located in a historic district but where the building is not individually designated as a historic property under federal, state, or local law.

(c) "Covered building" does not include:

(i) A building, or space within a building, individually designated as a historic property under federal, State, or local law, separate and apart from a building's inclusion in a historic district;

(ii) A public or nonpublic elementary or secondary school building;

(iii) A manufacturing building;

(iv) An agricultural building; or

(v) A building owned by the federal government;

(16) "Department" means the Maryland Department of the Environment.

(17) "Direct greenhouse gas emissions or direct emissions" means greenhouse gas emissions produced on-site by covered buildings, as calculated by the benchmarking tool unless otherwise specified by the Department.

(18) "District energy system" means a system in which thermal energy generated at one or more central facilities provides heating or cooling through a network of insulated underground pipes to provide hot water, steam, space heating, air conditioning, or chilled water to nearby buildings.

(19) "District energy provider" means an entity that provides thermal energy to customers through a district energy system.

(20) "Electric company" has the meaning stated in Public Utilities Article, § 1-101, Annotated Code of Maryland.

(21) "Final performance standard or final standard" means the numeric values of net direct greenhouse gas emissions that each covered building shall ultimately achieve on an annual basis in 2040 and beyond.

(22) "Financial distress" means:

A4

(a) A property that is the subject of a tax lien sale or public auction due to property tax arrearages;

(b) A property that is controlled by a court appointed receiver; or

(c) A property that was acquired by a deed in lieu of foreclosure in the last calendar year.

(23) "Food service facility" has the meaning stated in COMAR 10.15.03.02B.

(24) Full-Time-Equivalent Employee.

(a) "Full-time-equivalent employee" means a person that occupies a covered building for no less than 40 hours per week throughout a calendar year.

(b) "Full-time-equivalent employee" excludes:

(i) Security guards;

(ii) Janitors;

(iii) Construction workers;

(iv) Landscapers; and

(v) Other maintenance personnel.

(25) "Gas company" has the meaning stated in Public Utilities Article, § 1-101, Annotated Code of Maryland.

(26) "Greenhouse gas emissions or emissions" means gasses released into the atmosphere that contribute to climate change, including but not limited to carbon dioxide ($CO_2$), as calculated by the benchmarking tool unless otherwise specified by the Department.

(27) Gross Floor Area.

(a) "Gross floor area" means the total building square footage measured between the principal exterior surfaces of the enclosing fixed walls of a building.

(b) "Gross floor area" consists of all areas inside the building, including but not limited to lobbies, tenant areas, common areas, meeting rooms,

A5

break rooms, the base level of atriums, restrooms, elevator shafts, stairwells, mechanical equipment areas, basements, and storage rooms.

(c) "Gross floor area" does not include exterior spaces, balconies, bays, patios, exterior loading docks, driveways, covered walkways, outdoor play courts (e.g., tennis, basketball), parking, the interstitial space between floors, which house pipes and ventilation, and crawl spaces.

(d) "Gross floor area" is not the same as rentable space, but rather includes all areas inside the building or buildings.

(28) "Interim performance standard or interim standard" means the weather-normalized numeric values of net direct greenhouse gas emissions which covered buildings shall achieve by a specified calendar year that is prior to 2040.

(29) "Manufacturing building" means a building involved in the process of substantially transforming, or a substantial step in the process of substantially transforming, tangible personal property into a new and different article of tangible personal property by the use of labor or machinery, or otherwise designated as a manufacturing building by the Department.

(30) "Mixed-use building" means a building that contains two or more property types.

(31) Net Direct Greenhouse Gas Emissions or net direct emissions.

(a) "Net direct greenhouse gas emissions or Net Direct Emissions" means:

(i) The sum of all direct greenhouse gas emissions from a covered building; or

(ii) For a covered building connected to a district energy system, direct greenhouse gas emissions plus the greenhouse gas emissions attributable to thermal energy inputs from the district energy system used by the covered building, as calculated using the methodology provided in this regulation.

(b) "Net direct greenhouse gas emissions or net direct emissions" does not include direct greenhouse gas emissions from a food service facility located within a covered building.

A6

(32) "Newly constructed covered building" means a covered building that was constructed after 2024 and occupied by at least one full-time-equivalent employee or authorized occupant.

(33) "Occupied" means a covered building with at least one full-time equivalent employee or authorized occupant.

(34) "Property type" means the primary use of a building space as specified in ENERGY STAR Portfolio Manager.

(35) Site Energy Use.

> (a) "Site energy use" means all energy used on-site by a covered building to meet the energy loads of the building.

> (b) "Site energy use" includes electricity delivered to the building through the electric grid and/or generated on-site with renewable sources; thermal energy delivered to the building through a district energy system; and natural gas, diesel, propane, fuel oil, wood, coal, and other fuels used on-site.

> (c) "Site energy use" excludes electricity used for charging vehicles, a food service facility located within a covered building, and other electricity uses excluded from site energy use by the benchmarking tool.

(36) "Site energy use intensity or site EUI" is calculated by the benchmarking tool by dividing the total energy consumed in one calendar year by the gross floor area of the building and reported as a value of a thousand British thermal units (kBTU) per square foot per year.

(37) "Tenant" means a person or entity occupying or holding possession of a building, part of a building, or premises pursuant to a rental or lease agreement.

(38) "Weather-normalized" means a method for modifying the measured building energy use in a specific calendar year to estimate energy use under normal weather conditions as calculated by the benchmarking tool.

(39) Web services application programming interface (API) or web services API.

A7

(a) "Web services API" means the free application for use by organizations to exchange building energy and other data between their own systems and the benchmarking tool.

(b) "Web services API" may include the entry of data into the tool and/or the calculation and extraction of metrics and other information from the tool.

(40) "Whole building energy consumption data" means energy data that has been summed for an entire building, which may include a single occupant or a group of separately metered tenants, representing the cumulative total of energy used in the covered building.

.03 Incorporation by Reference.

In this subtitle, the Maryland Department of the Environment Technical Memorandum (TM) 24-01, "Technical Guidance and Calculation Methodologies to Comply with Building Energy Performance Standards", July 2024 is incorporated by reference.

## Chapter 02 Benchmarking and Reporting

.01 Purpose.

The purpose of this chapter is to establish reporting requirements for building owners, tenants, electric and gas companies, and district energy providers.

.02 Reporting Requirements of Building Owners.

A. Data Collection.

(1) Each calendar year beginning in 2025 or in the first calendar year after which a newly constructed covered building is occupied, the covered building owner shall collect and enter all required benchmarking information for the previous calendar year into the benchmarking tool.

(2) Nothing in this regulation shall be construed to permit a building owner to use tenant energy usage data for purposes other than evaluation of the performance of the building.

(3) A building owner shall follow the exemption procedures under the TM 24-01, "Technical Guidance and Calculation Methodologies to Comply with Building Energy Performance Standards".

A8

B. Benchmarking Report.

(1) A building owner shall submit a benchmarking report to the Department by June 1st of each year, beginning in 2025, using the benchmarking tool.

(2) Following the first full calendar year that energy data can be collected and the building was occupied, the owner of any newly constructed covered building shall benchmark the building and report to the Department no later than June 1st of the following year, and every June 1st thereafter.

(3) The annual benchmarking report shall include, at a minimum, the benchmarking information spanning January 1st to December 31st of the previous calendar year.

(4) The building owner shall enter data into the benchmarking tool such that the benchmarking report shall be based on an assessment of the energy consumed by the building for the entire calendar year being reported and demonstrate the net direct emissions and site EUI for the entire calendar year being reported.

(5) The building owner shall exclude from the benchmarking report submetered and separately metered energy consumption data for:

(a) Food service facilities that engage in commercial cooking and water heating;

(b) Electric vehicle charging;

(c) Other electricity uses excluded from site energy use by the benchmarking tool; and

(d) Emissions from required combustion equipment under the following conditions:

(i) Emissions from generators shall be excluded from the net direct emissions requirements if a federal or State regulation requires a covered building including a health care facility, laboratory, assisted living and nursing facility, military building, critical infrastructure, and a building used in life sciences to use a backup generator or other equipment that shall run on combustible fuels.

A9

(ii) A covered building is required to include emissions from a combustion generator/equipment if the relevant federal or State regulation is updated to allow battery storage and/or other types of systems that do not produce direct emissions.

(6) Energy consumption for food service facilities can be excluded using a standard deduction formula in accordance with the Department's TM 24-01 "Technical Guidance and Calculation Methodologies to Comply with Building Energy Performance Standards", which is incorporated by reference in COMAR 26.28.01.03 when such energy consumption cannot be excluded using submetered or separately metered data.

