# IN THE UNITED STATES COURT OF APPEALS
## FOR FOURTH CIRCUIT

◆

## No. 26-1552

◆

MARYLAND BUILDING INDUSTRY ASSOCIATION, *ET AL.*,
*Plaintiff-Appellants,*
v.
SERENA COLEMAN MCILWAIN, IN HER OFFICIAL CAPACITY AS SECRETARY OF
THE MARYLAND DEPARTMENT OF THE ENVIRONMENT,
*Defendant-Appellee.*

◆

## BRIEF OF *AMICUS CURIAE*
## AMERICAN GAS ASSOCIATION
## IN SUPPORT OF THE PLAINTIFF-APPELLANTS

◆

Michael L. Murray
American Gas Association
400 N. Capitol St., NW
Washington, DC 20001
(202) 824-7071
MMurray@aga.org

*Counsel for Amicus Curiae American Gas Association*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Fourth Circuit Rule 28(a)(1), *amicus curiae* American Gas Association certifies the following:

**Parties.** All parties and intervenors appearing in this case are listed in the Appellants' opening brief.

**Rulings Under Review.** References to the rulings at issue appear in the Appellants' opening brief.

**Related Cases.** References to related cases, if any, appear in the Appellants' opening brief.

*/s/ Michael L. Murray*
Michael L. Murray
American Gas Association
400 N. Capitol St., NW
Washington, DC 20001
(202) 824-7071
MMurray@aga.org

# DISCLOSURE STATEMENTS

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Fourth Circuit Rule 26.1, *amicus curiae* the American Gas Association hereby submits the following corporate disclosure statement:

The American Gas Association ("AGA") is an incorporated, non-stock, not-for-profit trade association representing local energy companies that deliver natural gas in the United States. AGA has no parent companies, subsidiaries, or affiliates that have issued publicly traded stock. Some AGA member companies are corporations with publicly traded stock.

No counsel for a party authored this brief in whole or in part, and no person other than the amicus curiae, its members, or its counsel contributed money that was intended to fund the preparation or submission of this brief. *See* Fed. R. App. P. 29(a)(4)(E).

*/s/ Michael L. Murray*
Michael L. Murray
American Gas Association
400 N. Capitol St., NW
Washington, DC 20001
(202) 824-7071
MMurray@aga.org

Dated: June 22, 2026

**STATEMENT REGARDING CONSENT TO FILE AND SEPARATE BRIEFING**

Pursuant to Federal Rule of Appellate Procedure 29(a)(2) all parties in this case have either consented, do not oppose, or do not take a position on the filing of this *amicus* brief, at this time. Contemporaneously with this brief, AGA filed a motion for leave to file this *amicus* brief with additional details.

Pursuant to Fourth Circuit Rule 29(a)(3), counsel for *amicus curiae* AGA certifies that a separate brief is necessary to provide the broad perspective of the companies that AGA represents. As the national advocate for natural gas utility companies, AGA is particularly well-suited to provide the Court important context on subjects at issue in this appeal, which will assist the Court in resolving this case.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............. i

DISCLOSURE STATEMENTS ................................................................. ii

STATEMENT REGARDING CONSENT TO FILE AND SEPARATE
BRIEFING ......................................................................................... iii

TABLE OF CONTENTS ....................................................................1

TABLE OF AUTHORITIES ................................................................2

INTEREST OF *AMICUS CURIAE* ...................................................1

SUMMARY OF THE ARGUMENT ...................................................3

ARGUMENT .....................................................................................5

    I.    Regulation of Utilities by State Authorities ..........................5

    II.    Duplicative Policing Regimes May Deny Utilities the
        Opportunity to Earn a Fair Rate of Return ...........................9

    III.    The Utility Regulatory Model and Its Constituional Protections
        Compel Societal and Legal Conclusions................................10

