No. 26-1552

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

_____

**MARYLAND BUILDING INDUSTRY ASSOCIATION, INC.,** *et al.*,

*Plaintiffs-Appellants*,

**v.**

**SERENA COLEMAN McILWAIN,**

*Defendant-Appellee.*

_____

On Appeal from the United States District Court for the District of Maryland
(Deborah L. Boardman, District Judge)

_____

**BRIEF OF APPELLEE**

_____

ANTHONY G. BROWN
Attorney General of Maryland

DORIS N. LANGE
KRISTEN M. SUMMERS
Assistant Attorneys General
1800 Washington Boulevard
Baltimore, Maryland 21230
doris.lange@maryland.gov
kristen.summers@maryland.gov
(410) 537-3038
(410) 537-3943 (facsimile)

July 29, 2026                    Attorneys for Appellee

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. _____     Caption: _____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_____

(name of party/amicus)

_____

 who is _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.     Is party/amicus a publicly held corporation or other publicly held entity?     YES     NO

2.     Does party/amicus have any parent corporations?     YES     NO
       If yes, identify all parent corporations, including all generations of parent corporations:

3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?     YES     NO
       If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? YES NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) YES NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? YES NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? YES NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: _____ Date: _____

Counsel for: _____

**TABLE OF CONTENTS**

Page

JURISDICTIONAL STATEMENT ..................................................................1

ISSUE PRESENTED FOR REVIEW ..............................................................2

    Statutory and Regulatory Background ......................................................2

        Maryland's Climate Legislation and the Building Energy Performance Standards Regulation Mandate ...................2

        The Building Energy Performance Standards Regulation ...................4

        The Energy Policy and Conservation Act ..........................................5

    Proceedings Below .................................................................................8

SUMMARY OF ARGUMENT.........................................................................9

ARGUMENT ...............................................................................................12

I.    THE DISTRICT COURT'S DISMISSAL OF THE COMPLAINT IS REVIEWED DE NOVO.............................................................................12

II.   THE TEXT OF THE ENERGY POLICY AND CONSERVATION ACT'S PREEMPTION CLAUSE ESTABLISHES THAT MARYLAND'S BUILDING ENERGY PERFORMANCE STANDARDS REGULATION IS NOT PREEMPTED.........12

    A.    "Energy Efficiency" and "Energy Use" Are Static Properties of a Product.................................................................15

    B.    Maryland's Building Energy Performance Standards Regulation Does Not "Concern" Either "Energy Use" or "Energy Efficiency."...................................................18

        1.    The Building Energy Performance Standards Regulation Lacks a Prohibited "Connection With" the "Energy Use" or "Energy Efficiency" of Covered Products. .........................19

        2.    The Building Energy Performance Standards Regulation Does Not Reference or Rely on Forbidden Subject Matter ......27

C.      The Plaintiffs Cannot Establish Preemption by Reading "Energy Use" in Its Colloquial Sense................................................................30

D.      The Preemption Provision's History Does Not Support the Plaintiffs' Broad Interpretation. ........................................................33

E.      This Court Should Align with the Second Circuit, Not the Ninth ......35

III.    THE ENERGY POLICY AND CONSERVATION ACT DOES NOT PROTECT THE ABILITY TO USE OR SELL NATURAL GAS APPLIANCES IN ALL SETTINGS. ......36

IV.     THE STATUTE'S EXCEPTION FOR CERTAIN BUILDING CODES DOES NOT SUPPORT THE PLAINTIFFS' BROAD VIEW OF THE PREEMPTION PROVISION. ........................................................................................42

V.      THE BUILDING ENERGY PERFORMANCE STANDARDS REGULATION CANNOT BE PREEMPTED BECAUSE OF ITS APPLICATION IN PARTICULAR CIRCUMSTANCES. ................................................................................46

CONCLUSION ................................................................................................49

REQUEST FOR ORAL ARGUMENT ................................................................49

Page

**Cases**

*Air Conditioning & Refrigeration Inst. v. Energy Res.*
*Conservation & Dev. Comm'n,*
410 F.3d 492 (9th Cir. 2005) ......................................................................6, 7

*Altria Grp., Inc. v. Good,*
555 U.S. 70 (2008)........................................................................................14

*American Auto. Mfrs. Ass'n v. Cahill,*
152 F.3d 196 (2d Cir. 1998) .........................................................................24

*American Pub. Gas Ass'n v. U.S. Dep't of Energy,*
22 F.4th 1018 (D.C. Cir. 2022)......................................................................12

*Association of Contracting Plumbers of City of N.Y., Inc. v. City of N.Y,*
No. 23-cv-11292, 2025 WL 843619 (S.D.N.Y. Mar. 18, 2025), ......................15

*Association of Contracting Plumbers of City of N.Y., Inc. v. City of N.Y,*
2026 WL 1871692 (June 30, 2026) ...........................................................passim

*Bates v. Dow Agrosciences, LLC,*
544 U.S. 431 (2005)......................................................................................23

*Building Indus. Ass'n of Wash. v. Washington State Bldg. Code Council,*
683 F.3d 1144 (9th Cir. 2012) .........................................................13, 23, 43

*Buono v. Tyco Fire Prods., L.P.,*
78 F.4th 490 (2d Cir. 2023) .........................................................................14

*California Div. of Lab. Stds. Enf't v. Dillingham Const., N.A., Inc.,*
519 U.S. 316 (1997).................................................................................19, 27

*California Rest. Ass'n v. City of Berkeley,*
89 F.4th 1094 (9th Cir. 2024) ..........................................................17, 35, 36

*Central Valley Chrysler-Jeep, Inc. v. Goldstene,*
529 F. Supp. 2d 1151, 1175 (E.D. Cal. 2007) ...............................................41

*Chamber of Commerce v. Whiting,*
    563 U.S. 582 (2011)..................................................................14

*Coventry Health Care of Mo., Inc. v. Nevils,*
    581 U.S. 87 (2017)....................................................................19

*Dan's City Used Cars, Inc. v. Pelkey,*
    569 U.S. 251 (2013)..................................................................44

*Engine Mfrs Ass'n v. South Coast Air Quality Mgmt. Dist.,*
    541 U.S. 246 (2004)..................................................................24

*Griffin v. Oceanic Contractors, Inc.,*
    458 U.S. 564 (1982)..................................................................41

*Gundy v. United States,* 588 U.S. 121 (2019)........................................16

*Hearth, Patio & Barbecue Ass'n v. U.S. Dep't of Energy,*
    706 F.3d 499 (D.C. Cir. 2013)..................................................32

*Lamar, Archer, & Confrin, LLP v. Appling,*
    584 U.S. 709 (2018)..................................................................18

*Lawson v. Suwannee Fruit & S.S. Co.,*
    336 U.S. 198 (1949)..................................................................31

*Massachusetts v. EPA,* 549 U.S. 497 (2007) .....................................3, 21

*Metropolitan Taxicab Bd. of Trade v. City of N.Y.,*
    615 F.3d 152 156 (2d Cir. 2010) ........................................27, 28, 29

*Morales v. Trans World Airlines, Inc.,*
    504 U.S. 374 (1992)........................................................19, 26, 28

*Mulhern Gas Co. v. Mosley,*
    798 F. Supp. 3d 304 (N.D.N.Y. 2025)......................................36

*National Ass'n of Home Builders v. District of Columbia,*
    No. 24-cv-02942, 2026 WL 837674 (D.D.C. Mar. 26, 2026)...........36

*National Ass'n of Home Builders v. Montgomery County,*
    No. 8:24-cv-03024-PX, 2026 WL 817322 (D. Md. Mar. 25, 2026) .................36

*National Meat Ass'n v. Harris*,
565 U.S. 452 (2012)...................................................................23, 24

*Natural Res. Def. Council, Inc. v. Herrington,*
768 F.2d 1355 (D.C. Cir. 2014)........................................................5, 6

*New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*,
514 U.S. 645 (1995)........................................................................18

*Puerto Rico v. Franklin Cal. Tax-Free Tr.*,
579 U.S. 115 (2016)........................................................................14

*Rinnai Am. Corp. v. South Coast Air Quality Mgmt. Dist.*,
No. 25-5129, 2026 WL 1912093 (9th Cir. July 2, 2026) ......................21, 22, 35

*Rowe v. New Hampshire Motor Transp. Ass'n,*
552 U.S. 364 (2008)....................................................................25, 26, 40

*Stenberg v. Carhart*,
530 U.S. 914 (2000)........................................................................31

*United States v. Turner*,
389 F.3d 111 (4th Cir. 2004) ...............................................................12

*Van Buren v. United States*,
593 U.S. 374 (2021)......................................................................14, 16

