## 26-1552

IN THE UNITED STATES COURT OF APPEALS FOR THE
FOURTH CIRCUIT

Maryland Building Industry Association, Inc. et al.,

*Plaintiffs-Appellants,*

v.

Serena Coleman McIlwain,

*Defendant-Appellee*

On appeal from the United States District Court for the
District of Maryland

**BRIEF OF *AMICUS CURIAE* PUBLIC HEALTH LAW CENTER
SUPPORTING DEFENDANT-APPELLEE AND AFFIRMANCE**

Esther Agbaje
Daniel Carpenter-Gold
Shannon Wolf

Public Health Law Center
875 Summit Ave.
St. Paul, MN 55105
(651) 290-6329

*Attorneys for* Amicus Curiae *Public Health Law Center*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __26-1552__        Caption: __Maryland Building Industry Association et al. v. McIlwain__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Public Health Law Center__
(name of party/amicus)

who is _____amicus_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

12/01/2019 SCC                                                - 1 -

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☐NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: _____  Date: _____8/5/26_____

Counsel for: Public Health Law Center

- 2 -

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................... ii

STATEMENT OF IDENTIFICATION .................................................................1

SUMMARY OF ARGUMENT ............................................................................1

ARGUMENT .......................................................................................................2

    I.    Maryland's BEPS Policy Does Not Conflict With EPCA ...........................2

        A.  EPCA's Legislative History Does Not Support Appellants' Interpretation 3

        B.  EPCA Regulates Covered Appliances, Not Fuel Types ..............................5

        C.  The BEPS Regulation Is Not a Ban, Nor Does It Create a Regulatory Patchwork ..................................................................................................6

    II.   The Ninth Circuit's Interpretation of EPCA in *Berkeley* Has Been Repeatedly Rejected and is Inapplicable to This Case ........................................10

        A.  All post-Berkeley Decisions Outside the Ninth Circuit Have Rejected That Court's Interpretation of EPCA .........................................................10

        B.  Maryland's BEPS Policy is Clearly Distinguishable from the Challenged Law in Berkeley .............................................................................................16

    III.  Appellants' Interpretation of EPCA Preemption is Unworkable and Unsupported.......................................................................................................18

        A.  Appellants Read EPCA to be Unworkably Broad ....................................18

        B.  Appellants' Mischaracterizations of EPCA and of Maryland's BEPS are Unsupported .............................................................................................22

        C.  Appellants Erroneously Suggest That EPCA Aims to Preserve the Availability of Gas Appliances Over Others—It Does the Opposite ...............25

CONCLUSION ....................................................................................................27

i

# TABLE OF AUTHORITIES

### Cases

*Ass'n of Contracting Plumbers of City of New York, Inc. v. City of New York*, No. 23-CV-11292 (RA), 2025 WL 843619 (S.D.N.Y. Mar. 18, 2025)......................20

*Ass'n of Contracting Plumbers of the City of New York, Inc. v. City of New York*, 180 F.4th 434 (2026) ........................... 3, 6, 7, 8, 11, 12, 13, 15, 20, 22, 23, 24, 27

*California Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094 (9th Cir. 2024)....... 10, 16

*Clean Energy Choice Coalition v. Village of Oak Park, Illinois,* No. 25-CV-04353, 2026 WL 2205908 (N.D. Ill. July 30, 2026) ........................................................15

*Exxon Mobil Corp. v. E.P.A.*, 217 F.3d 1246 (9th Cir. 2000) .................................18

*Fed. Trade Comm'n v. Pukke*, 53 F.4th 80 (4th Cir. 2022).......................................8

*Gonzalez v. Sessions*, 894 F.3d 131, 138 (4th Cir. 2018)..........................................8

*Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186 (1974).......................................25

*Nat'l Ass'n of Home Builders of the United States v. District of Columbia*, No. 24-CV-02942 (ACR), 2026 WL 837674 (D.D.C., 2026)............................ 14, 15, 22

*Nat'l Ass'n of Home Builders of United States v. Montgomery Cnty*, No. 8:24-CV-03024-PX, 2026 WL 817322 (D. Md. Mar. 25, 2026) ........................................14

*Rinnai Am. Corp. v. S. Coast Air Quality Mgmt. Dist.*, No. 25-5129, 2026 WL 1912093 (9th Cir. July 2, 2026)..................................................... 5, 9, 16, 17, 19

*S. Blasting Servs., Inc. v. Wilkes Cnty.*, NC, 288 F.3d 584 (4th Cir. 2002) ............18

### Statutes

42 U.S.C. § 6291(4) ...................................................................................... 11, 12

42 U.S.C. § 6292(a)(12).........................................................................................20

42 U.S.C. § 6293(b)(3)......................................................................11

42 U.S.C. § 6297(b) ...........................................................................1

42 U.S.C. § 6297(c) ................................................................ 1, 6, 23

42 U.S.C. § 6297(f) .............................................................................4

42 U.S.C. § 6297(g) ...........................................................................12

42 U.S.C. § 6316 ................................................................................1

42 U.S.C. § 6325(e)(1).......................................................................26

42 U.S.C. § 6834(a)(3)(D)(i)(I) .........................................................26

42 U.S.C. § 7401(a)(3).......................................................................18

### Session Laws and Legislative Materials

H.R. 5465, 99th Cong. § 7 (1986)......................................................25

H.R. Rep. No. 100-11 (1987)...............................................................5

National Energy Conservation and Policy Act, Pub. L. No. 95-619, § 102(a)(3), 92 Stat. 3206 (1978) ..........................................................26