(7) Before submitting a benchmarking report, the building owner shall run all automated data quality checker functions available within the benchmarking tool and shall confirm that all data has been accurately entered into the tool. The building owner shall correct all missing or incorrect information as identified by the data quality checker prior to submitting the benchmarking report to the Department.

(8) If a building owner is notified of an inaccuracy by the Department or other third party, then the building owner shall amend the information reported within the benchmarking tool, and shall provide the Department with an updated benchmarking submission within 30 days of learning of the inaccuracy.

(9) The building owner of a mixed-use covered building shall use the benchmarking tool to report the gross floor area for all property types in the building.

(10) The building owners of a covered building that is connected to district energy systems shall submit additional information to supplement the annual benchmarking report in accordance with the Department's TM 24-01,"Technical Guidance and Calculation Methodologies to Comply with Building Energy Performance Standards", which is incorporated by reference in COMAR 26.28.01.03.

C. Third Party Verification of Benchmarking Reports.

(1) The building owner shall have a third party verify the accuracy of benchmarking reports for calendar years:

(a) 2025 (benchmarking report due in 2026);

A10

(b) 2030 (benchmarking report due in 2031);

(c) 2035 (benchmarking report due in 2036);

(d) 2040 (benchmarking report due in 2041); and

(e) Every 5 years thereafter.

(2) The building owner of a newly constructed covered building shall have a third party verify the first required benchmarking report and then comply with the schedule in this chapter for verification of subsequent reports.

(3) The building owner shall provide to the third party verifier all utility bills, delivered fuel receipts, and other documentation needed by the verifier for the calendar year covered by the benchmarking report.

(4) The building owner shall submit a copy of a third party verification to the Department when submitting the associated benchmarking report in accordance with the Department's TM 24-01 "Technical Guidance and Calculation Methodologies to Comply with Building Energy Performance Standards", which is incorporated by reference in COMAR 26.28.01.03.

D. Maintenance of Historical Data.

(1) The building owner shall maintain adequate records demonstrating compliance with this chapter, including but not limited to, energy bills, reports, forms, and records received from tenants or utilities and records.

(2) Such records shall be preserved for a period no less than 5 years.

(3) At the request of the Department, such records shall be made available for inspection and audit by the Department.

E. Annual Reporting Fee.

(1) A building owner shall pay an annual reporting fee for each covered building as defined in Environment Article, § 201601, Annotated Code of Maryland.

(2) The annual reporting fee is due by June 1st of each year beginning in 2026.

(3) In 2026, the annual reporting fee is $100.

A11

(4) Beginning in 2027 and each year thereafter, the annual reporting fee is $100 as adjusted for inflation pursuant to §E*5) of this regulation.

(5) Consumer Price Index.

> (a) The annual reporting fee rate set forth in this chapter shall be increased each calendar year by the percentage, if any, by which the Consumer Price Index for the most recent calendar year exceeds the Consumer Price Index for the previous calendar year.

> (b) The Consumer Price Index for any calendar year is the 12-month average of the Consumer Price Index for all urban consumers published by the U.S. Department of Labor.

.03 Reporting Requirements of Tenants.

A tenant of a covered building shall, within 30 days of a request by the building owner, provide all requested benchmarking information that cannot otherwise be acquired by the building owner from other sources.

.04 Reporting Requirements of Electric and Gas Companies and District Energy Providers.

A. Electric and Gas Companies.

> (1) Electric and gas companies delivering energy to a covered building shall maintain whole-building energy consumption data for all buildings, for at least the most recent 5 years in an electronic format capable of being uploaded to the benchmarking tool.

> (2) On and after January 1, 2025, upon the request and authorization of a building owner an electric or gas company shall provide the building owner with at least the most recent 12 consecutive months of whole building energy consumption data by fuel type for the specified building for all the fuel types provided by the company.

>> (a) The electric or gas company shall provide data to the requestor as follows:

>>> (i) Data shall include whole building energy consumption, aggregating all utility meters that measure energy consumption at the building;

A12

(ii) Data shall be provided to the requestor within 90 days of receiving a data request in 2025;

(iii) Data shall be provided to the requestor within 30 days of receiving a data request in 2026 or later; and

(iv) Whole building energy consumption data shall be provided to the requestor in monthly intervals.

(b) An electric or gas company may be exempt from §A(2) of this regulation in accordance with §A(7) of this regulation.

(3) Investor-owned electric and gas companies serving 40,000 or more customers shall use the benchmarking tool's web services API to deliver data to requesters on an ongoing basis.

(4) Investor-owned electric and gas companies serving fewer than 40,000 customers, municipal electric and gas companies, or cooperatively owned electric and gas companies shall provide data in the spreadsheet template specified by the benchmarking tool, or through the benchmarking tool's web services API to requesters on an ongoing basis.

(5) Electric and gas companies shall develop and maintain a process to identify and confirm with the building owner the list of meters that will be used to calculate the aggregated total as follows:

(a) Electric and gas companies shall provide to the building owner a listing of all meters included in the whole building energy consumption data for verification purposes; and

(b) If any correction or update takes place at a meter that is included in the whole building energy consumption data, then the affected value or values shall be proactively updated by the electric or gas company through the benchmarking tool's web services API or through an updated spreadsheet template with a notification provided to the building owner/data requestor.

(6) For covered buildings with five or more tenants, electric and gas companies shall deliver to requestors the monthly whole building energy consumption data capturing total consumption by fuel type of all relevant fuel or fuels across all meters at the building.

A13

(a) The whole building energy consumption data shall not be deemed confidential information by the electric and gas companies for purposes of delivery to the building owner.

(b) Electric and gas companies will not be required to acquire explicit authorization for data release by the individual tenants.

(7) For covered buildings with fewer than five tenants, electric and gas companies shall deliver whole building energy consumption data to the building owner if the building tenants provide written or electronic consent for the delivery of the tenant's energy data to the building owner.

(a) The building tenant's consent may be provided in a lease agreement provision.

(b) The building tenant's consent is not required if an electric or gas company customer vacates the covered building before explicitly denying consent for the delivery of the tenant's energy data to the building owner.

(8) When providing whole-building consumption data to a property with onsite generation of renewable electricity (for example, solar or wind energy), electric and gas companies shall ensure that the consumption values delivered to the building owner capture total gross grid electricity consumption as metered by the electric or gas company, rather than net, or net-metered, consumption of grid electricity.

B. District Energy Providers.

(1) Starting no later than January 1, 2025, district energy providers shall maintain all records that are necessary to comply with this regulation for a period of not less than 5 years. At the request of the Department, such records shall be made available for inspection and audit by the Department.

(2) District energy providers shall provide greenhouse gas emissions factors per unit of district energy input (steam, hot water, chilled water, etc.) to the owners of covered buildings and to the Department for benchmarking and compliance purposes.

(3) Emissions factors and a full and detailed accounting of their calculation shall be provided by the district energy provider by March 1st of each calendar year and cover the previous calendar year based on actual fuel consumption

A14

and system performance data. The Department may require a third party review of such calculations paid for by the district energy provider.

(4) District energy providers shall use methodology for allocating emissions that will be based on the "Efficiency Method" in the World Resources Institute's "Calculation tool for direct emissions from stationary combustion: Allocation of GHG Emissions from a Combined Heat and Power (CHP) Plant".

.05 Disclosure of Covered Building Benchmarking and Performance Standards Information.

Before a buyer signs a contract for the purchase of a covered building, the building owner selling the covered building shall:

A. Disclose to the prospective buyer that the building is subject to requirements under this subtitle;

B. Transfer the following records to the prospective buyer:

(1) A copy of the complete benchmarking record from the benchmarking tool;

(2) Documentation of data verification;

(3) Documentation of any alternative compliance fee made to the Department; and

(4) Any other records relevant to maintain compliance under this subtitle; and

C. Provide to the prospective buyer the following information:

(1) Baseline performance; and

(2) Interim and final performance standards.

**Chapter 03 Performance Standards and Compliance Demonstration**

.01 Purpose.

The purpose of this chapter is to establish performance standards for covered buildings.

.02 Performance Standards.