CONCLUSION ................................................................................142

CERTIFICATE OF COMPLIANCE ...................................................13

CERTIFICATE OF SERVICE ...........................................................14

# TABLE OF AUTHORITIES

**Court Cases**

*Duquesne Light Co. v. Barasch,,*
  *488 U.S. 299, 312 (1989)* ...........................................................................................9

*Federal Power Commission v. Hope Natural Gas Co.,*
  320 U.S. 591 (1944)........................................................................................8, 9

*In re Permian Basin Area Rate Cases,*
  —*390 U.S. 747, 792 (1968)* ........................................................................................9

*Munn v. Illinois,*
  94 U.S. 113 (1877) ....................................................................................................6

*Olcott v. The Supervisors,*
  83 U.S. (16 Wall.) 678, 21 L. Ed. 382 (1872).........................................................6

*Pennsylvania R.R. Co. v. Puritan Coal Co.,,*
  237 U.S. 121 (1915)..................................................................................................6

**Other Authorities**

1 Energy Law and Transactions................................................................................6,10

AGA, *2026 Playbook*, https://playbook.aga.org/ (last visited June 15, 2026) ..........1

AGA, *About Us,* https://www.aga.org/about/ (last visited June 15, 2026)................1

Edward L. Glaeser; Claudia Goldin, *Corruption and Reform: Lessons
from America's Econonic History* (2006)......................................................... 10, 18

Miller, *Railroads and the Granger Laws* (1971) ......................................................6

Troesken, *Regime Change and Corruption A History of Public Utility Regulation*
  (2006) .......................................................................................................................6

U.S. Energy Info. Admin., *Annual Energy Outlook 2026*
  https://www.eia.gov/outlooks/aeo/ ..........................................................................2

U.S. Energy Info. Admin., *What is U.S. electricity generation by energy source?*
https://www.eia.gov/tools/faqs/faq.php?id=427&t=3 .................................................1

The *amicus curiae* American Gas Association ("AGA") represents critical domestic infrastructure – namely, local natural gas distribution companies that deliver natural gas to homes and businesses. There are more than 79 million residential, commercial, and industrial natural gas customers in the U.S., of which 74 million customers receive their gas from AGA members. AGA is an advocate for natural gas utility companies and their customers, and provides a broad range of programs and services for member natural gas pipelines, marketers, gatherers, international natural gas companies, and industry associates. Today, natural gas meets more than thirty percent of the United States' energy needs.[1]

AGA and its members have a substantial interest in the unique regulatory model that governs their business, and in ensuring predictable and consistent laws and court rulings that affect that model. The gas they move heats millions of American homes and generates over 30 percent of the nation's electricity.[2] Nearly 189 million Americans and 5.8 million businesses use natural gas.[3] Demand for natural gas continues to increase because it is abundant, safe, and cost- effective, and

---

[1] *See* AGA, *About Us,* https://www.aga.org/about/ (last visited June 22, 2026).
[2] *See* U.S. Energy Info. Admin., *What is U.S. electricity generation by energy source?*, https://www.eia.gov/tools/faqs/faq.php?id=427&t=3 (last visited June 22, 2026).
[3] *See* AGA, *2026 Playbook*, https://playbook.aga.org/ (last visited June 22, 2025)

reliable infrastructure will be needed for the foreseeable future.[4]

AGA and its members have a substantial interest in the continued ability of natural gas utilities to install natural gas services infrastructure and provide natural gas services to customers within their jurisdictional service areas. Additionally, AGA has an interest in ensuring laws and regulations affecting the utilities' unique and comprehensive framework of regulatory oversight and private investment are followed.

This brief should be of assistance to the Court because it provides information about the natural gas distribution industry, which supplies natural gas to the consumers and businesses via a comprehensive and unique regulatory model whose principal purpose is to serve the public interest.

The public's interest in safe and efficient access to energy at reasonable cost, and how utilities plan for and provide that service are subject to the meticulous oversight of public utility commissions like the Maryland Public Service Commission ("Commission").