**Statutes**

28 U.S.C. § 1291 .............................................................................2

28 U.S.C. § 1331 .............................................................................2

42 U.S.C. § 6201 .........................................................................20, 37

42 U.S.C. § 6201(4) .........................................................................20

42 U.S.C. § 6201(5) .........................................................................20

42 U.S.C. §§ 6291 – 6309 ...............................................................13, 20

42 U.S.C. § 6291(4) ..................................................................8, 15, 16, 31

42 U.S.C. § 6291(5) .........................................................................15

42 U.S.C. § 6291(6) ..................................................................................8, 13, 17

42 U.S.C. § 6292(b)(1)(B) ...................................................................................31

42 U.S.C. § 6292(b)(2)(A) ...................................................................................32

42 U.S.C. § 6293 .........................................................................7, 8, 13, 15

42 U.S.C. § 6293(a) ...............................................................................................15

42 U.S.C. § 6293(b)(3) ..........................................................................................15

42 U.S.C. § 6294 ...............................................................................................7, 17

42 U.S.C. § 6295(*l*)(1)(B) ..............................................................................31, 32

42 U.S.C. § 6295(o)(4) ..........................................................................................39

42 U.S.C. § 6296 .....................................................................................................7

42 U.S.C. § 6297(c) ....................................................................................8, 13, 46

42 U.S.C. § 6297(d)(1)(C)(ii) ...............................................................................38

42 U.S.C. § 6297(f)(3) ....................................................................................43, 45

42 U.S.C. § 6297(f)(3)(a)-(g) ...............................................................................43

42 U.S.C. § 6297(f)(3)(B) .....................................................................................44

42 U.S.C. § 6297(f)(3)(F) ......................................................................................45

42 U.S.C. § 6302(a)(5) ...........................................................................................17

42 U.S.C. § 6303(a) ...............................................................................................47

42 U.S.C. §§ 6311 – 6317 ......................................................................................20

42 U.S.C. § 6316 .....................................................................................................13

42 U.S.C. § 6325(e)(1) ...........................................................................................38

42 U.S.C. § 6316(b)(2)(B)(i). ...............................................................................45

42 U.S.C. § 6834(a)(3)(D)(i)(I) ............................................................................38

42 U.S.C. §§ 6374 – 6374e .............................................................................20

Energy Policy and Conservation Act,
Pub. L. No. 94-163, 89 Stat. 871 (1975) ......................................................33

National Appliance Energy Conservation Act of 1987,
Pub. L. No. 100-12, 101 Stat. 103 (1987) ............................................... 7, 34, 36

National Energy Conservation Policy Act,
Pub. L. No. 95-619, 92 Stat. 3206 (1978) .....................................................6

Md. Code Ann., Env't § 2-1204.2 (LexisNexis Supp. 2025) ...................................3

Md. Code Ann., Env't § 2-1601(e)(1) (LexisNexis Supp. 2025) ..............................3

Md. Code Ann., Env't § 2-1602(a) (LexisNexis Supp. 2025).................................3

**Rules**

Fed. R. Civ. P. 12(b)(6)..............................................................................9, 12

**Regulations**

10 C.F.R. § 429.13 ...................................................................................15

10 C.F.R. § 431.64 ...................................................................................15

16 C.F.R. §§ 305.1 – 305.32 ........................................................................17

Energy Conservation Program for Consumer Products,
47 Fed. Reg. 14,424 (Apr. 2, 1982) ........................................................ 17, 41

Energy Conservation Standards for Residential Refrigerators,
Refrigerator-Freezers, and Freezers,
75 Fed. Reg. 59,470, 59,530 (Sept. 27, 2010) ................................................30

COMAR 26.28.01.02B(15)(c) .....................................................................13

COMAR 26.28.01.02B(21)..........................................................................27

COMAR 26.28.02.02B(5)..............................................................................5

COMAR 26.28.03.02 ......................................................................... 4, 5, 22

COMAR 26.28.04.01 ....................................................................................5

COMAR 26.28.04.01A(2) .......................................................................47

**Miscellaneous**

S. Rep. No. 100-6, 1987 WL 61449 (1987)...................................... passim

S. Rep. No. 95-516 (1975) ....................................................................5

U.S. Env't Prot. Agency, *Fluorinated Gas Emissions* (Mar. 20, 2026),
    https://tinyurl.com/5cdmza88 ...................................................2

U.S. Env't Prot. Agency, *Overview of Greenhouse Gases* (Dec. 29, 2025),
    https://tinyurl.com/49f2hus8......................................................2

Univ. of Md. Ctr. for Env't Sci. & Md. Comm'n on Climate Change,
    *Sea-Level Rise Projections for Maryland 2023* (2023),
    https://tinyurl.com/kcs8pwue........................................................3

No. 26-1552

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

_____

**MARYLAND BUILDING INDUSTRY ASSOCIATION, INC.,** *et al.*,

*Plaintiffs-Appellants*,

**v.**

**SERENA COLEMAN McILWAIN,**

*Defendant-Appellee.*

_____

On Appeal from the United States District Court for the District of Maryland
(Deborah L. Boardman, District Judge)

_____

**BRIEF OF APPELLEE**

_____

**JURISDICTIONAL STATEMENT**

This civil action concerns a claim that the federal Energy Policy and Conservation Act ("EPCA") preempts the Maryland Department of the Environment's Building Energy Performance Standards, which the Department adopted under a legislative mandate to reduce greenhouse gas emissions from certain large buildings.

The district court had subject matter jurisdiction under 28 U.S.C. § 1331. The court entered final judgment on March 31, 2026 (JA1), and the plaintiffs appealed on April 29, 2026 (JA147). This Court accordingly has jurisdiction under 28 U.S.C. § 1291.

## ISSUE PRESENTED FOR REVIEW

Was the district court correct to conclude that the Energy Policy Conservation Act, which provides for federal energy conservation standards applicable to certain products, does not preempt a state regulation establishing limits on net direct greenhouse gas emissions by large buildings?

## STATEMENT OF THE CASE

### Statutory and Regulatory Background

#### Maryland's Climate Legislation and the Building Energy Performance Standards Regulation Mandate

The emission of greenhouse gases—namely, carbon dioxide, methane, nitrous oxide, hydrofluorocarbons, perfluorocarbons, and sulfur hexafluoride—contributes to global warming and exacerbates the effects of climate change, including rising sea levels, changes in growing seasons, and changes in frequency and intensity of storms. *See* U.S. Env't Prot. Agency, *Overview of Greenhouse Gases*, (Dec. 29, 2025), https://tinyurl.com/49f2hus8; U.S. Env't Prot. Agency, *Fluorinated Gas Emissions* (Mar. 20, 2026), https://tinyurl.com/5cdmza88. The Supreme Court has

acknowledged that the harms associated with climate change are "serious and well recognized," *Massachusetts v. EPA*, 549 U.S. 497, 521 (2007), and that manmade greenhouse gases released into the atmosphere "may be producing a long-term and substantial increase in the average temperature on Earth." *Id*. at 508. Maryland's extensive shoreline, low-lying coastal land, and estuarine habitats, and the industries that rely on them, are particularly vulnerable to the effects of climate change. *See* Univ. of Md. Ctr. for Env't Sci. & Md. Comm'n on Climate Change, *Sea-Level Rise Projections for Maryland 2023*, at 2 (2023), https://tinyurl.com/kcs8pwue.

In response to the climate crisis, the Maryland General Assembly enacted the Climate Solutions Now Act of 2022, a comprehensive statutory program aimed at reducing climate pollution and requiring the State to achieve net-zero statewide greenhouse gas emissions by 2045. *See, e.g.*, Md. Code Ann., Env't § 2-1204.2 (LexisNexis Supp. 2025). As part of that program, the Act targets greenhouse gases emitted from certain commercial and multi-family residential buildings of 35,000 square feet or more. *Id.* § 2-1601(e)(1). It directs the Maryland Department of the Environment to develop and adopt building energy performance standards for covered buildings to achieve (1) a 20% reduction in net direct greenhouse gas emissions from covered buildings on or before January 1, 2030; and (2) net-zero direct greenhouse gas emissions on or before January 1, 2040. *Id.* § 2-1602(a).

**The Building Energy Performance Standards Regulation**

To implement the Act, the Department initiated notice-and-comment rulemaking under Maryland's Administrative Procedure Act and related environmental rulemaking provisions.  (JA5.)  During the comment process, Washington Gas Light Company—a plaintiff in this case—advocated for the standards to allow compliance through advanced solutions such as carbon capture and the use of alternative fuels (e.g., renewable natural gas or hydrogen).  (JA5.)  In its published responses, the Department acknowledged that such measures could be used to meet the requirements.  (JA5.)  It explained that it would convene a working group to determine how to account for sources and sinks of on-site emissions (including carbon capture systems) before the standards take effect in 2030.  (JA5.)

On December 13, 2024, the Department adopted the Building Energy Performance Standards ("BEPS") as Code of Maryland Regulations ("COMAR") title 26, subtitle 28.  The BEPS regulation requires covered buildings to reduce "net direct greenhouse gas emissions" to zero by 2040 and establishes interim net direct emissions standards for 2030 and 2035.  COMAR 26.28.03.02.  The regulation excludes certain categories of buildings, including historic properties, elementary and secondary schools, manufacturing buildings, agricultural buildings, and federally owned buildings.  COMAR 26.28.01.02B(15).  It also excludes specified emissions and energy uses from the calculation of net direct emissions, including

certain fuel combustion for commercial cooking and water heating, electric vehicle charging, and the use of some generators. COMAR 26.28.02.02B(5). The regulation further provides for exemptions in circumstances such as financial distress or low occupancy. COMAR 26.28.04.02.

The BEPS regulation does not mandate any specific method of reducing net greenhouse gas emissions. COMAR 26.28.03.02. Thus, owners of covered buildings may adopt any combination of paths toward compliance, including building-envelope improvements, replacement of equipment with lower-emitting or non-emitting alternatives, retrofits to use lower-emitting or non-emitting fuels, and installation of carbon-capture systems. Owners may also elect to pay an alternative compliance fee for emissions exceeding the applicable standard. COMAR 26.28.04.01.

### The Energy Policy and Conservation Act

The Energy Policy and Conservation Act ("EPCA") was enacted in response to the 1973-1974 oil embargo imposed upon the United States by the Organization of Petroleum Exporting Countries. (JA91.) Congress enacted EPCA as part of a "comprehensive national energy policy." *Natural Res. Def. Council, Inc. v. Herrington,* 768 F.2d 1355, 1362 (D.C. Cir. 2014) (quoting S. Rep. No. 95-516, at 116 (1975), *as reprinted in* 1975 U.S.C.C.A.N. 9260)). EPCA's purposes were to increase national energy production, decrease foreign energy dependence, and

reduce domestic energy consumption. *See Natural Res. Def. Council*, 768 F.2d at 1364.