S. Rep. No.100-6 (1987) ..................................................................3, 4

### Other Authorities

Berkeley Mun. Code § 12.80.040(A)...................................................16

Berkeley Mun. Code § 12.80.040(E)...................................................16

Katherine M. Noonan, Bldg. Owners and Managers Ass'n Int'l, Green Lease Guide (2018)...................................................................................9

Md. Code Regs. § 26.02.03................................................................19

Md. Code Regs. § 26.28.01........................................................ 1, 3, 6

iii

Md. Code Regs. § 26.28.02.................................................................................1, 6

Md. Code Regs. § 26.28.03....................................................... 1, 3, 6, 16

Md. Code Regs. § 26.28.04........................................................ 1, 6, 17

Ruth Ann Norton et al., Green & Healthy Homes Initiative, Weatherization and Its Impact on Occupant Health Outcomes (2017) ......................................................7

## STATEMENT OF IDENTIFICATION

The Public Health Law Center (Center) is a public interest legal resource center dedicated to improving health through the power of law and policy. The Center helps local, state, national, Tribal, and global leaders promote health by strengthening public policies. These policies include regulations that reduce indoor and outdoor pollution caused by the combustion of certain fuels, such as the challenged regulation in this case. The Center is also concerned with preserving the power of state and local governments to protect their constituents through regulations that protect public health. The Center files this brief with the consent of all parties.[1]

## SUMMARY OF ARGUMENT

Maryland's Building Energy Performance Standards (BEPS), Md. Code Regs. §§ 26.28.01.01 *et seq.* (2025), do not "concern[]" the energy efficiency or energy use of appliances for the purposes of the Energy Policy and Conservation Act (EPCA), 42 U.S.C. §§ 6297(b), (c), 6316. The BEPS set net greenhouse gas emissions targets for buildings which decline over time, eventually reaching zero. The program, designed for "maximum flexibility," Md. Code Ann., Env't § 2-1602(c)(2)(vi), offers a variety of options to meet these targets; it also specifies

---

[1] No party's counsel authored this brief in whole or in part. No party's counsel, or any person other than the Center, contributed money intended to fund the preparation or submission of this brief.

exemptions for certain buildings that cannot meet those targets. If building owners prefer, they may also simply pay an alternative compliance fee designed to offset the cost of their excess emissions rather than meeting the targets directly. Thus, the BEPS have only a distant connection to the energy efficiency or energy use of any particular appliance, and certainly none that would bring them within the scope of EPCA's preemption provisions.

Appellants attempt to expand EPCA's preemptive scope to all state and local regulations that "restrict and penalize" either the use of EPCA-covered appliances or the use of particular types of energy. Opening Br. of Appellants, ECF No. 26 (Appellants' Br.), at 23. This is not the correct test for EPCA preemption, as both the plain statutory language and the legislative history demonstrate. *See generally* Br. of Appellee, ECF No. 35 (Appellee's Br.). Moreover, this interpretation would threaten Maryland's ability to regulate in several core areas of state authority, such as health and safety standards. Congress could not possibly have intended this result and therefore it cannot be the correct reading of the law. The Center therefore urges the Court to affirm the District Court's judgment.

## ARGUMENT

### I. Maryland's BEPS Policy Does Not Conflict With EPCA

Appellants' interpretation of EPCA is unfounded. The law preempts states and local governments from regulating appliance efficiency standards, but it does

not and cannot preempt the BEPS. Appellants' Br. at 16-17. *See generally Ass'n of Contracting Plumbers of the City of New York, Inc. v. City of New York*, 180 F.4th 434, 440 (2026) [hereinafter *NYC*] (rejecting similar arguments). Maryland's BEPS create greenhouse gas emissions targets for certain large buildings in the state. Specifically, the BEPS apply to certain buildings and groups of buildings that have at least 35,000 square feet of gross floor area and are used for one or more designated purposes, such as multifamily housing, offices, or retail stores. *See* Md. Code Regs. §§ 26.28.01.02(B)(15), 26.28.03.02(A), tbl. 1. These provisions do not regulate appliance efficiency standards, which is the extent of EPCA's preemption. EPCA therefore does not, and is not intended to, preempt Maryland's BEPS.

A. *EPCA's Legislative History Does Not Support Appellants' Interpretation*

Congress wrote EPCA as a response to the national energy crisis in the 1970s. *E.g.*, *NYC*, 180 F.4th at 442. The purpose of its preemption provision was to "reduce the Nation's consumption of energy" and reduce "burdens on the appliance manufacturing industry" by establishing "national energy conservation standards." S. Rep. No. 100-6, at 2 (1987). As the Second Circuit put it:

> EPCA, at its core, sets energy conservation standards. It contains no provisions which affirmatively protect consumers' ability to access covered products, nor does it include language affirmatively preserving manufacturers' ability to operate in static markets.

*NYC*, 180 F.4th at 443. Maryland's BEPS do not regulate energy conservation standards and therefore do not overlap with EPCA.

3

The legislative record supports the reading that EPCA preemption does not apply to standards like the BEPS. First, the record shows an intent to preempt only regulations that directly address appliances, which the BEPS do not. The National Appliance Energy Conservation Act of 1987 (NAECA), the source for the preemption language at issue here, was specifically written to counteract the trend of "separate State *appliance* standards." S. Rep. No.100-6, at 4 (1987) (emphasis added). The preemption provision itself is described as affecting "State *appliance* efficiency regulations or requirements." *Id*. at 9 (emphasis added). Similarly, the regulatory impact evaluation for NAECA describes it as preempting "State *appliance* efficiency regulations." *Id*. at 13 (emphasis added). Conversely, there is no indication that Congress intended to preempt regulations that do not regulate specific appliances. Even the exemption for building codes, 42 U.S.C. § 6297(f), was included to protect codes that "regulate the energy efficiency of *central heating and cooling equipment and water heaters*"; that is, NAECA's building-codes provision anticipates protecting building codes with provisions that regulate specific appliances, not regulations like the BEPS that apply only to buildings as a whole. S. Rep. 100-6, at 10 (emphasis added).