A. Interim and final net direct emissions standards are set forth below.

Table 1. Performance Standards.

| Property Type | Net Direct Emissions Standards Kg CO2e per square foot | | |
| --- | --- | --- | --- |
| | Interim Standard for 2023–2034 | Interim Standard for 2035–2039 | Final Standard for 2040 and beyond |
| Adult Education | 2.34 | 1.17 | 0 |
| Ambulatory Surgical Center | 1.76 | 0.88 | 0 |
| Aquarium | 1.99 | 1.00 | 0 |
| Bank Branch | 1.01 | 0.50 | 0 |
| Bar/Nightclub | 1.70 | 0.85 | 0 |
| Barracks | 0.57 | 0.29 | 0 |
| Bowling Alley | | 1.03 | 0 |
| Casino | 1.03 | 0.52 | 0 |
| College/University | 2.43 | 1.21 | 0 |
| Convenience Store with Gas Station | 2.25 | 1.13 | 0 |
| Convenience Store without Gas Station | 2.25 | 1.13 | 0 |
| Convention Center | 2.25 | 0.19 | 0 |
| Courthouse | 1.14 | 0.57 | 0 |
| Data Center | 1.26 | 0.63 | 0 |
| Distribution Center | 0.58 | 0.29 | 0 |

A16

| | | | |
|---|---|---|---|
| Fast Food Restaurant | exempt | exempt | exempt |
| Financial Office | 0.32 | 0.16 | 0 |
| Fire Station | 1.70 | 0.85 | 0 |
| Fitness Center/Health Club Gym | 2.87 | 1.43 | 0 |
| Food Sales | 2.25 | 1.13 | 0 |
| Food Service | exempt | exempt | exempt |
| Heated Swimming Pool | 2.07 | 1.03 | 0 |
| Hotel | 1.47 | 3.05 | 0 |
| Ice/Curling Rink | 2.07 | 0.74 | 0 |
| Indoor Arena | 1.03 | 0.52 | 0 |
| K-12 School | exempt | exempt | exempt |
| Laboratory | 5.35 | 2.68 | 0 |
| Library | 1.92 | 0.96 | 0 |
| Lifestyle Center | 0.91 | 0.46 | 0 |
| Mailing Center/Post Office | 0.92 | 0.46 | 0 |
| Medical Office | 0.18 | 0.09 | 0 |
| Movie Theatre | 0.78 | 0.39 | 0 |
| Multifamily Housing | 0.82 | 0.41 | 0 |
| Museum | 0.75 | 0.38 | 0 |
| Non-Refrigerated Warehouse | 0.09 | 0.05 | |
| Office | 0.22 | 0.11 | 0 |

A17

| | | | |
|---|---|---|---|
| Other—Education | 1.59 | 0.80 | 0 |
| Other—Entertainment/Public Assembly | 0.54 | 0.27 | 0 |
| Other—Lodging/Residential | 0.002 | 0.001 | 0 |
| Other—Mall | 1.40 | 0.70 | 0 |
| Other—Other | 1.60 | 0.80 | 0 |
| Other—Public Services | 2.12 | 1.06 | 0 |
| Other—Services | 2.63 | 1.31 | 0 |
| Other—Specialty Hospital | 6.10 | 3.05 | 0 |
| Other—Stadium | 0.31 | 0.16 | 0 |
| Other—Technology/Science | 0.001 | 0.001 | 0 |
| Outpatient Rehabilitation/Physical Therapy | 1.76 | 0.88 | 0 |
| Parking | exempt | exempt | exempt |
| Performing Arts | 2.38 | 1.19 | 0 |
| Personal Services (Health/Beauty, Dry Cleaning, etc.) | 2.17 | 1.09 | 0 |
| Police Station | 1.52 | 0.76 | 0 |
| Pre-school/Daycare | 2.45 | 1.23 | 0 |
| Prison/Incarceration | 0.57 | 0.29 | 0 |
| Race Track | 1.03 | 0.52 | 0 |
| Refrigerated Warehouse | 1.37 | 0.69 | 0 |

A18

| Repair Services (Vehicle, Shoe, Locksmith, etc.) | 2.16 | 1.08 | 0 |
|---|---|---|---|
| Residential Hall/Dormitory | 0.70 | 0.35 | 0 |
| Residential Care Facility | 1.43 | 0.72 | 0 |
| Restaurant | exempt | exempt | exempt |
| Retail Store | 0.60 | 0.30 | 0 |
| Roller Rink | 2.07 | 1.03 | 0 |
| Self-Storage Facility | 0.19 | 0.10 | 0 |
| Senior Living Community | 1.43 | 0.72 | 0 |
| Social/Metting Hall | 1.53 | 0.76 | 0 |
| Stadium (Closed) | .031 | 0.16 | 0 |
| Stadium (Open) | 0.32 | 0.16 | 0 |
| Strip Mall | 1.90 | 0.95 | 0 |
| Supermarket/Grocery Store | 2.25 | 1.13 | 0 |
| Transportation Terminal/Station | 2.22 | 1.11 | 0 |
| Urgent Care/Clinic/Other/Outpatient | 1.76 | 0.88 | 0 |
| Vehicle Dealership | 2.23 | 1.12 | 0 |
| Veterinary Office | 1.76 | 0.88 | 0 |
| Vocational School | 2.34 | 1.17 | 0 |
| Wholesale Club/Supermarket | .60 | 0.30 | 0 |
| Worship Facility | 0.87 | 0.44 | 0 |

A19

| Zoo | 1.03 | 0.52 | 0 |
|-----|------|------|---|

B. Reserved.

C. Interim and Final Standards for Mixed-Use Covered Buildings. Area-weighted standards for net direct emissions for mixed-use buildings will be set by the compliance tool as specified in the Department's TM 24-01, "Technical Guidance and Calculation Methodologies to Comply with Building Energy Performance Standards", which is incorporated by reference in COMAR 26.28.01.03.

D. Achieving and Maintaining the Standards.

> (1) Each covered building shall not exceed the net direct emissions standards for 2030—2034 in each calendar year including 2030, 2031, 2032, 2033, and 2034, as determined on a yearly basis.

> (2) Each covered building shall not exceed the net direct emissions standards for 2035—2039 in each calendar year including 2035, 2036, 2037, 2038, and 2039, as determined on a yearly basis.

> (3) Each covered building shall not exceed the net direct emissions standards in calendar year 2040 and each calendar year thereafter, as determined on a yearly basis.

## Chapter 04 Alternative Compliance and Specialty Provisions

.01 Alternative Compliance Pathway.

A. Alternative Compliance Pathway for Net Direct Emissions Standards.

> (1) In lieu of meeting the net direct emissions standards in COMAR 26.28.03, the building owner shall come into compliance with the net direct emissions standards by paying an alternative compliance fee for the greenhouse gas emissions in excess of the net direct emissions standards.

> (2) An alternative compliance fee shall be paid for every metric ton of net direct emissions in excess of the net direct emissions standard in a given calendar year. The fee shall be:

>> (a) $230 per metric ton of excess $CO_2e$ in 2020 dollars, adjusted for inflation, for 2030;

A20

(b) $234 per metric ton of excess $CO_2e$ in 2020 dollars, adjusted for inflation, for 2031;

(c) $238 per metric ton of excess $CO_2e$ in 2020 dollars, adjusted for inflation, for 2032;

(d) $242 per metric ton of excess $CO_2e$ in 2020 dollars, adjusted for inflation, for 2033;

(e) $246 per metric ton of excess $CO_2e$ in 2020 dollars, adjusted for inflation, for 2034;

(f) $250 per metric ton of excess $CO_2e$ in 2020 dollars, adjusted for inflation, for 2035;

(g) $254 per metric ton of excess $CO_2e$ in 2020 dollars, adjusted for inflation, for 2036;

(h) $258 per metric ton of excess $CO_2e$ in 2020 dollars, adjusted for inflation, for 2037;

(i) $262 per metric ton of excess $CO_2e$ in 2020 dollars, adjusted for inflation, for 2038;

(j) $266 per metric ton of excess $CO_2e$ in 2020 dollars, adjusted for inflation, for 2039;

(k) $270 per metric ton of excess $CO_2e$ in 2020 dollars, adjusted for inflation, for 2040; and

(l) The fee rate increases by $4 per metric ton of CO2e per calendar year in 2020 dollars, adjusted for inflation, in each calendar year following 2040.

(3) The annual fee rate set forth in this chapter shall be increased each calendar year by the percentage, if any, by which the Consumer Price Index-U (All Urban Consumers) for the most recent calendar year exceeds the Consumer Price Index-U (All Urban Consumers) for the previous calendar year.

B. Other Provisions. If covered building ownership changes in 2030 or any calendar year thereafter, then the owner of the building on December 31st is responsible for compliance with this regulation and paying alternative compliance fees or penalties

A21

for the calendar year ending on December 31st and every calendar year thereafter until that person is no longer the owner of the covered building.

.02 Exemptions.

A. Exemptions from Benchmarking and Performance Standard Requirements. A building owner may apply for an exemption from the requirements of this regulation for one calendar year when the building owner can provide documentation showing that one of the following conditions are met:

(1) Financial distress;

(2) The covered building was not occupied for the entirety of the calendar year being reported; or

(3) The covered building was demolished during the calendar year for which benchmarking is required.

B. Exemption from Establishing Baseline Performance.

(1) The Department may, in its sole discretion, grant an exemption from the requirement to establish baseline performance when, during the baseline year, less than 50 percent of the floor area of the covered building was occupied for at least 180 days and where the building owner applies for such exemption.