Judicial decisions that impose new burdens on that regulatory model have a direct impact on gas utilities, their customers, and the regulatory model by which utility services are provided. AGA has a direct interest in ensuring that judicial

---

[4] *See* U.S. Energy Info. Admin., *Annual Energy Outlook 2026*, https://www.eia.gov/outlooks/aeo/ (last visited June 22, 2026).

decisions are made in light of a full record of existing utility regulatory structures and doctrines.

## SUMMARY OF THE ARGUMENT

Central issues in this case include the scope and purpose of state regulation of utilities, the public service purpose of utilities, and the unique and comprehensive regulatory model that serves the needs of the state, utility customers, the general public, and utilities.

Local distribution of natural gas by privately-owned utilities is subject to regulation by state commissions, but that regulation focuses on several specific, though related goals: service to all who apply for service; provision of safe, continuous, adequate service; a just and reasonable price; and provision of service without undue discrimination.

The scope of state public utility regulators' authority to regulate utilities in the public interest is broad and manifested in numerous powers, such as granting utilities certificates to build facilities and provide services, and to regulate rates and services, to approve financing and acquisitions, to audit and review accounts, etc.

Public Service Commissions, customers, and utilities, have a symbiotic relationship in which each is closely dependent and aligned with the interests of the others. This gives the Commission unique insights into the structure, planning, and communications of utilities.

The role of the state authorities over utilities leads to a series of necessary conclusions: (1) the distribution of natural gas by a utility is considered to be a positive benefit to the public as well as an important right for consumers; (2) the state regulators' potent regulatory powers focus on achievement of the specific regulatory goals; (3) states do not have broad rights to impose additional costs or burdens on utilities and their customers outside the regulatory framework that would impair the utility's ability to earn a fair rate of return; and (4) regulatory decisions by the state or municipal authorities is subject to review under, *inter alia*, the doctrine of the regulatory compact which is the 'bargain' struck between the utilities and the state, under which in return for the obligations imposed on the utility, the utility is entitled to a fair rate of return.

Limiting the ability of natural gas utilities to install natural gas service infrastructure and provide natural gas services to customers within its jurisdictional service area outside of the regulatory structure would impose new costs, burdens, and risks at variance with the fundamental purpose of both the utility and the public utility regulatory framework. That comprehensive framework was carefully developed and is subject to continuous monitoring and disclosure requirements to help ensure Maryland residents receive essential life services in a safe and efficient manner at reasonable cost.

**ARGUMENT**

AGA supports the Appellants in their request that the decision of the District Court be reversed. AGA opposes the imposition of costs or burdens on utilities and utility customers that do not arise from the regulatory framework or which upset the careful balance amongst the Commission, customers, and the utility. The imposition of costs or burdens outside that comprehensive framework would result in an inequitable burden to the utility and its customers who could face long-term costs and consequences and would have profound implications to the long-established legal obligations fundamental to the utility model. The purpose of this brief is to provide context for these concerns that would otherwise be absent from the record.

## I.    Regulation of Utilities by State Authorities

AGA submits that it is essential for the record to reflect accurately the nature and scope of state and local regulation of natural gas distribution, including the purpose of utility regulation, its goals and its scope. The Court should be fully informed as to how gas distribution is regulated, and how it is not regulated.

Utilities are regulated by state regulatory agencies, like the Maryland Public Service Commission ("Commission"), under state public utility statutes.

Current public utility regulation evolved from earlier state regulation of

common carriers and similar entities, particularly railroads,[5] and earlier still, from common law regulatory concepts.[6] Courts have long rejected challenges to such regulations of private businesses on the grounds, in effect, that "when private property is devoted to a public use, it is subject to public regulation."[7] This general principle also informed the early 20th century growth of state regulation[8] as to a range of what we now consider to be public utilities – electric, natural gas, water, telephone and telegraph companies. Indeed, the early 20th century also represented a time during which earlier regulatory structures at the municipal level were replaced with state-wide regulatory rules and administration.[9]

Broadly speaking, the goal of the state utility regulators is to ensure proper oversight as to four principal obligations of public: 1) service to all who apply for service; 2) provision of safe, adequate service; 3) a just and reasonable price; and

---

[5] *See e.g.*, 1 *Energy Law and Transactions* Section 2.03; *see also* Miller, *Railroads and the Granger Laws* (1971). Prior to railroads, ferries, coaches and certain other activities were subject to common law regulation.