As initially drafted, EPCA required manufacturers to label each covered product with its energy use, so that consumers would be better informed and could choose more efficient appliances. *See Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*, 410 F.3d 492, 499 (9th Cir. 2005). The labeling requirement failed to drive consumers toward more efficient appliances, however, so Congress amended EPCA to require the Department of Energy to adopt energy efficiency standards by product type for certain appliances. *See* National Energy Conservation Policy Act, Pub. L. No. 95-619, 92 Stat. 3206 (1978).

The Department of Energy declined to follow that directive, deciding instead that standards were not economically justified because the energy savings would be insignificant. *See Air Conditioning & Refrigeration Inst.*, 410 F.3d at 499. Instead, it initiated a general policy of authorizing States, through preemption waivers, to establish their own individualized energy efficiency standards. *Id.* at 499. The D.C. Circuit, in turn, held that this approach was unlawful and ordered the Department of Energy to adopt federal appliance efficiency standards. *Natural Res. Def. Council*, 768 F.2d at 1363-64.

Thereafter, major manufacturer trade associations and the Natural Resources Defense Council negotiated a compromise solution, which resulted in Congress's

adoption of the National Appliance Energy Conservation Act of 1987. *Air Conditioning & Refrigeration Inst.*, 410 F.3d at 499-500. The 1987 legislation established federal energy conservation standards for certain "covered products" and directed the Department to amend and supplement those standards periodically. *See* National Appliance Energy Conservation Act of 1987, Pub. L. No. 100-12, § 325(b), 101 Stat. 103, 108 (1987). Industry members must design and manufacture covered products (such as refrigerators and ovens) that meet the applicable standards. *See* 42 U.S.C. § 6296. They must demonstrate that their products meet those standards through "test procedures," *see id.* § 6293, and must affix a label to each product documenting its energy efficiency and energy use, *see id.* § 6294.

In the 1987 legislation, Congress also amended EPCA's preemption provision. It did so to "counteract the systems of separate state appliance standards," which would "increasingly complicate [appliance manufacturers'] design, production and marketing plans." *Air Conditioning & Refrigeration Inst.*, 410 F.3d at 500 (quoting S. Rep. No. 100-6, at 4, 1987 WL 61449 (1987)). The portions of the provision relevant to this appeal have not changed materially since then. Under the heading "General rule of preemption for energy conservation standards when Federal standard becomes effective for product," EPCA now provides that (subject to exceptions not relevant here) for any product for which a federal energy conservation standard exists, "no State regulation concerning the energy efficiency,

7

energy use, or water use of such covered product shall be effective with respect to such product." 42 U.S.C. § 6297(c).

The statute defines the operative terms. Today, "energy conservation standard" is defined as "a performance standard which prescribes a minimum level of energy efficiency or a maximum quantity of energy use . . . for a covered product, determined in accordance with test procedures prescribed under section 6293 of this title; or . . . a design requirement for [certain specified products]." *Id.* § 6291(6). "Energy efficiency" is "the ratio of the useful output of services from a consumer product to the energy use of such product, determined in accordance with test procedures under section 6293 of this title." *Id.* § 6291(5). "Energy use" is defined as "the quantity of energy directly consumed by a consumer product at point of use, determined in accordance with test procedures under section 6293 of this title." *Id.* § 6291(4).

**Proceedings Below**

On January 13, 2025, the plaintiffs filed this suit against Maryland's Secretary of the Environment; they subsequently amended their complaint. (JA89-114, JA115-143.) The amended complaint asserted a single cause of action: that the BEPS regulation is preempted by EPCA and therefore should be declared void, with its enforcement enjoined. (JA115-143.)

The Department moved to dismiss the amended complaint under Federal Rule of Civil Procedure 12(b)(6), and the district court granted that motion.  (JA39.)  The court concluded that the BEPS regulation falls outside EPCA's preemptive scope because it does not "concern" the "energy use" or "energy efficiency" of covered products.  (JA33-34.)  More specifically, the court determined that the BEPS regulation "does not 'refer to' or have an impermissible 'connection with'" those subjects.  (JA19.)  Recognizing that the regulation does not require covered building owners to abandon or reduce use of gas appliances (JA30), the district court noted that the regulation provides flexible pathways to compliance, such as using carbon-capture technology or electing to pay an alternative compliance fee.  (JA34-36.)  Finally, the court held that the plaintiffs' facial challenge failed as a matter of law because the BEPS regulation can lawfully be applied under multiple scenarios that do not implicate EPCA preemption at all.  (JA17, JA38.)

This appeal followed.

## SUMMARY OF ARGUMENT

The BEPS regulation, an air pollution control measure designed to curb building-wide greenhouse gas emissions, is not preempted by EPCA.  EPCA preempts state regulations "concerning" the "energy efficiency" or "energy use" of covered products, with the purpose of eliminating the need for manufacturers to comply with standards that differ from one State to the next.  Consistent with that

purpose, EPCA defines "energy efficiency" and "energy use" as fixed, static characteristics of covered products determined using certain test procedures. A product's "energy use" and "energy efficiency," in other words, remain the same regardless of how or whether a consumer ultimately uses it. The BEPS regulation does not speak to "energy use" or "energy efficiency" at all, much less require the installation or manufacture of products with a particular minimum energy efficiency or maximum energy use. Instead, it places limits on a building's net greenhouse gas emissions. Any collateral incentive to install products whose energy use is lower or whose energy efficiency is higher does not result in preemption.

That the BEPS regulation may result in less actual consumption of energy in the real world—whether because people do not install certain products, or because people use them less often—does not mean the regulation is preempted, either. In urging adoption of a broad, colloquial reading of "energy use," the plaintiffs disregard that both "energy use" and "energy efficiency" are defined terms that must be given the meaning that Congress prescribed. Indeed, those terms are the foundation for the term "energy conservation standard." But even if "energy use" were read colloquially, any reductions in energy consumption incidentally flowing from the BEPS regulation's limits on emissions still would not establish preemption.

More generally, while EPCA does seek to shield manufacturers from the burden of having to comply with a patchwork of state energy conservation standards,

it does not protect anyone's ability to sell or use gas-fueled products in all settings without hindrance.  EPCA's purpose is to conserve energy; if anything, it operates to *confine* manufacturers' and consumers' choices, as the Second Circuit observed in rejecting the Ninth Circuit's view of EPCA preemption.  Even if pollution control regulations make gas-powered products financially unfeasible (or just more expensive) for some purchasers or users, the result is not preemption.  A contrary conclusion would call into question a plethora of state and local regulations that have goals unrelated to energy efficiency but that may make it difficult or impossible to use certain kinds of products in some instances.

EPCA's building code exception does not aid the plaintiffs' case for preemption, either.  That exception does suggest that EPCA's preemptive effect is not limited to laws that operate at the product level, rather than the whole-building level.  But the nature of that exception merely underscores that the BEPS regulation falls outside the statute's preemptive scope, for the exception addresses regulations that have an "energy consumption or conservation objective," not regulations whose aim is to control emissions.  Neither the BEPS regulation nor a regulation covered by the exception is "harsher" or "gentler" than the other, for the two operate on different axes altogether.

Finally, even if some owners might choose to comply with the BEPS regulation by removing gas-fueled products, that owner-specific effect could not

11

result in preemption under EPCA. EPCA's preemption provision speaks of *regulations*—not regulatory applications—that concern energy use or energy efficiency. But the BEPS regulation allows building owners to select from any combination of compliance pathways, including building envelope improvements, carbon-capture technologies, and alternative compliance payments. Especially with the zero-net-emissions deadline more than 13 years away, the prospect that some owners may choose to comply in a particular manner cannot call the regulation's facial validity into question.

The judgment of the district court should be affirmed.

## ARGUMENT

**I.** **THE DISTRICT COURT'S DISMISSAL OF THE COMPLAINT IS REVIEWED DE NOVO.**

Dismissal of a complaint under Rule 12(b)(6) is reviewed de novo. *See United States v. Turner*, 389 F.3d 111 (4th Cir. 2004).

**II.** **THE TEXT OF THE ENERGY POLICY AND CONSERVATION ACT'S PREEMPTION CLAUSE ESTABLISHES THAT MARYLAND'S BUILDING ENERGY PERFORMANCE STANDARDS REGULATION IS NOT PREEMPTED.**

Recognizing that commercial consumer appliances and industrial equipment represent a significant source of fuel consumption, Congress developed a statutory scheme that regulates the design and manufacturing of those products through the development of energy conservation standards. *See American Pub. Gas Ass'n v.*

*U.S. Dep't of Energy*, 22 F.4th 1018, 1022 (D.C. Cir. 2022); *Building Indus. Ass'n of Wash. v. Washington State Bldg. Code Council*, 683 F.3d 1144, 1148 (9th Cir. 2012).[1]  An "energy conservation standard" is a "performance standard which prescribes a minimum level of energy efficiency or a maximum quantity of energy use . . . for a covered product, determined in accordance with test procedures prescribed under section 6293 of this title" or "a design requirement for" certain specified products.  42 U.S.C. § 6291(6).