It is likewise clear that Congress only intended NAECA to preempt regulations that prescribed specific design or performance requirements to appliances. A House committee report describes the "efficiency standards" that

4

NAECA preempts as "design requirements or minimum efficiency requirements for appliances"; in other words, "actual baseline, minimum requirements for [a] covered product." H.R. Rep. No. 100-11, at 18, 24 (1987). This description matches the intent behind NAECA preemption, namely, to avoid "a patchwork of numerous conflicting State requirements." *Id*. at 24.

### B.  EPCA Regulates Covered Appliances, Not Fuel Types

EPCA regulates the manufacture of covered appliances. Manufacturers must meet EPCA's regulatory standards whether they make appliances that use gas, electricity, or other fuel sources. These appliance standards are made national and uniform to benefit manufacturers, ensuring that they do not need to create different products for different states. *Rinnai Am. Corp. v. S. Coast Air Quality Mgmt. Dist.*, No. 25-5129, 2026 WL 1912093, at *7 (9th Cir. July 2, 2026) [hereinafter *Rinnai Am. Corp.*] (noting EPCA's purpose to establish "uniform conservation standards to remedy the patchwork of different state standards that existed under the previous regime"). The preemptions and exemptions listed in EPCA therefore pertain to the covered appliances—not to emission standards for buildings. Thus, Appellants conflation of regulations focused on appliances with regulations focused on emissions, Appellants' Br. 16-20, is not supported by the statute.

Appellants argue that Maryland's BEPS "concern[]" the "energy use" of covered appliances, as would be preempted by EPCA. Appellants' Br. 20-24; *see*

5

*also* 42 U.S.C. § 6297(c). While the term "concerning" does expand the meaning of a section in a statute, the court below was correct in finding that the BEPS do not "concern" this prohibited area by any legal definition. JA017-034; *see generally* Appellee's Br. 18-30. This is, in part, because the BEPS are concerned with emissions stemming from appliances' consumer use, whereas EPCA's preemption of "energy use" regulations "refers to a metric determined before an appliance ever reaches consumers." *NYC*, 180 F.4th at 451. Further, the BEPS do not even reference any particular appliance, EPCA-covered or otherwise. Rather, the BEPS regulate emissions from buildings and allow building owners varied options to comply. *See generally,* Md. Code Regs. §§ 26.28.02; 26.28.04.

### C. The BEPS Regulation Is Not a Ban, Nor Does It Create a Regulatory Patchwork

Maryland's BEPS aim to reduce greenhouse gas emissions of certain large buildings in the State of Maryland. They set targets for those buildings' net greenhouse gas emissions, which vary based on building type and year but which all decline to zero in the year 2040. *See* Code Md. Regs. §§ 26.28.01.02(B)(15), 26.28.03.02(A), tbl. 1, (D). Nothing in the regulations specifies the method required to achieve the new standards. In fact, the BEPS offer varied options to comply with the regulations without having to change any operations within the building. Md. Code Regs. § 26.28.04.02. Therefore, the BEPS are not an effective

6

ban on gas appliances. Further, the BEPS do not create a regulatory patchwork for manufacturers, as Maryland's law does not require any equipment modifications.

   i.  BEPS are Not a Ban on Gas Appliances, and the Compliance Fee is Not a Penalty

Appellants write much about the claim that the BEPS must be a de facto ban on gas appliances, and that they therefore are preempted by EPCA. Appellants' Br. 16, 18, 23, 24, 35. Both assertions are incorrect. State and local laws prohibiting gas-powered appliances are not preempted by EPCA. *NYC*, 180 F.4th at 454. Were this not the case, the BEPS still would not be preempted by EPCA because they do not amount to a ban. Maryland's law does not prohibit the use of any products, nor does it specify how regulated buildings must meet the new emissions standards. For example, buildings can meet their emissions targets through weatherization measures like insulation and ventilation improvements—which will also improve health outcomes for the people that live and work in these buildings. *See generally*, e.g., Ruth Ann Norton et al., Green & Healthy Homes Initiative, Weatherization and Its Impact on Occupant Health Outcomes (2017).[2] Additional approaches to reducing emissions, including the use of biomethane or carbon capture, are under

---

[2] *Available at* https://www.greenandhealthyhomes.org/wp-content/uploads/ Weatherization-and-its-Impact-on-Occupant-Health_Final_5_23_2017_online.pdf.

development. JA43. Given these varied compliance pathways, the BEPS cannot be considered a de facto ban on gas appliances.

It is possible that building owners may decide to comply with the BEPS by switching from gas appliances to those powered by electricity or another renewable energy source. EPCA cannot be read to preempt such individual consumer choices in the marketplace. *NYC*, 180 F.4th at 443. By claiming that the BEPS impermissibly steer consumers away from gas appliances, Appellants are asking the court to read into EPCA a provision that protects the gas industry—a provision that does not exist. *See infra* § III(C). Rather, as stated by the Second Circuit, "it is clear that EPCA's 'objectives' were to establish a standardized set of performance standards for covered appliances to promote energy conservation." *NYC*, 180 F.4th at 444. The BEPS do not block this objective.