(2) A covered building may not receive an exemption from the requirement to establish baseline performance for more than 3 years.

C. Exemptions for Affordable Housing Providers.

(1) The Department may grant the application of reduced alternative compliance fees to an affordable housing provider when the building owner submits in writing such request by June 1st of each calendar year, beginning in 2031 which demonstrates to the Department that it has made a good faith effort, as demonstrated under § C(2) of this regulation.

(2) A good faith effort may be demonstrated to the Department by submitting a copy of the application to a federal or Maryland administered program that would make the building or buildings more energy efficient and/or reduce greenhouse gas emissions. The submission shall also include the benchmark report, intended scope of work, and estimated greenhouse gas reductions expected from the intended scope of work to achieve at least the applicable interim or final standard.

A22

(3) An alternative compliance fee granted by the Department under § C(1) of this regulation is good for one calendar year.

(4) A project that has applied to a program under § C(2) of this regulation but has not yet completed the improvements, can submit a confirmation received from the program administrator to the Department, verifying the project's active participation status to satisfy the good faith effort for another year.

(5) An alternative compliance fee granted by the Department under § C(1) of this regulation does not exempt the owner from complying with the benchmarking and reporting requirements in COMAR 26.28.02.

(6) An affordable housing provider may apply for the alternative compliance fee annually.

.03 Option for Campus-Level Compliance.

A. The owner of a covered building may choose to meet net direct emissions standards, as specified under this regulation, at the campus level instead of the individual building level when two or more covered buildings are:

(1) Connected to a district energy system;

(2) Served by the same electric or gas meter; or

(3) Served by the same heating or cooling system or systems, which is not a district energy system.

B. Campus-level reporting shall include energy consumption and greenhouse gas emissions for all buildings and stationary equipment located on the campus, including all central plants, except as provided in §B(1) of this regulation.

(1) Campus-level reporting does not include energy consumption and greenhouse gas emissions from activities/sources that are excluded from the benchmarking report requirements in COMAR 26.28.02.

(2) The owner of a campus shall report to the Department annually by June 1st:

(a) Any permits to build new buildings or change the footprint or usage of existing buildings on the campus; and

(b) Any buildings that have received new certificates of occupancy.

A23

(3) The Department shall, in consultation with the principal owner of a campus, determine whether the affected buildings will be included in campus-level compliance following the rules established in this chapter and whether and how to adjust the campus' interim and final performance standards.

C. Performance Standards for Campus-Level Compliance.

(1) For a campus that consists of one property type, the interim and final net direct emissions standards are those that correspond with that property type.

(2) For a campus that consists of more than one property type, the interim and final net direct emissions standards are based on area-weighted standards as specified in the Department's TM 24-01 "Technical Guidance and Calculation Methodologies to Comply with Building Energy Performance Standards", which is incorporated by reference in COMAR 26.28.01.03.

(3) Reserved.

(4) Achieving and Maintaining the Standards.

(a) Campus-level energy use shall not exceed the net direct emissions standards for 2030—2034 in each calendar year including 2030, 2031, 2032, 2033, and 2034, as determined on a yearly basis.

(b) Campus-level energy use shall not exceed the net direct emissions standards for 2035—2039 in each calendar year including 2035, 2036, 2037, 2038, and 2039, as determined on a yearly basis.

(c) Campus-level energy use shall not exceed the final net direct emissions standards in calendar year 2040 and each calendar year thereafter, as determined on a yearly basis.

A24

**42 U.S.C. § 6291**

## § 6291. Definitions

For purposes of this part:

(1) The term "consumer product" means any article (other than an automobile, as defined in section 32901(a)(3) of title 49) of a type—

> (A) which in operation consumes, or is designed to consume, energy or, with respect to showerheads, faucets, water closets, and urinals, water; and

> (B) which, to any significant extent, is distributed in commerce for personal use or consumption by individuals;

without regard to whether such article of such type is in fact distributed in commerce for personal use or consumption by an individual, except that such term includes fluorescent lamp ballasts, general service fluorescent lamps, incandescent reflector lamps, showerheads, faucets, water closets, and urinals distributed in commerce for personal or commercial use or consumption.

(2) The term "covered product" means a consumer product of a type specified in section 6292 of this title.

(3) The term "energy" means electricity, or fossil fuels. The Secretary may, by rule, include other fuels within the meaning of the term "energy" if he determines that such inclusion is necessary or appropriate to carry out the purposes of this chapter.

(4) The term "energy use" means the quantity of energy directly consumed by a consumer product at point of use, determined in accordance with test procedures under section 6293 of this title.

(5) The term "energy efficiency" means the ratio of the useful output of services from a consumer product to the energy use of such product, determined in accordance with test procedures under section 6293 of this title.

(6) The term "energy conservation standard" means—

> (A) a performance standard which prescribes a minimum level of energy efficiency or a maximum quantity of energy use, or, in the case of showerheads, faucets, water closets, and urinals, water use, for a covered product, determined in accordance with test procedures prescribed under section 6293 of this title; or

(B) a design requirement for the products specified in paragraphs (6), (7), (8), (10), (15), (16), (17), and (20) of section 6292(a) of this title; and

includes any other requirements which the Secretary may prescribe under section 6295(r) of this title.

. . .

(8) The term "measure of energy consumption" means energy use, energy efficiency, estimated annual operating cost, or other measure of energy consumption.

(9) The term "class of covered products" means a group of covered products, the functions or intended uses of which are similar (as determined by the Secretary).

. . . .

A26

## 42 U.S.C. § 6292

### § 6292. Coverage

### (a) In general

The following consumer products, excluding those consumer products designed solely for use in recreational vehicles and other mobile equipment, are covered products:

> (1) Refrigerators, refrigerator-freezers, and freezers which can be operated by alternating current electricity, excluding—
>
>> (A) any type designed to be used without doors; and
>>
>> (B) any type which does not include a compressor and condenser unit as an integral part of the cabinet assembly.
>
> (2) Room air conditioners.
>
> (3) Central air conditioners and central air conditioning heat pumps.
>
> (4) Water heaters.
>
> (5) Furnaces.
>
> (6) Dishwashers.
>
> (7) Clothes washers.
>
> (8) Clothes dryers.
>
> (9) Direct heating equipment.
>
> (10) Kitchen ranges and ovens.
>
> (11) Pool heaters.
>
> (12) Television sets.
>
> (13) Fluorescent lamp ballasts.
>
> (14) General service fluorescent lamps, general service incandescent lamps, and incandescent reflector lamps.

A27

(15) Showerheads, except safety shower showerheads.

(16) Faucets.

(17) Water closets.

(18) Urinals.

(19) Metal halide lamp fixtures.

(20) Any other type of consumer product which the Secretary classifies as a covered product under subsection (b).

**(b) Special classification of consumer product**

(1) The Secretary may classify a type of consumer product as a covered product if he determines that—

(A) classifying products of such type as covered products is necessary or appropriate to carry out the purposes of this chapter, and

(B) average annual per-household energy use by products of such type is likely to exceed 100 kilowatt-hours (or its Btu equivalent) per year.

(2) For purposes of this subsection:

(A) The term "average annual per-household energy use with respect to a type of product" means the estimated aggregate annual energy use (in kilowatt-hours or the Btu equivalent) of consumer products of such type which are used by households in the United States, divided by the number of such households which use products of such type.

(B) The Btu equivalent of one kilowatt-hour is 3,412 British thermal units.

(C) The term "household" shall be defined under rules of the Secretary.

A28

## 42 U.S.C. § 6293

**§ 6293. Test procedures**

. . .

**(b) Amended and new procedures**

(1) Test procedures.—

. . .

(B) The Secretary may, in accordance with the requirements of this subsection, prescribe test procedures for any consumer product classified as a covered product under section 6292(b) of this title.

. . .

(3) Any test procedures prescribed or amended under this section shall be reasonably designed to produce test results which measure energy efficiency, energy use, water use (in the case of showerheads, faucets, water closets and urinals), or estimated annual operating cost of a covered product during a representative average use cycle or period of use, as determined by the Secretary, and shall not be unduly burdensome to conduct.

. . . .

**42 U.S.C. § 6295**

## § 6295. Energy conservation standards

## (a) Purposes

The purposes of this section are to—

(1) provide Federal energy conservation standards  applicable to covered products; and

(2) authorize the Secretary to prescribe amended or new energy conservation standards  for each type (or class) of covered product.

. . .