[6] *See e.g.*, *The Concept of a Business Affected with a Public Interest* 7-69, Hall (1940). The Supreme Court, in ruling on railroad case in 1915, quoted in its support "the common law of old." *Pennsylvania R.R. Co. v. Puritan Coal Co.*, 237 U.S. 121, 133 (1915).

[7] *Munn v. Illinois*, 94 U.S. 113, 125 (1877) ("*Munn*"); *see also Olcott v. The Supervisors*, 83 U.S. (16 Wall.) 678, 697, 21 L. Ed. 382 (1873).

[8] *See e.g.*, "Regime Change and Corruption A History of Public Utility Regulation" by Werner Troesken, in *Corruption and Reform: Lessons from America's Economic History*, ed. Edward L. Glaeser and Claudia Goldin (2006).

[9] *Id*.

4) provision of service without undue discrimination.[10]

In order to ensure that these goals are met, public utility regulators across the nation have a number of key tools, including, direct oversight over the rates, terms of service provided by gas utilities, all of which are submitted to the regulators for approval in the form of tariffs or other filings and oversight mechanisms. Although utilities file the rates, typically, approval of the state regulators is required for the rates to become effective.

Broad and intrusive authorities granted to state regulators – direct authority to approve the charges for service, authority to grant or deny entry and to oversee accounting and financing/acquisition/sales by the utilities – are far-ranging in scope. Yet, all are in direct furtherance of the central goals of the regulators, to ensure reasonable rates, service to those who seek it, and continued safe and adequate service to the public at a fair rate of return to the utility.

Moreover, the obligations imposed by the public utility statutes and regulatory commissions, when fulfilled by the public utility via investment in the necessary assets to meet such obligations, merge to create a further regulatory concept: the "regulatory compact."

The goal of the regulators is to ensure that the rates are "just and reasonable," which in turn results in rates that do not burden ratepayers with unnecessary costs,

---

[10] 1 Energy Law and Transactions Section 2.01.

but also are sufficient to provide the utility with a fair return on its investment, as measured by the ability to attract capital.[11]

The granting of a utility franchise monopoly presumes that rates are minimized, and service offerings maximized, when these costs are spread over a larger number of units, whether number of customers or the quantity of sales. Reversing this regulatory goal, capping and contracting the number of customers through limiting natural gas infrastructure, which is the end goal of the Marylnad Building Efficiency Performance Standards and which the District Court upheld in error, and imposing extraordinary burdens outside the legislatively mandated scope of responsibilities, naturally, leads to *higher* short-run average costs and, consequently, consumer prices.

The Appellee set in motion the process for vastly increasing the potential affordability of utility service and business risks for natural gas utilities regulated by the Maryland Public Service Commission. Over time this will increase the costs of regulatory compliance to utilities and burden utilities' ability to promptly and effectively respond to provide safe, reliable, and continuous service at reasonable cost.

It will also greatly increase costs to existing customers as higher rates of

---

[11] *See e.g.*, *Federal Power Commission v. Hope Natural Gas Co.*, 320 U.S. 591, 603 (1944) ("*Hope*").

service will also result from increased costs of capital which are tied to a contracting customer base. These factors directly affect the ability for the utility to earn a fair rate of return.

## II. Duplicative Policing Regimes May Deny Utilities the Opportunity to Earn a Fair Rate of Return

For over seventy years, the United States Supreme Court has held that the Constitution guarantees a regulated business the opportunity to earn "enough revenue not only for operating expenses but also for the capital costs of the business." *Fed. Power Comm'n* v. *Hope Nat. Gas Co.*, 320 U.S. 591, 603 (1944).