To prevent a patchwork of state regulations setting different energy conservation standards for the same products, EPCA includes an express preemption provision that prohibits States from setting their own energy conservation standards for covered products.[2]  That provision states that, for any product for which a federal energy conservation standard exists, "no State regulation concerning the energy

---

[1] EPCA addresses consumer products and industrial equipment in separate statutory provisions.  *See* 42 U.S.C. §§ 6291 – 6309 (consumer products); *id.* §§ 6311 – 6317 (industrial equipment).  The differences between the consumer and industrial provisions are immaterial to this appeal.  For ease of reference, and because the BEPS regulation exempts most natural gas-fueled industrial equipment, *see* COMAR 26.28.01.02B(15)(c), this brief generally cites only the provisions applicable to consumer products.

[2] EPCA has substantially similar preemption clauses for both consumer products and industrial equipment.  *See* 42 U.S.C. § 6297(c) (consumer); *id.* § 6316 (industrial).  For the reasons previously stated, this brief refers only to the consumer product preemption clause.

efficiency, energy use, or water use of such covered product shall be effective with respect to such product." *Id.* § 6297(c).

When a statute contains an express preemption clause like the one here, a court must "focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent." *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016) (quoting *Chamber of Commerce v. Whiting*, 563 U.S. 582, 594 (2011)). In addition, a court must consider "the question of substance and scope of Congress' displacement of state law." *Buono v. Tyco Fire Prods., L.P.,* 78 F.4th 490, 495-96 (2d Cir. 2023) (quoting *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008)). Further, "[w]hen a statute includes an explicit definition of a term, [courts] must follow that definition, even if it varies from a term's ordinary meaning." *Van Buren v. United States*, 593 U.S. 374, 387 (2021) (quotation omitted)); *see id.* at 388 n.7 (explaining that, for statutes addressing a technical subject, "a specialized meaning should be expected").

Under these principles, EPCA's preemption provision does not encompass Maryland's BEPS regulation. That regulation does not concern the "energy efficiency" or "energy use" of any product. Instead, it places limits on a building's net emissions and offers multiple paths for compliance. Pollution control measures such as this one fall outside EPCA's preemptive scope, regardless of whether they

make it more expensive or less convenient to use products fueled by particular energy sources.

### A. "Energy Efficiency" and "Energy Use" Are Static Properties of a Product.

The terms central to deciding the preemptive scope of § 6297(c) are "energy use" and "energy efficiency." Both are defined terms: "Energy efficiency" is "the ratio of the useful output of services from a consumer product to the energy use of such product, determined in accordance with test procedures under section 6293 of this title," 42 U.S.C. § 6291(5), while "energy use" is "the quantity of energy directly consumed by a consumer product at point of use, determined in accordance with test procedures under section 6293 of this title," *id*. § 6291(4).

The definitions make clear that both "energy efficiency" and "energy use" are properties of a product (or, as the plaintiffs put it, "factory-floor, static value[s]"). Appellants' Br. 24. Both metrics are to be determined in accordance with "test procedures" developed by the Department of Energy. Those test procedures must be "reasonably designed to produce test results" that measure "energy efficiency, energy use . . . or estimated annual operating cost of a covered product during a representative average use cycle or period of use." 42 U.S.C. § 6293(a), ((b)(3); *see also, e.g.*, 10 C.F.R. §§ 429.13, 431.64. As they are measured by testing, both the "quantity of energy directly consumed by a consumer product at point of use" and "the ratio of the useful output of services from a consumer product to the energy use

15

of such product" must be characteristics of the product itself as it is designed and produced, not measures that reflect whether and how a product is in fact used by a particular consumer. *See Association of Contracting Plumbers of City of N.Y., Inc. v. City of N.Y.*, No. 23-cv-11292, 2025 WL 843619, at *5 (S.D.N.Y. Mar. 18, 2025), *aff'd*, Nos. 25-977 & 25-2041, 2026 WL 1871692 (June 30, 2026) (concluding that "'energy use' refers to a predetermined fixed value that measures the characteristics of a covered product as manufactured"). The "energy use" or "energy efficiency" of a product, in other words, is the same whether it sits unplugged in a garage or is used in a kitchen every day. And the "energy use' of a covered product that is never used is not zero; it is the value displayed on the product's EPCA-mandated label that was affixed prior to sale.

The "energy use" definition's reference to the amount of energy consumed "at point of use" does not change this conclusion. *See* Appellants' Br. 27-28. Again, "the quantity of energy directly consumed by a consumer product at point of use" still must be "determined in accordance with [certain] test procedures." 42 U.S.C. § 6291(4). The plaintiffs' interpretation—i.e., that the term "point of use" transforms "energy use" into a measure reflecting how often a product is in fact used—cannot be squared with that requirement. *See, e.g.*, *Gundy v. United States*, 588 U.S. 121, 141 (2019) (stressing the importance of interpreting statutory terms in context). At the same time, although EPCA does not define "point of use," the term

16

bears a readily apparent technical meaning. *See Van Buren,* 593 U.S. at 389 n.7. Specifically, a measurement of energy use may include only energy used on-site by a product, or it may also include energy used to produce and deliver that energy. *See California Rest. Ass'n v. City of Berkeley,* 89 F.4th 1094, 1123 (9th Cir. 2024) (Friedland, J., dissenting from denial of rehearing en banc); *see also* Energy Conservation Program for Consumer Products, 47 Fed. Reg. 14,424, 14,427 (Apr. 2, 1982). The "at point of use" qualifier in the definition of "energy use" constitutes a technical instruction to measure only the energy directly used by the product and not energy used to produce and deliver that energy. *See City of Berkeley*, 89 F.4th at 1123-25 (Friedland, J., dissenting from denial of rehearing en banc) (citing technical studies and regulatory documents employing the term "point of use" in this sense); *Association of Contracting Plumbers*, 2026 WL 1871692, at *14-16.

The fixed-value understanding of "energy use" and "energy efficiency," moreover, is the only one that makes sense as part of the term "energy conservation standard," which refers to "a performance standard which prescribes a minimum level of energy efficiency or a maximum quantity of energy use . . . for a covered product." 42 U.S.C. § 6291(6). Manufacturers are to sell only *products* that meet the applicable standard, whether it takes the form of maximum energy use or minimum energy efficiency. *Id.* § 6302(a)(5). And manufacturers are to label each product with its energy use or energy efficiency. *Id.* § 6294; 16 C.F.R. §§ 305.1 –

305.32. These requirements make sense only if "energy use" and "energy efficiency" are fixed properties of a product, not measures that vary depending on whether the product is used.

**B.    Maryland's Building Energy Performance Standards Regulation Does Not "Concern" Either "Energy Use" or "Energy Efficiency."**

EPCA's preemption provision applies to state regulations "concerning" a product's energy use or energy efficiency.  The use of the word "concerning" does signal that the statute's preemptive scope extends beyond regulations that purport to issue energy conservation standards.  Still, as the Second Circuit recently explained, the scope of EPCA's preemption provision remains "fairly limited." *Association of Contracting Plumbers*, 2026 WL 1871692, at *1; *see id.* ("EPCA preempts energy conservation standards for covered appliances and a fairly limited realm of additional regulations which operate in a similar manner.").

The Supreme Court has explained that "[c]oncerning means 'relating to,' and is the equivalent of 'regarding, respecting, about.'" *Lamar, Archer, & Confrin, LLP v. Appling*, 584 U.S. 709, 717-718 (2018).  That term cannot be interpreted to extend to its furthest literal sense.  *See New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995) ("If 'relate to' were taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes preemption would never run its course, for 'really, universally, relations stop

nowhere.'" (internal citation omitted)). Instead, "relating to" (and therefore "concerning") denotes regulations that have either a "'connection with, or reference to,' the topics the statute enumerates"—here, the energy use or energy efficiency of covered products. *Coventry Health Care of Mo., Inc. v. Nevils*, 581 U.S. 87, 96 (2017) (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992)) (interpreting "relate to" in the ERISA context).

For the reasons below, the BEPS regulation lacks a prohibited connection with, or reference to, the energy use or energy efficiency of covered products.

### 1. The Building Energy Performance Standards Regulation Lacks a Prohibited "Connection With" the "Energy Use" or "Energy Efficiency" of Covered Products.

Determining whether the BEPS regulation is "connected with" the "energy use" or "energy efficiency" of covered products requires the Court to consider EPCA's purpose and the BEPS regulation's effect on federal energy conservation standards. *See California Div. of Lab. Stds. Enf't v. Dillingham Const., N.A., Inc.*, 519 U.S. 316, 325 (1997) (explaining that "to determine whether a state law has the forbidden connection," a court must "look both to the objectives of the [federal] statute as a guide to the scope of the state law that Congress understood would survive, as well as to the nature of the effect of the state law" on the subject matter of the federal statute (citation omitted)). Both counsel against a finding of preemption.

Although EPCA lists a series of purposes, two are relevant here: "to conserve energy supplies through energy conservation programs, and, where necessary, the regulation of certain energy use," and "to provide for improved energy efficiency of motor vehicles, major appliances, and certain other consumer products." 42 U.S.C. § 6201(4), (5); *see also* S. Rep. No. 100-6, at 2 ("The purpose of S. 83 is to reduce the Nation's consumption of energy and to reduce the regulatory and economic burdens on the appliance manufacturing industry through the establishment of national energy conservation standards for major residential appliances."). EPCA effectuates these purposes through a series of programs addressing the sectors responsible for using fuel, including consumer products, 42 U.S.C. §§ 6291 – 6309, industrial equipment, *id.* §§ 6311 – 6317, and off-highway motor vehicles, *id.* § 6373. EPCA also effectuates these purposes by establishing state and federal energy conservation programs, *id.* §§ 6321 – 6327, and by providing incentives to use alternative fuels, *id.* §§ 6374 – 6374e.