Appellants' claim that the BEPS prohibit gas appliances rests in part on their assertion that the BEPS compliance fee is a penalty. Appellants' Br. 42-43. This is not true. Building owners that comply by paying a fee in lieu of meeting their targets are still in compliance with the law. The fee is not a punishment for a violation or a wrong committed. *See Gonzalez v. Sessions*, 894 F.3d 131, 138 (4th Cir. 2018) (penalties are "sought for the purpose of punishment"); *Fed. Trade Comm'n v. Pukke*, 53 F.4th 80, 109 (4th Cir. 2022) ("A penalty redresses a 'wrong to the public' for violation of public laws." (quoting *Kokesh v. S.E.C.*, 581 U.S.

455, 461 (2017)). This distinction is relevant in practice, as well: Model leases have already been designed so that building owners can pass on such fees to commercial tenants as compliance costs, rather than as penalties for violations of law. *See, e.g.*, Katherine M. Noonan, Bldg. Owners and Managers Ass'n Int'l, Green Lease Guide 21-23 & n.102 (2018).[3] The alternative compliance fee simply offers another option for building owners to be in full compliance with the BEPS without changing any building operations.

### ii. Different Emissions Regulations Do Not Create a Regulatory Patchwork for Appliance Manufacturers

EPCA's history makes clear that the law's purpose is to prevent a patchwork of manufacturing standards for appliance energy conservation around the country. *Rinnai Am. Corp.*, 2026 WL 1912093, at *7. The text of EPCA's preemption provision underscores this fact. *Id.* The BEPS, by setting targets for building emissions, do not interfere with this purpose. Building owners can lower emissions using alternative approaches such as updating the building envelope or switching from gas appliances to electric, pay the alternative compliance fee, or seek an exemption waiver. None of those options require manufacturers of gas appliances, or any other type of appliance, to manufacture separate products for the state of Maryland, and therefore the BEPS do not create any risk of conflicting standards.

---

[3] *Available at* https://boma.org/wp-content/uploads/2024/11/BOMAgreenLeaseGuide-hr.pdf.

The BEPS are therefore unlike the sort of efficiency standards that EPCA preempts. For example, if one state were to require 85% efficiency for gas furnaces and another state to require 86% efficiency, a furnace manufacturer would either need to conform to the more stringent state's requirements or split their product lines into two very similar sub-categories for the two states, with all the attendant logistical difficulties and economic inefficiencies. But manufacturers face no such restriction under the BEPS—they can sell the exact same appliances in Maryland as they could sell to any other state. And if another state passes a similar set of standards with, say, different net greenhouse gas emissions targets, manufacturers will still be free to sell the same product lines in both states.

## II. The Ninth Circuit's Interpretation of EPCA in *Berkeley* Has Been Repeatedly Rejected and is Inapplicable to This Case

### A. All post-*Berkeley* Decisions Outside the Ninth Circuit Have Rejected That Court's Interpretation of EPCA

Appellants rely heavily on the analysis in *California Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094 (9th Cir. 2024) [hereinafter *Berkeley*], to support their position. Appellants' Br. 23, 27, 29, 51. However, the *Berkeley* interpretation of EPCA preemption has been rejected by every court to have heard it, and the Ninth Circuit itself declined to expand it to new contexts.

Recently, the Second Circuit split from *Berkeley* and upheld two district court holdings, finding that EPCA did not preempt laws prohibiting either the use

10

of fossil fuels in new buildings or the installation of fossil fuel equipment in new buildings, respectively. *NYC*, 180 F.4th at 436. The court reasoned that "[t]he statute does not directly regulate the availability of fossil-fuel-powered appliances, and its express preemption provision does not extend to laws far beyond its defined regulatory reach." *Id.* at 438. Specifically, the court addressed the definitions of "energy use," "point of use," and "concerning," finding that EPCA's preemption provision does not apply to the challenged laws.

First, the court rejected the argument that "energy use" refers to the consumer use of a product. Instead, the court found that "a product's 'energy use' is a standardized, fixed measure assigned to a product before it reaches consumers." *Id.* at 439. The court reached this conclusion through examination of the statute's plain text, which defines "energy use" as "the quantity of energy directly consumed by a consumer product at point of use, *determined in accordance with test procedures* under section 6293." 42 U.S.C. § 6291(4) (emphasis added). The "test procedures" referred to in that definition measure "energy use… during a representative average use cycle or period of use." 42 U.S.C. § 6293(b)(3). Therefore, the court reasoned, it would make no sense for "energy use" to refer to a product's application in the hands of consumers, as "those test procedures are designed to *replicate* the appliance's average use, meaning the tests are performed in a controlled setting[.]" *NYC*, 180 F.4th at 439.

11

The court leveraged several other contextual clues throughout the statute to support this interpretation. For example, the text provides that manufacturers' disclosure of a product's energy use does not constitute a warranty "that such energy use … will not be exceeded under conditions of actual use." 42 U.S.C. § 6297(g). The court reasoned that this provision makes no logical sense unless "energy use" and "actual use" are distinct values. *NYC*, 180 F.4th at 440. Additionally, the court pointed to multiple provisions within the statute that require covered products' "energy use" to be determined *before* reaching consumers, meaning EPCA cannot possibly be referring to consumer use in its definition of "energy use." *Id*. at 339-40.