## (*l*) Standards for other covered products

(1) The Secretary may prescribe an energy conservation standard for any type (or class) of covered products of a type specified in subsections (o) and (p) are met and the Secretary determines that—

(A) the average per household energy use within the United States by products of such type (or class) exceeded 150 kilowatt hours (or its Btu equivalent) for any 12-month period ending before such determination;

(B) the aggregate household energy use within the United States by products of such type (or class) exceeded 4,200,000,000 kilowatt-hours (or its Btu equivalent) for any such 12-month period;

(C) substantial improvement in the energy efficiency of products of such type (or class) is technologically feasible; and

(D) the application of a labeling rule under section 6294 of this title to such type (or class) is not likely to be sufficient to induce manufacturers to produce, and consumers and other persons to purchase, covered products of such type (or class) which achieve the maximum energy efficiency which is technologically feasible and economically justified.

. . .

## (*o*) Criteria for prescribing new or amended standards

(1) The Secretary may not prescribe any amended standard which increases the maximum allowable energy use, or, in the case of showerheads, faucets, water closets, or urinals, water use, or decreases the minimum required energy efficiency, of a covered product.

(2)

(A) Any new or amended energy conservation standard prescribed by the Secretary under this section for any type (or class) of covered product shall be designed to achieve the maximum improvement in energy efficiency, or, in the case of showerheads, faucets, water closets, or urinals, water efficiency, which the Secretary determines is technologically feasible and economically justified.

(B)

(i) In determining whether a standard is economically justified, the Secretary shall, after receiving views and comments furnished with respect to the proposed standard, determine whether the benefits of the standard exceed its burdens by, to the greatest extent practicable, considering—

(I) the economic impact of the standard on the manufacturers and on the consumers of the products subject to such standard;

(II) the savings in operating costs throughout the estimated average life of the covered product in the type (or class) compared to any increase in the price of, or in the initial charges for, or maintenance expenses of, the covered products which are likely to result from the imposition of the standard;

(III) the total projected amount of energy, or as applicable, water, savings likely to result directly from the imposition of the standard;

(IV) any lessening of the utility or the performance of the covered products likely to result from the imposition of the standard;

A31

(V) the impact of any lessening of competition, as determined in writing by the Attorney General, that is likely to result from the imposition of the standard;

(VI) the need for national energy and water conservation; and

(VII) other factors the Secretary considers relevant.

(ii) For purposes of clause (i)(V), the Attorney General shall make a determination of the impact, if any, of any lessening of competition likely to result from such standard and shall transmit such determination, not later than 60 days after the publication of a proposed rule prescribing or amending an energy conservation standard, in writing to the Secretary, together with an analysis of the nature and extent of such impact. Any such determination and analysis shall be published by the Secretary in the Federal Register.

(iii) If the Secretary finds that the additional cost to the consumer of purchasing a product complying with an energy conservation standard level will be less than three times the value of the energy, and as applicable, water, savings during the first year that the consumer will receive as a result of the standard, as calculated under the applicable test procedure, there shall be a rebuttable presumption that such standard level is economically justified. A determination by the Secretary that such criterion is not met shall not be taken into consideration in the Secretary's determination of whether a standard is economically justified.

(3) The Secretary may not prescribe an amended or new standard under this section for a type (or class) of covered product if—

(A) for products other than dishwashers, clothes washers, clothes dryers, and kitchen ranges and ovens, a test procedure has not been prescribed pursuant to section 6293 of this title with respect to that type (or class) of product; or

(B) the Secretary determines, by rule, that the establishment of such standard will not result in significant conservation of energy or, in the case of showerheads, faucets, water closets, or urinals, water, or that

A32

the establishment of such standard is not technologically feasible or economically justified.

> For purposes of section 6297 of this title, a determination under subparagraph (B) with respect to any type (or class) of covered products shall have the same effect as would a standard prescribed for such type (or class).

(4) The Secretary may not prescribe an amended or new standard under this section if the Secretary finds (and publishes such finding) that interested persons have established by a preponderance of the evidence that the standard is likely to result in the unavailability in the United States in any covered product type (or class) of performance characteristics (including reliability), features, sizes, capacities, and volumes that are substantially the same as those generally available in the United States at the time of the Secretary's finding. The failure of some types (or classes) to meet this criterion shall not affect the Secretary's determination of whether to prescribe a standard for other types (or classes).

. . .

## (q) Special rule for certain types or classes of products

(1) A rule prescribing an energy conservation standard for a type (or class) of covered products shall specify a level of energy use or efficiency higher or lower than that which applies (or would apply) for such type (or class) for any group of covered products which have the same function or intended use, if the Secretary determines that covered products within such group—

(A) consume a different kind of energy from that consumed by other covered products within such type (or class); or

(B) have a capacity or other performance-related feature which other products within such type (or class) do not have and such feature justifies a higher or lower standard from that which applies (or will apply) to other products within such type (or class).

> In making a determination under this paragraph concerning whether a performance-related feature justifies the establishment of a higher or lower standard, the Secretary shall consider such factors as the utility to the consumer of such a feature, and such other factors as the Secretary deems appropriate.

A33

(2) Any rule prescribing a higher or lower level of energy use or efficiency under paragraph (1) shall include an explanation of the basis on which such higher or lower level was established.

. . . .

A34

## 42 U.S.C. § 6297

### § 6297. Effect on other law

### (a) Preemption of testing and labeling requirements

(1) Effective on March 17, 1987, this part supersedes any State regulation insofar as such State regulation provides at any time for the disclosure of information with respect to any measure of energy consumption or water use of any covered product if—

(A) such State regulation requires testing or the use of any measure of energy consumption, water use, or energy descriptor in any manner other than that provided under section 6293 of this title; or

(B) such State regulation requires disclosure of information with respect to the energy use, energy efficiency, or water use of any covered product other than information required under section 6294 of this title.

(2) For purposes of this section, the following definitions apply:

(A) The term "State regulation" means a law, regulation, or other requirement of a State or its political subdivisions. With respect to showerheads, faucets, water closets, and urinals, such term shall also mean a law, regulation, or other requirement of a river basin commission that has jurisdiction within a State.

(B) The term "river basin commission" means—

(i) a commission established by interstate compact to apportion, store, regulate, or otherwise manage or coordinate the management of the waters of a river basin; and

(ii) a commission established under section 1962b(a) of this title.

### (b) General rule of preemption for energy conservation standards before Federal standard becomes effective for product

Effective on March 17, 1987, and ending on the effective date of an energy conservation standard established under section 6295 of this title for any covered product, no State regulation, or revision thereof, concerning the energy efficiency, energy use, or water use of the covered product shall be effective with respect to such covered product, unless the State regulation or revision—

A35

(1)

(A) was prescribed or enacted before January 8, 1987, and is applicable to products before January 3, 1988, or in the case of any portion of any regulation which establishes requirements for fluorescent lamp ballasts, was prescribed or enacted before June 28, 1988, or in the case of any portion of any regulation which establishes requirements for fluorescent or incandescent lamps, flow rate requirements for showerheads or faucets, or water use requirements for water closets or urinals, was prescribed or enacted before October 24, 1992; or

(B) in the case of any portion of any regulation that establishes requirements for general service incandescent lamps, intermediate base incandescent lamps, or candelabra base lamps, was enacted or adopted by the State of California or Nevada before December 4, 2007, except that—

(i) the regulation adopted by the California Energy Commission with an effective date of January 1, 2008, shall only be effective until the effective date of the Federal standard for the applicable lamp category under subparagraphs (A), (B), and (C) of section 6295(i)(1) of this title; and

(ii) the States of California and Nevada may, at any time, modify or adopt a State standard for general service lamps to conform with Federal standards with effective dates no earlier than 12 months prior to the Federal effective dates prescribed under subparagraphs (A), (B), and (C) of section 6295(i)(1) of this title, at which time any prior regulations adopted by the State of California or Nevada shall no longer be effective.

(2) is a State procurement regulation described in subsection (e);

(3) is a regulation described in subsection (f)(1) or is prescribed or enacted in a building code for new construction described in subsection (f)(2);

(4) is a regulation prohibiting the use in pool heaters of a constant burning pilot, or is a regulation (or portion thereof) regulating fluorescent lamp ballasts other than those to which paragraph (5) of section 6295(g) of this title is applicable, or is a regulation (or portion thereof) regulating fluorescent or incandescent lamps other than those to which section 6295(i) of this title is applicable, or is a regulation (or portion thereof) regulating showerheads or

A36

faucets other than those to which section 6295(j) of this title is applicable or regulating lavatory faucets (other than metering faucets) for installation in public places, or is a regulation (or portion thereof) regulating water closets or urinals other than those to which section 6295(k) of this title is applicable;

(5) is a regulation described in subsection (d)(5)(B) for which a waiver has been granted under subsection (d);

(6) is a regulation effective on or after January 1, 1992, concerning the energy efficiency or energy use of television sets; or

(7) is a regulation (or portion thereof) concerning the water efficiency or water use of low consumption flushometer valve water closets.