In case after case, the Supreme Court of the United States has emphasized that government-imposed rates must allow affected firms to "maintain financial integrity, attract necessary capital, and fairly compensate investors for the risks they have assumed." *In re Permian Basin Area Rate Cases*, 390 U.S. 747, 792 (1968); *cf. Duquesne Light Co.* v. *Barasch*, 488 U.S. 299, 312 (1989). Rate regulations must "guarantee the constitutionally required 'fair and reasonable return," including "'enough revenue not only for operating expenses but also for the capital costs of the business.' " *Id.*[12]

Imposing new economic burdens on utilities and customers independent of the comprehensive utility regulatory framework, diminishes the ability of the utility

---

[12] *Hope Nat. Gas*, 320 U.S. at 603.

to earn a fair rate of return. This would place deep financial hardship on the utility regulatory model and impose extraordinary new costs on both existing customers and the local utilities and, ultimately, the economic well-being of the Appellee the state of Maryland itself.

That could threaten the ability of utilities to provide safe, efficient service at reasonable cost and for Maryland residents to receive them. Such extraordinary actions impose undue costs on existing customers and utilities.

## III. The Utility Regulatory Model and Its Constitutional Protections Compel Societal and Legal Conclusions

AGA submits that Sections I and II compel several conclusions.

First, regulated utility service is considered to be a positive benefit to the public, such that it is imbued with the public interest sufficiently to support regulation, and further that legislature concluded that the obligation to provide it exists, and safeguards against abuses.

Second, that although the state regulators have broad and potent powers to ensure that the goals of regulation are met – reasonable prices, broad access, safe and reliable supplies, not unduly discriminatory services, fair rate of return to the utility – those powers are focused on achievement of specific regulatory goals. costs or burdens on the operations of the regulated utility should not be imposed outside the regulatory framework, but only those costs and burdens necessary to ensure that

the result of the utility's tariff, organization, and actions are to meet the above-noted regulatory goals.[13]

Third, any actions by the state or state regulator that might impact the utility operations or viability of gas utilities, may be considered a violation of the regulatory compact (which serves the symbiotic relationship amongst the state, utility, customers and the general public welfare) and constitutional principles protecting property and due process and thus are invalid.

The fourth conclusion builds on the first three; pricing and provision of natural gas distribution show that an allocation of costs and risks related to service is an important right for consumers as well as the utility and protected by the structure of the public utility laws, the regulatory compact, constitutional principles, and the obligations imposed on the utility.

---

[13] A filed tariff governs a utility's relationship with its customers.

**CONCLUSION**

Amicus Curiae American Gas Association requests that the Court consider the arguments raised in this brief, which support the Appellants' request that the Court reverse the judgment of the District Court.

Respectfully submitted,

*/s/ Michael L. Murray*

Michael L. Murray
American Gas Association
400 N. Capitol St., NW
Washington, DC 20001
(202) 824-7071
MMurray@aga.org

*Counsel for American Gas Association*

Dated: June 22, 2026

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), I certify the following:

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(b) for and, because this brief contains **2,600** words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5), and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6), because this brief has been prepared in a proportionately spaced typeface using Microsoft Word in 14-point Times New Roman font.

*/s/ Michael L. Murray*
Michael L. Murray
American Gas Association
400 N. Capitol St., NW
Washington, DC 20001
(202) 824-7071
MMurray@aga.org

Dated: June 22, 2026

**CERTIFICATE OF SERVICE**

I hereby certify that on June 22, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all registered CM/ECF users.

*/s/ Michael L. Murray*
Michael L. Murray
American Gas Association
400 N. Capitol St., NW
Washington, DC 20001
(202) 824-7071
MMurray@aga.org

Dated: June 22, 2026