The preemption provision itself has a more specific purpose. In 1978, Congress amended EPCA and instructed the Department of Energy to establish energy efficiency standards for covered products. The Department declined to establish such standards and, instead, granted States preemption waivers that allowed them to impose their own standards. *See Rinnai Am. Corp. v. South Coast Air Quality Mgmt. Dist.*, No. 25-5129, 2026 WL 1912093, at *4 (9th Cir. July 2,

20

2026). Consequently, "appliance manufacturers were confronted with the problem of a growing patchwork of differing State regulations which would increasingly complicate their design, production and marketing plans." S. Rep. No. 100-6, at 4; *see id.* ("Regulations in a few populous States could as a practical matter determine the product lines sold nationwide, even in States where no regulations existed."). The preemption provision, which both establishes EPCA's preemptive effect and prescribes stringent criteria for granting preemption waivers, thus reflects a desire to achieve uniformity of regulation for the benefit of manufacturers of covered products.

The BEPS regulation does not implicate these purposes at all. It does not speak to fuel consumption, energy efficiency, or regulatory uniformity for appliance manufacturers. Rather, it addresses greenhouse gas emissions from certain large buildings. And nothing in EPCA's text or history suggests that its purpose encompasses emissions regulation. In fact, regulation of air pollution has coexisted with EPCA's energy conservation standards for decades. *See Massachusetts v. EPA*, 549 U.S. 497, 531-32 (2007) (rejecting the argument that EPA "cannot regulate carbon dioxide emissions from motor vehicles because doing so would require it to tighten mileage standards, a job (according to EPA) that Congress has assigned to [the Department of Transportation]"); *id.* at 532 (explaining that EPA's mandate to protect public health and welfare is "wholly independent of the Department of

21

Transportation's mandate to promote energy efficiency" and that while "[t]he two obligations may overlap, . . . there is no reason to think the two agencies cannot both administer their obligations and yet avoid inconsistency"); *see also Rinnai Am. Corp*, 2026 WL 1912093, at *12 (recognizing "that state and local regulators do not necessarily run afoul of EPCA preemption when they exercise their statutory duties under the [Clean Air Act]").

Nor does the BEPS regulation have an impermissible effect on energy conservation standards for covered products. The regulation requires owners of certain large buildings to reduce those buildings' net greenhouse gas emissions. COMAR 26.28.03.02. But it does not prohibit or require the use of any specific appliance, it does not require that appliances use less energy or operate more efficiently, and it does not otherwise require changes to the design of covered products. It therefore is not, as the plaintiffs would have it, an energy conservation standard of 0 kBtu/year. *See* Appellants' Br. 17. Ultimately, the BEPS regulation will require owners of covered buildings to achieve net-zero emissions—but they can use any combination of strategies to attain that goal. Besides replacing or retrofitting gas-fueled appliances, they can modify their buildings to reduce emissions, engage in carbon capture, or pay alternative compliance fees. That the BEPS regulation may increase the costs associated with gas-fueled products does not convert it into a regulation bearing on those products' "energy efficiency" or

"energy use." *See Building Indus. Ass'n of Wash.*, 683 F.3d at 1145 (observing that "a builder is not 'required' to select an option . . . simply because there is an economic incentive to do so"). As for the plaintiffs' assertion that "appliance manufacturers would be forced to radically shift or add production lines" in response to regulations like Maryland's "in an attempt to accommodate discrete jurisdictions all over the nation," Appellants' Br. 35, this prediction is little more than speculation. The same is true of their prediction that consumers "could find themselves hours away from a business that could repair their gas appliances." Appellants' Br. 35.

Indeed, even if the regulation *did* bear on products' "energy efficiency" or "energy use," the Supreme Court has distinguished between regulations that mandate particular conduct in a preempted area and those that merely yield incentives to act in that area. *Compare National Meat Ass'n v. Harris*, 565 U.S. 452 (2012) (holding that the Federal Meat Inspection Act, which regulates activities at slaughterhouses and contemplates that slaughterhouses receive and process non-ambulatory pigs, preempted a state law prohibiting the purchase, receipt, and sale of non-ambulatory pigs), *with Bates v. Dow Agrosciences*, LLC, 544 U.S. 431, 433 (2005) (holding that the Federal Insecticide, Fungicide, and Rodenticide Act's preemption of state "requirements for labeling or packaging" pesticides or devices does not extend to state laws that may simply induce pesticide manufacturers to

change their labels).  The BEPS regulation is, at most, the latter—"[a]n occurrence that merely motivates an optional decision."  *Bates*, 544 U.S. at 443.

The plaintiffs similarly are incorrect to liken the BEPS regulation to "backdoor attempts to regulate subject matter on which federal law is supreme."  Appellants' Br. 44.  In the cases they cite, the state regulations at issue imposed direct requirements in areas regulated by superior federal law.  In *American Automobile Manufacturers Association v. Cahill*, 152 F.3d 196 (2d Cir. 1998), for instance, the court held that Section 209 of the Clean Air Act, which preempts standards "relating to the control of emissions," preempted a state law requiring that a certain percentage of light-duty vehicle sales in the state be zero-emission vehicles.  *See id.* at 197.  Similarly, in *Engine Manufacturers Association v. South Coast Air Quality Management District*, 541 U.S. 246 (2004), the Supreme Court held that the same provision preempted state rules that prohibited certain fleet operators from purchasing or leasing vehicles unless they met stringent emissions standards.  *See id.* at 254-55.  And in *National Meat Association*, the state statute prohibited slaughterhouses from purchasing, receiving, or selling the very pigs for which federal law had prescribed different handling requirements.  *See* 565 U.S. at 468; *see also id.* at 463-64 (emphasizing that the State's prohibition on sale was more than a mere "incentive" to keep non-ambulatory pigs out of the production process).  In each instance, the regulation operated in the preempted area by design.

The BEPS regulation has no comparable design. To be a similar "backdoor attempt" to set energy conservation standards for covered products, it would, at a minimum, have to indirectly require that covered products meet energy efficiency or energy use standards different from the federal ones. The BEPS regulation, which speaks to building-wide emissions, does no such thing. And to the extent that it incidentally reduces the use or installation of gas-fueled equipment, that result is far from anomalous and does not support a finding of preemption. Many pollution restrictions will have some impact on the amount of time that regulated equipment is run and, by extension, on the amount of energy consumed. But these collateral effects do not transform emissions limits into energy conservation standards. Such limits do not "produce[] the very effect that the federal law sought to avoid," Appellants' Br. 22, because they do not require "manufacturers to produce appliances that exceed federal standards." *Association of Contracting Plumbers,* 2026 WL 1871692, at *8. As the Second Circuit explained, "federal regulation of certain activities," like appliance energy use, "does not mean that States must authorize activities antecedent to those federally regulated." *Id*. (citations omitted).

For similar reasons, the plaintiffs' reliance on *Rowe v. New Hampshire Motor Transport Association,* 552 U.S. 364 (2008), which considered the scope of a "related to" preemption clause, is misplaced. *See* Appellants' Br. 21-22. *Rowe* addressed the Federal Aviation Administration Authorization Act of 1994's

25

preemption of state laws related to motor carriers' "rates, routes, or services." *Rowe*, 552 U.S. at 364.  The Court held that this clause preempted a state law requiring tobacco shippers (not carriers) to use a recipient age-verification service, because the law would require motor carriers to provide that service.  *See Rowe*, 552 U.S. at 364.  In so holding, *Rowe* emphasized the deregulatory purpose of federal airline and motor-carrier legislation, which sought to prevent states from substituting governmental commands for competitive market forces, and to avoid a patchwork of state service mandates.  *See id.* at 373.  The BEPS regulation, by contrast, does not require any manufacturer to supply covered products that satisfy any maximum energy use or minimum energy efficiency requirement.

*Morales*, on which the plaintiffs also rely, is even farther afield.  *See* Appellants' Br. 22-23.  There, the Supreme Court construed the Airline Deregulation Act of 1978's clause preempting any law "relating to [air carriers'] rates, routes, or services."  *Morales*, 504 U.S. at 378.  That clause, the Court held, preempted state guidelines restricting how airlines could advertise airfares.  *Id.* at 391.  Not only did the guidelines expressly concern airfares—i.e., "rates"—but it was "clear as an economic matter" that they would "have the forbidden significant effect upon fares by impeding price competition.  *Id.* at 388.  And in holding the guidelines preempted, *Morales* stressed that some effects of state law are "too tenuous, remote, or peripheral" for state law to be preempted.  *Id.* at 390.  In contrast with the *Morales*

26

guidelines' express references to the preempted domain of airline "rates," the BEPS regulation says *nothing* about the "energy use" or "energy efficiency" of covered products. Nor is there any reason to think that the regulation will require manufacturers to make products whose "energy use" is lower or whose "energy efficiency" is higher.

### 2. The Building Energy Performance Standards Regulation Does Not Reference or Rely on Forbidden Subject Matter.

Alternatively, the BEPS regulation could "concern" the energy use or energy efficiency of covered products if it made direct "reference to" them by acting "immediately and exclusively upon" covered products' energy efficiency or energy use, *California Div. of Lab. Standards Enf't*, 519 U.S. at 317, or if it "ma[de] the existence of preempted subject matter essential to the [BEPS regulation's] operation," *Metropolitan Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152, 156 (2d Cir. 2010). The BEPS regulation does neither.