Second, the court rejected the Ninth Circuit's definition of "point of use." Again, "energy use" is defined as "the quantity of energy directly consumed by a consumer product at *point of use*, determined in accordance with test procedures under section 6293." 42 U.S.C. § 6291(4) (emphasis added). The court contended that, in finding EPCA to be "concerned with the end-user's ability to use installed products at their intended final destinations" due to the phrase "point of use," the Ninth Circuit erroneously ignored the second clause of that definition. *NYC*, 180 F.4th at 450 (citing *Berkeley*, 89 F.4th at 1101-02). Thus, the court reiterated, "the statutory definition and its reliance on 'test procedures' is simply incompatible with the idea that 'energy use' refers to the energy an appliance consumes at its

12

'intended final destination[].'" *Id.* at 451 (citing *Berkeley,* 89 F.4th, at 1102). Additionally, the court sided with Judge Friedland's dissent from *Berkeley*, finding that the Ninth Circuit had overlooked the technical, textual meaning of "point of use" that it was bound to honor. *Id.* at 451-52.

Third, the court found that EPCA's preempted regulations do not share enough of a nexus with the challenged laws to meet the provision's threshold of "concerning." *Id.* at 441. While acknowledging that the term is not necessarily the same as "relating to," *id.* at 441 n.4, the court determined that even under the test of "relating to" the challenged laws were not preempted. The panel found that they are not impermissibly "connected to" EPCA's subject matter because EPCA does not have the objective of preserving consumer choice that plaintiffs suggest, and because the challenged laws don't have an effect of influencing manufacturing or consumer choices with respect to energy consumption or conservation. *Id.* at 443-45. Further, the court reasoned, the challenged laws do not "reference" energy use because they have no effect on appliances' "energy use" as technically defined by the statute, and because there are plausible purposes for the challenged laws other than regulating appliances' energy use. *Id.* at 445-46.

Similarly, the U.S. District Court of Maryland relied on Judge Friedland's dissenting view in *Berkeley* in deciding that an all-electric mandate for certain new buildings was not preempted by EPCA. *Nat'l Ass'n of Home Builders of United*

13

*States v. Montgomery Cnty.*, No. 8:24-CV-03024-PX, 2026 WL 817322, at *7 (D. Md. Mar. 25, 2026), *on appeal*, No. 26-1449 (4th Cir.). Like the Second Circuit, the court took issue with the plaintiff's colloquial interpretation of "energy use," finding that the statute's technical definition takes precedent. *Id.* at *6. Additionally, the court mirrored the Second Circuit's reasoning that, if "energy use" referred to the consumer's use of the product, the statute's requirement to meet "energy-use testing standards" would be literally impossible to meet. *Id.*

The U.S. District Court of D.C. applied similar reasoning to find that a D.C. prohibition on gas appliances in some new construction was not preempted by EPCA. *Nat'l Ass'n of Home Builders of the United States v. District of Columbia*, No. 24-CV-02942 (ACR), 2026 WL 837674, at *1 (D.D.C., 2026), *on appeal*, No. 26-7050 (D.C. Cir.) [hereinafter *D.C.*]. That court reasoned that although the challenged law "mandates that gas appliances cannot be used in certain buildings … it says nothing about the performance standards the appliances must meet when used elsewhere" as would be preempted by the EPCA. *Id.* at *1. The court further explained that "EPCA preempts regulations that govern the design, manufacture, and production of an appliance—i.e., colloquially, how it 'performs' … under 'simulat[ed]' test conditions, not in other settings." *Id.* at *6. Finding that "'point of use,' properly defined in the EPCA context, has nothing to do with an appliance's use at the place it is used[,]" the court held that the challenged law had

14

no such impermissible impact and therefore could not be preempted by the federal statute. *Id.* at *8.

Most recently, the Northern District of Illinois upheld a village ordinance prohibiting fossil fuels in certain new buildings was upheld against an EPCA preemption challenge. *Clean Energy Choice Coalition v. Village of Oak Park, Illinois,* No. 25-CV-04353, 2026 WL 2205908, at *9 (N.D. Ill. July 30, 2026). The court adopted the Second Circuit's reasoning in *NYC,* finding "that 'energy use' in EPCA refers to a predetermined value that is assigned to a product before it reaches consumers[,]" and that therefore EPCA preemption does not extend to regulations of consumer fossil fuel use. *Id.* at *8. The court further reasoned that EPCA's "building code exemption illustrates that Congress intended to preempt regulations that mandate installation of appliances with energy efficiency exceeding predetermined federal standards … The [challenged fossil fuel ban] is not one such regulation." *Id.* at *9.

If this Court finds it necessary to resolve the question, then the clear weight of authority and reasoning favors rejecting Appellants' argument that EPCA preempts prohibitions on fossil-fuel appliances. As described above, no other courts have adopted the *Berkeley* panel's reading of EPCA. Eleven Ninth Circuit judges either joined or supported an opinion "urg[ing] any future court that interprets [EPCA] not to repeat the [*Berkeley*] panel opinion's mistakes." *Berkeley*,

15

89 F.4th at 1120 (Friedland, J., dissenting from denial of rehearing en banc); *id.* at 1126 (Berzon, J., respecting denial of rehearing en banc). And the sole post-*Berkeley* Ninth Circuit opinion on EPCA preemption emphasized the limitations of *Berkeley* and declined to expand it to new contexts. *Rinnai Am. Corp.*, 2026 WL 1912093, at *7-9; *see also id.* at *15 n.1 (Lee, J., dissenting) (acknowledging that "if we look at the entire structure and context of [EPCA], then perhaps 'energy use' should be read more narrowly such that it is tailored to energy efficiency").