**(c) General rule of preemption for energy conservation standards when Federal standard becomes effective for product**

Except as provided in section 6295(b)(3)(A)(ii) of this title, subparagraphs (B) and (C) of section 6295(j)(3) of this title, and subparagraphs (B) and (C) of section 6295(k)(3) of this title and effective on the effective date of an energy conservation standard established in or prescribed under section 6295 of this title for any covered product, no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be effective with respect to such product unless the regulation—

(1) is a regulation described in paragraph (2) or (4) of subsection (b), except that a State regulation (or portion thereof) regulating fluorescent lamp ballasts other than those to which paragraph (5) of section 6295(g) of this title is applicable shall be effective only until the effective date of a standard that is prescribed by the Secretary under paragraph (7) of such section and is applicable to such ballasts, except that a State regulation (or portion thereof) regulating fluorescent or incandescent lamps other than those for which section 6295(i) of this title is applicable shall be effective only until the effective date of a standard that is prescribed by the Secretary and is applicable to such lamps;

(2) is a regulation which has been granted a waiver under subsection (d);

(3) is in a building code for new construction described in subsection (f)(3);

(4) is a regulation concerning the water use of lavatory faucets adopted by the State of New York or the State of Georgia before October 24, 1992;

A37

(5) is a regulation concerning the water use of lavatory or kitchen faucets adopted by the State of Rhode Island prior to October 24, 1992;

(6) is a regulation (or portion thereof) concerning the water efficiency or water use of gravity tank-type low consumption water closets for installation in public places, except that such a regulation shall be effective only until January 1, 1997; or

(7)

    (A) is a regulation concerning standards for commercial prerinse spray valves adopted by the California Energy Commission before January 1, 2005; or

    (B) is an amendment to a regulation described in subparagraph (A) that was developed to align California regulations with changes in American Society for Testing and Materials Standard F2324; adopted by the California Energy Commission before January 1, 2005; or

(8)

    (A) is a regulation concerning standards for pedestrian adopted by the California Energy Commission before January 1, 2005; or

    (B) is an amendment to a regulation described in subparagraph (A) that was developed to align California regulations to changes in the Institute for Transportation Engineers standards, entitled "Performance Specification: Pedestrian Traffic Control Signal Indications"; and

(9) is a regulation concerning metal halide lamp fixtures adopted by the California Energy Commission on or before January 1, 2011, except that—

    (A) if the Secretary fails to issue a final rule within 180 days after the deadlines for rulemakings in section 6295(hh) of this title, notwithstanding any other provision of this section, preemption shall not apply to a regulation concerning metal halide lamp fixtures adopted by the California Energy Commission—

        (i) on or before July 1, 2015, if the Secretary fails to meet the deadline specified in section 6295(hh)(2) of this title; or

        (ii) on or before July 1, 2022, if the Secretary fails to meet the deadline specified in section 6295(hh)(3) of this title.

A38

**(d) Waiver of Federal preemption**

(1)

(A) Any State or river basin commission with a State regulation which provides for any energy conservation standard or other requirement with respect to energy use, energy efficiency, or water use for any type (or class) of covered product for which there is a Federal energy conservation standard under section 6295 of this title may file a petition with the Secretary requesting a rule that such State regulation become effective with respect to such covered product.

(B) Subject to paragraphs (2) through (5), the Secretary shall, within the period described in paragraph (2) and after consideration of the petition and the comments of interested persons, prescribe such rule if the Secretary finds (and publishes such finding) that the State or river basin commission has established by a preponderance of the evidence that such State regulation is needed to meet unusual and compelling State or local energy or water interests.

(C) For purposes of this subsection, the term "unusual and compelling State or local energy or water interests" means interests which—

(i) are substantially different in nature or magnitude than those prevailing in the United States generally; and

(ii) are such that the costs, benefits, burdens, and reliability of energy or water savings resulting from the State regulation make such regulation preferable or necessary when measured against the costs, benefits, burdens, and reliability of alternative approaches to energy or water savings or production, including reliance on reasonably predictable market-induced improvements in efficiency of all products subject to the State regulation.

The factors described in clause (ii) shall be evaluated within the context of the State's energy plan and forecast, and, with respect to a State regulation for which a petition has been submitted to the Secretary which provides for any energy conservation standard or requirement with respect to water use of a covered product, within the context of the water supply and groundwater management plan, water quality program, and comprehensive plan (if any) of the State or river basin

A39

commission for improving, developing, or conserving a waterway affected by water supply development.

(2) The Secretary shall give notice of any petition filed under paragraph (1)(A) and afford interested persons a reasonable opportunity to make written comments, including rebuttal comments, thereon. The Secretary shall, within the 6-month period beginning on the date on which any such petition is filed, deny such petition or prescribe the requested rule, except that the Secretary may publish a notice in the Federal Register extending such period to a date certain but no longer than one year after the date on which the petition was filed. Such notice shall include the reasons for delay. In the case of any denial of a petition under this subsection, the Secretary shall publish in the Federal Register notice of, and the reasons for, such denial.

(3) The Secretary may not prescribe a rule under this subsection if the Secretary finds (and publishes such finding) that interested persons have established, by a preponderance of the evidence, that such State regulation will significantly burden manufacturing, marketing, distribution, sale, or servicing of the covered product on a national basis. In determining whether to make such finding, the Secretary shall evaluate all relevant factors, including—

(A) the extent to which the State regulation will increase manufacturing or distribution costs of manufacturers, distributors, and others;

(B) the extent to which the State regulation will disadvantage smaller manufacturers, distributors, or dealers or lessen competition in the sale of the covered product in the State;

(C) the extent to which the State regulation would cause a burden to manufacturers to redesign and produce the covered product type (or class), taking into consideration the extent to which the regulation would result in a reduction-

(i) in the current models, or in the projected availability of models, that could be shipped on the effective date of the regulation to the State and within the United States; or

(ii) in the current or projected sales volume of the covered product type (or class) in the State and the United States; and

A40

(D) the extent to which the State regulation is likely to contribute significantly to a proliferation of State appliance efficiency requirements and the cumulative impact such requirements would have.

(4) The Secretary may not prescribe a rule under this subsection if the Secretary finds (and publishes such finding) that interested persons have established, by a preponderance of the evidence, that the State regulation is likely to result in the unavailability in the State of any covered product type (or class) of performance characteristics (including reliability), features, sizes, capacities, and volumes that are substantially the same as those generally available in the State at the time of the Secretary's finding, except that the failure of some classes (or types) to meet this criterion shall not affect the Secretary's determination of whether to prescribe a rule for other classes (or types).

(5) No final rule prescribed by the Secretary under this subsection may—

> (A) permit any State regulation to become effective with respect to any covered product manufactured within three years after such rule is published in the Federal Register or within five years if the Secretary finds that such additional time is necessary due to the substantial burdens of retooling, redesign, or distribution needed to comply with the State regulation; or

> (B) become effective with respect to a covered product manufactured before the earliest possible effective date specified in section 6295 of this title for the initial amendment of the energy conservation standard established in such section for the covered product; except that such rule may become effective before such date if the Secretary finds (and publishes such finding) that, in addition to the other requirements of this subsection the State has established, by a preponderance of the evidence, that—

>> (i) there exists within the State an energy emergency condition or, if the State regulation provides for an energy conservation standard or other requirement with respect to the water use of a covered product for which there is a Federal energy conservation standard under subsection (j) or (k) of section 6295 of this title, a water emergency condition, which—

A41

(I) imperils the health, safety, and welfare of its residents because of the inability of the State or utilities within the State to provide adequate quantities of gas or electric energy or, in the case of a water emergency condition, water or wastewater treatment, to its residents at less than prohibitive costs; and

(II) cannot be substantially alleviated by the importation of energy or, in the case of a water emergency condition, by the importation of water, or by the use of interconnection agreements; and

(ii) the State regulation is necessary to alleviate substantially such condition.

(6) In any case in which a State is issued a rule under paragraph (1) with respect to a covered product and subsequently a Federal energy conservation standard concerning such product is amended pursuant to section 6295 of this title, any person subject to such State regulation may file a petition with the Secretary requesting the Secretary to withdraw the rule issued under paragraph (1) with respect to such product in such State. The Secretary shall consider such petition in accordance with the requirements of paragraphs (1), (3), and (4), except that the burden shall be on the petitioner to show by a preponderance of the evidence that the rule received by the State under paragraph (1) should be withdrawn as a result of the amendment to the Federal standard. If the Secretary determines that the petitioner has shown that the rule issued by the State should be so withdrawn, the Secretary shall withdraw it.