First, the BEPS regulation does not reference covered products at all, let alone the "energy use" or "energy efficiency" of those products. The BEPS regulation is a limit on pollution; it establishes the "numeric values of net direct greenhouse gas emissions that each covered building shall ultimately achieve on an annual basis in 2040 and beyond." COMAR 26.28.01.02B(21). Whether a building is in compliance depends on whether it achieves those values, regardless of the "energy

use" or "energy efficiency" of any products used therein. *Compare Morales*, 504 U.S. at 388 (finding that advertising guidelines referenced rates where "[e]ach guideline bears an express reference to airfares").

Second, the energy use or energy efficiency of covered products is not essential to the operation of the BEPS regulation. Again, the BEPS regulation is an air pollution control regulation that limits greenhouse gas emissions. Compliance depends on whether a building's net greenhouse gas emissions exceed the limit, not on the "energy use" or "energy efficiency" of covered products in those buildings.

The Second Circuit's decision in *Metropolitan Taxicab*, on which the plaintiffs rely, *see* Appellants' Br. 50, does not suggest that the BEPS regulation impermissibly makes reference to energy use or energy efficiency. There, the court held that a city regulation that expressly privileged hybrid over non-hybrid taxis was "related to" fuel economy standards and thus preempted. *Metropolitan Taxicab*, 615 F.3d at 157-58. The court reasoned that "[t]he requirement that a taxi be a hybrid in order to qualify for [favorable treatment] does nothing more than draw a distinction between vehicles with greater or lesser fuel-efficiency." *Id.* at 157; *see id.* (commenting that "in furtherance of the City's regulatory purpose, 'hybrid' is simply a proxy for 'greater fuel efficiency'"). Further, the distinction the local law drew had "no relation to an end other than an improvement in fuel economy across the

28

taxi fleets operating in New York City," and the city was "unable to identify any plausible alternative reason for" the distinction. *Id.*

The BEPS regulation is nothing like the hybrid rule in *Metropolitan Taxicab*. It does not distinguish between covered products based on their energy use or energy efficiency. Nor does it have "no relation to an end other than an improvement in" energy use or energy efficiency. *Id.* Indeed, energy use and energy efficiency are not the BEPS regulation's intended ends at all, as the regulation's intent and effect are to reduce greenhouse gas emissions. It is therefore unsurprising that, when faced with state and local requirements that were *more* stringent than the BEPS regulation, the Second Circuit declined to treat *Metropolitan Taxicab* as controlling the outcome. *See Association of Contracting Plumbers*, 2026 WL 1871692, at *9.

More generally, the plaintiffs are wrong to contend that the BEPS regulation concerns "energy use" or "energy efficiency" because it purportedly "penalizes EPCA-covered gas appliances that have a non-zero number specified on the kBtu/year energy use labels," Appellants' Br. at 24-25, or penalizes the "use of gas energy" or "less efficient . . . gas appliances," Appellants' Br. 19. The BEPS regulation concerns building-wide pollutant output and is agnostic as to how owners attain compliance. It thus does not act upon or refer to the "energy use" or "energy efficiency" of covered products. EPCA's preemption framework was designed to provide manufacturers with regulatory uniformity, *see* S. Rep. No. 100-6, at 4, not

to forestall efforts to control building pollution. *See* Energy Conservation Standards for Residential Refrigerators, Refrigerator-Freezers, and Freezers, 75 Fed. Reg. 59,470, 59,530 (Sept. 27, 2010) (explaining that the Department of Energy "interprets 'regulation concerning energy use' [in EPCA's preemption provision] to be equivalent to 'energy conservation standard'"). Indeed, a plethora of air pollution regulations could be said to increase the costs associated with the operation of products that run on a particular source of energy, and thus to "penalize" their use; that does not mean they are preempted.

**C. The Plaintiffs Cannot Establish Preemption by Reading "Energy Use" in Its Colloquial Sense.**

In the face of all of this, the plaintiffs urge that the BEPS regulation "concerns" the "energy use" of covered products because, in their view, "energy use" should be interpreted to mean the amount of energy that a covered product in fact consumes—or, in their words, "the actual use of energy in the real world." Appellants' Br. 25. Using this interpretation, the plaintiffs contend that if a regulation affects the way a consumer uses a covered product, the regulation "concerns the energy use" of that product and is thus preempted. Appellants' Br. 25.

This argument runs aground on the fact that "energy use" is a defined term; it means "the quantity of energy directly consumed by a consumer product at point of use, determined in accordance with test procedures under section 6293 of this title."

*Id.* § 6291(4). As explained at pages 15-18 above, "energy use" is a static property of a product, and it remains the same regardless of whether, how, and how often the product is used.

The plaintiffs are wrong to urge the Court to disregard the statutory definition. *See* Appellants' Br. 25 ("To be sure, EPCA provides a technical definition for 'energy use,' but the presence of a statutory definition does not foreclose adopting the plain meaning of the term in certain circumstances."). "When a statute includes an explicit definition," the Supreme Court has stressed, "we must follow that definition, even if it varies from that term's ordinary meaning." *Stenberg v. Carhart*, 530 U.S. 914, 942 (2000). Although there are exceptions where, for instance, adhering to the statutory definition would create "obvious incongruities," *Lawson v. Suwannee Fruit & S.S. Co.*, 336 U.S. 198, 201 (1949), there is no incongruity in interpreting "energy use" in accordance with how Congress chose to define that phrase. This is not, as the plaintiffs would have it, a matter of whether terms should be given the same meaning in different parts of a statute, *see* Appellants' Br. 25-26; it is a matter of whether they should be given the meaning that Congress expressly prescribed.

That EPCA elsewhere refers to "average annual per-household energy use" and "aggregate household energy use," Appellants' Br. 26 (quoting 42 U.S.C. §§ 6292(b)(1)(B) and 6295(*l*)(1)(B)), does not establish that "energy use" in the

31

preemption clause should be given its colloquial meaning. In these instances, which concern the Department of Energy's threshold authority to classify covered products and prescribe national energy conservation standards, EPCA may well use the term "energy use" colloquially. That conclusion, however, flows from the fact that applying the statutory definition would make no sense: "[A]verage annual per-household energy use of products of [a particular] type," 42 U.S.C. §§ 6292(b)(1)(B), defined with reference to "the estimated aggregate energy use . . . of consumer products of such type," *id.* §§ 6292(b)(2)(A), *cannot* be understood as referring to a static value associated with a product. The same is true of the statute's reference to "the average per household energy use within the United States by products of [a particular] type (or class) . . . for any 12-month period," measured in kilowatt-hours or their Btu equivalent. 42 U.S.C. § 6295(*l*)(1)(B). "Energy use" in these instances can only be understood colloquially.

That applying the statutory definition would be incongruous or nonsensical in certain instances does not warrant deviating from that definition elsewhere. Indeed, the plaintiffs' position contravenes what one court has called a "methodically drafted—and amended—statutory scheme." *Hearth, Patio & Barbecue Ass'n v. U.S. Dep't of Energy*, 706 F.3d 499, 506 (D.C. Cir. 2013). "Energy use" should be interpreted exactly how Congress defined the term. But even if "energy use" were given its colloquial meaning, the BEPS regulation still would not be preempted

32

because, at most, it merely creates an incentive to use less energy as one means of compliance. As discussed at pages 22-25 above, that sort of incentive, which is a byproduct of a law regulating emissions, does not result in preemption.

**D.     The Preemption Provision's History Does Not Support the Plaintiffs' Broad Interpretation.**

The plaintiffs' contentions that the history of EPCA's preemption provision demonstrates congressional intent to include building emissions regulations within its scope, *see* Appellants' Br. 36, are equally unavailing. The various amendments leading up to 1987 did strengthen and clarify EPCA's preemption of state and local laws that set conflicting energy conservation standards, whether directly or indirectly. But they did not expand the preemption provision's scope to include air pollution regulations.

As enacted in 1975, EPCA's preemption provision stated that "[t]his part supersedes any State regulation insofar as such State regulation may now or hereafter provide for . . . any energy efficiency standard or similar requirement with respect to energy efficiency or energy use of a covered product." Energy Policy and Conservation Act, Pub. L. No. 94-163, § 327, 89 Stat. 871, 926 (1975). In 1978, EPCA was amended. The only change to the preemption provision consisted of replacing "similar requirement" with "other requirement." *See* National Energy Conservation Policy Act § 424, 92 Stat. at 3263. Although "other" may be more

33

expansive than "similar," both terms still modified the clause "with respect to energy efficiency or energy use of a covered product."

The more substantial modification to the preemption provision occurred in 1987, when Congress enacted the National Appliance Energy Conservation Act. In that Act, Congress made it more difficult for States to obtain waivers of preemption. *See* National Appliance Energy Conservation Act § 327, 101 Stat. at 118. But the legislation also changed the object of preemption from "energy efficiency standard or similar requirement with respect to energy efficiency or energy use of a covered product" to "regulation concerning the energy efficiency or energy use of the covered product." *Id*.

The plaintiffs are incorrect to view this move away from "energy efficiency standard" as broadening the statute's preemptive effect. Appellants' Br. 38. Prior to 1987, the statute generally spoke of "energy efficiency standards," defined to include "performance standard[s] . . . which prescribe[] a minimum level of energy efficiency for a covered product, determined in accordance with [certain] test procedures." Energy Policy and Conservation Act § 327, 89 Stat. at 917. The 1987 amendments did away with the term "energy efficiency standard" in favor of "energy conservation standard"—a term encompassing not just energy efficiency and energy use standards, but also design requirements. Far from broadening the scope of preemption, the choice of "regulation concerning . . . energy efficiency or energy

use" in lieu of the new "energy conservation standard" was necessary to avoid preempting an additional area of state law. *See Association of Contracting Plumbers*, 2026 WL 1871692, at \*12.