B.  *Maryland's BEPS Policy is Clearly Distinguishable from the Challenged Law in Berkeley*

Even if it were legally sound, the Ninth Circuit's opinion in *Berkeley* would not apply to Maryland's BEPS. The City of Berkeley ordinance at issue in *Berkeley* was a "building code," according to the Ninth Circuit, *e.g.*, 89 F.4th at 1098, which prohibited newly constructed buildings from including natural gas infrastructure, including "fuel gas piping … extending from the point of delivery at the gas meter[.]" Berkeley Mun. Code §§ 12.80.040(A), (E) (2019) (repealed 2024). In stark contrast, the BEPS cap greenhouse gas emissions from certain buildings, saying nothing of any specific equipment or infrastructure. Md. Code Regs. § 26.28.03.02.

Unlike the ordinance at issue in *Berkeley*, Maryland's BEPS do not prohibit the use of gas or gas appliances. *See supra* § I(C)(i). The BEPS do not require regulated entities to stop using any particular appliance. Md. Code Regs.

16

§§ 26.28.04.01 *et seq*. It is possible for a regulated entity to comply fully with the regulation without changing any aspect of its EPCA-covered appliances, by changing the fuel used, capturing the carbon, or making an alternative compliance payment. *Id.*; *see also* Appellee's Br. 47-48. Thus, *Berkeley* is not relevant to them.

The Ninth Circuit's decision in *Rinnai Am. Corp.* emphasizes this point. In that case, the panel distinguished the type of regulation preempted under *Berkeley*—which "physically block[s] otherwise available energy from reaching its end destination" and prohibited "the natural gas infrastructure that supplied gas into appliances"—from an appliance emissions regulation, which "does not regulate the 'energy use' of covered appliances at all" because it "presents no physical barrier to the use of natural gas" and ultimately regulates the emissions "output," rather than the energy input, of appliances. *Rinnai Am. Corp.*, 2026 WL 1912093, at *11. Additionally, the court noted plaintiffs' inability "to identify anything in EPCA's text, structure, or history indicating a congressional desire to preempt appliance *emissions* regulations[.]" *Id.* at *10 (emphasis added). Taken together, the court found that an appliance emissions regulation did not fall within *Berkeley*'s "very narrow" scope. *Id.* The BEPS are much more similar to the emissions regulation in *Rinnai* than the prohibition on appliances in *Berkeley*: they do not "physically block" any energy from reaching any appliance, and the energy

17

targets they set are on the output, not the input of appliances. Thus, even the Ninth Circuit's caselaw would not apply *Berkeley* to the BEPS.

## III.   Appellants' Interpretation of EPCA Preemption is Unworkable and Unsupported

States have broad authority to protect the environment for their residents, including air quality. *Exxon Mobil Corp. v. E.P.A.*, 217 F.3d 1246, 1255 (9th Cir. 2000) ("Air pollution prevention falls under the broad police powers of the states, which include the power to protect the health of citizens in the state"); *see also S. Blasting Servs., Inc. v. Wilkes Cnty.*, 288 F.3d 584, 590 (4th Cir. 2002) ("States have long possessed primary responsibility in our federal system for protecting the health and safety of their citizens"). In fact, the Clean Air Act explicitly states "that air pollution prevention … and air pollution control at its source is the primary responsibility of States and local governments." 42 U.S.C. § 7401(a)(3). Here, Appellants misinterpret a narrow preemption provision in EPCA to encroach on a vast swath of police powers reserved to the states, including the right to regulate air quality. To support their position, Appellants rely on a series of unsupported mischaracterizations of both EPCA and Maryland's BEPS.

### A.   Appellants Read EPCA to be Unworkably Broad

Appellants assert that Maryland does not have the right to regulate the "natural byproducts" of EPCA-covered appliances. Appellants' Br. 16. In doing so, Appellants quickly encroach on state regulation of public health. EPCA-covered

18

appliances have many natural byproducts which state governments regulate. As

discussed *supra* at § II(B), the Ninth Circuit has already rejected an effort to use

EPCA preemption to invalidate air pollution regulations. *Rinnai Am. Corp.*, 2026

WL 1912093. A wide variety of other regulations would also be called into

question under this theory, however—any imaginable byproduct of using an

EPCA-covered appliance would no longer be regulable by state or local

governments.

To take one example: Appellants' theory would lead to EPCA preempting

Maryland's noise regulations. Maryland limits the aggregate amount of permissible

noise in most cases to between 55 and 75 A-weighted decibels (dbA), depending

on the area and the time of day. Md. Code Regs. § 26.02.03.02(B). These noise

standards function similarly to the BEPS' greenhouse gas emissions targets, in that

both limit aggregate emissions from appliances without regulating those

appliances. Louder EPCA-covered appliances, such as industrial air compressors,

cannot operate at all without taking other compensating measures to reduce noise

emissions.[4] Other EPCA-covered appliances, such as televisions, *see* 42 U.S.C.

---

[4] DOE has designated industrial air compressors as EPCA-covered appliances
pursuant to 42 U.S.C. § 6312(b). *See generally* 81 Fed. Reg. 79,991 (Nov. 15,
2016). Such air compressors can easily exceed certain state noise limits; for
example, air compressors used for construction typically emit 80 dbA of noise at
50 feet of distance. *E.g.,* Fed. Transit Admin., Transit Noise and Vibration Impact
Assessment Manual, tbl. 7-1 (2018), *available at*
https://www.transit.dot.gov/sites/fta.dot.gov/files/docs/research-

§ 6292(a)(12), must be operated in a limited manner to avoid exceeding Maryland's noise emission caps. There is no alternative compliance option for Maryland noise regulations that is equivalent to the BEPS' alternative compliance fee. Thus, Maryland's noise-control regulations "restrict and penalize," Appellants' Br. at 23, the use of EPCA-covered appliances even more directly than BEPS regulations.