## (e) Exception for certain State procurement standards

Any State regulation which sets forth procurement standards for a State (or political subdivision thereof) shall not be superseded by the provisions of this part if such standards are more stringent than the corresponding Federal energy conservation standards.

## (f) Exception for certain building code requirements

(1) A regulation or other requirement enacted or prescribed before January 8, 1987, that is contained in a State or local building code for new construction concerning the energy efficiency or energy use of a covered product is not superseded by this part until the effective date of the energy conservation

A42

standard established in or prescribed under section 6295 of this title for such covered product.

(2) A regulation or other requirement, or revision thereof, enacted or prescribed on or after January 8, 1987, that is contained in a State or local building code for new construction concerning the energy efficiency or energy use of a covered product is not superseded by this part until the effective date of the energy conservation standard established in or prescribed under section 6295 of this title for such covered product if the code does not require that the energy efficiency of such covered product exceed—

(A) the applicable minimum efficiency requirement in a national voluntary consensus standard; or

(B) the minimum energy efficiency level in a regulation or other requirement of the State meeting the requirements of subsection (b)(1) or (b)(5), whichever is higher.

(3) Effective on the effective date of an energy conservation standard for a covered product established in or prescribed under section 6295 of this title, a regulation or other requirement contained in a State or local building code for new construction concerning the energy efficiency or energy use of such covered product is not superseded by this part if the code complies with all of the following requirements:

(A) The code permits a builder to meet an energy consumption or conservation objective for a building by selecting items whose combined energy efficiencies meet the objective.

(B) The code does not require that the covered product have an energy efficiency exceeding the applicable energy conservation standard established in or prescribed under section 6295 of this title, except that the required efficiency may exceed such standard up to the level required by a regulation of that State for which the Secretary has issued a rule granting a waiver under subsection (d).

(C) The credit to the energy consumption or conservation objective allowed by the code for installing covered products having energy efficiencies exceeding such energy conservation standard established in or prescribed under section 6295 of this title or the efficiency level required in a State regulation referred to in subparagraph (B) is on a one-for-one equivalent energy use or equivalent cost basis.

A43

(D) If the code uses one or more baseline building designs against which all submitted building designs are to be evaluated and such baseline building designs contain a covered product subject to an energy conservation standard established in or prescribed under section 6295 of this title, the baseline building designs are based on the efficiency level for such covered product which meets but does not exceed such standard or the efficiency level required by a regulation of that State for which the Secretary has issued a rule granting a waiver under subsection (d).

(E) If the code sets forth one or more optional combinations of items which meet the energy consumption or conservation objective, for every combination which includes a covered product the efficiency of which exceeds either standard or level referred to in subparagraph (D), there also shall be at least one combination which includes such covered product the efficiency of which does not exceed such standard or level by more than 5 percent, except that at least one combination shall include such covered product the efficiency of which meets but does not exceed such standard.

(F) The energy consumption or conservation objective is specified in terms of an estimated total consumption of energy (which may be calculated from energy loss- or gain-based codes) utilizing an equivalent amount of energy (which may be specified in units of energy or its equivalent cost).

(G) The estimated energy use of any covered product permitted or required in the code, or used in calculating the objective, is determined using the applicable test procedures prescribed under section 6293 of this title, except that the State may permit the estimated energy use calculation to be adjusted to reflect the conditions of the areas where the code is being applied if such adjustment is based on the use of the applicable test procedures prescribed under section 6293 of this title or other technically accurate documented procedure.

(4)

(A) Subject to subparagraph (B), a State or local government is not required to submit a petition to the Secretary in order to enforce or apply its building code or to establish that the code meets the conditions set forth in this subsection.

A44

(B) If a building code requires the installation of covered products with efficiencies exceeding both the applicable Federal standard established in or prescribed under section 6295 of this title and the applicable standard of such State, if any, that has been granted a waiver under subsection (d), such requirement of the building code shall not be applicable unless the Secretary has granted a waiver for such requirement under subsection (d).

**(g) No warranty**

Any disclosure with respect to energy use, energy efficiency, or estimated annual operating cost which is required to be made under the provisions of this part shall not create an express or implied warranty under State or Federal law that such energy efficiency will be achieved or that such energy use or estimated annual operating cost will not be exceeded under conditions of actual use.

## 42 U.S.C. § 6311

### § 6311. Definitions

For purposes of this part—

(1) The term "covered equipment" means one of the following types of industrial equipment:

(A) Electric motors and pumps.

(B) Small commercial package air conditioning and heating equipment.

(C) Large commercial package air conditioning and heating equipment.

(D) Very large commercial package air conditioning and heating equipment.

(E) Commercial refrigerators, freezers, and refrigerator-freezers.

(F) Automatic commercial ice makers.

(G) Walk-in coolers and walk-in freezers.

(H) Commercial clothes washers.

(I) Packaged terminal air-conditioners and packaged terminal heat pumps.

(J) Warm air furnaces and packaged boilers.

(K) Storage water heaters, instantaneous water heaters, and unfired hot water storage tanks.

(L) Any other type of industrial equipment which the Secretary classifies as covered equipment under section 6312(b) of this title.

(2)

(A) The term "industrial equipment" means any article of equipment referred to in subparagraph (B) of a type—

(i) which in operation consumes, or is designed to consume, energy;

A46

(ii) which, to any significant extent, is distributed in commerce for industrial or commercial use; and

(iii) which is not a "covered product" as defined in section 6291(a)(2) of this title, other than a component of a covered product with respect to which there is in effect a determination under section 6312(c) of this title;

> without regard to whether such article is in fact distributed in commerce for industrial or commercial use.

(B) The types of equipment referred to in this subparagraph (in addition to electric motors and pumps, commercial package air conditioning and heating equipment, commercial refrigerators, freezers, and refrigerator-freezers, automatic commercial ice makers, commercial clothes washers, packaged terminal air conditioners, packaged terminal heat pumps, warm air furnaces, packaged boilers, storage water heaters, instantaneous water heaters, and unfired hot water storage tanks) are as follows:

> (i) compressors;
>
> (ii) fans;
>
> (iii) blowers;
>
> (iv) refrigeration equipment;
>
> (v) electric lights and lighting power supply circuits;
>
> (vi) electrolytic equipment;
>
> (vii) electric arc equipment;
>
> (viii) steam boilers;
>
> (ix) ovens;
>
> (x) kilns;
>
> (xi) evaporators;
>
> (xii) dryers; and

A47

(xiii) other motors.

(3) The term "energy efficiency" means the ratio of the useful output of services from an article of industrial equipment to the energy use by such article, determined in accordance with test procedures under section 6314 of this title.

(4) The term "energy use" means the quantity of energy directly consumed by an article of industrial equipment at the point of use, determined in accordance with test procedures established under section 6314 of this title.

…

(7) The terms "energy", "manufacture", "import", "importation", "consumer product", "distribute in commerce", "distribution in commerce", and "commerce" have the same meaning as is given such terms in section 6291 of this title.

…

(18) The term "energy conservation standard" means—

> (A) a performance standard that prescribes a minimum level of energy efficiency or a maximum quantity of energy use for a product; or

> (B) a design requirement for a product.

…

A48

**42 U.S.C. § 6314**

**§ 6314. Test Procedures**

**(a) Prescription by Secretary; requirements**

(1) Test procedures.—

…

(2) Test procedures prescribed in accordance with this section shall be reasonably designed to produce test results which reflect energy efficiency, energy use, and estimated operating costs of a type of industrial equipment (or class thereof) during a representative average use cycle (as determined by the Secretary) and shall not be unduly burdensome to conduct.

….

A49

## 42 U.S.C. § 6316

### § 6316. Administration, penalties, enforcement, and preemption

(a) The provisions of section 6296(a), (b), and (d) of this title, the provisions of subsections (l) through (s) of section 6295 of this title, and section 1 6297 through 6306 of this title shall apply with respect to this part (other than the equipment specified in subparagraphs (B), (C), (D), (I), (J), and (K) of section 6311(1) of this title) to the same extent and in the same manner as they apply in part A. In applying such provisions for the purposes of this part

(1) references to sections 6293, 6294, and 6295 of this title shall be considered as references to sections 6314, 6315, and 6313 of this title, respectively;

(2) references to "this part" shall be treated as referring to part A-1;

(3) the term "equipment" shall be substituted for the term "product";

(4) the term "Secretary" shall be substituted for "Commission" each place it appears (other than in section 6303(c) of title);

(5) section 6297(a) of this title shall be applied, in the case of electric motors, as if the National Appliance Energy Conservation Act of 1987 was the Energy Policy Act of 1992;

(6) section 6297(b)(1) of this title shall be applied as if electric motors were fluorescent lamp ballasts and as if the National Appliance Energy Conservation Amendments of 1988 were the Energy Policy Act of 1992;

(7) section 6297(b)(4) of this title shall be applied as if electric motors were fluorescent lamp ballasts and as if paragraph (5) of section 6295(g) of this title were section 6313 of this title;

(8) notwithstanding any other provision of law, a regulation or other requirement adopted by a State or subdivision of a State contained in a State or local building code for new construction concerning the energy efficiency or energy use of an electric motor covered under this part is not superseded by the standards for such electric motor established or prescribed under section 6313(b) of this title if such regulation or requirement is identical to the standards established or prescribed under such section;

A50

(9) in the case of commercial clothes washers, section 6297(b)(1) of this title shall be applied as if the National Appliance Energy Conservation Act of 1987 was the Energy Policy Act of 2005; and

(10) section 6297 of this title shall apply with respect to the equipment described in section 6311(1)(L) of this title beginning on the date on which a final rule establishing an energy conservation standard is issued by the Secretary, except that any State or local standard prescribed or enacted for the equipment before the date on which the final rule is issued shall not be preempted until the energy conservation standard established by the Secretary for the equipment takes effect.