**E.    This Court Should Align with the Second Circuit, Not the Ninth.**

The plaintiffs' brief relies heavily on the Ninth Circuit's decision in *California Restaurant Association v. City of Berkeley*, 89 F.4th 1094 (9th Cir. 2024), which interpreted EPCA's preemption clause using the colloquial meaning of "energy use," rather than the technical definition that Congress supplied. *Id.* at 1120. *City of Berkeley* is factually distinguishable because it involved an outright ban on natural gas piping in new construction. *See id.* at 1098. The Ninth Circuit itself has begun to limit the decision's scope. *See Rinnai Am. Corp.*, 2026 WL 1912093, at \*12. And, as a marker of its contentious nature, the court's denial of rehearing en banc prompted a robust dissent joined almost in its entirety by eight judges, with an additional three agreeing with that dissent. *See id.* at 1119-26 (Friedland, J., dissenting from denial of rehearing en banc) ("urg[ing] any future court that interprets the Energy Policy and Conservation Act not to repeat the panel opinion's mistakes'); *id.* at 1126 (statement of Berzon, J., respecting the denial of rehearing en banc).

Thus far, in addition to the district court in this case, other courts—including the Second Circuit—have declined to follow *City of Berkeley*. After that decision,

a flurry of preemption lawsuits were filed to challenge state and local building decarbonization regulations. Judge Friedland's dissent from the denial of rehearing en banc has largely guided courts in their interpretation of EPCA's preemption clause. *See Association of Contracting Plumbers*, 2026 WL 1871692, at *14; *Mulhern Gas Co. v. Mosley*, 798 F. Supp. 3d 304, 325 (N.D.N.Y. 2025), *aff'd sub nom. Association of Contracting Plumbers of the City of New York, Inc. v. City of New York*, No. 25-2041, 2026 WL 1871692 (2d Cir. June 30, 2026); *National Ass'n of Home Builders v. Montgomery County*, No. 8:24-cv-03024-PX, 2026 WL 817322, at *7 (D. Md. Mar. 25, 2026); *National Ass'n of Home Builders v. District of Columbia*, No. 24-cv-02942, 2026 WL 837674, at *7-8 (D.D.C. Mar. 26, 2026). Each of these courts rejected *City of Berkeley*'s broad view of EPCA's preemption clause. *See, e.g.*, *Association of Contracting Plumbers*, 2026 WL 1871692, at *14 (reasoning that the Ninth Circuit "ignored crucial text" and adopted an interpretation that would make the statute "incoherent"). This Court should do the same.

III. **THE ENERGY POLICY AND CONSERVATION ACT DOES NOT PROTECT THE ABILITY TO USE OR SELL NATURAL GAS APPLIANCES IN ALL SETTINGS.**

A recurring theme of the plaintiffs' case for preemption is that, as a practical matter, the BEPS regulation reduces the ability of building owners and other Marylanders to use gas-fueled products, or reduces the ability of manufacturers and

distributors to sell those products. *E.g.*, Appellants' Br. 16-17. Regardless of the form they take, these arguments do not establish preemption.

To begin, there is no textual basis for concluding that EPCA has a broad purpose of preserving consumers' access to gas-fueled products (or manufacturers' access to markets for such products), or that EPCA created a right for consumers to use whatever such products manufacturers are willing to supply. EPCA's statutory statement of purpose says nothing of the sort. *See* 42 U.S.C. § 6201 (listing purposes that include "to conserve energy supplies through energy conservation programs, and, where necessary, the regulation of certain energy uses" and "to provide for improved energy efficiency of motor vehicles, major appliances, and certain other consumer products"). As the Second Circuit observed, EPCA "contains no provisions which affirmatively protect consumers' ability to access covered products, nor does it include language affirmatively preserving manufacturers' ability to operate in static markets." *Association of Contracting Plumbers*, 2026 WL 1871692, at *7. To the contrary, EPCA "on a fundamental level . . . operates to *confine* the choices of consumers and manufacturers by setting standards." *Id.* (emphasis in original); *see id.* (rejecting the argument that Congress sought to preserve "consumer choice through the passage of a statute that says so little on the subject").

Indeed, EPCA and other federal energy laws include provisions confirming that the statute's focus is on energy conservation, rather than protecting a consumer's ability to use gas-powered products. For example, EPCA authorizes the Department of Energy to fund "renewable-resource energy measures," 42 U.S.C. § 6325(e)(1), defined as certain measures for pre-1976 buildings that "involve changing, in whole or in part, the fuel or source of the energy used to meet the requirements of such building or plant from a depletable source of energy to a nondepletable source of energy," *id.* § 6321(c)(7)(A). And in a related energy reduction law—the Energy Policy Act, which was passed in 1992 and amended in 2005—Congress mandated a building-level phase-out of fossil fuels for federal buildings. Specifically, after 2030, new federal buildings and major renovations must have zero fossil fuel-generated energy consumption. *Id.* § 6834(a)(3)(D)(i)(I). These provisions are inconsistent with the notion that, in EPCA, Congress broadly sought to preserve the market for, and availability of, gas-powered appliances. *See, e.g.*, *Wyeth v. Levine*, 555 U.S. 555, 574 (considering other enactments in rejecting a claim of federal preemption).

The plaintiffs' reliance on 42 U.S.C. § 6297(d)(1)(C)(ii), meanwhile, is misplaced. They cite that provision (among others) to support the theory that "Congress sought to protect" local consumers, businesses, and manufacturers, from "significant financial burdens" because the Department of Energy must consider the

38

"costs, benefits, burdens, and reliability resulting from the state regulation." Appellants' Br. 34. But this provision does not suggest a broad purpose of protecting against financial burdens. Instead, § 6297(d) specifies what the Department of Energy must consider when granting a State a *waiver* of federal preemption; consideration of "costs, benefits, burdens, and reliability" is part of the ultimate determination whether the state regulation is needed to meet unusual and compelling state or local energy or water interests. 42 U.S.C. § 6297(d)(1)(c)(ii). Rather than bear on the scope of preemption, consideration of "costs, benefits, burdens, and reliability" presupposes that the state regulation would otherwise be preempted in the first place.

The plaintiffs' reliance on 42 U.S.C. § 6295(o)(4) is likewise unavailing. *See* Appellants' Br. 33-34. As the plaintiffs note, EPCA prevents the Department of Energy from promulgating an energy conservation standard that "is likely to result in the unavailability in the United States in any covered product type (or class) of performance characteristics (including reliability), features, sizes, capacities, and volumes that are substantially the same as those generally available in the United States." 42 U.S.C. § 6295(o)(4). That provision merely establishes an outer limit for the Department's exercise of its regulatory authority: It cannot set energy conservation standards that are so stringent as to drive products with certain characteristics from the domestic market altogether, in the name of conserving

39

energy.  The provision does not protect the ability to sell or purchase products with particular characteristics apart from that extreme scenario.  It does not, for instance, preclude standards that may make it more difficult or expensive, or even impossible, for particular users or sectors to use certain kinds of products.   And it says nothing about regulations that are not directed toward energy conservation but, instead, aim to limit pollution.

Nor are the plaintiffs correct to contend that use of the term "concerning" in § 6297(c) pulls the BEPS regulation into EPCA's preemptive scope because the regulation produces "'the very effect that the federal law sought to avoid.'" Appellants' Br. 22 (quoting *Rowe*, 552 U.S. at 371).  EPCA's objective is not, as the plaintiffs would have it, to "protect product availability."   Appellants' Br. 12. Instead, its purpose is to conserve energy. *See Association of Contracting Plumbers*, 2026 WL 1871692, at *7.  And the purpose of the preemption provision is to preserve regulatory uniformity for manufacturers.  S. Rep. No. 100-6, at 4.

The plaintiffs' view of EPCA preemption, moreover, would have absurd results.  The nub of their theory is that regulations that have the effect of making gas-powered products financially unfeasible (or even just more expensive) for some users are preempted, regardless of those regulations' purpose.  That theory could sweep in virtually any state or local health, safety, or environmental law that restricts the use of EPCA-covered products.  For instance, state and local fire codes adopted

in accordance with traditional state police powers—such as those prohibiting the use of gas stoves in high-density residential or dormitory occupancies—would be preempted by EPCA. So would local prohibitions on indoor kerosene heaters, which could cause a fire that may "quickly escalate into a devastating event." *Association of Contracting Plumbers*, 2026 WL 1871692, at *13; *see id.* at 13 n.14 (observing that kerosene heaters are covered products for which the Department of Energy could issue energy conservation standards, even though it has not done so). Such absurd results should be avoided. *See, e.g.*, *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982).

Under a proper interpretation of EPCA, regulations such as these are not preempted even though they disincentivize or even prohibit the use of certain covered products. That is because they "serve a purpose that is distinct from, and not in conflict with, the purpose of EPCA," and therefore do not concern the energy use or energy efficiency of covered products. *Central Valley Chrysler-Jeep, Inc. v. Goldstene*, 529 F. Supp. 2d 1151, 1175 (E.D. Cal. 2007); *see also* Energy Conservation Program for Consumer Products, 47 Fed. Reg. at 14,456 (stating that "[a] rule whose purpose is other than energy efficiency[,] such as a law on fire safety, would not appear to be preempted by the Federal rule, even if it has a secondary and incidental effect of improving the efficiency of a covered product"). The same logic holds for regulations whose aim is to control pollution, rather than to conserve

energy; otherwise, all pollution regulations applying to facilities with EPCA-covered polluting products could be preempted. For that reason, it is immaterial whether (as the plaintiffs claim, *see* Appellants' Br. 16-19, 23-24, 35) the BEPS regulation results in a ban on certain EPCA-covered products by effectively setting an energy conservation standard of 0 kBtu/year for those products.