There is no principled way to distinguish, for the purposes of EPCA preemption, between the BEPS and these other commonsense regulations. Accepting Appellants' broad interpretation of EPCA preemption would therefore invalidate vast swaths of state and local regulations, in many cases creating unfillable policy vacuums. This is on top of the "absurd result" created by applying Appellants' reasoning to regulations that prohibit the installation or use of appliances in specific areas, as has been recognized by other courts. *E.g.*, *Ass'n of Contracting Plumbers of the City of New York, Inc. v. City of New York*, No. 23-CV-11292 (RA), 2025 WL 843619, at *6 (S.D.N.Y. Mar. 18, 2025), *aff'd, NYC*, 180 F.4th 434 (finding that "[r]egulations prohibiting the use of certain types of fuels and appliances in residential, commercial, and industrial settings are integral

---

innovation/118131/transit-noise-and-vibration-impact-assessment-manual-fta-report-no-0123_0.pdf.

to municipal construction and fire codes," and EPCA preemption of these "vital safety regulations" would produce an "absurd result that the Court must avoid").

In addition to the public health gaps that would be caused by broad EPCA preemption, Appellants' interpretation would be practically impossible to implement. Appellants assert that Maryland's law is preempted by EPCA even during the period in which positive net greenhouse-gas emissions targets "restrict and penalize" appliance use. Appellants' Br. 19. If this is correct, then states would be virtually powerless to regulate emissions (or noise, or any other "byproduct" of operating an EPCA-covered appliance) from any building. Even if the BEPS' targets were only prohibited when they reached zero, the standard would be unworkable. What volume of greenhouse gases *must* the state of Maryland allow buildings to emit, according to Appellants' reading of EPCA? Must a building owner be allowed enough emissions to run every possible type of EPCA-covered appliance? To run each for a prescribed number of hours per day? These questions are unanswerable because EPCA contains no such requirement for the state.

Ultimately, a law preempting appliance efficiency regulations does not implicitly mandate unfettered access to the possession and use of those appliances. As the Second Circuit pointed out: "[I]t is plain that a federal statute that sets standards for the construction and safety of manufactured homes (i.e., mobile homes) does not preempt zoning regulations that 'exclude mobile homes' from

21

certain areas altogether." *NYC*, 180 F.4th at 445 (citing *Scurlock v. City of Lynn Haven*, 858 F.2d 1521, 1524-25 (11th Cir. 1988)). Similarly, the court in *D.C.* compared this reasoning to a hypothetical in which a federal law mandated a specific ratio of chips to salsa within restaurants: "[n]o one would say that because Congress set a chips-to-salsa ratio, it intended to ensure that every restaurant has a right to sell chips and salsa." *D.C.*, 2026 WL 837674, at *8. Appellants' contention that EPCA requires universal access to all covered products falls flat on these grounds. *See NYC,* 180 F.4th at 443 ("[EPCA] contains no provisions which affirmatively protect consumers' ability to access covered products … We cannot conclude that Congress pursued an 'objective' of consumer choice through the passage of a statute that says so little on the subject").

### B. Appellants' Mischaracterizations of EPCA and of Maryland's BEPS are Unsupported

To support their position, Appellants rely on several characterizations of both EPCA and Maryland's BEPS for which there are no legal or factual bases. For example, Appellants repeatedly frame the BEPS as "harsh" and "extreme" in comparison to "benign" or "gentle" fuel-neutral building codes. Appellant's Br. 12, 18, 20, 33 47, 48. Appellants also state that a law like Maryland's "falls within the core of EPCA's preemption provision," suggesting that there is some outer policy rung in which preemption may be more worthy of debate. *Id.* at 24. But EPCA does not recognize the arbitrary dichotomies of "harsh" versus "benign" or "core"

22

versus peripheral created by Appellants; rather, the a black and white scope of policy preemption in which the BEPS policy simply does not fall.

Additionally, Appellants reason that the BEPS will ultimately lead to a shortage of available appliance inventory and repair services within the regulated region, and that it therefore must be preempted by EPCA. *Id.* at 35. There are several flaws with this reasoning. First, this ignores the fact that the BEPS only apply to a subset of buildings, meaning the demand for appliances and servicing among unregulated building owners will be untouched. Second, this reasoning draws on the requirements for a waiver of preemption, 42 U.S.C. § 6297(d), not the scope of initial preemption, *id.* § 6297(c). Third, this expansive reading of EPCA invites limitless preemption by implying that the act preempts any regulation that could potentially have indirect effects on the appliance market. *See* Appellants' Br. at 33-34. As previously discussed, Congress could not possibly have intended these sweeping results. *See supra* III(A) (the court ought not adopt a legislative interpretation that would produce an "absurd result"). As the Second Circuit noted:

> [The challenged laws] will undoubtedly have an effect on the market for, and availability of, certain covered products. But that is irrelevant to the question [of preemption] because the preemption provision targets regulations concerning appliances' "energy use," not, as Appellants sometimes seem to suggest, regulations concerning the covered appliances themselves.

*NYC*, 180 F.4th at 445.

23

Moreover, Appellants falsely equate emissions with energy efficiency and energy use. Appellants' Br. 51. But the BEPS' net greenhouse gas targets are not a legitimate proxy for energy use, however defined. In fact, lower-emissions appliances could use *more* energy than their higher-emissions alternatives. For example, one gas-powered clothes dryer—used in a compact washer/dryer combination from GE—can dry 60% more clothing per unit energy than some electric dryers.[5] But only the gas dryer will create emissions that count toward a buildings' net emissions target. Appellants seek to avoid this result by referencing "gas energy use" specifically. *Id.* But EPCA does not divide energy use in that way: "there is no 'equivalency' between the type of energy an appliance uses and that appliance's 'energy use.'" *NYC*, 180 F.4th at 445 (citing *Metro. Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152, 157-58) (2d Cir. 2010)). Maryland's policy says nothing of appliance use or efficiency, nor does it encroach on these preempted areas through regulation of emissions as a proxy.