(b)

(1) The provisions of section 6295(p)(4) of this title, section 6296(a), (b), and (d) of this title, section 6297(a) of this title, and sections 6298 through 6306 of this title shall apply with respect to the equipment specified in subparagraphs (B), (C), (D), (I), (J), and (K) of section 6311(1) of this title to the same extent and in the same manner as they apply in part A. In applying such provisions for the purposes of such equipment, paragraphs (1), (2), (3), and (4) of subsection (a) shall apply.

(2)

(A) A standard prescribed or established under section 6313(a) of this title shall, beginning on the effective date of such standard, supersede any State or local regulation concerning the energy efficiency or energy use of a product for which a standard is prescribed or established pursuant to such section.

(B) Notwithstanding subparagraph (A), a standard prescribed or established under section 6313(a) of this title shall not supersede a standard for such a product contained in a State or local building code for new construction if—

(i) the standard in the building code does not require that the energy efficiency of such product exceed the applicable minimum energy efficiency requirement in amended ASHRAE/IES Standard 90.1; and

A51

(ii) the standard in the building code does not take effect prior to the effective date of the applicable minimum energy efficiency requirement in amended ASHRAE/IES Standard 90.1.

(C) Notwithstanding subparagraph (A), a standard prescribed or established under section 6313(a) of this title shall not supersede the standards established by the State of California set forth in Table C-6, California Code of Regulations, Title 24, Part 2, Chapter 2-53, for water-source heat pumps below 135,000 Btu per hour (cooling capacity) that become effective on January 1, 1993.

(D) Notwithstanding subparagraph (A), a standard prescribed or established under section 6313(a) of this title shall not supersede a State regulation which has been granted a waiver by the Secretary. The Secretary may grant a waiver pursuant to the terms, conditions, criteria, procedures, and other requirements specified in section 6297(d) of this title.

(c) With respect to any electric motor to which standards are applicable under section 6313(b) of this title, the Secretary shall require manufacturers to certify, through an independent testing or certification program nationally recognized in the United States, that such motor meets the applicable standard.

(d)

(1) Except as provided in paragraphs (2) and (3), section 6297 of this title shall apply with respect to very large commercial package air conditioning and heating equipment to the same extent and in the same manner as section 6297 of this title applies under part A on August 8, 2005.

(2) Any State or local standard issued before August 8, 2005, shall not be preempted until the standards established under section 6313(a)(9) of this title take effect on January 1, 2010.

(e)

(1)

(A) Subsections (a), (b), and (d) of section 6296 of this title, subsections (m) through (s) of section 6295 of this title, and sections 6298 through 6306 of this title shall apply with respect to commercial refrigerators,

freezers, and refrigerator-freezers to the same extent and in the same manner as those provisions apply under part A.

(B) In applying those provisions to commercial refrigerators, freezers, and refrigerator-freezers, paragraphs (1), (2), (3), and (4) of subsection (a) shall apply.

(2)

(A) Section 6297 of this title shall apply to commercial refrigerators, freezers, and refrigerator-freezers for which standards are established under paragraphs (2) and (3) of section 6313(c) of this title to the same extent and in the same manner as those provisions apply under part A on August 8, 2005, except that any State or local standard issued before August 8, 2005, shall not be preempted until the standards established under paragraphs (2) and (3) of section 6313(c) of this title take effect.

(B) In applying section 6297 of this title in accordance with subparagraph (A), paragraphs (1), (2), and (3) of subsection (a) shall apply.

(3)

(A) Section 6297 of this title shall apply to commercial refrigerators, freezers, and refrigerator-freezers for which standards are established under section 6313(c)(4) of this title to the same extent and in the same manner as the provisions apply under part A on the date of publication of the final rule by the Secretary, except that any State or local standard issued before the date of publication of the final rule by the Secretary shall not be preempted until the standards take effect.

(B) In applying section 6297 of this title in accordance with subparagraph (A), paragraphs (1), (2), and (3) of subsection (a) shall apply.

(4)

(A) If the Secretary does not issue a final rule for a specific type of commercial refrigerator, freezer, or refrigerator-freezer within the time frame specified in section 6313(c)(5) of this title, subsections (b) and (c) of section 6297 of this title shall not apply to that specific type

A53

of refrigerator, freezer, or refrigerator-freezer for the period beginning on the date that is 2 years after the scheduled date for a final rule and ending on the date on which the Secretary publishes a final rule covering the specific type of refrigerator, freezer, or refrigerator-freezer.

(B) Any State or local standard issued before the date of publication of the final rule shall not be preempted until the final rule takes effect.

(5)

(A) In the case of any commercial refrigerator, freezer, or refrigerator-freezer to which standards are applicable under paragraphs (2) and (3) of section 6313(c) of this title, the Secretary shall require manufacturers to certify, through an independent, nationally recognized testing or certification program, that the commercial refrigerator, freezer, or refrigerator-freezer meets the applicable standard.

(B) The Secretary shall, to the maximum extent practicable, encourage the establishment of at least 2 independent testing and certification programs.

(C) As part of certification, information on equipment energy use and interior volume shall be made available to the Secretary.

(f)

(1)

(A)

(i) Except as provided in clause (ii), section 6297 of this title shall apply to automatic commercial ice makers for which standards have been established under section 6313(d)(1) of this title to the same extent and in the same manner as the section applies under part A on August 8, 2005.

(ii) Any State standard issued before August 8, 2005, shall not be preempted until the standards established under section 6313(d)(1) of this title take effect.

A54

(B) In applying section 6297 of this title to the equipment under subparagraph (A), paragraphs (1), (2), and (3) of subsection (a) shall apply.

(2)

(A)

(i) Except as provided in clause (ii), section 6297 of this title shall apply to automatic commercial ice makers for which standards have been established under section 6313(d)(2) of this title to the same extent and in the same manner as the section applies under part A on the date of publication of the final rule by the Secretary.

(ii) Any State standard issued before the date of publication of the final rule by the Secretary shall not be preempted until the standards established under section 6313(d)(2) of this title take effect.

(B) In applying section 6297 of this title in accordance with subparagraph (A), paragraphs (1), (2), and (3) of subsection (a) shall apply.

(3)

(A) If the Secretary does not issue a final rule for a specific type of automatic commercial ice maker within the time frame specified in section 6313(d) of this title, subsections (b) and (c) of section 6297 of this title shall no longer apply to the specific type of automatic commercial ice maker for the period beginning on the day after the scheduled date for a final rule and ending on the date on which the Secretary publishes a final rule covering the specific type of automatic commercial ice maker.

(B) Any State standard issued before the publication of the final rule shall not be preempted until the standards established in the final rule take effect.

(4)

A55

(A) The Secretary shall monitor whether manufacturers are reducing harvest rates below tested values for the purpose of bringing non-complying equipment into compliance.

(B) If the Secretary finds that there has been a substantial amount of manipulation with respect to harvest rates under subparagraph (A), the Secretary shall take steps to minimize the manipulation, such as requiring harvest rates to be within 5 percent of tested values.

(g)

(1)

(A) If the Secretary does not issue a final rule for commercial clothes washers within the timeframe specified in section 6313(e)(2) of this title, subsections (b) and (c) of section 6297 of this title shall not apply to commercial clothes washers for the period beginning on the day after the scheduled date for a final rule and ending on the date on which the Secretary publishes a final rule covering commercial clothes washers.

(B) Any State or local standard issued before the date on which the Secretary publishes a final rule shall not be preempted until the standards established under section 6313(e)(2) of this title take effect.

(2) The Secretary shall undertake an educational program to inform owners of laundromats, multifamily housing, and other sites where commercial clothes washers are located about the new standard, including impacts on washer purchase costs and options for recovering those costs through coin collection.

….

A56