Nor does the BEPS regulation in fact do any such thing. The regulation, which applies to only a subset of buildings, does not require industry members to design or manufacture products with an energy use of 0 kBtu/year, and it does not require building owners to use only such products. Even in 2040, when the net-emissions cap declines to zero, owners can use gas-powered products as long as they capture those products' emissions or offset them with compliance fees. The BEPS regulation's focus remains on emissions, not "energy use" or "energy efficiency" of covered products.

## IV. THE STATUTE'S EXCEPTION FOR CERTAIN BUILDING CODES DOES NOT SUPPORT THE PLAINTIFFS' BROAD VIEW OF THE PREEMPTION PROVISION.

Alternatively, the plaintiffs advocate for preemption on the basis of the statute's exception for energy efficiency and energy use requirements contained within certain building codes. That exception provides no support for their position: whether the BEPS regulation comes within the exception is immaterial because (as explained above) it is not a regulation concerning "energy efficiency" or "energy

use" in the first place. And the existence of the exception does not suggest that the preemption provision is broad enough to encompass pollution regulations.

To begin, the building code exception in § 6297(f)(3) is just that: an exception. In 1987, Congress expressly authorized certain regulations concerning energy use or energy efficiency that are part of building codes, even though those regulations otherwise would have been preempted. Congress did so in recognition that "state and local building codes have a major impact on energy consumption." *Building Indus. Ass'n of Wash.*, 683 F.3d at 1148. At the same time, Congress insisted that regulations meet certain criteria to be exempted, *see* 42 U.S.C. § 6297(f)(3)(a)-(g), so as to prevent state building codes from requiring "the installation of covered products which have efficiencies exceeding the applicable Federal standard," S. Rep. No. 100-6, at 2. Nonetheless, the provision with affirmative preemptive force remains § 6297(c). The BEPS regulation does not fall within that provision's preemptive scope, so whether it meets any of the criteria of § 6297(f)(3) is beside the point.

Nor does the nature of the building code exception suggest that § 6297(c) is itself broad enough to encompass pollution control measures like the BEPS regulation. The building code exception does not control the scope of preemption, as the plaintiffs insist, *see* Appellant's Br. 29, for "[e]xceptions to a general rule,

43

while sometimes a helpful interpretive guide, do not in themselves delineate the scope of the rule." *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 264 (2013).

Regardless, that the BEPS regulation involves buildings does not make it comparable to provisions that would be preempted were it not for the building code exception. The BEPS regulation is not part of a building code at all. Building codes generally are characterized by specific, prescriptive requirements as to how a building is constructed or what it must contain, and they typically require permitting, plan approval, and inspections. The BEPS regulation does none of this. That it offers an alternative compliance pathway, moreover, is inconsistent with the idea that it is part of a building code, as owners cannot simply pay a fee to avoid compliance with, for example, Americans with Disabilities Act or safety requirements. The legislation underlying the BEPS regulation is not even found in Maryland's state building codes (which are codified in the Public Safety Article) but, instead, is part of the Environment Article.

Just as importantly, nothing about the substance of what is excepted suggests that the preemption provision encompasses pollution control regulations. To the contrary, the building code exception applies only to regulations that, by their terms, aim to conserve energy or limit energy consumption. *See, e.g.*, 42 U.S.C. § 6297(f)(3)(B) (code must "permit[] a builder to meet *an energy consumption or conservation objective* for a building by selecting items whose combined energy

efficiencies meet the objective" (emphasis added)); *id.* § 6297(f)(3)(C) (code must allow certain "credit to *the energy consumption or conservation objective*" (emphasis added)); *id.* § 6297(f)(3)(F) (requiring that "*[t]he energy consumption or conservation objective*" be "specified in [certain] terms" (emphasis added)).[3] The building code exception nowhere mentions regulations that are meant to control pollution and may also have the effect of reducing energy consumption.

To the extent that the exception implies that a particular category of regulations would otherwise fall within the statute's preemptive scope, it is certain state regulations that, unlike the BEPS regulation, are aimed at reducing energy consumption or promoting energy conservation. *See* S. Rep. No. 100-6, at 11 (stating that "[t]he limited requirements of [§ 6297(f)(3)] are designed to ensure the performance-based building codes cannot circumvent the federal standard for a given covered product by effectively requiring the installation of such product with an efficiency exceeding the applicable Federal standards or State standards for which a waiver from preemption has been obtained"). If anything, the criteria for satisfying the building code exception shed light on what kinds of regulations Congress *did*

---

[3] Similarly, the corresponding exception for industrial appliances applies only to a "standard"—i.e., an energy conservation standard—contained in a building code and thus suggests nothing about what regulations other than standards might be preempted. 42 U.S.C. § 6316(b)(2)(B)(i).

intend to preempt (absent the exception) and confirm that the BEPS regulation is not among them.

For similar reasons, the plaintiffs err in attempting to use the building code exemption as a reference point for the BEPS regulation. They suggest that because "gentle[]" regulations like those described by the building code exemption must satisfy a series of stringent criteria in order to avoid preemption, "harsh" regulations like the BEPS regulation that do not meet those criteria are necessarily preempted. Appellants' Br. 12. But the BEPS regulation and the building code exception operate along different axes altogether, with the former directed to emissions and the latter addressing regulations that are directed to energy consumption. It therefore makes little sense to characterize the BEPS regulation as "harsher" than a regulation at the outer edge of the building code exemption.

## V. THE BUILDING ENERGY PERFORMANCE STANDARDS REGULATION CANNOT BE PREEMPTED BECAUSE OF ITS APPLICATION IN PARTICULAR CIRCUMSTANCES.

Finally, even if the impact of the BEPS regulation's impact on energy efficiency or energy use might raise questions about preemption, there is a fundamental mismatch between EPCA's preemption provision and the sort of challenge that the plaintiffs raise. The preemption provision is cast in terms of facial invalidity, in that preemption depends on whether a "regulation" concerns a covered product's energy efficiency or energy use. 42 U.S.C. § 6297(c). But here, even

under the plaintiffs' preferred construction of "energy use," it is only the regulation's application in particular circumstances that might raise concerns. That is because building owners have compliance options other than ceasing reliance on natural gas—a fact that defeats the plaintiffs' assertion that greenhouse gas emissions are just a "proxy" for energy use. Appellants' Br. 51.

For example, a building owner can opt for alternative compliance payments ($230/metric ton of $CO_2e$ initially) in lieu of reducing emissions. *See* COMAR 26.28.04.01A(2). As the district court observed, this payment is a non-penal, elective compliance path. (JA36-37.) Paying these fees is not a penalty for failing to comply; it is itself a means of compliance. *Compare* 42 U.S.C. § 6303(a), (d) (authorizing civil penalties for EPCA violations and providing a framework for assessing those penalties).

A building owner also can use gas appliances while operating localized carbon-capture technology to prevent greenhouse gases from entering the atmosphere. (JA43.) Indeed, plaintiff Washington Gas Light Company advocated for this exact compliance mechanism during the public comment period. (JA5.) The regulation imposes no limit on a building owner's ability to comply in this manner. And the plaintiffs could hardly be more mistaken in likening the cost of carbon capture to a fee. *See* Appellants' Br. 18, 43. Instead, carbon capture is a solution

47

that prevents emissions from reaching the atmosphere (JA35-36), thus directly alleviating the harms that the BEPS regulation is meant to address.

Further, a building owner can reduce the building's direct greenhouse gas emissions reductions through weatherization measures, such as improvements to insulation and ventilation. (JA31.) Solutions such as these reduce emissions by reducing a building's energy needs, irrespective of whatever covered products (or energy sources) an owner may elect to use.

The BEPS regulation, in short, provides ample opportunity for building owners to comply without switching from natural gas. It is agnostic as to the mechanical design, energy use, or energy efficiency of any specific appliance, and permits covered building owners to continue using gas appliances while fully complying. While some owners may choose to electrify by 2040 to reduce their buildings' direct greenhouse gas emissions to zero, others may comply without changing their buildings' operations in this manner, or may employ a mix of compliance strategies.

Even under the plaintiffs' theory, then, it is not the *regulation* that might concern the energy use of covered products; it is only the regulation's *application* to owners who must switch from natural gas in order to comply—and even then, the regulation might be of concern only to the extent that those owners do not also choose other means of compliance. At the same time, the deadline for building

owners to reduce their net direct emissions to zero is more than 13 years away, so the regulation's actual effects are necessarily a matter of speculation. Under these circumstances, it cannot be said that the BPS regulation itself, as distinct from its application in particular circumstances, is one that impermissibly concerns the energy use or energy efficiency of covered products.

## CONCLUSION

The judgment of the United States District Court for the District of Maryland should be affirmed.

## REQUEST FOR ORAL ARGUMENT

Appellee requests oral argument in this matter, as it involves a challenge to the validity of state regulations that implement an important statutory scheme.

Respectfully submitted,

ANTHONY G. BROWN
Attorney General of Maryland

/s/ Doris N. Lange
_____

DORIS N. LANGE
KRISTEN M. SUMMERS
Assistant Attorneys General
1800 Washington Boulevard
Baltimore, Maryland 21230
doris.lange@maryland.gov
kristen.summers@maryland.gov
(410) 537-3038
(410) 537-3943 (facsimile)

Attorneys for Appellee

**CERTIFICATE OF COMPLIANCE**

1.      This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 11,126 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.      This response complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because this response has been prepared in a proportionally spaced typeface in 14-point Times New Roman.

/s/ Doris N. Lange
_____
Doris N. Lange