---

[5] Specifically, the GE gas dryer has a "combined energy factor"—a measure of pounds of laundry dried per unit energy—of 3.3, while an equivalent Whirlpool electric dryer has a combined energy factor of 2.08. U.S. Dept. of Energy, CCMS - Public Database (accessed May 12, 2025), *available at* https://www.regulations.doe.gov/certification-data/ (product group "Clothes Dryers - Appendix D1," model number "M44G_4_M" for the gas dryer and "C18HAQ13AM0" for the electric dryer).

*C. Appellants Erroneously Suggest That EPCA Aims to Preserve the Availability of Gas Appliances Over Others—It Does the Opposite*

Appellants' attempt to further an unfounded position that EPCA exists to ensure a regulatory thumb on the scale in favor of gas products over electric, and this is not so. To this end, Appellants take issue with the BEPS policy "favor[ing] electric appliances over gas ones[,]" "set[ting] no fuel-neutral energy consumption target[s]," and enforcing emissions limits "that inherently penalize[] gas appliances[,]" attempting to depict this policy as one driven by a problematic agenda that is antithetical to EPCA's purpose. Appellants' Br. 33, 47. This is an inaccurate depiction of EPCA.

First, Congress contemplated and rejected appliance neutrality in the context of EPCA's building code exemption. In drafting a previous amended version of the statute, Congress considered including the following requirement for any building code that sought to regulate appliance efficiency: "[t]he code does not arbitrarily attempt to promote or discourage use of any type of covered product." H.R. 5465, 99th Cong. § 7 (1986), reprinted in H.R. Rep. No. 99-850, at 14 (1986). Ultimately, Congress declined to include this stipulation in all future iterations of the statute. Such a deletion "strongly militates against a judgment that Congress intended a result that it expressly declined to enact." *Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 200 (1974). Thus, to the extent that the building code exemption sheds light on EPCA's overall preemptive scope, the statute does not

25

seek to preempt regulations solely because they may favor some types of covered appliances.

Second, to the extent that the BEPS reduces fossil fuel consumption, several federal policies—including EPCA—explicitly *support* this policy. For example, EPCA directs the Secretary of Energy to "publish a list of energy conservation measures and renewable-resource energy measures which are eligible (on a national or regional basis) for financial assistance[.]" 42 U.S.C. § 6325(e)(1). More directly, while amending EPCA, Congress declared that "all sectors of our Nation's economy must begin immediately to significantly reduce the demand for nonrenewable energy resources such as oil and natural gas." National Energy Conservation and Policy Act, Pub. L. No. 95-619, § 102(a)(3), 92 Stat. 3206, 3209 (1978). To this end, federal code requires newly constructed and renovated Federal buildings to phase out fossil fuel consumption progressively, mandating 100% reduction by 2030. 42 U.S.C. § 6834(a)(3)(D)(i)(I). Clearly, a state law that reduces natural gas consumption is not antithetical to federal policy.

Third, a natural market reaction is not a problem to be remedied. Appellants warn that this law may result in manufacturers of gas appliances "shift[ing] to the production of electric appliances instead" of gas ones to accommodate changing market demands. Appellants' Br. 35. However, EPCA does not preclude private businesses from responding to market fluctuations, and it was never intended to

26

stymie energy innovation. *See NYC*, 180 F.4th at 443. Instead, EPCA directs the Department of Energy to set standards that "achieve the maximum improvement in energy efficiency that was technologically feasible and economically justified." *Id.* at 442 (citing *Nat. Res. Def. Council v. Abraham*, 355 F.3d 179, 186 (2d Cir. 2004)) (internal quotation marks omitted). Thus, such a market reaction to Maryland's law would not contravene the spirit of EPCA.

## CONCLUSION

EPCA does not preempt regulations like the BEPS and expanding EPCA preemption to reach this law would threaten a large swath of core state authority, something Congress clearly did not intend. The Center therefore urges the Court to affirm the District Court in this appeal.

Dated: August 5, 2026                    Respectfully submitted,

/s/ Daniel Carpenter-Gold
Daniel Carpenter-Gold
Esther Agbaje
Shannon Wolf

Public Health Law Center
875 Summit Ave.
St. Paul, MN 55105
daniel.carpentergold@mitchellhamline.edu
(651) 290-6329

*Counsel for* Amicus Curiae *Public Health Law Center*

27

## UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. 26-1552          Caption: Maryland Building Industry Association v. McIlwain

### CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT
Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

**Type-Volume Limit for Briefs if Produced Using a Computer:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 15,300 words or 1,500 lines. A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type. See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

**Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words. Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2) & 40(d)(3).

**Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6). Sans-serif type, such as Arial, may not be used except in captions and headings.

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[✓] this brief or other document contains _____6,233_____ [*state number of*] words

[ ] this brief uses monospaced type and contains _____ [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

[✓] this brief or other document has been prepared in a proportionally spaced typeface using
Word _____ [*identify word processing program*] in
Times New Roman, 14 pt, standard ____ [*identify font, size, and type style*];

**or**

[ ] this brief or other document has been prepared in a monospaced typeface using
_____ [*identify word processing program*] in
_____ [*identify font, size, and type style*].

**NOTE: The Court's preferred typefaces are Times New Roman, Century Schoolbook, and Georgia. The Court discourages the use of Garamond.**

(s) _____

Party Name Public Health Law Center          Date: 8/5/26